# EXHIBIT 3

## IN THE CIRCUIT COURT OF SOMERSET COUNTY

## MARYLAND

| | |
|---|---|
| JACOB DOE<br>**Plaintiff**<br><br>v.<br><br>HEIDI M. ANDERSON<br>JASON CASARES<br>ALEXANDRA GINTA MARTIN<br>CECILIA RIVERA<br>UNIVERSITY OF MARYLAND EASTERN SHORE<br>TNG CONSULTING<br><br>11868 College Backbone Rd<br>Princess Anne, MD 21853<br>Serve UMES: civil_service@oag.state.md.us<br>Office of Attorney General<br>200 St Paul Pl. Baltimore MD 21202<br>**Defendants** | **COMPLAINT**<br>**AND**<br>**JURY DEMAND**<br><br>**Case No.** C-19-CV-26-000016 |

## INTRODUCTION

The Plaintiff is a tenured professor at the University of Maryland Eastern Shore (UMES). He observed Heidi Anderson and her organized gang engaging in criminal activities and filed complaints with federal and state agencies which initiated investigations. Upon learning about the Plaintiff's complaints, the Defendants took retaliatory actions under the guise of a fake complaint alleging that the Plaintiff had created a "hostile working environment" for a temporary worker [Karizaki] whose contract was due to expire in two months. Critically, the allegations concerned statements allegedly made by Plaintiff to Karizaki <u>before she was an employee of UMES or had any connection to UMES</u>. Plaintiff has never met Karizaki alone, never shaken her hand, and never been within six feet of her. Defendants started an investigation by the Title IX Director (Jason Casares: Def. 2) – who, according to publicly available news media reports, was allegedly a rapist and serial abuser of investigatory processes.

Plaintiff rejected the accusations and asserted the complainant had an ulterior motive because she was caught committing time-sheet and immigration fraud and was desperate to stay in the US. Plaintiff's keys, id card, and equipment were seized, and he was escorted out by campus police.

The Defendants' unlawful gambit ran aground when they realized that their fabricated allegations would not meet the minimal requirements of Title IX. Casares and Ginta Martin violated all due process protections, provided no evidence, no opportunities to cross-examine any witnesses, or otherwise challenge the flimsy and vague fake charges. The Plaintiff's then attorney showed the Defendants that even if their allegations were taken fully at face value, it did not satisfy the definition of harassment or intimidation or hostile environment. Plaintiff repeatedly demanded Title IX and due process requirements be followed but was ignored. Not one of the alleged text messages were sent after the complainant joined UMES. The complainant had applied for the role and relocated from another state after receiving the alleged messages and responding in a friendly manner. The Defendants issued a finding that even though nothing that the Plaintiffs did was "severe or pervasive," he should be removed from his current role and demoted to a much lower role of a different type with half his current pay. The Plaintiff appealed that **Title IX was the mandatory applicable law and that the state law was preempted**. The appeal authority was Rondall Allen, who had an ulterior motive because he was connected to Heidi Anderson's fraud. He denied the appeal without even a pretense and produced a report apparently by ChatGPT.

The Defendants' vengeance did not end there.

In late September 2025, Plaintiff filed a complaint with the University System of Maryland (USM) that Heidi Anderson (Def. 1) had egregiously plagiarized her PhD dissertation and obtained her degree by fraud. Others also filed similar complaints. The national media including, the

*Washington Post*, *Baltimore Sun*, and the *Daily Wire* exposed Anderson's cheating with side-by-side comparisons of plagiarized materials.

In early October 2025, Defendants retaliated by starting another "investigation" based on the same prior facts claiming that Plaintiff had reported Karizaki to ICE for immigration fraud and that it was retaliation. Plaintiff rejected the charges and noted that any communications with law enforcement about fraud are protected by the Constitution. Defendants faked an investigation with Defendants 2, 3, and 4 as the only witnesses – ignoring their ulterior motives (they were named defendants in a federal case by the Plaintiff) – and claimed without any evidence that Plaintiff was responsible for retaliation. They notified Plaintiff on February 9th 2026 threatening to punish him imminently.

Plaintiff approaches this Hon'ble Court seeking an injunction and remedies against threatened imminent unlawful adverse actions. Plaintiff seeks reinstatement to his prior position with full rights, punitive damages, attorney's fees and costs.

Plaintiff requests an urgent hearing on his motion for a preliminary injunction.

## I. PARTIES

1. Plaintiff Jacob Doe is a tenured full professor and administrator at the University of Maryland Eastern Shore (UMES). Most of the facts giving rise to this complaint arose in Maryland.

2. Defendant 1 is Ms. Heidi Anderson, President of UMES. She is a Maryland resident and is being sued in her personal capacity.

3. Defendant 2 is Jason Casares, Title IX Director, AVP, and Director of the Office of Institutional Equity (OIE). He is a resident of MD and is being sued in his personal capacity.

3

4.  Defendant 3 is Alexandra Ginta Martin, Assistant Director of OIE, a Maryland resident sued in her personal capacity.

5.  Defendant 4 is Cecilia Rivera, Associate Director, OIE, a Maryland resident sued in her personal capacity.

6.  Defendant 5 is the University of Maryland Eastern Shore, based in Princess Anne, Somerset Co., MD. It is required to certify compliance with Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 ("Title IX").

7.  Defendant 6 is TNG Consulting, a private firm with an address in Pennsylvania, hired by Defendants 1 and 2 and acting on their behalf in Maryland.


## II. JURISDICTION AND VENUE

8.  This court has jurisdiction pursuant to MD Courts and Judicial Proceedings Code § 6-102 and § 6-103 as the Defendants all reside and conduct business in Maryland. The court has concurrent jurisdiction over Plaintiff's federal law claims including under 42 U.S.C. § 1983.

9.  Venue lies in Somerset County under MD Courts and Judicial Proceedings Code § 6-201(a) because the defendants reside or conduct their business and vocation here and their unlawful actions individually and collectively were conducted here.


## III. FACTS COMMON TO ALL COUNTS[1]

10. The Plaintiff joined UMES in 2023 as a tenured professor and administrator to help improve an institution producing some of the worst outcomes in the nation. He is a vocal anti-corruption and law-enforcement advocate, including for the enforcement of immigration laws.

---

[1] The contents of the Exhibits to the Complaint are fully incorporated into this Complaint as facts for all counts.

11. Defendant 1 Heidi Anderson became President of UMES in 2018. She was selected apparently for ulterior reasons despite a problematic prior record of abuses. UMES had an enrollment of about 4800 students in 2018; the university's enrollment collapsed to 3000 in 2026.[2] Anderson is embroiled in scandal and running corrupt schemes -- evidenced by numerous serious complaints against her (**EXs 1**, **2, 2A**). Anderson was Plaintiff's direct supervisor. She exhibited racial animus against White and Asian employees in hiring, pay, and promotion. Anderson only has Blacks as vice presidents and implements racial discrimination. She gave Plaintiff the worst working conditions, lower pay, no budget, worst facilities, and discriminatory working environment.

12. Heidi Anderson has also been busted for plagiarizing her PhD dissertation. (**EXs 29, 30, 31**)

13. Jason Casares, Defendant 2, was promoted to his current position by Defendant 1 and paid a massively inflated salary in exchange for suppressing complaints against her and her husband, and intimidating faculty and staff who oppose illegal activities. Casares has a public news-media record as an alleged rapist and abuser of Title IX policies at other universities and has been a named defendant before courts in many states. He led the investigation against the Plaintiff. Anderson is his direct supervisor. (**EX 32**)

14. Whistleblower complaints were filed against Casares by UMES employees shortly after his appointment detailing fraudulent claims in his job application. These were ignored. There were subsequent complaints about illegal activities including obstruction of justice, illegal trespass, surveillance, intimidation, and conspiracy (**EX 2**). Casares' salary was exceptionally increased by 50% as a quid pro quo bribe by Anderson.

---

[2] This is a fraudulent claim made by Heidi Anderson to deceive state and federal governments.

15. UMES Faculty and staff have reported fraud, fake investigations, and egregious violations by Casares, Ginta, and Rivera in numerous surveys. Def. 5 neglected these complaints. (**EX 33**)

16. Alexandra Ginta Martin is a crony of Casares hired due to her willingness to engage in unlawful activities. Her salary increased by 100% in recent years likely as a bribe for unlawful acts.

17. TNG Consulting is a firm embroiled in fraud and was likely contracted by Heidi Anderson due to their willingness to engage in tortious acts. Casares and Anderson supervise TNG. **EX 34**.

18. Individual defendants operate as a gang to engage in corruption and fraud with others at UMES.

19. Plaintiff directly observed Heidi Anderson engaging in unlawful activities, organized corruption, racketeering, bribery, fraud, discrimination, deception, and abuse of processes.

20. After witnessing criminal activity, Plaintiff filed reports against Defendants 1 and 2 with the USM Board, federal and state agencies in June, September, and December 2024. Federal investigations were launched and are ongoing.

21. In August 2024, Ms. Anderson informed Plaintiff that there was a complaint against her and that "from the language used in the whistleblower letter I know who did it." Anderson claimed the Office of Attorney General[3] and USM told her about the complaints.

22. Anderson and her toady Rondall Allen were cold and hostile toward Plaintiff thereafter. They obstructed Plaintiff's participation in a federal audit triggered by allegations of fraud and sought to deceive the external auditors. Plaintiff realized that Defendants knew about his complaint and was near certain that Anderson would retaliate because of her vicious nature.

23. The USM initiated a cosmetic investigation intended to save Anderson but could not avoid learning about scams under Anderson reported via the USM Fraud Hotline (**EX 3**).

---

[3] Anthony Brown, the Attorney General, attended a fund-raiser at UMES shortly after the complaints against Heidi Anderson apparently organized by Anderson. He has not been seen in this area prior to the complaint.

24. Heidi Anderson was informed by USM about complaints against her and shown the complaints. This includes the Plaintiff's reporting of Anderson's plagiarism as proven by Anderson mentioning Plaintiff in a fake defamation case she filed in October 2025 to intimidate another whistleblower. Anderson knew that Plaintiff had reported her for fraud. Only she and her gang had the motive, means, and opportunity to retaliate against Plaintiff.

25. Mahsa Sheikhi Karizaki,[4] an Iranian national, graduated from another university and came to UMES as a temporary worker to work on a project of the Plaintiff. Her legal ability to work is from her student visa which permits Optional Practical Training (OPT).

26. Plaintiff did not directly supervise Karizaki and his office was about half a mile from hers. He only had minimal interactions with her typically lasting a few minutes. From day one, Karizaki was not punctual, did not work, and was frequently absent. Plaintiff reprimanded Karizaki for poor attendance, coming to work impaired, not delivering work products, and submitting false timesheets to collect federal funds. In Oct-Nov. 2024, Karizaki feared being reported for fraud and knew her 6-month contract would not be renewed. She was desperate to remain in the US and enjoy a partying-lifestyle without doing any work and made up a false complaint.

27. Anderson's gang met Karizaki and coached her after learning that Plaintiff reprimanded her because they wanted to retaliate against Plaintiff for reporting Heidi Anderson's fraud.

28. On December 5, 2024, after work hours, Jason Casares asked Plaintiff to attend a meeting on December 6th. He refused to answer what the meeting was for despite two inquiries.

29. During the December 6th meeting, Casares and Ginta Martin placed Plaintiff on administrative leave accusing him of creating a "hostile and intimidatory work environment" for Karizaki. Casares informed Plaintiff that a Title IX investigation would ensue. Plaintiff was not given an

---

[4] Plaintiff hereby notifies Defendants that he is likely to add Karizaki as a Defendant at a later date.

opportunity to refute and the administrative leave was predetermined in violation of the presumption of innocence.

30. On December 11, 2024, Professor X, a faculty member and colleague of Plaintiff emailed Ginta Martin stating, "I am the only person who works with [Karizaki] ... She is a temp worker and I coordinate all communications between two parties. They only met in-person six times (all at the public areas) and one virtual meeting. I arranged all those meetings and was present as an eyewitness on every occasion. Your office has never contacted me for investigation before putting [Plaintiff] on leave." (**EX 5**)

31. On December 12, 2024, Plaintiff's then counsel wrote to Defendant 5 telling him that "Karizaki is a temporary employee housed in a separate building" with whom Plaintiff "has met no more than six times, never more than for a few minutes, and always in the presence of a witness." The counsel's letter named Professor X who attended every meeting with Karizaki. (**EX 4**)

32. Plaintiff's counsel's stated "Manifestly, [Plaintiff] has never been in a position to intimidate or harass [Karizaki]" as Professor X can confirm. Counsel is aware that Defendant 3 Ginta Martin is attempting to develop support for Karizaki's "specious accusation."

33. Defendants ignored the letter and did not contact Professor X.

34. From December 2024 onwards, Defendants displayed Plaintiff's photo in the Campus Police department and told employees and students that Plaintiff has been "fired," "is never coming back," and "he has been removed." This was before the "investigation" even started and shows that the entire process is a pretextual witch hunt with a predetermined outcome.

35. The display of Plaintiff's photo in a public area as if he is an offender is extreme and outrageous and violates all decency and no civilized person would consider this acceptable.

8

36. Throughout December 2024, Rivera and Ginta emailed people who they believed could speak negatively about Plaintiff as part of a smear campaign. They failed miserably.

37. Plaintiff obtained sworn notarized affidavits from Jane Coe 1 and Jane Coe 2 testifying that Rivera, Casares, and Ginta Martin had interviewed them under coercion and sought to get them to speak negatively about Plaintiff. Coes 1 and 2 swore under oath that Plaintiff had always behaved respectfully toward them and he was a decent person. (**EX6, EX7**)

38. In December, Plaintiff filed a complaint with USM against Jason Casares but was ignored.

39. In  January, Defendants unlawfully took away a federal grant that Plaintiff had obtained without any due process and in brazen violation of 2 CFR Part 200 which governs grant administration and establishes liberty interests for the Plaintiff as the Principal Investigator.

40. In early January 2025, Ginta Martin wrote to Plaintiff summoning him to a meeting as part of her "investigation" into the accusation.

41. Plaintiff attended the meeting on January 21, 2025, along with his counsel.

42. Plaintiff and counsel both denied the accusations, reiterated that Plaintiff had never met Karizaki alone, that her accusations were baseless and pretextual. They reiterated that Karizaki had an ulterior motive because she was caught submitting fraudulent work and not attending to her duties, was desperate to stay in the US and would do anything to get a visa.

43. Ginta Martin thrust a 2-page document which contained "Notice of Allegations" at Plaintiff.

44. The Notice contained about 10-15 phrase statements allegedly attributed to Plaintiff. There were no dates, times, or locations, and no indication when they were uttered or in what context. Taking the alleged comments in the most favorable light to Defendants, the worst of the statements were, "people say Turkish women are beautiful, but I prefer Persian women," "all

work and no fun makes [Karizaki] a dull girl," and asking for "pics" of an event Karizaki attended. (**EX8**)

45. Plaintiff responded that the contents were false and concocted and that he would respond in writing. He also challenged the absence of dates and other details establishing that OIE had any jurisdiction in the matter because it was not evident that the comments were made after Karizaki was employed at UMES – **a precondition for OIE's investigatory powers**.

46. It appeared the alleged comments were made before Karizaki was an employee or an applicant.

47. During the meeting, Plaintiff asked Ginta Martin to provide an update into his complaint against Jason Casares. Ginta Martin was flustered and responded that she would "check and get back to him." The meeting ended.

48. Notably, Karizaki's contract was due to expire in about 3 weeks from this meeting and her visa with it. Defendants renewed her visa in violation of the OPT rules and immigration laws.

49. On January 21, Ginta Martin wrote to Plaintiff asking him to provide a written response by January 24, 2025: less than 3 days after the meeting.

50. On January 24, 2025, Plaintiff and counsel submitted two documents in response to Ginta Martin: a legal analysis by counsel and factual response by Plaintiff.

51. Plaintiff's counsel wrote that nowhere do the allegations note that Plaintiff's comments were "unwelcome" to Karizaki and cited *Albero v. City of Salisbury*, 422 F. Supp. 2d. 549 for the proposition that the analysis was objective rather than subjective. Counsel stated, "even if one adopts complainant's allegations wholesale, they cannot constitute sexual harassment as a matter of law because the complainant never objected, protested, or complained about the conduct attributed ... Had she done so, and had [Plaintiff] persisted, then and only then would it have become necessary to determine if the conduct was "severe" or "pervasive". (**EX9**)

52. Counsel wrote "[Plaintiff] disputes the accuracy of [Karizaki's] allegations, even if one assumes arguendo, they are true, they fall short of attributing to him a sexual animus... the "comments are not overtly sexual and certainly fall far short of the severe-or-pervasive standard."

53. Counsel denied any impropriety in connection with Karizaki and "regards her complaint as pretextual and the University's handling of it as retaliatory."

54. Counsel closed by asserting that the "complaint should be dismissed as untenable."

55. Plaintiff asserted that the accusations were false and the "OIE staff ... are engaging in a pretextual witch hunt against me despite conclusive exculpatory evidence. This biased "investigation" is in retaliation for a criminal complaint filed against [Heidi Anderson] ..."

56. Plaintiff stated he had provided Karizaki with "critical feedback for impaired cognitive performance ... and for not producing work products of acceptable quality within deadlines. These ... provided the unlawful motivation for [Karizaki's] fabricated allegations." (**EX10**)

57. Plaintiff stated, "I have never met [Mahsa Sheikhi Karizaki] in person without other employees being present. I have never even shaken her hand. I have never been within 6 feet of her. I have had no physical contact of any kind with her. I categorically reject the allegations as fabricated, concocted, manipulated, and manufactured with malicious motivations."

58. Next, Plaintiff pointed out the Notice of Allegations only had a "word salad that you have deliberately and maliciously sequenced as a monologue with no context, dates, or actual production of the cell phone to create a flimsy innuendo does not constitute sexual harassment, intimidation, or any kind of harassment."

59. Plaintiff noted that "Not a single word ... has any connection with anything sexual."

60. He wrote, "... the flimsiness of the innuendo – even assuming arguendo the ... fabrication at face value – highlights how it does not satisfy even the weakest definition of harassment ..."

61. Plaintiff also highlighted the fatal flaw in the Defendants' fraudulent allegations: the absence of dates and acknowledgment by individual Defendant 3 that the comments were prior to Karizaki commencing employment. He wrote: "as you yourself admit, the word salad presented was "temporally" long before [Karizaki] was an UMES employee. She was not even an applicant for employment. Communications between a stranger to the university and me on matters completely unrelated to the university are beyond the jurisdiction of your office."

62. Further, he reiterated "this maliciously fabricated complaint is a pretextual witch hunt … It does not satisfy the definitions of sexual harassment, harassment, or intimidation. ..."

63. Defendants provided no response to this rebuttal.

64. Defendants employed an evasion strategy. On January 27, 2025, Ginta Martin asked Plaintiff to attend a follow-up meeting side-stepping the written responses provided.

65. Plaintiff replied that he had "not received an update about ... my complaint against Casares. As noted ... we have plenty of evidence about the OIE staff's bias ... we can do any further follow-ups in writing. ...." (**EX11**)

66. Ginta replied on January 28th stating "... do need to meet and reconnect in-person during the week of February 3 through February 7, 2025." (**EX12**)

67. Ginta Martin's email on the 28th again did not address the clear and convincing denials, legal analysis, lack of jurisdiction, and conclusions detailed in Plaintiff's email on January 24th.

68. Plaintiff responded on the same date (28th) asking, *inter alia*, "What happened to the complaint against Jason Casares? ... I need my questions to be answered in full."

69. On February 19, 2025, Karizaki's contract should have expired thereby concluding this investigation. Defendants extended Karizaki's visa and contract will malintent and in egregious violation of immigration laws to keep the complaint alive and retaliate against Plaintiff – claiming it is a "supporting measure." This is illegal under immigration law because Optional Practical Training visa extensions must be for specific "work experience" for identified tasks. The visa was a bribe for Mahsa Sheikhi Karizaki in furtherance of the conspiracy against Plaintiff: pay without any work and the right to remain in the US.

70. Ginta Martin threatened Plaintiff: "... failure to respond to this email  ... and meet with our office  ... will result in you being placed in unpaid administrative leave.  ..." (**EX14**)

71. Ginta Martin also asked Plaintiff: "… provide the passcode (that you generated) for your University-issued/owned cell phone." This was in reference to the cellphone that had been seized by Casares on December 6th.

72. Ginta's email again evaded the submissions made in Plaintiff's January 24th email asking for due process and closure of the untenable allegations.

73. On February 24, 2025, Plaintiff wrote to Ginta Martin attaching a legal memorandum (**EX15**): "Please send me a copy of the actual complaint allegedly submitted by [Karizaki]. Notably, her contract ended on February 19, 2025. What is her current employment status?" .... Previously, when told that your actions may be violating the law ... you have scoffed dismissively, exhibiting contempt ... Other faculty have also reported similar conduct ...."

74. The email text specifically asked for an opportunity to cross-examine Karizaki and another witness used by Ginta to pad her false allegations: "... you have not indicated the date when I may cross-examine [Karizaki] and [her friend]. Please provide some dates and times for me to review for the cross-examination. ..."

13

75. Cross-examination is mandated by 4th Circuit case law but Defendants violated it.

76. The memorandum attached to that email asked for a copy of the complaint filed:

"You have alleged that there is a complaint in which I am a Respondent. Where is this complaint? I have not been provided with a copy. Please provide a copy immediately."

77. The memorandum argued that the definition of harassment was not satisfied:

"Your notice of allegations contains nothing that satisfies the definition of sexual harassment in Title IX. There is nothing even remotely sexual in the word salad you have stated in your Notice of Allegations, no 'sexual conduct,' no 'unwelcome conduct' of any kind, and nothing that is 'severe, pervasive, or objectively offensive.'

78. Next, the memorandum attacked the Plaintiff's being unlawfully placed on leave, the biased and predetermined nature of the investigation, violation of the presumption of innocence, conflict of interest, ulterior motives, coercion of witnesses by Casares, procedural errors, arbitrary violation of deadlines, lack of jurisdiction, and willful refusal to interview witnesses with actual data contradicting the allegations.

79. The memorandum specifically highlighted that Defendants had not contacted Professor X at all despite her being identified as early as December 11th as possessing conclusively exculpatory evidence. Professor X had directly emailed Ginta Martin stating that she was a witness to every interaction but received no response at all. The memorandum noted:

"The statutory mandate to evaluate exculpatory evidence has been completely ignored. ... Similarly, there is incontrovertible evidence that I never met [Karizaki] alone, never was within 6 feet of her, and had no inappropriate interactions with her. ..."

80. Finally, the memorandum asserted Defendants' legally binding duty to dismiss the complaint:

"Section 106.45(3) mandates OIE to dismiss a complaint when "the conduct alleged in the formal complaint would not constitute sexual harassment as defined in § 106.30 even if

14

proved." We have explained to you in considerable detail ...why the allegations do not meet the Title IX definition of sexual harassment. ... The statute uses the words "must dismiss" and the language is binding and unambiguous. ...”

81. Ginta Martin provided no response. Defendants violated their legal duties to provide the complaint, proof of jurisdiction, evidence, and cross examination.

82. On February 26th, Ginta Martin evaded again asking Plaintiff to attend another meeting.

83. On March 3rd again she willfully ignored the requests for a copy of the complaint, the evidence, an opportunity to cross-examine witnesses, etc.

84. Plaintiff followed up again on March 4th. (**EX16**)

85. Ginta Martin and Defendants provided no response to this email. There was no communication from Defendants for over 6 weeks.

86. Defendants were in no hurry, violated all their deadlines whilst imposing harsh ones on Plaintiff, and had the ability to consult counsel. They deliberately chose to act unlawfully.

87. Abruptly, on May 19, 2025, Ginta Martin resurfaced claiming to have concluded the investigation and asking Plaintiff to attend a meeting to review a “preliminary report” beginning May 20th and offering some dates and times.

88. Plaintiff was about to travel overseas during that time for a 2-week trip.

89. On June 2nd, when Plaintiff was overseas, Ginta-Martin emailed a document purporting to be the Final Report of the investigation. Ginta did not even adhere to her own deadline.

90. On June 2nd, whilst overseas, Plaintiff replied:
“Hello Ms. Ginta Martin, ... I have not received a response to my email sent to you on 4 April 2025.... about my right to examine your "evidence", cross-examine the alleged complainant, and the status of my complaint against the rape-accused Jason Casares, amongst other matters. ... Perhaps you do not know that the Maryland law you reference is pre-empted by federal law? ....” (**EX17**)

15

91. The "Final Report" which is identical to the preliminary report purported to make "findings" against Plaintiff. Despite their actual malice, desperate attempts to manufacture evidence, coerce witnesses, and violate the laws, they <u>had to conclude that Plaintiff's actions were not "severe or pervasive."</u> The document was illogical, lied about witnesses interviewed, not supported by any evidence, and exhibited circular and incoherent reasoning. Even so, Defendants imposed a massive demotion in rank and type of job, a reprimand on Plaintiff's file, and "training". This is cruel and disproportionate punishment aside from being entirely illegal and was done for retribution against Plaintiff for exposing corruption and fraud.

92. On June 5th, Plaintiff emailed the Office of Attorney General outlining unlawful activities and attached a statement by 6 female Iranian students that Plaintiff had only behaved respectfully with them. It was offered by the students themselves and emphasized their "full and unwavering support" for Plaintiff and stressed that "he has consistently served as a dedicated academic mentor, advocate and principal investigator who has guided us through our research journey with utmost professionalism, compassion, and integrity." (**EX21**)

93. Critically, the students clearly stated they had never witnessed "any misconduct or mismanagement" by Plaintiff and "on the contrary, **he has always acted in accordance with university and federal guidelines and has tirelessly advocated for our academic rights. He deserves institutional protection not retaliation for standing up for truth and student welfare**."

94. Again, there was no response from OAG. Defendants willfully violated Plaintiff's rights.

95. Plaintiff submitted his appeal in a timely manner on June 9th, asking Ginta Martin to "Please identify the appeal authority so that additional information may be delivered directly ...." (**EX22**)

16

96. Ginta Martin acknowledged the email but did not identify the "appeal authority." (**EX23**)

97. Plaintiff's appeal submission challenged the nonsensical "findings" noting the pretextual nature of the investigation and bias throughout (**EX25**):

"The "report" is absolute gibberish ... even lie about the most basic facts such as the witnesses interviewed -- conveniently omitting the names of several witnesses they interviewed from the list on page 3 of their fraudulent report. ...**we have sworn testimony from individuals who are not named as "witnesses" that they were in fact interviewed by Casares and Ginta and attempted to be coerced.**"

98. Plaintiff was under no illusion that the appeal would also be biased against him writing: "This appeal ... is being submitted without any expectation that the OIE ... will follow the law ... the anticipated illegal actions...will only underscore their criminality ...."

99. Plaintiff's appeal challenged the willful refusal to follow mandatory law:

" The violations of applicable legal protections are willful, malicious, and with the apparent aid of the UMES General Counsel. Absurdly, the OIE crooks err even about one of the most basic questions in this case: the applicable legal regime. .... after realizing that their fake case would go up in smoke, now claim for the first time in their "Final Report" that Title IX does not apply."

100.    Plaintiff showed why Title IX is mandatory by its own language:
"... General Counsel Matthew Taylor[5] has apparently not advised the OIE crooks about the preemption doctrine and ... that Title IX must be followed and that its due process protections must be afforded .... The US Department of Education's explanatory memorandum issued whilst promulgating regulations states: "Title IX applies to all recipients of Federal financial assistance, whether the recipient is a public or private entity and regardless of the size of the recipient's student body (emphasis supplied.) ...The final regulations therefore prescribe (emphasis supplied) a consistent grievance process for application by all recipients without distinction as to public or private status, or the size of the institution.""

---

[5] Defendants are hereby given notice that Plaintiff is likely to add Matthew Taylor as a Defendant at a later date.

101.    Plaintiff explained that UMES receives federal financial assistance which is conditional on

the university adhering to Title IX:

"UMES is a recipient of federal financial assistance.... ... must follow ... Title IX. The deliberate
refusal to follow Title IX by itself means that UMES is discriminating against [Plaintiff] based
on sex. .... This flows from Supreme Court case law including ...Cannon v. University of
Chicago, 441 U.S. 677, 717 (1979). As the court explained in Cannon, "Title IX ... sought to
accomplish two related, ... objectives. First, Congress wanted to avoid the use of federal
resources to support discriminatory practices; second, it wanted to provide individual citizens
effective protection against those practices."

102.    In the memorandum's factual background section, Plaintiff highlighted that Karizaki was

in the US on a student visa and was hired to her temp position under that visa:

"Optional Practical Training (OPT), by definition, is part of educational activity at a US public
university receiving federal funds - meaning that the OIE crooks' claim that Title IX does not
apply in this case is absurd from the start."

103.    It noted that Karizaki came to work cognitively impaired "smelled of weed or alcohol on
numerous occasions and was frequently confused and clueless about basic matters such as the
day/date and time, work instructions, deadlines, performance expectations, locations, names
of UMES personnel, events, etc."

104.    Plaintiff explained that:
"[Karizaki] did not seem to comprehend basic work instructions, could not work
independently, and was not producing written work. [she] was requested to provide a daily
report of her work activities prior to closing her time-sheet at 5pm each day. ... [Karizaki] failed
to upload daily work reports despite numerous reminders.

When it became impossible to ignore that [Karizaki] was submitting fraudulent timesheets,
[Plaintiff] sent her a polite email inquiring if she was actually working the hours claimed.
[Karizaki] admitted that she was not working the hours claimed. ...
In late November 2024, [Karizaki] apprehended that her contract would be terminated and that
she may be deported ... the consumption of drugs is a violation of immigration law."

105.    Plaintiff outlined various other facts showing a conspiracy between Defendants to retaliate.

106.    The memorandum outlined a legal analysis noting, the "applicable legal regime for

harassment allegations in the educational environment is provided by Title IX. In fact, this is

18

why Casares and Ginta Martin referenced Title IX as the applicable law during the meeting on

December 6, 2024. ....”

107.    Section 1 of the appeal memo explained by Title IX is the mandatory regime:
"The 2020 Title IX rules are the mandatory legal rules governing this case. As the US Department of Education elucidated in its explanatory memorandum in 2020, "Title IX applies to all recipients of Federal financial assistance..."

108.    That memorandum also recognized that UMES has additional obligations: "some recipients are State actors with responsibilities to provide due process of law to students and employees under the U.S. Constitution, including the Fourteenth Amendment." ... Section 106(6) (b) is unambiguous in its text: "**The obligation to comply with Title IX and this part is not obviated or alleviated by any State or local law or other requirement that conflicts with Title IX or this part**."

109.    Next, Plaintiff asserted that Casares and other Defendants' refusal to follow mandatory

laws was willful and malicious:

"Section 106(6) (d) underlines the inalienable nature of constitutional protections that must be guaranteed to [Plaintiff]: "Nothing in this part requires a recipient to: (1) Restrict any rights that would otherwise be protected from government action by the First Amendment of the U.S. Constitution; (2) Deprive a person of any rights that would otherwise be protected from government action under the Due Process Clauses of the Fifth and Fourteenth Amendments of the U.S. Constitution; or (3) Restrict any other rights guaranteed against government action by the U.S. Constitution." And section 106(11) relating to scope of application is equally unambiguous: "this part applies to every recipient and to all sex discrimination occurring under a recipient's education program or activity in the United States..." Simply put, Casares and his toadies have no escape from Title IX ...”

110.    Plaintiff asserted that Defendants were biased:
"Casares had already typed up the letter placing [Plaintiff] on administrative leave even without giving him an opportunity to be heard before the first meeting on December 6, 2024. This was a willful and malicious violation of basic due process. It shows that Casares was never interested in assessing the merits of the allegations, had predetermined the outcome to suit his criminal masters, and was absolutely biased. ... Further, there were ample facts contradictory of any harassment: application for a job by [Karizaki] after the comments were allegedly made, relocation by [Karizaki] ...[Karizaki] requested money from [Plaintiff], etc.”

19

111.    Plaintiff asserted that Defendants refused to provide dates because they knew that there was not even one comment made to Karizaki after her hiring at UMES and therefore they had no case.

112.    Plaintiff challenged the refusal to allow cross-examination of witnesses and complainant: "The statute mandates the questioning of witnesses and parties ... "to adequately assess a party's or witness's credibility to the extent credibility is both in dispute and relevant to evaluating one or more allegations of sex-based harassment." ...Despite repeated requests in writing, the OIE crooks have not provided an opportunity to cross-examine [Karizaki] or any audio or video transcript. ..."

113.    Plaintiff submitted that Defendants determined credibility without cross-examination: "[Plaintiff] provided evidence that [Karizaki] had no credibility repeatedly. [Karizaki] submitted fake time sheets, was reprimanded for coming to work under the influence of drugs or alcohol, reprimanded for poor attendance and performance, and lied. She has zero credibility and her conduct subsequent to the alleged incidents destroys any implication that she experienced harassment...."

114.    Regardless of whether they applied Title IX or the state of Maryland policy, the due process protections accorded by the US and Maryland Constitutions including the right to cross-examine one's accuser, right to notice containing dates, establishment of jurisdiction to prosecute, etc., should have been provided to the Plaintiff. Defendants violated Plaintiff's due process rights.

115.    Plaintiff submitted that Defendants willfully ignored his requests for cross-examination "because their entire case rested on ...[a] fraudulent edifice. The critical need for cross-examination has been upheld in a number of judicial decisions. For instance, in *Doe v.*

*University of Cincinnati*, Judge Barrett ruled, "where a disciplinary proceeding depends on a 'choice between believing an accuser and an accused … cross-examination is not only beneficial, but essential to due process."

116.    Plaintiff cited *Doe v. Baum et al* (2018), where the court ruled that:
"if a public university has to choose between competing narratives to resolve a case, the university must give the accused ... an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder." Plaintiff pointed out ... was absolutely costless to require [Karizaki] to attend cross-examination."

117.    Plaintiff quoted the *Baum* court's rationale and explained why the precedent applied:
"[Karizaki] frequently attended work appearing intoxicated and cognitively impaired. She had no recollection for basic facts, dates, times, people, locations, etc. Her memory and intelligence were very much in question. Even more devastatingly for Casares and [Karizaki], both had ulterior motives for fabricating these fake allegations. ... As in *Baum*, these proceedings must be quashed."

118.    Plaintiff appealed that the definition of hostile work environment was not satisfied:
"Even reading [Karizaki] and Casares's fabricated allegations in the most favorable light and assuming everything to be true, the allegations do not satisfy the legal definition. As even Casares is forced to concede, they are not offensive, severe, or pervasive."

119.    Plaintiff appealed that the Final Report should be quashed because it was:
"...full of irrelevant drivel and riddled with lies about relevant matters ... Final Report claims that [Plaintiff] did not participate in the proceedings. This is an absolute lie. [Plaintiff] attended meetings ... on 6th December and in January 2025. ... [Plaintiff] submitted detailed written responses in conjunction with his then legal counsel categorically rejecting and debunking the fake allegations. ...."

120.    Plaintiff attacked Defendants' circular reasoning and opinions dressed up as "findings of fact, he had not been provided with any evidence, he had never met Karizaki alone, and the doctored screenshots had no date or timestamps.

121.    Plaintiff submitted:
the "only doctored screenshots provided with dates expose the allegations as fake. The <u>first instance of screenshots showing any dates are contained on page 13. The date is shown as August 8, 2024</u>. The message shows emojis sent by [Karizaki] laughing. This response by [Karizaki] conclusively debunks any claim that she was harassed or experienced any

21

discrimination from any messages sent prior. In addition, the date of <u>August 8th is extremely significant. It was well before [Karizaki] commenced employment at UMES, relocated out of state to Maryland</u> from [...], and before she completed any paperwork for employment. ...The other screenshots with dates of August 13, and 17th also debunk any claim of harassment. They show friendly exchanges and meetings. Not once did [Karizaki] express any reservations about the alleged communications. There is not a shred of evidence that she objected to the humor or tone of the communications or indicate that they were anything but in jest."

122.    Plaintiff challenged the Defendants' findings as illogical:
"If [Karizaki] felt harassed on August 17th, why did she wait until December ... until she was caught submitting false timesheets and coming to work impaired? Why are the OIE... unable to produce a single message after the date on which [Karizaki] started working at UMES ..."

123.    Plaintiff appealed the Defendants "findings" that "totality of the circumstances in this matter is sufficient to establish that [Plaintiff] engaged in a course of conduct constituted unequal treatment based on national origin and gender, which amounted to harassment and a hostile work environment" (page 24).

124.    The "totality of circumstances" shows exactly the contrary. It shows that [Karizaki] has no credibility, made up false accusations that not even the OIE crooks could prop-up, was caught submitting fraudulent timesheets and coming to work under the influence of alcohol or drugs, and performed poorly at work. The totality of circumstances shows OIE staff manufacturing lies, ... this was a scam of a witch hunt organized by a criminal gang in retaliation for a complaint against Heidi Anderson ..."

125.    Plaintiff appealed on the ground that the Supremacy Clause of the US Constitution mandated the application of Title IX to this case. Plaintiff submitted:

"based on a plain reading of Article VI clause 2, Title IX preempts the Maryland Sexual Harassment policy and UMES policies that are in conflict. There is absolutely not even a shred of opportunity to argue this point because Congress explicitly stated such preemption in the plain wording of Title IX as noted previously in this appeal. As that quoted language notes, universities receiving federal financial assistance must apply Title IX provisions ..."

22

126.    Plaintiff appealed that there was clear Congressional intent to preempt state law:
"Congressional intent to preempt any conflicting state law is expressly stated in the
Explanatory Memorandum ... notes that sexual harassment allegations are substantially
different in the educational context that other workplaces because of the implications of
constitutional requirements such as the First Amendment, the use of federal funds, etc. It
explains the deliberate legal protections including specific mandatory definitions ... and the
need to ensure that innocent persons are not wrongly accused and punished."

127.    Plaintiff pointed out that the Department ... explained why universities are different:
"an institution of higher education differs from the workplace. ... these final regulations are
consistent with the sense of Congress ... that "an institution of higher education should facilitate
the free and open exchange of ideas."

128.    Plaintiff argued that Title IX is the law based on the US Department of Education's

published guidance available to UMES:

"these final regulations create clear legal obligations that facilitate the Department's robust
enforcement of a recipient's Title IX responsibilities. The mandatory obligations imposed on
recipients under these final regulations share the same aim as the Department's guidance."

129.    Plaintiff submitted that Defendants' investigation applied the wrong legal standard:
"OIE's failure to apply the correct legal standard, and the willful application of the wrong,
preempted state law standard vitiate this fake investigation." Even if the state law had been
applied, Title IX's procedural protections including cross-examination must have been
provided to Plaintiff..."

130.    Plaintiff asserted that UMES discriminated on the basis of gender by blindly believing

Karizaki and ignoring his statements rebutting her assertions.

131.    Plaintiff appealed the sanction imposed even though he did not do anything "severe or

pervasive." Despite this "finding", Defendants imposed a sanction of demotion to a position

paying half of what Plaintiff currently earned. He asserted the punishment was grossly

disproportionate and violated the constitutional norm against cruel and unjust punishment.

132.    There was total silence from Defendants after this appeal submission and there was no decision within the timeframe stipulated in the Defendants' policies.

133.    Abruptly, on July 25th, Defendant Ginta Martin emailed Plaintiff a "Final Appeal Decision" issued by the appeal authority, Rondall Allen.

134.    The appeal authority simply evaded the appeal grounds and just recited what was in the Defendants' report in a short peremptory response without reasoning or logic. (**EX26**)

135.    The Plaintiff has evidence that this decision was produced by ChatGPT or other AI violating substantive due process. The appeal process was fake and the outcome was predetermined.

136.    Under the Defendants' policies, Karizaki has to be provided the Plaintiff's appeal submission, and she is required to provide a response within 5 days. There is no evidence showing that Karizaki was provided with the Plaintiff's appeal submission or what her response was.

137.    Rondall Allen does not seem to understand preemption, the supremacy clause, and mandatory legal rules. He did not cite the standard of review for the appeal, nor does he seem to understand what that concept is.

138.    Incredibly, Rondall Allen claimed to have spoken to OIE Defendants *Ex Parte* to ask why Title IX does not apply. He swallowed wholesale their statement that Title IX does not apply without checking if they are right. He did not consult the General Counsel or seek input from Plaintiff. There is not even one line of reasoning explaining why Title IX does not apply.

139.    Defendants would have known and ought to have known of the 4th Circuit's controlling law that cross-examination is an essential part of due process in such proceedings. Plaintiff

was denied this right despite repeated requests. Rondall Allen did not address this point. **EX 26.**

140.    On July 27, 2025, Heidi Anderson demoted Plaintiff to a position of a different type paying less than half of his current salary. This was malicious, unjustified, and aimed at retribution. It accorded with no policy or practice at UMES and breached all precedent.

141.    In August 2025, Plaintiff was abruptly assigned 3 courses to teach about 5 days before the semester started without any consultation or notice.

142.    In September 2025, on at least 4-5 dates, Plaintiff was stalked and intimidated by Leesa Thomas-Banks, a goon of Heidi Anderson. This was calculated to make Plaintiff resign and he reported the stalking to Campus Police and the OIE. The OIE has not investigated the complaint because they orchestrated the stalking with the connivance of Heidi Anderson. (**EX 35**)

143.    In late September 2025, Plaintiff filed a complaint about egregious plagiarism by Heidi Anderson in her PhD dissertation.

144.    A few days later, Plaintiff received an email from OIE that he was being investigated for "retaliation" against Karizaki for allegedly reporting her to ICE.

145.    The timing of this new investigation based on the same old facts shows that it is just a pretextual witch hunt in retaliation for reporting cheating by Heidi Anderson.

146.    Plaintiff asked to see the complaint and any evidence but was refused.

147.    Jason Casares claimed to hire TNG Consulting – a firm in the news for fraud – to conduct this investigation. **EX 34**.

148.    Plaintiff met with Lauren Starnes from TNG once and it was obvious that she was hired for a hit job. She provided no details or evidence and appeared to be committing fraud. Plaintiff

provides notice that he will likely add Starnes as a defendant later. Plaintiff asked for strict proof of all allegations and reiterated that he did not permit any assumptions without proof. **EX 36**.

149.    On February 10th, TNG claimed to issue a report "finding" that Plaintiff had retaliated against Karizaki. Their only witnesses were Jason Casares, Alexandra Ginta Martin, and Cecilia Rivera – all three of whom are fraudsters and were named defendants in a lawsuit filed by Plaintiff and have motives to retaliate against Plaintiff. They plan to punish him.

150.    The fake "investigation" based on three "witnesses" who witnessed nothing and who had every ulterior motive to retaliate against Plaintiff was for malicious and retributive purposes. It is to provide a pretext to take further adverse action against Plaintiff.

151.    As a result of Defendants' unlawful actions, Plaintiff has and continues to suffer immense damages. He has been demoted from leadership to a different type of role with negative impact.

152.    Plaintiff's reputation has been irreversibly harmed, and he has been labeled an abuser, banned from campus and shunned by colleagues who are afraid of Heidi Anderson's criminal gang.

## IV. STATEMENT OF CLAIMS

**COUNT 1: Intentional Violation of 42 U.S.C. § 1983-Denial of Fourteenth Amendment and Article 24 Maryland Constitution Due Process and Conspiracy (42 U.S.C. § 1985)**

153.    Plaintiff incorporates the allegations above and Exhibits and realleges them as if fully set forth again below.

154.    The Fourteenth Amendment to the US Constitution states that no state shall "deprive any person of life, liberty, or property, without due process of law." Article 24 of the Maryland

Constitution provides that "no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

155.    UMES is a public university, and it exists solely because of federal funds and defendants are subject to the Constitution and the laws.

156.    Title IX of the Educational Amendments Act 0f 1972 and its implementing Regulations are the **mandatory, exclusive legal regime for harassment and discrimination complaints in universities**. Congress fully occupied the field in enacting this law and regulations which prescribes the procedures to be followed. Title IX implements the due process protections of the Fourteenth Amendment mandating rights to examine evidence, presumption of innocence, cross-examination of complainant and witnesses, consideration of exculpatory evidence, hearing of appeals, etc. Plaintiff has property and liberty interests in the protections enshrined by Title IX and in not being removed from his role unlawfully based on fake complaints.

157.    Plaintiff is entitled to due process protections by the Defendants following Title IX, including by way of proper notice of charges showing dates and locations of any alleged misconduct, an opportunity to examine and rebut evidence, an opportunity to cross-examine an accuser, hearing by an impartial fact finder, and have exculpatory witnesses be heard. *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 402-04 (6th Cir. 2017).

158.    Defendants cannot substitute their own processes and claim they followed due process. They have no such choice because Congress mandate they follow Title IX's processes.

159.    Plaintiff has a liberty interest in those processes, his good name, reputation, honor, career, employment opportunities, career advancement, and freedom – all violated by the Defendants.

160.    Plaintiff has a right to be free from arbitrary demotion to a different type of role derived from UMES and USM policies and rules and state laws in addition to his contract.

161.    Individual Defendants had the motive, means, and opportunity to undertake the fake investigation based on a false complaint they procured from Karizaki who had an ulterior motive to lie. The temporal proximity of the false complaint within weeks of Plaintiff's whistleblowing about Heidi Anderson's fraud shows that the demotion was retribution. Within days of the fake complaint Plaintiff was removed from campus. No other complaint at UMES has been processed this quickly – including complaints filed by Plaintiff which have received no action after many months. The temporal proximity, speed of action in a place reputed for tardiness, sloth, and incompetence, and severity of punishment for non-severe alleged acts all show that the actions were caused by Plaintiff's reporting of fraud by Heidi Anderson.

162.    Defendants acted beyond their lawful authority, refused to follow mandatory law, willfully deprived due process protections including evidence examination and cross-examination and conspired to deprive Plaintiff of his due process rights to achieve a predetermined outcome in retaliation of the complaints he had filed against them.

163.    As detailed above and in the Exhibits, Defendants violated Plaintiff's due process rights by violating mandatory Title IX requirements: a. failing to give him required notice of allegations stating dates and times, b. acting beyond their jurisdiction to process a complaint based on accusations before Karizaki was associated with UMES or connected to Maryland, c. refusing to allow Plaintiff to examine evidence, d. refusing to provide cross-examination of complainant and witnesses, e. deliberately ignoring exculpatory evidence, f. violating their own policies' timelines, g. refusing to apply the correct legal standard, h. refusing to apply the correct standard of review to the appeal, i. refusing to be equitable in supportive measures, j. refusing

to follow the rules allowing Plaintiff to contest supportive measures, k. failing to follow conflict of interest rules, l. failing to refrain from bias, m. refusing to observe controlling US Supreme Court and 4th Circuit case law.

164. Defendants acted in furtherance of the conspiracy by going beyond their scope of employment[6] after forming an agreement to retaliate because of Plaintiff's complaints against their corruption and unlawful activities. Anderson, Ginta Martin, Matthew Taylor, Jason Casares, and Cecilia Rivera conspired, met, and acted to ignore demands for due process including applying the correct legal standards, withholding exculpatory witnesses, intimidating witnesses, coercing witnesses (e.g. **EX6,7**), defaming Plaintiff, falsely conveying that Plaintiff had been fired, concealing evidence, refusing to provide sufficient notice with dates, times, and locations of alleged misconduct, conducting an investigation into matters over which they had no jurisdiction because complainant Karizaki was not an employee at that time, manipulating and doctoring evidence to convey a false narrative, adding extraneous and irrelevant matters, deliberately claiming to make "findings of fact" when there were neither "finding" nor "facts" but just gibberish, and making illogical unlawful claims.

165. Defendants violated due process by producing an appeal decision obtained from ChatGPT without even addressing any of the appeal grounds. The appeal process was fake.

166. 42 USC Section 1983 provides that "Every person who, under color of any statute ... subjects, or causes to be subjected, any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable . . . ."

---

[6] Individual defendants' scope of employment and authority is restricted to undertaking lawful actions. If unlawful actions are pointed out, they have a duty to consult readily available legal counsel and obtain an opinion that their understanding of the law is correct. Here the mandatory legal regime was brought to their attention repeatedly. Defendants did not explain why they violated that regime or how their actions were in conformity with the law. The lack of explanation leads to the inference that they could not support their actions with legal basis. Their pivot away from the mandatory regime after finding out they could not meet the law's burden shows malice.

29

167.    Individual Defendants knew that they were acting in violation of the law. Each of the Defendants has received training in Title IX and related policies, had access to counsel, and is aware of their legal responsibilities. There is no grey area or ambiguity, and they wanted to violate established legal rights of the Plaintiff.

168.    Defendants are not entitled to any kind of immunity because they acted outside the scope of their authority, unlawfully, maliciously, and in bad faith for retribution against Plaintiff for exposing their corruption and fraud. Only they had the motive, means, and opportunity.

169.    Defendants' intentional actions in violation of the laws were in furtherance of a conspiracy against Plaintiff and included refusing to follow requirements for notice, jurisdiction, examination of evidence, cross-examination, and extending Karizaki's contract in violation of immigration law.

170.    Plaintiff suffered serious and pervasive economic and emotional damages as a result of Defendants' unlawful actions.

171.    Plaintiff is entitled to reinstatement and declaratory and injunctive relief.

**COUNT 2: Violation of 20 U.S.C. § 1681 et seq.-Title IX**

172.    Plaintiff incorporates all the allegations in paragraphs above and Exhibits as if they were realleged and fully set forth again.

173.    On February 4, 2025, the US Department of Education issued a Dear Colleague Letter stating "the binding regulatory framework for Title IX enforcement includes the principles and provisions of the 2020 Title IX Rule ... open Title IX investigations initiated under the 2024 Title IX Rule should be immediately reevaluated to ensure consistency with the requirements of the 2020 Title IX Rule ..." (**EX27**)

174.    The DCL was read by Defendants but ignored because it frustrated their illegal scheme.

175.    Defendants were sanctioned by the Department of Justice for Title IX violations against women and feared further sanctions. Defendants wanted to punish Plaintiff because he is a man and wanted to make an example of him to appease overzealous gender campaigners.

176.    Defendants could not satisfy the requirements of the 2020 Rules and chose evasion instead of compliance, thereby intentionally engaging in unlawful activity.

177.    20 USC Section 1681 provides that "No person in the United States shall, on the basis of sex, ... be subjected to discrimination under any education program or activity receiving Federal financial assistance." It is enforceable through an implied private right of action. See *Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979).

178.    Title IX applies to all institutions receiving federal funds via Title IV and as noted above, UMES is wholly dependent upon federal funds for its diurnal survival. Title IX applies to UMES, and it is required to certify compliance to the US Department of Education.

179.    Defendants violated Title IX when it was clearly the mandatory legal regime governing this case, by failing to follow the February 4, 2025, DCL, failing to follow mandatory rules prescribed by Title IX, and arriving at an erroneous outcome against the Plaintiff.

180.    Defendants' failure to follow Title IX was due to animosity and gender bias to appease pressure from previous Office of Civil Rights investigations, adverse findings, and negative media coverage. The failure to follow Title IX's procedural protections which give protections for false complaints against men is itself a Title IX violation based on sex and gender.

181.    Defendants misapplied, failed to apply, or violated its own policies with a discriminatory intent against Plaintiff thereby violating Title IX.

182.    Defendants conducted their sham investigation in ways calculated to achieve their erroneous outcome to harm Plaintiff including by intimidating witnesses, excluding

exculpatory witnesses, manipulating and doctoring evidence, bribing the complainant, exhibiting bias, failing to apply the correct legal standards, claiming their opinions are "facts", denying notice, denying cross-examination, denying any opportunity to examine evidence, failing to uphold the presumption of innocence, and a fake appeal process.

183.    Defendants deliberately failed to follow witness testimony from Professor X and other witnesses as that would have destroyed Karizaki's claims.

184.    The difference in evidence collection, treatment, credibility highlights discriminatory treatment. Karizaki's words are taken as the truth whereas the Plaintiff's statements and the statements by 8 student witnesses that Plaintiff acted respectfully was ignored.

185.    Defendants are not entitled to any immunity. They acted outside their authority and willfully flouted established rights. They knew that Title IX and its protections are the mandatory law and establish rights for Plaintiff. They knew that evidence had to be provided for examination and cross-examination and proper appeals had to be given. They refused to follow the law and denied all due process and produced an appeal decision by ChatGPT. They used their illegal motive, means, and opportunities for retribution against Plaintiff. Defendants are diverted of their "official capacity" and authority when they wantonly engage in illegality.

186.    Defendants' actions caused severe and pervasive harm to Plaintiff that is primarily capable of redressal by declaratory and injunctive relief and an award of punitive damages.


**Count 3: Violation of First Amendment – Freedom of Speech and Conspiracy 42 USC 1983**

187.    Plaintiff incorporates all the allegations in paragraphs hereinabove and Exhibits.

188.    Plaintiff had a constitutionally protected right under the First Amendment to freedom of speech and expression. Plaintiff's complaints against individual defendants engaging in criminal activities are protected by the First Amendment. *Assuming arguendo*, Plaintiff filed

any complaint about Defendants and Karizaki violating immigration laws and unlawfully engaging in time-sheet/payroll fraud, that is protected speech of public concern and importance. Defendants' retaliatory actions and demotion of Plaintiff to a lower paid different type of position violate the right to freedom of speech.

189.    Defendants started this fake investigation to signal to others that complaining against them would entail vicious retaliation and their actions are aimed at chilling speech and preventing the exposure of corruption and fraud by public officials abusing their position.

190.    Defendants have access to general counsel, receive training in corruption, and knew their actions are unlawful and do not merit qualified immunity.

191.    Defendants' unlawful actions caused Plaintiff severe and pervasive harm and is capable of redress only through declaratory and injunctive relief and reinstatement.


**Count 4: Violation of Maryland Declaration of Rights Article 40**

192.    Plaintiff incorporates all the allegations above and the Exhibits as if realleged again.

193.    Article 40 guarantees "that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege."

194.    Plaintiff's reports to government agencies about fraud, corruption, and illegal activities including the violation of immigration laws by Individual Defendants and Karizaki is protected by Article 40's language which is broader than even the First Amendment of the US Constitution.

195.    Plaintiff's whistleblowing about unlawful acts and the Individual Defendants acting as an organized gang to engage in corruption is in the public interest.

196. Defendants violated article 40 by retaliating against Plaintiff for exercising his free speech rights for unlawful purposes. They would not have concocted their fake allegations and punished Plaintiff under a pretext but for his speech.

197. Plaintiff continues to suffer harm as a result of the Defendants' violation of article 40.

## COUNT 5: Negligent Hiring, Supervision, and Retention

198. Plaintiff incorporates all the allegations in paragraphs above.

199. Defendant 5 owes a duty of care to Plaintiff to use care in hiring, supervision, and retention of its personnel including all the individual defendants and in ensuring they follow the law.

200. Defendant 2 has a well-publicized public record as an alleged rapist and abuser of investigatory processes and rules. Defendant 1 hired him because of this record.

201. Defendant 1 intentionally and maliciously promoted and paid exorbitant salaries and benefits to Jason Casares as a bribe for engaging in illegal activities on her behalf.

202. It was entirely foreseeable that employing Jason Casares would result in biased Title IX investigations, lawsuits, discrimination complaints, and serious violations. Numerous faculty and staff at UMES have filed complaints about serious fraud and abuses by Casares, Rivera, and Ginta Martin since 2018. There are over 100 such complaints against them.

203. Defendant 1 employed gang-recruitment tactics in hiring persons of manifest and documented illegal activities precisely because of their willingness to violate the law.

204. Defendant 1 deliberately and maliciously failed to properly train and supervise Jason Casares, Rivera, and Ginta Martin because she wanted to employ them for unlawful purposes including suppressing complaints against her and associates, and weaponizing Title IX for unlawful purposes.

205.    Defendant 1 did not possess the qualifications, experience, or character to be appointed president of UMES. Defendant 1 plagiarized her PhD and despite obvious cheating exposed in the national media, Defendant 5 was negligent in taking any action.

206.    Defendant 5 did not train Individual Defendants or supervise them appropriately and was recklessly indifferent to their unlawful actions despite numerous complaints (**EX1, EX2**).

207.    Defendant 6 had a publicly known record of alleged fraud. Defendant 5 was negligent or reckless in hiring them and should have foreseen that they would engage in fraudulent investigations, abuse processes, and violate the Plaintiff's legal rights.

208.    Defendant 5's improper hiring, failure to supervise, train, and monitor all the other Defendants was negligent or reckless and violated their duty of care and caused severe foreseeable economic, reputational, health, and emotional harm to Plaintiff.


**COUNT 6: The Maryland State Policy on Sexual Harassment Violates the First Amendment and Article 40 of the Maryland Constitution, is Preempted, Unconstitutionally Vague and Overbroad, and must be struck down.**

209.    Defendants intentionally adopted a ruse by seeking to apply the inapplicable Maryland State Policy on Sexual Harassment because their fake case could not withstand applicable law.

210.    This state law, adopted in 2022, drastically departs from federal law and drops the "severe and pervasive" standard. It is a content-based restriction on speech that violates the First Amendment to the US Constitution.

211.    The Maryland law is preempted, unconstitutionally vague and overbroad.

212.    The Maryland law is preempted by Title IX. Congress fully occupied the field of sexual harassment and discrimination in universities in legislating Title IX as the mandatory regime.

213.    Article 20 610(a) of SB 450 defines "sexual harassment" in vague and overbroad terms to include unwelcome and offensive conduct, which ***need not*** be severe or pervasive, when the conduct "the conduct unreasonably creates a working environment that a reasonable person would perceive to be abusive or hostile, considering the totality of the circumstances."

214.    The Maryland policy reaches constitutionally protected speech that is merely offensive or unwelcome to some listeners. This upends the long-established judicial precedent and Congressional intent to only punish severe and pervasive offensive conduct.

215.    The Maryland policy is overbroad by sweeping up any kind of speech content that a listener deems offensive or unwelcome thereby eliminating jokes, casual statements, or harmless banal remarks. It does not define prohibited conduct, offers no procedural protections, prohibits speech outside Maryland (e.g. the text messages here), and is facially unconstitutional.

216.    It is well settled that the government cannot prohibit speech merely on the grounds that it is "offensive" or "unwelcome" to some listeners. Speech cannot be abrogated merely because it would cause discomfort to a hyper-sensitive listener such as Karizaki.

217.    Article 40's ban on prior restraints was designed to prevent exactly this type of law as it chills the right of "every citizen of the State … to be allowed to speak, write and publish his sentiments on all subjects …"

218.    Plaintiff has standing to bring this constitutional challenge because he was directly harmed by the enforcement of the Maryland law. He was demoted after a farcical investigation based on this law, deprived of procedural and substantive due process, and deemed responsible based on vague and overbroad conclusions under the color of this law for speech outside Maryland about unlawful activities by the Defendants including fraud, corruption, plagiarism, and violation of immigration laws.

219.    Here, Defendants cited alleged private comments by Plaintiff from outside Maryland (MD) to Karizaki who was in Pennsylvania (PA) and unaffiliated to Defendants such as "that [Plaintiff] thinks Persian women are beautiful" as constituting sexual harassment under the Maryland policy illustrating its unconstitutional vagueness, overbreadth, and overreach. Defendants have no legitimate interest in policing such speech outside the employment context to a non-employee. The speech was outside the state and unconnected to employment – meaning there was no police powers at all.

There is no evidence that Karizaki is Persian and none was presented. Not all Iranians are Persians. Iran is a multi-ethnic country where Persians constitute a segment. A statement that Persian women are beautiful is pure opinion and constitutionally protected speech that cannot be prevented by a government entity. Ditto the other statements attributed to the Plaintiff before Karizaki was hired that were sent from outside MD to a person outside MD without using any MD equipment or having any connection to MD.

220.    Plaintiff had a free speech right to make the alleged (denied) comments to a non-employee.

221.    Plaintiff repeatedly asserted that he had no interest in Karizaki, that she never objected to any comment, that she responded with smiling emojis, that the comments were made prior to her employment or even making an application for employment, and she never asked Plaintiff to cease making any comment.

222.    Defendants themselves admitted that Plaintiff's conduct was not "severe or pervasive."

223.    Defendants punished Plaintiff for allegedly making a report about an immigration law violation and timesheet/payroll fraud to the US government involving public funds. The fraud was by public officials and Plaintiff had every right to report fraud.

224.    Defendants' fake investigation is retaliation for Plaintiff reporting plagiarism and cheating by Heidi Anderson. A report about cheating by a public official who is using the product of that cheating to obtain public funds is protected speech under the US and Maryland Constitutions. It is a matter of public concern relating to a public institution. The fake complaint is a pretext to punish protected speech.

225.    If the Defendants' position were to be accepted an employee could not communicate with any third party without being a risk of termination if that third party complained to his employer. Such an interpretation would be absurd and chill all speech.

226.    The plaintiff suffered an individual injury because of the unconstitutional Maryland law.

227.    The Maryland law's vagueness, overreach, and overbreadth enables substantial violations of the First Amendment and Article 40 and due process rights by officials acting arbitrarily and discriminatorily.

228.    In *DeJohn v. Temple University*, 537 F.3d 301, 320 (3d Cir. 2008), the 3rd Circuit Court of Appeals analyzed binding Supreme Court precedents and opined: "since the inception of overbreadth jurisprudence, the Supreme Court has recognized its prominent role in preventing a "chilling effect" on protected expression. *Broadrick v. Oklahoma*, 413 U.S. 601, 630, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) ... This laudable goal is no less implicated on public university campuses throughout this country, where free speech is of critical importance because it is the lifeblood of academic freedom. As the Supreme Court in *Healy v. James* explained, "the precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large." The court's analysis resulted in its finding that the sexual harassment policy was unconstitutionally overbroad.

38

229.    The Maryland law abrogates procedural protections and confers untrammeled and arbitrary powers to public officials, as in this case, to run kangaroo courts to stifle speech to achieve retribution for exposing corruption.

230.    In the hands of Defendants, any statements can be twisted to meet the Maryland law's definition of harassment based on the vague and overbroad "totality of circumstances" regardless of to whom or where they were made. It can mean anything that an official wants it to mean.

231.    The Maryland law will have a chilling effect on protected speech under the Constitution, especially in a university environment. As the Supreme Court has held, "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools [of higher learning]." *Healy v. James*, 408 US 169, 180 (1972). In *Rust v. Sullivan*, 500 U.S. 173, 200, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), the Supreme Court "recognized that the university is a traditional sphere of free expression so fundamental to the functioning of our society that the Government's ability to control speech within that sphere by means of conditions attached to the expenditure of Government funds is restricted by the vagueness and overbreadth doctrines of the First Amendment." In *Rust*, the Court noted that the "existence of a Government "subsidy," ... does not justify the restriction of speech in areas that have "been traditionally open to the public for expressive activity."

232.    The government has no compelling interest that outweighs the Plaintiff's speech rights under article 40 or the First Amendment. Indeed, the public interest compels the protection of the Plaintiff's rights to file reports about fraud and corruption involving public funds and outweigh any considerations that such activities may be "offensive." Equally, it protects the Plaintiff's right to have private conversations without the fear of state discipline.

233.   The plaintiff's injury can be corrected by striking down the Maryland law.

**COUNT 7: Intentional or Reckless Infliction of Emotional Distress and Conspiracy**

234.   Plaintiff realleges and incorporates again all the allegations above and in Exhibits.

235.   Defendants Anderson, Casares, Rivera, Ginta Martin, and TNG engaged in reckless and malicious conduct when, either acting individually or in concert, they abused processes calculated to lead to the predetermined punishment of Plaintiff.

236.   Only the Defendants had the motive, means, and opportunity to concoct fake allegations, abuse processes, and unlawfully punish Plaintiff in retaliation for his complaints against them.

237.   Defendants maliciously and recklessly did not provide sufficient notice of allegations with dates and times because they knew the dates would show they had no jurisdiction and the process was fake, refused to provide cross-examination because they knew the allegations were false and would collapse, refused to show evidence for examination because none existed, falsified evidence, intimidated witnesses, lied about witnesses who contradicted the complainant, excluded exculpatory testimony, refused to apply the correct law and processes, predetermined a conclusion, presumed the Plaintiff guilty, predetermined the cruel punishment, and acted with malice and bias.

238.   Defendants' violation of mandatory law is extreme and outrageous and violates all humane notions of civilized conduct in a university. They knew that the extreme conduct would harm Plaintiff particularly because he was a person of integrity who upheld the rule of law.

239.   Plaintiff suffered serious and pervasive harm because of Defendants' actions including hospital visits for serious health complications.

**COUNT 8: Discrimination under Title VI and 42 U.S.C. §1981**

240. 42 USC section 2000d provides "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

241. Defendants discriminated against Plaintiff because he is Asian and they possessed animus against Asians. They denied him the equal conditions of employment including without limitation, higher pay, professional opportunities, and working conditions. Defendants also exercised unequal and cruel discipline solely because of his protected class. Other UMES employees who had far more serious evidence-backed complaints were not punished or treated in such a harsh manner.

242. Specifically, others including Moses Kairo, Rondall Allen, Robert Brown, Lakeisha Harris, Grace Namwamba, Latoya Jenkins – all Black employees in similar positions– were not disciplined despite more serious allegations. Defendants singled out Plaintiff for exceptionally punitive punishment due to his race unlike similar others who were treated leniently.

243. As a direct and proximate result of Defendants' unlawful actions, Plaintiff suffers serious harm including but not limited to loss of significant past and future salary, benefits, and other entitlements of employment, loss of professional rank and career growth. The Plaintiff has also suffered from emotional distress arising from the loss of his position, the damage to his good reputation.

**COUNT 9: Race Based Hostile Working Environment 42 USC 1981**

244. Plaintiff incorporates by reference allegations in paragraphs above and the Exhibits.

245. Defendants created a hostile working environment and harassed Plaintiff because of his race, the conduct was unwelcome, was sufficiently severe or pervasive when it substantially

altered the conditions of his employment and created an abusive work environment. Plaintiff's supervisor – Heidi Anderson – took adverse action by demoting Plaintiff and threatens to take further adverse action for racial, pretextual, and retaliatory reasons. It accords with Anderson's two-tier system of discrimination against Whites and Asians.

246.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff suffers serious harm including but not limited to loss of significant past and future salary, benefits, and other entitlements of employment, loss of professional rank and career growth. The Plaintiff has also suffered emotional distress and damage to his good reputation.

## COUNT 10: Retaliation Under 42 U.S.C. §1981

247.    Plaintiff incorporates by reference allegations in paragraphs above and the Exhibits.

248.    Plaintiff engaged in protected activities and opposed acts made unlawful under 42 USC §1981 while employed by Defendant 5 by submitting whistleblower complaints.

249.    As a direct result of engagement in protected activities and opposition to acts unlawful by §1981, Defendants retaliated against Plaintiff and took adverse employment actions including demotion and reduction in salary.

250.    The illegal retaliation was caused by the Plaintiff's reporting of unlawful acts by the Defendants and no action would have ensued but for the reporting. The Defendants' motive, means, opportunity, temporal proximity, fake allegations bereft of the slightest evidence, willful violation of due process all establish causation.

251.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff suffers serious harm including but not limited to loss of significant past and future salary, benefits, other entitlements, loss of professional rank, and career growth. The Plaintiff has also suffered from emotional distress arising from the loss of his position and damage to his good reputation.

**COUNT 11: Interference with Contract/Economic Opportunities**

252.    Plaintiff incorporates by reference allegations in paragraphs above and the Exhibits.

253.    Plaintiff had a valid contract with UMES that contained both a permanent administrative role and a tenured professorship and expected to continue in those roles. He has an exceptional record of achievement throughout his career and everyone including Defendant 1 expected him to attain higher positions. On Dec. 3, 2024 she said Plaintiff would become a university president soon and he had given up other jobs in reliance upon her promise of the role.

254.    Individual Defendants tortiously interfered with that contract and demoted him by: a. retaliating against him for reporting fraud, b. starting a fake investigation based on an inapplicable law, c. conducting an investigation without valid jurisdiction because the acts alleged occurred before Karizaki was an employee, d. making false statements, e. illegally putting him on leave, f. willfully refusing to provide a copy of the complaint and any evidence, g. willfully refusing to consider alternative explanations, h. willfully refusing to interview exculpatory witnesses, i. willfully lying about witnesses they interviewed, j. willfully refusing to follow applicable legal standards under the Maryland law, k. willfully refusing to follow applicable federal law and the US Constitution, l. willfully refusing to adhere to federal preemption, m. willfully lying that Plaintiff admitted reporting to ICE, n. willfully giving Karizaki a visa in violation of immigration law as a bribe, o. willfully defaming Plaintiff by making false statements to harm his reputation, p. willfully imposing a cruel and disproportionate sanction despite their own fake investigation concluding that Plaintiff's actions were not severe or pervasive.

255.    Defendants knew that the demotion and defamation would harm Plaintiff's career and cause him immense loss. They did it anyway because causing harm was their intent.

256.    Defendants' actions were malicious retribution against Plaintiff for reporting fraud, plagiarism and cheating by Heidi Anderson, and exposing the various scams she was implementing at UMES.

257.    Defendants' conduct was independently wrongful and unlawful, consisting of willful refusal to follow applicable laws, violation of the Constitution, every law and policy, defamation and injurious falsehood, and was undertaken with the intent to disrupt Plaintiff's contract  and prospective economic relationships and opportunities.

258.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff suffers serious harm including but not limited to loss of significant past and future salary, benefits, other entitlements, loss of professional rank, and career growth. The Plaintiff has also suffered from emotional distress arising from the loss of his position and damage to his good reputation.

## COUNT 12: INJUNCTION

259.    Plaintiff incorporates by reference allegations in paragraphs above and the Exhibits.

260.    According to *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), a party seeking a preliminary injunction must establish: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest.

261.    Plaintiff is highly likely to succeed on the merits because the entire edifice of the unlawful actions against him is premised on an inapplicable, preempted, or unconstitutional law, and in gross violation of both the US and Maryland constitutions. There is no legal basis for any action against Plaintiff because he did not violate any law or policy and no evidence of wrongdoing exists. Defendants' actions are unlawful retribution for being reported for fraud.

262.    Plaintiff will suffer irreparable harm if Defendants are allowed to take further adverse action based on their fake investigation violating every rule of applicable law. A court decision after trial that the Defendants acted illegally and an award of compensation will not suffice to cure the harm caused to Plaintiff's career, reputation, health, and good name.

263.    Defendants will suffer no harm as a result of an injunction whereas the Plaintiff will suffer irreparable harm if the threatened adverse actions are taken. The balance tips in his favor.

264.    The public interest is advanced by prohibiting unlawful retaliation against an employee who reports fraud involving federal and state funds. Indeed, the very purpose of article 40 of the Maryland Constitution and the various whistleblower protection laws is premised on that public interest.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, the Plaintiff prays that this court award relief by:

1.  Scheduling an urgent hearing for a preliminary injunction;

2.  Enjoining defendants and the state from continuing violations of the Plaintiff's constitutional rights;

3.  Awarding Plaintiff injunctive relief directing UMES to: (i) refrain from any adverse action pending this litigation; (ii) reverse the outcome, findings, and sanction for the fake Karizaki complaint; (iii) expunge Plaintiff's disciplinary record in its entirety; (iv) take all steps necessary to return Plaintiff to the status quo ante; (v) awarding damages including punitive damages, prejudgment interest and costs not less than $5,000,000 from Defendant 5;

4.  Striking down the Maryland State Policy on Sexual Harassment as unconstitutional and violative of the First Amendment;

5.  Declaring that the Defendants' adverse actions against Plaintiff are unlawful;

6.  Reinstating the Plaintiff to his position as on 5th December 2024;

7.  On the count related to improper hiring, supervising, and training, awarding damages in an amount to be determined at trial, including, damages to well-being, emotional and psychological damages, damages to reputation, past and future economic losses, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, and costs;

8.  On the counts related to interference with contract/economic opportunities and intentional or reckless infliction of emotional harm, awarding damages from individual defendants to be recovered from their personal funds in an amount not less than $2,000,000 from Defendant 1, and not less than $1,000,000 from each of the other Defendants;

9.  Awarding attorney fees, costs, other relief and orders as the Court deems just and proper.


## JURY DEMAND

Plaintiff hereby demands trial by jury for all issues triable by jury.


## CERTIFICATION

Under Maryland Code and Court Rules, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; and (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Dated: 02/16/2026

Jacob Doe, Plaintiff

Jacobdoe2025@gmail.com

## REQUEST FOR ISSUANCE OF SUMMONS

Plaintiff respectfully requests the Clerk of the Court to issue summons to the Defendants urgently.

  Serve summons by email for UMES by emailing documents to: civil_service@oag.state.md.us

Respectfully submitted on the 16th day of February 2026.

Jacob Doe, Plaintiff

Jacobdoe2025@gmail.com

11868 College Backbone Rd
Princess Anne MD 21853

47

E-FILED: Somerset Circuit Court
Docketed: 2/16/2026 4:12 PM; Submission: 2/16/2026 4:12 PM
Envelope: 25126466

# EX 1

Chancellor Perman,

University of Maryland Eastern Shore (UMES) President Dr. Heidi Anderson's performance is **well below** being acceptable. Even after taking into consideration the impact COVID-19 has had on all institutions within the University System of Maryland (USM) she has posted the penultimate enrollment growth rate in the USM – only the University of Baltimore (UB) has beaten her to the basement. Her poor leadership preceded COVID-19 and it continues to underperform during the pandemic. August 31st marked the completion of Dr. Anderson's third full year at the helm of UMES. It must be her last.

We waited too long to sound the alarm when former President Juliette Bell started to tank UMES' enrollment. From that experience we learned it is all too important to bring these failures directly to the attention of the Chancellor and the Board of Regents as quickly as possible. It is an unfortunate fact, that as a smaller campus in the University System of Maryland, UMES does not receive the same nurturing embrace or benefit from the same performance expectations that its sister institutions receive from the Board of Regents. As such, the Chancellor and Board allowed Dr. Bell, and now Dr. Anderson, to languish and flounder far longer than would be allowed anywhere else in the USM.

To underscore this point, under NO circumstances would the President of the flagship campus be allowed to remain in position if enrollment tanked by over 25% in three years. However, this is exactly what Dr. Bell was allowed to do from 2015 to 2018 (a 28.5% decrease) and what Heidi Anderson has been allowed to do from 2018 – 2021 (a 25.3% decrease). The USM Chancellors and the Board of Regents have allowed to occur at UMES twice (in back-to-back presidencies and in consecutive three-year periods) what would be inconceivable to allow even ONCE at UMCP, UMB, UMBC, Towson, or Salisbury!

It is failures like Dr. Bell's and Dr. Anderson's that reinforce racial stereotypes that Historically Black Universities (HBCUs) are poorly managed. When these stereotypes persist in the community, they contribute to decreased enrollment and stagnate efforts to increase diversity at these campuses. However, we must unequivocally state the data show the past decade of failed leadership at UMES falls squarely on the shoulders of the respective Chancellors and the Boards of Regents. The past two UMES presidents were specifically hand-picked by the respective Chancellors in direct defiance of the leadership recommendations made by the campus-based presidential search committees. It is beyond belief that individuals whose only professional involvement with an HBCU have been to visit an isolated building or two during required Board of Regents meetings seem to feel their opinion of what is best for these campuses is superior to those who live and breathe the uniquely diverse needs for the faculty and student bodies there. And when their hand-picked stooges failed, the Chancellors dragged their feet to address their messes and hoped no one would notice or care. Chancellor Perman, let it be known, we care. Please clean up YOUR mess.

The popular belief is you made the referral and endorsement to former Chancellor Caret to hire Dr. Heidi Anderson as the President for the University of Maryland Eastern Shore. This was done with full knowledge that she had already been pushed out of her role as Provost and Vice President for Academic Affairs at Texas A&M University-Kingsville at least nine months prior to the application deadline for the UMES Presidency[1]. As a result, Chancellor Caret hired a freshly failed Provost as the President of UMES

---

[1] Dr. George Allen Rasmussen was appointed Provost and Vice President for Academica Affairs at Texas A&M University-Kingsville on March 23, 2018. He had been serving as interim provost since September 2017. This means Dr. Heidi Anderson had vacated her provost position at least eight full months before the priority deadline for applications for the UMES Presidency on June 1, 2018. **Source:**
https://www.tamuk.edu/news/2018/03/Rasmussen%20Named%20Provost%20.html#.YVTINZ1KiUk

based on your endorsement. We recognize it is hard to terminate a colleague's employment when they are not meeting performance expectations, but, Chancellor Perman, the time has come.

To assist you with this matter, we are bringing awareness of the current failure to your attention for immediate action. Specifically, Dr. Anderson has:

- Failed to stabilize enrollment at the University of Maryland Eastern Shore (presumably her top priority); [Note: COVID-19 is no excuse as she was already failing in this regard prior to the pandemic]
- Failed to develop/implement even a smattering of a staffing plan to address the enrollment crash;
- Provided (*alleged*) predators with critical access to the university community; and,
- Willfully hidden material issues from the Chancellor, the Board of Regents, and the USM Internal Audit Office.

Recent history has shown the USM Office must take immediate action to address abysmal performance. It is not acceptable to simply say, "Oh, that's just UMES" and to allow this failure to continue. It is also not acceptable to sit idly by and to try to wait out the storm. This level of ineptitude would not be tolerated anywhere else in the USM (except apparently UB). UMES has been a demonstrated leader in the USM in the recent past and has tremendous assets to do so again. Bowie President Dr. Breaux has demonstrated that new leadership (even during a pandemic) does not have to result in continued institutional failure.

UMES' Fall 2021 enrollment has plummeted, yet again. To this end, we are asking that you take swift and decisive action to:

1. Take expedient steps to replace UMES' failed leadership.
    a. Fill the interim role with a knowledgeable, fully qualified executive.
    b. Fill the permanent role with an individual with a successful track record of leadership. (e.g., the last two selections had been recently failed provosts)
2. Actively engage with the new president to implement a Strategic Plan that is endorsed and embraced by the USM Office (akin to Chancellor Toll's *Prospectus*) that includes:
    a. Timelines for restoring UMES new student enrollment, admission's standards, and transfer student enrollment;
    b. An action plan for boosting retention and graduation rates; and,
    c. A strategy for ensuring quality vice-presidential hires (President Bell's revolving door was addressed in a previous whitepaper; President Anderson's failures are addressed below)

To be clear, **UMES' failure is your failure**. If you opt to wait out the storm, then buckle up buttercup … there's a bumpy road ahead. The Assistant Attorney General representing UMES and the Legislative Auditors can confirm the materials provided herein are just the tip of the iceberg.

# Historical Perspective:  The Current Trend is NOT Consistent with UMES' Track Record



Figure 1: UMES total enrollment from Fall 1978 to Fall 2021 according to Chancellor. [Source: www.usmd.edu/IRIS]

## UMES grew enrollment and mission for 30 consecutive years.

Once University of Maryland System (UMS) President "Bull" Elkins put his foot down and made it clear that a merger of the University of Maryland Eastern Shore and Salisbury State College (SSC) would result in Salisbury State folding under UMES (consistent with the 1970 Heller Report findings), the 1977 Webb Task Force came to an abrupt end.

Elkins' immediate successor (as he faced mandatory retirement at age 70), UMS President John Toll forged a strong relationship with UMES Chancellor Hytche that ultimately led to UMES being a perennial growth institution (despite not being formally labeled as such).

- In 1978, President Toll introduced *The Prospectus*[2] which included the creation, funding, and staffing for innovative and unique academic programs at UMES. Toll's commitment to the success of UMES was so strong, he worked with Hytche to implement nineteen new and unique degree programs and actually flew faculty members from UMB to Princess Anne to teach courses. This squelched any concern regarding the quality of the education received at the campus.

- In January 1987, Richard A. Henson made a transformational $2M gift to UMES and personally called Governor Schaefer to improve the appearance of the campus.[3] Governor Schaefer honored his commitment. For the next four years, UMES' General Funds per FTE matched its sister land grant institution, UMCP.

## From 1988 on, UMES enrollment skyrocketed.

- UMES' relative growth in headcount was unmatched by the other brick-and-mortar institutions.

- The combination of high-value programs and funding led to UMES having the most diverse faculty and student body in the state of Maryland for decades

- During Dr. Spikes' tenure, enrollment dipped slightly in 1998 due to a policy change. However, it quickly rebounded the following year once students understood the requirements for continued enrollment.

---

[2] President John Toll's *The* Prospectus included the following items:

- The University will establish a work force of highly competent people drawn from throughout the University to work with the president of the University and the chancellor of the UMES campus in carrying out the changes, which are identified as necessary or desirable.

- The objective of the University is to make the UMES campus the focal point of the University's activities on the Eastern Shore.

- The University will continue to involve UMES as a partner within the system, sharing both human and physical resources, and engaging the campus in cooperative planning for the optimal use of available resources.

- The instructional resources at UMES will be expanded to allow various new and interrelated "majors." It is assumed the SBHE [MHEC] will approve the program plans, which are covered in this paper.

- Facilities will be brought up to a competitive level of quality, and the cost of their maintenance will be related to the functions they serve.

- Cost estimates are offered in response to the State Board for Higher Education's requirement that the cost per student at UMES become consistent with the per student costs at other Maryland four-year public institutions.

- The research efforts at UMES will be coordinated with research efforts at other units of the University and supportive services will be provided.

- Sustained cooperative effort between the University of Maryland Eastern Shore and Salisbury State College is important to the educational welfare of Eastern Shore residents. The plan being offered by the University assumes the responsibility for this cooperation will be shared equitably by the two campuses.

- We share in common an awareness of the historical, legal, political, demographic, and economic circumstances, which have made educational planning difficult at UMES. The academic programming presented in this paper is addressed to regional needs and in some instances Statewide needs. **With adequate support, the objects can be accomplished**. (Emphasis added)

[3] Dr. Henson told Governor Schaefer the appearance of the campus did not match the caliber of faculty and students he had met there, and he wanted to improve the campus' appearance.

- The addition of unique academic programs continued under Dr. Thompson's leadership. Enrollment growth only slowed during the latter portion of her term when concerted efforts were made to raise the admissions standards and to increase transfer student enrollment while still maintaining a commitment to first generation college students.



Figure 2: UMES total enrollment from Fall 1978 to Fall 2021 according to President. [Source: www.usmd.edu/IRIS]

## Interim President Mortimer Neufville initiated the precipitous decline in enrollment at UMES.

- Dr. Mortimer Neufville's introduction as interim President slammed the brakes on UMES' growth momentum. (Incidentally, he repeated this feat as interim President of Coppin when he reversed the slight stint of enrollment growth that immediately preceded his introduction to that university as well).

## Chancellor Caret intentionally ignored all the warning signs.

- Figures 1 and 2 clearly show Chancellor Caret permitted Dr. Juliette Bell, whose prior failures were documented in a previous whitepaper, to continue her losing streak at UMES. After a couple of years at the helm, she sacrificed admissions standards to boost enrollment. The data are now in – her reckless move drove an 8-percentage point decline in 6-year graduation rates from the 2014 to 2015 cohorts. (Same institution 6-year graduation rates dropped from 40% to 32%; 'anywhere in the USM' 6-year rates dropped from 45% to 37%). Following that failure, she then drove the 28.5% decrease in enrollment from Fall 2015 to Fall 2018 referenced above.

## Chancellor Perman, UMES Needs Your Attention…Now!

- After only three years on the job, Dr. Anderson has added her own 25.3% enrollment drop to the craterous decline with no hint of its reversal. While it would be wonderful to be able to blame the decline on the COVID-19 pandemic, this cannot be done. Her lack of effective leadership led to:
    - o  A substantial enrollment decrease in Fall 2019 (before COVID-19 was an issue), and
    - o  Enrollment decreases at UMES that significantly surpass the declines other USM institutions experienced.

## Providing Context:   Comparing UMES enrollment growth to the other USM brick-and-mortar institutions.

- Figure 3 demonstrates that by 2005, **UMES' relative enrollment growth had tripled that of the USM** as a whole (using 1978 as a baseline).

- The chart illustrates that President John Toll's *The Prospectus* had added the necessary fuel to spur UMES to gain 15% in enrollment growth relative to its peers from 1978 to 1987. Richard A. Henson and Governor Schaefer's actions added the spark that launched UMES' growth.

- The steep upward slope of the UMES enrollment curve demonstrates it was by far the fastest growing institution in the USM (excluding UMGC) in terms of total enrollment for decades. The curve did not flatten until 2007 to 2012 when UMES made a concerted effort to increase admissions standards that would drive the increased retention/graduation rates President Anderson is sadly touting as her own achievement. Keep in mind, UMES enrollment was still increasing during this period. The flatter curve simply means UMES enrollment was increasing slightly faster than the USM as a whole. For example, during that period UMES grew 9% compared to 7.8% for the USM (excluding UMGC).

- Drs. Neufville, Bell, and Anderson have managed to create a sinkhole that has eroded a 33-year growth advantage in just 9 years. Their combined efforts have not only reduced enrollment, but also diminished the quality, attractiveness, and vibrance of UMES' unique academic programs, gutted UMES' fiscal/audit integrity, and trashed UMES' reputation in the surrounding community. **To be clear, all three of these leadership choices were imposed on UMES by the USM Chancellor in direct defiance to recommendations made by campus selection committees.**



Change in Total Enrollment Relative to the USM
(excluding UMGC): Baseline: 1978

**Figure 3:** This chart normalizes enrollment growth (or decline) of institutions relative to the University System of Maryland as a whole (excluding Global Campus) using Fall 1978 as a baseline. When a line has an upward slope, the campus enrollment grew compared to the total USM enrollment in that year. When a line has a downward slope, the campus enrollment contracted compared to the total USM enrollment in that year. The steeper the angle, the greater the increase/decrease relative to the USM as a whole such that a horizontal line means the institution's growth matched the USM's overall growth or contraction for that year.

## Issue 1: UMES Enrollment Continues to Crater Under Dr. Anderson



**Figure 4:** This chart normalizes enrollment growth (or decline) of institutions relative to the University System of Maryland as a whole (excluding Global Campus) using Fall 2018 as a baseline. This chart demonstrates that since Dr. Heidi Anderson took the helm of UMES in Fall 2018, UMES has already experienced a 13%+ decline in enrollment relative to the USM as a whole. **This does not include the additional 260 student loss UMES has announced for Fall 2021.**

## Dr. Heidi Anderson has no ability to fix the enrollment problem.

- Dr. Anderson assumed the UMES presidency in Fall 2018. By Fall 2020, UMES enrollment had already fallen an additional 13.8% behind the USM as a whole. Only UB has saved her from occupying the basement alone.

- **COVID-19 is no excuse.**

  - Dr. Heidi Anderson had already posted a 9% loss compared to the USM in her first year – well before COVID-19 was an issue.

  - The downward slope between Fall 2019 and Fall 2020 demonstrates her ineffective leadership led to deeper COVID-19 losses compared to the USM as a whole. In other words, the USM lost enrollment; UMES suffered even more.

8

- o  Bowie's success destroys any notion that HBCU's were disproportionately impacted.
- Dr. Heidi Anderson has already indicated that Fall 2021 enrollment has decreased by another 260 students (i.e., another 9.8% decline in enrollment). Combined, this means Dr. Anderson has tanked enrollment by a total of 25.3% in the three short years she has been president. **She has already demonstrated that she does not have the ability to fix the enrollment problem!**

## Issue 2: More Importantly, Dr. Anderson Has No Plan



Figure 5: UMES First Time / Full Time Freshman enrollment continues to be at its lowest point in over three decades. Initial reports indicate Fall 2021 FT/FT Freshman enrolment may be ~570.

If President Anderson truly had a plan to address UMES cratering enrollment, there would not be a reason to sound the alarm after just 3 short years. However, her results are demonstrating otherwise.

9

**Dr. Anderson has demonstrated her inability to recruit new students.**

- Dr. Heidi Anderson was fully responsible for the Fall 2019 enrollment. She had been in office since September 1, 2018 and had plenty of time to influence the Fall 2019 results. Her poor Fall 2019 performance preceded any potential COVID-19 impact.

- A generous preliminary projection for the Fall 2021 FT/FT Freshman cohort is 570 new students. While Dr. Anderson is busy patting herself on the back about how wonderful this is, she has ignored the fact that these are still the lowest postings at UMES in over three decades. Her posted results are barely above UMES' efforts in the 1980s and early 1990s – results from an entirely different millennium.

  - o Further, if one were to assume a 100% 4-year graduation rate for this cohort of students, it is only enough to maintain an undergraduate enrollment of 2,280 students

  - o This also means that if the graduate student enrollment holds steady, **UMES will be experiencing its lowest undergraduate enrollment since 1989!**

**Dr. Anderson has taken UMES transfer student enrollments to new lows.**



Figure 6: UMES transfer students from Maryland 4-year and 2-year institutions continues to plummet. **Source:** Maryland Higher Education (https://mhec.maryland.gov/publications/Pages/research/index.aspx) (**Note:** The MHEC site has errors in its files. The transfer student archives do not load for 2014-2015. The data for 2012-2013 repeats the file for 2011-2012 figures.)

- President Anderson has continued Dr. Bell's trend of ignoring transfer students. After her first year in office (2019), Dr. Anderson managed to gut Maryland transfer students by a whopping 32%! (Figure 6)

- In her second year, the Maryland institutions saw an average decrease of 8.43% in transfer student movement due to the COVID-19 influence (a decrease from 14,476 to 13,255). However, UMES saw another astounding 22.73% decline (110 to 85). The 110 tally was already less than half the previous 2012 high of 230.

- Transfer student enrollment is not just a measure for the (in)effectiveness of the recruitment and admissions functions, it is also a surrogate measure for institutional reputation. Students are less likely to transfer to institutions that are poorly perceived.

## Dr. Anderson has demonstrated her inability to staff an enrollment function.

President Anderson has no true plan or ability to address UMES' enrollment collapse. In fact, her lack of planning, lack of action, and inexperience are contributing to the issue. Not only have Fall 2019 and Fall 2020 demonstrated continued gaps, but the upcoming Fall 2021 results will underscore this point. COVID-19 has simply masked the underlying failures of her leadership. The enrollment will continue to crater because Dr. Anderson has failed to provide appropriate leadership in critical areas.

These ongoing failures include:

- **Poor choice in hiring Vice Presidents.** There has not been a Vice President for Enrollment & Student Experience with either doctoral training and/or demonstrated experience since she arrived. Hans Cooper's inexperience and lack of training rang clear. The recently named VP also does not have the necessary experience or credentials.

- **The recruitment function has collapsed.** As of this writing, **UMES only has 1 recruiter!** In the past, UMES has had at least seven that were physically located across the state.

- **The Admissions function is understaffed.** The Admissions function is still led by an interim Director. The office is a shell of what it has been in the past and has not been fully staffed in years.

- **Long-term Registrar vacancy.** Until recently, UMES was operating with an Interim Registrar who was physically located in the Midwest.

In short, after three years at the post, President Anderson has already posted three of the worst FT/FT Freshman enrollments in modern UMES history and her efforts to staff recruitment and admissions functions have collapsed. The Registrar position also affects overall admissions due to its role in supporting the enrollment of transfer students. There is no wonder why new student enrollment continues to be low. Given the complete meltdown of recruitment/admissions infrastructure, this year's slight enrollment increase can only be viewed as a 'dead cat bounce'.

Certainly, when Dr. Anderson was a candidate for the top spot, the question would have been asked, "What would a successful presidency at UMES look like after 90 days/1 year/3 years?" The response would have included "Stabilized enrollment" as one of the top components. She has failed to stabilize enrollment. She has failed to even put in place the infrastructure needed to stabilize enrollment. She has simply failed. Nothing in her prior professional experience or in the actions she has taken since arriving would have predicted an alternate outcome.

11

## Issue 3: Dr. Anderson has Provided a Safe Haven for Predators

### Dr. Heidi Anderson is directly responsible for predators thriving on campus.

Dr. Anderson does not understand fiscal and legal compliance and has entrusted individuals with power who have abused their authority to bully and intimidate the campus community.

- Dr. Anderson crowed about hiring Hans Cooper as VP for Enrollment Management and Student Experience. She proceeded to bestow tremendous influence and power upon him despite his lack of demonstrated experience, credentials, or discretion. As a result,

  o Hans Cooper consolidated campus scholarship funds and passed them out like a Pez dispenser to those he sought to illicitly influence. (The USM should investigate whether the university has violated Federal grant and other funding restrictions in the process).

  o Hans Cooper demanded that a particular student be crowned the 25th Mr. UMES despite knowledge of him having a dubious criminal record. It is also alleged that Hans Cooper had also provided unwarranted scholarships to this individual and sought sexual favors in return.

  o It is also alleged that Hans Cooper had an affair with a female direct report to whom he had provided a generous salary increase.

- It is alleged that Dr. Anderson's husband Leon Roberts had inappropriate interactions with student athletes during a volleyball team practice.

  o Rather than asking the USM Internal Audit Office to investigate these allegations, she sought to have this addressed internally. The UMES General Counsel, recognizing he had a conflict, reached out to Salisbury University to conduct an independent investigation. They promptly turned him down.

  o Ultimately, Jason Cesares, UMES Campus Compliance Officer, identified resources to conduct the "independent" investigation.

- Unfortunately, Jason Cesares[4] has a blemish on his record that leads one to question his credibility with respect to reviewing harassment cases appropriately. While there have been no criminal charges or findings against him, the specter of whether he exercises appropriate discretion still looms (as confirmed by his choice to resign or be terminated by the University of Indiana Bloomington). He continues to demonstrate that lack of discretion.

  o He too, should have referred the alleged incident involving the President's husband to the USM Internal Audit Office.

  o Jason Cesares also took it upon himself to "audit" Jimmy Lunnermon – a long term member of the UMES community with a sterling reputation and track record – based on a disagreement from a conflicted staff member.

  o In the process Mr. Cesares identified a number of material control deficiencies in the University's financial processes. Rather than referring them to the USM Internal Audit Office for a comprehensive review, he leveraged them to target his intended victim, Mr. Lunnermon. Ultimately, Mr. Lunnermon was fired due to a pervasive fiscal failure that should actually be attributed to the CFO or the CEO.

---

[4] https://www.huffpost.com/entry/jason-casares-resigns-sexual-assault_n_56d081d1e4b03260bf769320

## Issue 4: Dr. Anderson Has Intentionally Withheld Material Information from the Chancellor, USM Internal Audit, and the Board of Regents

Chancellor Perman, don't be fooled. Even if Dr. Anderson has "briefed" you on the issues, the implications run much deeper than what she could have possibly described. The challenge you face, is that she does not have the experience to understand the structural failure that has occurred. Only the Internal Audit Office would have the necessary sophistication to properly frame the compliance and financial issues.

The President is in a Catch-22 situation. It is highly likely the Internal Audit Office will discover there are no true fiscal compliance issues (or that they are actually immaterial). What the auditors will actually find, is the President has fostered a culture of predators, vultures, and vigilantes that have terrorized the university community.

- The University System of Maryland Internal Audit Office should have directed the investigation regarding the allegations of her husband's indiscretion consistent with **USM Policy VIII-7.50 – *University System of Maryland Internal Audit Office Charter***
  (https://www.usmd.edu/regents/bylaws/SectionVIII/VIII-7.50.pdf). This would have ensured the investigation would be conducted professionally and would avoid real or perceived conflicts of interest.

  - o It simply is not appropriate for a university president to instruct members of the campus community, who may fear retaliation stemming from an adverse decision, to investigate the malfeasance of their spouse. This should have been reported to the USM Office of Internal Audit.

- Dr. Heidi Anderson, Dr. Robert Mock (UMES Chief of Staff), and Jason Cesares violated State Law and **USM Policy VIII-7.10 – *Policy on Reporting Suspected or Known Fiscal Irregularities***
  (https://www.usmd.edu/regents/bylaws/SectionVIII/VIII711.pdf).

  - o They allowed Jason Cesares to act as a vigilante to target a long-term employee. His "findings" point to the possibility of a material deficiency in fiscal control at UMES that has still gone unreported for almost 9 months.

  - o There is no evidence that the Director of Procurement, the CFO, or the UMES General Counsel were consulted or even aware of this rogue "investigation" as it was being conducted. Arguably, either none of the senior officials agree this was a material finding and are simply remaining silent to avoid retaliation, or all of them are willfully hiding a material finding from the Board of Regents and the Attorney General.

  - o Ironically, the grounds that were used to fire Mr. Lunnermon also appear in Jason Cesares' own university transactions as well as others within his department.

  - o Further, no evidence was provided that Mr. Lunnermon's transactions were illegitimate, unauthorized, or inappropriate.

- Dr. Heidi Anderson allowed Hans Cooper to slither into the darkness rather than to address his horrible acts.

  - o USM Internal Audit should have been called in to review his scholarship granting practices to ensure they were consistent with Federal, State, and Donor restrictions.

**Ex 2**

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

Whistleblower Complaint

**Rosalie I. Hornbuckle**
**5308 Sharps Point rd.**
**Salisbury Md, 21801**
**302- 290- 3839**

**Title: Director of Human Resources, Chief Human Resources Officer**
**Respondent Agency; University of Maryland Eastern Shore**

**Persons Against whom the Complaint is Made**

Dr. Heidi Anderson – President

Mr. Lester Primus – VP Admin and Finance

Dr. Robert Mock – Chief of Staff to President

Matthew Taylor – Legal Counsel for UMES

**Underlying Facts**

1) Pre-Employment –

    a)   Interviewed for the Associate VP Position HR, at the request of President Heidi Anderson–

    b)   Title switched to Interim Director of HR

    c)   Function and Responsibilities all aligned with VP HR-

    d)   @ final interview with President, Heidi Anderson, she explained that the position was going to be interim due to the climate on campus not trusting HR.

    e)   President Anderson stated the position would be a part of the President's Cabinet, immediately and that the position would be transitioned to VP on July 1, 2019.  She stated that the interim was meant for the title and not the job.

    f)   Dr Anderson, then asked what $ amount would get me there?  I stated that my salary was $160k and that I was in three searches, VP of HR Ithaca College, approximately 200; West Chester University, 175K and Frederick Community College $165k.

    g)   President Anderson stated that she couldn't afford 200K; and could pay 135k and move the salary to $165k on July 1, along with the title of Vice President of HR, reporting directly to her.  She indicated that all the other cabinet members had to accept less due to the University's fiscal situation.

2)  Employment Offer

    a)   I was hired by the University of Maryland Eastern Shore on February 18, 2019, As the Interim Director of Human Resources, reporting to Mr. Primus, as a member of the President's Cabinet

    b)   I am an African American Female, born on July 16, 1961 (age 58)

    c)   I did an excellent Job.  Amongst my accomplishments was, remedying unfair labor practices, streamlining the recruitment process, cleaning up the payroll/salary budgeting system, and investigation of fraud and theft of resources and money in the Henson Center, and identifying payroll waste of University funds in the payment to individuals who were placed in fictitious jobs; and identifying abuse

1

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

of restricted funds to pay employees with federal government grants (i.e. Tittle iv); amongst other abuse of power for which the President sent me an e-mail commending my work on March 17, 2019.

3) Reporting Relationship –

a) Sometime in January of 2019, after the President had encouraged me to "to bring my talents back to an HBCU", and I had accepted the position and( I had withdrawn from the search for VP of HR for Ithaca College; CHRO for Frederick Community College; And Associate VP of West Chester University all of which I had an excellent chance of getting) on a housing trip to the area, President Anderson invited my husband and I to dinner;

b) She informed me that the position (HR) always reported into Finance and that they hired a new VP of Administration and Finance, who would be starting on Feb 4, 2019, and that the position of Associate VP would be a Director Position and would continue to report to Finance on paper.

c) She informed me that she had alerted Mr. Primus to the fact that my position would be on Cabinet and that it would be unofficially reporting to her.  I expressed my displeasure with that, due to the lack of transparency;  the fact that I had already withdrawn from numerous searches based on our relationship/her word; and the fact that HR needed independence from the control of Finance due to the historical relationship of both departments and the impact on the rest of the campus.  She stated that she would discuss that with Dr. Mock her Chief of Staff.  I once again expressed my concern.

d) Sometime at the end of January I received an email from Mr. Primus requesting a conference call, prior to the start of my employ. I discussed the tone of the e-mail with the President (I found it to be very authoritative, considering I wasn't yet employed with the University).  I shared the email with President Anderson who agreed with me and stated that she would speak with Mr. Primus.  I asked if she had discussed my role and the transition (reporting to her).  She stated that she had. President Anderson said that she would call and speak with Mr. Primus, she apologized for his behavior and expressed that he was new to the scope of the role coming from a two (2) year community college.  I asked her to hold off until Mr. Primus and I had talked since at times it was difficult to establish tone in e-mail and I would let her know how the conversation went.

e) On or around January 29, 1019 I received a call from Mr. Primus, sometime after 3pm. He started the conversation by reprimanding me ("we had an appointment for 3pm and I don't like a lack of punctuality).  I greeted him and explained that my conference call with a client (Swarthmore College) ran late.  During the conversation he expressed his views of HR and dictated how our working relationship would work.  After, he spoke I highlighted for him my experience in Higher Ed, and gave him my philosophy on HR.  After highlighting my experience, he toned down and the conversation ended on a better note from which it started.

f) I sent a text message to President Anderson, stating that the conversation was good.  During a follow-up phone conversation with President Anderson, I described him as, chauvinistic, in-experienced and questioned if he was the right choice for the University considering the history of the finance area since he lacked management and interpersonal skills.

g) President Anderson said that the search committee loved him, and it was the only time that the committee was unanimous.  She stated that he only had two-year experience and that together we would be able to groom him.

h) Sometime after, February 18, 2019, I found out that much of the search committee did not want Mr. Primus; that the members of the Administration and Finance area were all aligned welcoming his candidacy and the remainder of the search committee felt that he was known to Finance. Many felt that

2

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

there was a better qualified candidate with better credentials and University experience who had been verbally attacked by members of the finance team on the search committee, and treated so badly that he raised the treatment to HR.

i)   On February 18, 2019, my first day of work I was summoned to Mr. Primus's office.  During that meeting he gave me a folder full of reclassifications that he had approved and told me to finish processing them. He reiterated his philosophy on HR – "HR was to have independence, and that meant of complaints.  HR was to keep out of financial matters, and we would get along".  I responded by letting Mr. Primus know that I appreciated his perspective and that I only knew how to do HR one way, based on my training and 30 years of experience.  And that I was sure we would get along because we all had a fiduciary responsibility to the organization.

j)   I met with the President that evening and discussed the conversation. President Anderson stated that she needed me to work with Mr. Primus while Dr. Mock worked with the new VP of Student Affairs, Mr. Hans Cooper.

k)   President Anderson also discussed with me the History and perception of the HR Department.  She made note to share a dated consultant's report on the department via email.  After reading the report it was clear that President Anderson had not read the report, because the report highlighted the deficiencies of the Finance Area, and the impact it had on HR fulfilling their obligations.  I found the consultants report to be relevant in terms of the strangle hold on HR by Finance.

l)   On Monday, February 25 I am in my office (a small room 8*8) meeting with my HR Manager, Mary Ames, when Mr. Primus barged in unannounced.

m)   Ms. Ames got up and had to brush around him, his posture was aggressive and belligerent.  My office was an 8*8 closet, with a broken phone and a computer that crashed every 20 minutes running windows 2007.  This was the former HR AVP's office.  I was sitting at my desk and Mr. Primus standing, towering over me while he slammed the door shut, literally on Mary Ames.  Patricia Mann, our HR office Assistant was at the front desk. Mr. Primus was upset over the following:

   a.   Me questioning his team; On explaining the policy to me, I asked the question because I was unfamiliar with that type of policy and wanted to make sure it was defendable.

   b.   My processing of reclassifications and processing of prior approved replacement positions; I explained that he had signed all the reclassifications and after reviewing the stack, I only processed the ones, that the Union MOU required us to process.  That the searches currently running were all approved prior to my starting.

Not processing or Denying other reclassifications primarily for Supervisory employees. I asked why the exempt supervisory employees making a higher salary should be processed if he was concerned about the budget?

   c.   He yelled, used language such as "what's wrong with you?  I know you are HR but let me explain to you what a budget is? He explained that we have to balance the budget by June 30th 2019. And that meant not processing re-classifications, and to stop hiring people.  I was not to process any searches or any further contracts. We could hire who ever we wanted after July 1, 2019; I asked what was special about July 1, 2019?  How would we be able to afford positions then?

   d.   The fact that I had begun work to review and audit payroll and was questioning the lack of budget codes and item numbers associated with payroll angered him.  I questioned why he would be so upset about this since we would be helping him in his budget process

3

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

n)  I held my composer although I was visibly upset and told Primus that I did not appreciate his approach. I stated that I was uncomfortable in the manner her was speaking to me.

o)  After Mr. Primus left my office. I asked my staff, many of whom had gathered in the outer office, concerned for my safety, to write down what they had heard and observed, privately in their own work area and not to discuss it with each other or anyone else.

p)  I went to seek out the President and found Dr. Mock (COS), I explained to him what had just happened, and he voiced very similar concerns to the ones Mr. Primus brought up and never once expressed concern over Mr. Primus's behavior.  Much of the language that Dr. Mock used was very similar to Mr. Primus's.  Internally I was alarmed, externally I tried not to make my emotions show.  I asked Dr. Mock, why am I here if it weren't to help clean up the situation, we all found ourselves in?  I stated that I withdrew from several searches in order to come here and support "Heidi", President Anderson, and in doing so my first obligation is to the organization, not to anyone person.

q)  Dr. Mock stated, "you proceed at your own peril".  I asked what that meant?  I got no reply.  I felt threatened and was shocked.

r)  I spoke to President Anderson later that evening and told her that I planned on meeting with Mr. Primus the next day try and square things up.  I asked her once again if Mr. Primus knew that I would not be reporting to him?  Because in my estimation he didn't act like it, and that I was physically afraid of him.  She stated that she had spoken to Mr. Primus and that he knew I was unofficially reporting to her.

s)  I described my conversation with Dr. Mock and questioned why a former President at Johnson and Wales would take a position as Chief of Staff?  She stated that he was unofficially her Executive Vice President.

t)  I further asked, why no one else on the Cabinet had not found or brought to her the issues that I was finding in my first few days.  A question that I would continue to ask throughout my short tenure.

u)  On or around February 25, 2019, I went to Mr. Primus's Office and spoke to him.  I told him that his conversation with me was very aggressive.  That I was uncomfortable around him regarding his behavior.  I provided examples of his e-mail before either of us had started at UMES, and continued to provide him with examples of demeaning phrases and tone of voice.  He stated that he acted that way because I was unprofessional.  I asked him to describe the behavior that I exhibited that he labeled unprofessional.  He stated, that I got mad when he was telling me what not to do and that I didn't follow his orders, so that's why he was yelling.  Mr. Primus stated, "If you're unprofessional or question me, your boss, then I'm goanna give it right back to you!".

v)  I asked Mr. Primus if the President had discussed with him my reporting order? He stated that your reporting order is on your contract.

w)  I was shocked by his belligerent behavior; his responses and I had no reply.

x)  On or around the evening of February 25 I spoke to President Anderson about my conversation with Mr. Primus. I described his belligerent behavior towards me; and that other females had outside of his office had reported similar behavior and interactions.  I described his lack of emotional intelligence; management acumen, lack of technological skills and concern for the lack of his finance and administration experience.

y)  President Anderson informed me that she was changing my reporting order immediately and that I would be named Vice President and she would make the announcement to campus.  She sent me an email later that evening saying that Mr. Primus, she, Dr. Mock and I would meet at 9am, the next morning.

4

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

z) On or around February 26 at 9am, Dr. Mock, Mr. Primus, President Anderson and I met. President Anderson verbally made the change in reporting order.

aa) I was shocked when during the meeting Dr. Mock stated that I was difficult to get along with and described me as not a team player.

bb) At the Cabinet meeting right afterwards, Dr. Mock would praise communication between The VP of Student Affairs and Mr. Primus by stopping the meeting and stating, "great teamwork guys", "that's commendable teamwork! Right there between Mr. Primus and Hans". He would then pointedly look at me and state "that's how you handle teamwork". I noticed that whenever I made comments or suggestions they were ignored. At one point, Mr. Hans Cooper repeated verbatim one of my suggestions, to which Dr. Mock then praised him and said, "let's go with that"!

cc) I felt humiliated, marginalized, demeaned and felt hostility directed towards me by a male dominated environment. I was shocked that President Anderson allowed that behavior to continue.

dd) It became apparent to everyone in the room that Dr. Mock was running the show. Often telling the President, "no we're not going to do that", "let's move on" when President Anderson mentioned that the Governor wanted us to hire former Senator Matthias.

    *a.* In subsequent cabinet meetings Mr. Primus began ridiculing me in public. I remember at a meeting during which President Anderson was asking for volunteers and Mr. Primus, volunteering for something and then stating, "We'll just have Ms. Hornbuckle handle the finances all by herself". To which he and Dr. Mock laughed. These comments came at a time when, I informed Mr. Primus that the budget which Ms. Michelle Martin and Ms. Beatrice Wright was responsible for, had not been updated with the system in 5 years. That in HR, I was having the payroll Manager (who reported to HR) work with the system to help update the budget by including budget codes and item numbers for each employee. That these efforts would only provide a current budget and that there was no way we could develop a balanced budget for the next Fiscal Year, because we would not meet the May deadline this late.

ee) At the Cabinet meeting the President made the announcement regarding my change in reporting order, at which time I commented "since HR no longer reported to Finance and now reported directly to the President, that I would be working with Mr. Primus to ensure that all Administrative HR and Payroll processes and approvals would be moved from Finance. Thus, ensuring that we begin to streamline processes, move more quickly on recruitment requests etc." I further stated that HR would continue to help Mr. Primus by cleaning up the payroll/salary budget him the budgetary codes and item numbers for each employee on payroll and providing it to the System. Mr. Primus and the President thanked me. The President then asked Mr. Primus to include me on the agenda for his next direct reports meeting to make the announcement to the Finance team. He agreed but failed to invite me to the meeting.

ff) Dr. Mock was concerned that we would be giving the system too much information and didn't think that was a good idea.

gg) After the cabinet meeting I meet with President Anderson and asked her about the announce informing campus of my reporting order and new title, and the raise?

hh) She stated that Dr. Mock didn't think we should make the announcement public or that it was a good time to change my status. I also asked why Dr. Mock had concerns, to which she indicated that it would water down his authority as Executive Vice President.

ii) President Anderson went on to tell me that the prior President, who she said she was friends with, had an Executive Vice President in the prior administration, a Ms. Kimberly Dumpson, and the Chancellor did

5

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

not want another EVP, because of what had happened.  So, Dr. Mock's role would have to be under the table.

4) Compensation Equity

a) **Hiring Senator Mathias** – President Anderson spoke to me in late February, she indicated that she was under pressure from the Regents, Chancellor and the Governor to provide Senator Mathias a position with the University.

b) She indicated that cabinet members (Dr. Robert Mock, Mr. Matt Taylor and Mr. Mr. Primus) did not want to do this.  She stated that in discussion with Dr. Mock, she was told to offer Senator Matthias a salary of $40,000 so that the salary would discourage him from accepting the offer.

c) She stated that in discussion with Dr. Mock and Mr. Primus, she had made the Senator an offer of $32k, because Dr. Mock wanted him to go away.  That Dr. Mock indicated that they didn't need a former Senator around meddling in the University's affairs.

d) I advised President Anderson that there was an approved open position that the University had not filled in several years, that it was still posted along with numerous other unfilled positions (That Ms. Martin buried positions, upgrades and searches that she did not want processed, often blaming the former Assoc VP of HR, Ms. Marie Billie for the lack of follow through) and that treating Senator Matthias in such a way could be a liability to the University as it related to reverse race discrimination and on compensation equity grounds.    President Anderson replied that she would only have $40k left after paying the new Provost.

e) I proposed that we hire senator Matthias, bring him in at the bottom of the scale with a base salary of $61,000 and 10% bonus when he hit measurable targets identified by her and the VP of Advancement.  I told her that Senator Mathias could be worth his weight in gold.  I processed the paperwork got her signoff and sent the form onto Mr. Primus.  Mr. Primus contacted my manager and stated that the position was only budgeted for part-time. I spoke with the President who advised me to post the position and get the Senator on-board.

f) Mr. Primus and Robert Mock each came to see me individually to let me know that I was overstepping my bounds.  During a conversation with Dr. Mock he asked me "why do you think you're here"? Shocked, I didn't respond.  I felt threatened, by his tone and physical presence.

g) At the last cabinet meeting I attended it was announced that Senator Mathias had closed a deal of $1,000,000 donation to UMES; and had $1,500,000 pending.  President Anderson commended me on my judgment to encourage his hire.

h) **Hiring Nancy Niemi, Provost -** The President asked me to handle the hiring and the offer to Dr. Niemi, the finalist for Provost from Yale.

i) President Anderson indicated that I was to process a salary of $175,000.  I questioned the dollar amount because that was the same salary that she indicated that I would make beginning July 1, 2019.  I stated that as Provost she should be the second highest paid in the organization.  I asked her to remember that we had Gender Equity to be aware of and that historically women didn't negotiate.

j) President Anderson "I did and so did Mr. Primus, VP Administration and Finance, and Hans Copper, VP Student Affairs.  Mr. Primus got $200k and Hans Cooper got $190k, and free University housing".

k) Mr. Primus is an African American Male

l) Mr. Cooper is an African American Male under 40

6

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

m) I was shocked, (based, on our discussions regarding my salary) and stated that the Provost needed to be paid in the low 200K, President Anderson said that Dr. Mock suggested $185k to keep the salary low.

n) I asked how could we pay the Provost below the VP of Finance? President Anderson stated because she doesn't know budgets. I replied that neither did the VP of Finance. I reminded her that I was cleaning up the budget and that Mr. Primus was completely lost. And conversely Mr. Primus didn't know how to be Provost

o) The President agreed to provide Dr. Niemi 3% more than the VP of Administration and Finance for a total compensation of $206,000.

p) Dr. Mock and Mr. Primus both expressed their fury towards me; and Mr. Primus went so far as to send the President an e-mail to the President requesting that the three of us meet to discuss salary offers and the impact to the budget.

q) During a meeting with President Anderson she asked me if there were any positions that we could evaluate for savings?

r) I informed the President that due to the decrease in student enrollment the organization was top heavy. I asked her about Ms. Alissa Carr's role in the organization.

s) Ms. Carr had recently been promoted to AVP/Director of Marketing, placed on Cabinet with no demonstrable work assigned or being completed. And the faculty on campus were disgruntled with the lack of service and responsiveness from the office.

t) President Anderson stated that she liked Ms. Carr and had promoted her with an increase in pay and placed her on the cabinet so she could break up the testosterone. And that Ms. Carr was responsible for reviewing her speeches, because there was no budget for marketing and branding.

u) Ms. Carr is a white female.


 5) Employee, Labor & Faculty Relations Issues and Policy Infractions – On my first day at work and after it became known that I reported directly to the President and not to Finance my schedule became overwhelming, with employees, Faculty and Union Representatives requesting to meet with me.

a) **Labor Relations Quiana Tillman** – The union brought me 5 out of 10 cases on my first day of employment.

b) Ms. Tillman, a Resident Hall Advisor in student affairs, while on Maternity Leave and under FMLA protection she was provided a letter of termination, written by her manager, Ms. Shannon Warren, which was delivered to her in a pizza parlor.

c) Sometime later, after bringing this to the attention of the Union Steward, Joe Hartman, the letter was rescinded, and a grievance ensued. The Grievance was heard by Matt Taylor, legal Counsel, and Mr. Jason Casares, Equity, Title IX and Compliance officer.

d) The grievance was denied, and a termination letter was then prepared by Mr. Taylor, providing 6 months' notice, with pay.

e) Ms. Tillman and her newborn were confined to her University housing. A review of the documentation stated that she was terminated based on her "At-Will" status (Union Employee) due to her Performance.

f) A review of her Human Resources file revealed good performance reviews, and no prior disciplines in her file.

g) I spoke to Manager Ms. Shannon Warren, she informed me that she hadn't provided any performance feedback and further conversations indicated that there were personal feelings surrounding the

7

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

termination.  Ms. Warren also stated that she had spoken to Dr. Mock about all of this, and he, Dr. Mock, had approved. She also stated that she had already decided to promote someone else into Ms. Tillman's role.

h)  I spoke with Mr. Matt Taylor, Mr. Jason Casares, Mr. Robert Mock, and Mr. Hans Cooper (VP of Student Affairs) asking what the grounds for the termination were?  They could provide no substantial reasons that violated policy, procedures, or performance.  During my meeting it was relayed that she was well respected by and responsive to students.

i)  I contacted the President and informed her of the liability to the organization; the strength of the union's case for appeal and my shock that Mr. Matt Taylor, as legal counsel would write a letter to terminate that was devoid facts.  The President thanked me for "keeping us safe". Later I found out the following:

   a.  Quiana Tillman had testified before the Regents on the loss of her job which resulted in a change to the AT Will employment policy.  I was commended for my actions at an HR system's meeting, on April 4, 2019, for doing the right thing, returning Ms. Tillman to work;

   b.  Ms. Tillman had met with the President and informed her of her situation.  According to Ms. Tillman, the President hugged her and promised her support to ensure that she kept her job.

   c.  That the President (who had stated to me that she had no knowledge of the issue) had full knowledge that Dr. Mock and Mr. Taylor were going to fire Ms. Tillman;

   d.  The President right before my termination stated that I kept overstepping my bounds and that people were upset with me for reversing Ms. Tillman's situation.  That I had overturned a decision that others had weighed heavily and took weeks to make decisions on, for reasons not known to me. And that Dr. Mock was not pleased.

   e.  That Dr. Mock had moved an employee into a defunct department in order to save her position; and took advantage of the Tillman situation to have her terminated in order to save the other young lady he was hiding, so that it would be budget neutral.

   f.  The person, an admin employee was assigned to a department without a supervisor, no other employees and no work assignment.  This individual was paid for months until Mr. Cooper discovered her after I asked the Cabinet to do a physical census of their departments and update their organization chart.

   g.  In the Cabinet meeting on or around March 27, 2019, Mr. Hans Cooper praised the work that Ms. Tillman was doing on the Spring Fling for students and discussed how much the Students loved and appreciated her. He also commended Ms. Tillman for her attention to detail, initiative and work ethics.

J). Mr. Tree Mills was an employee, in the finance area, pulled over by the Princess Anne police who had a large amount of Marijuana packaged for sale and eatables, with a UMES student in the car.  I first heard about the situation from President Anderson, regarding the large number of employees placed on paid Administrative leave pending investigations, back in early December 2018.

a)  Again, this was a case handled by Mr. Matt Taylor and Mr. Jason Casares.  In this situation Mr. Primus, interjected himself by working with Ms. Mary Ames, HR Manager, to resolve the situation.  He interviewed the employee to hear his side of the story and recommended to Ms. Ames that we provide the employee with severance, rather than just terminate him.

b)  I spoke to Mr. Taylor and asked why the paid leave vs. termination?  He stated that the University had no way of knowing if the employee had sold drugs to students.

8

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

c) I spoke to Mr. Primus and asked why he wanted to provide a severance for this employee? He repeated the same thing as Mr. Matt Taylor, that we had no way of knowing if Mr. Mills was selling drugs to students.

d) I discovered that Mr. Mills was the nephew of the Budget Director, Ms. Beatrice Wright. Over time I came to realize a pattern of behavior by Mr. Taylor to find ways of circumventing University Policy, creating confusion with the President for people in the university community who were favored; and falsifying documentation for those who were not in favor or those perceived to be a threat. Ms. Wright, Budget Director, had failed to complete the budget for the last five (5) years and was provided a 50k increase and promoted to Budget Director from an executive administration position. And lacked the competencies for the position.

e) A review of the police report and the Drug policy showed that Mr. Mills who had confessed to the possession of illegal substance had violated policy and could be terminated.

f) I met with Mr. Hartman, Union steward and Mr. Mills and terminated him for violation of the University's drug policy, and possession of an illegal substance, that he had pled guilty to.

g) Mr. Taylor, Mr. Casares, Mr. Primus, Ms. Martin and Mr. Mock all expressed disapproval to the President over this. In a meeting with the President, she informed me, "that while they were all upset with me. I had done the right thing and that she wanted to know If I had reviewed the Dr. Whitehead situation and the situation with Ms. Martin, both of whom has been insubordinate to me and that she wanted terminated". During this meeting she also complained about Ms. Wright and felt that she should be terminated as well.

K) Mr. Belton – was the head of the Physical Plant and was placed on Paid Leave at some point in the latter half of 2018. He was out on leave for approximately 6 months. The investigation was conducted by Mr. Jason Casares (Title IX, compliance officer) with oversight by Mr. Matt Taylor. Many of the allegations included fraud, quid pro quo sexual harassment, physical confrontations, and aggressive bullying. From the debrief provided to me by Mr. Jason Casares, the investigation at its embryo stage provided concrete evidence of violation of system policy, state and federal violations, and allegations of theft of university property. All initially, providing strong grounds for termination for cause.

a) I was shocked to hear from Mr. Casares that there was no write up of investigative notes and I questioned why it took so long to remove him from the university? Mr. Casares speculated that Mr. Bolton was a close friend of Ms. Michelle Martin, who had been the Interim VP of Administration and Finance and under her protection.

b) After questioning the President and Mr. Matt Taylor why we were paying so many people out on Paid Leave to do nothing when we were having budgetary crisis. I was told, by the President, to speak with Mr. Casares and get a handle on it. I was told by Mr. Taylor that they were protected from termination by the Termination Policy.

c) Prior to discussing with Mr. Casares, I became aware that Mr. Matt Taylor and Mr. Primus were planning on terminating Mr. Belton, without HR involvement, a violation of the system policy. I spoke to the President and she agreed that the termination should be handled by HR. I laid out a plan to contact Mr. Belton and terminate him via certified letter. I decided on Certified Letter and not to have him come to campus because of a violent physical incident that Mr. Belton had engaged in while he was Director of Physical Plant.

d) I was shocked when Mr. Taylor, and Mr. Primus became concerned about the potential of me meeting with Mr. Belton.

9

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

    e) What I discovered was that Mr. Belton had given instructions to the Lock Smith, to make a duplicate Key to the former Title IX Director's office and to provide the Key to Mr. Matt Taylor and Mr. Jason Casares. The lock smith who is the son of the Union President, reported the order to his father who told him not to do it. Weeks after the order was given, the former Title IX office was broken into.

    f) Mr. Jason Casares and Mr. Matt Taylor alerted the President of the lack of effectiveness and other issues with the former Title IX officer, the result was that Mr. Jason Casares took over the duties when the former Title IX officer, utilizing paperwork from the Office after the break-in.

    g) I strongly believe the reason to originally exclude Me, HR from the process to terminate Mr. Belton was to ensure that Mr. Belton did not have any opportunity to bring up any compromising information against Mr. Jason Casares, or Mr. Matt Taylor.

L) Leigh Anne Vreeland – Administrative Assistant in the department of Human Ecology, Prior employment if Sociology. Came to my office to report concerns about Mr. Jason Casares and stated that she, "felt retaliated against for bringing forth a complaint against her former boss Dr. Boyd".

    a) In 2018 Ms. Vreeland went to Mr. Jason Casares and complained that her Department Chair (Dr. Boyd) had removed her from her office after she presented him (Dr. Boyd) with pictures of used condoms found in her office. Her concern was that someone had access to her office which held student information and a potential violation of FERPA.

    b) Ms. Vreeland had e-mails from Dr. Boyd instructing her to academically advise students in the program, (Department of Sociology), a violation of Accreditation standards and FERPA;

    c) Ms. Vreeland had been employed in the department for over 10 years and enjoyed the respect of the faculty and the students in the program and according to her was successful at advising what she deemed as "her students". Her Student Advisees were successful and had a higher than average graduation rate, going on to graduate school and in several cases graduating earlier than anticipated.

    d) Ms. Vreeland's goal in contacting Mr. Jason Casares was to get back her office after being placed at the front receptionist desk, in order to continue counseling student's academically in private, pursuant to Dr. Boyd's directive.

    e) During the meeting, Ms. Vreeland informed Mr. Casares that she had ADD and that regardless of advising students she needed the Office as an accommodation which provided her the ability to focus without the major distractions at the front desk.

    f) At some point in October (possibly October 9, 2018) Ms. Vreeland was given notice that she was being switched with the Admin in Human Ecology Ms. Theresa Shockley (who had worked in the Human Ecology dept for over 20 yrs) in order to help her ADD.

    g) Directly after the switch of the two Admins, which caused disruptions to both departments, students and faculty; and resulted in Ms. Shockley suffering a stress related attack that landed her in the hospital.

    h) Mr. Jason Casares was then given two (2) adjunct faculty assignments by Dr. Boyd, one class Mondays in the evening, and the other MWF during the workday, in violation of system and university policy. Dr. Boyd left the University one week later to attend to personal family issues.

    i) Mr. Caasares, adjunct faculty assignment did not go through the appropriate approval process for payment and conflicted with primary job.

M) Dr. Prince Attoh, Director of the ORLD program – At some point in December 2018 Dr. Attoh was removed from campus, placed on Paid Administrative Leave based on a complaint of sexual harassment.

10

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

a)  I took the opportunity to speak with Mr. Jason Casares, after the President asked me to check into the large number of cases of the University employees out on paid leave, when he stopped by my office regarding a write up of a union grievance handled by he an Matt Taylor for failure to pay a union member for work performed for a year.

b)  Mr. Casares stated that he had placed Dr. Attoh on paid leave 6 months ago.  That he had interviewed over 50 students and had about 15 more students to interview over the course of the next few weeks.

c)  He stated that he had no written complaints and did not take notes on the matter

d)  When asked what the allegations against Dr. Attoh were, he said it varied, he became very defensive and evasive.  I asked if it was quid pro Quo, he said no and stated it was creating a hostile environment.  Giving harder grades to white females on tests.

e)  I asked Jason if he had met with or interviewed Dr. Attoh about the investigation.  He said that he had not.  I asked when the last time was anyone had communication with Dr. Attoh, Mr. Casares stated its been over six months.

f)  I asked if he had applied the course rubric to the test grades in question? Mr. Casares replied that he doubted if the course had a Rubric.

g)  I replied we must have a Rubric if the program was accredited.  And if we don't have one, did we consider getting one of the other two professors in the program re-grade the test and see how it differs.

h)  Jason then informed me that I report to the President and not to you.

i)  I stated that it would probably be beneficial to him if he reported directly to Student Affairs, since you are now assuming the duties of the Student Disabilities Officer in addition to your other duties; or report to the Provost Office, because the President doesn't have the time to provide the oversight needed.

j)  It's my belief that no investigation had taken place in over 6 months.

**N) Quid Pro Quo sexual Harassment Claims –**

a)  According to the President, Mr. Robert Mock, Mr. Jason Casares and Mr. Matt Taylor had received complaints regarding an Assistant Manager, Mr. Kenny Evans in physical plant.  According to reports Mr. Evans who oversaw housekeeping would hire young female housekeepers into a Contingent 1 category, in order to move to a more permanent status of Contingent 2, they would be approached by Mr. Evans to have sexual intercourse with him. If they refused, they were threatened with the loss of their jobs and terminated.

b)  None of the above cabinet members and Mr. Casares saw the urgency in investigating these allegations.  Mr. Casares stated that Mr. Evan's could not be investigate, because "the ones who complained have all been fired and are no longer here"; And that Mr. Kenny Evans was under the protection of Ms. Michelle Martin.

c)  Mr. Casares stated that he believed that Mr. Evans was the father of Ms. Martin's child.  He shared that all employment matters related to Mr. Evans was protected by Ms. Martin and that his employment file was maintained by Ms. Martin in Finance.  Mr. Casares stated that I was causing problems because all HR issues were typically handled by Finance.  He stated that certain people in the University were hands off.

d)  To prove his point Mr. Casares then provided me with a disciplinary action that had been removed from Ms. Martin's file, it was a confidential last chance agreement by the former title IX officer Mr. Rudasill that had been buried in Ms. Martin's office; and

11

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

e) a series of confidential e-mails between Ms. Marie Billie (former Assoc. VP of HR) and Ms. Martin.  In the e-mails Ms. Martin forbade Ms. Billie to attend grievance meetings in support of an employee had filed complaints against Mr. Evans.

f)  I asked how Mr. Casares had obtained the emails and the report.  He stated that Mr. Matt Taylor provided him access to all Ms. Billie's (former AVP of HR) e-mails and that of the former Title IX officers file.

g) At some point at the end of April Mr. Evans was rewarded with a substantial increase in pay and was appointed second in charge of the physical plant, while he continued to oversee housekeeping.

h) To defray liability to the university, I worked with the acting director of physical plant and set up an interdisciplinary team to hire housekeepers and process promotions of contingent 1 and 2s with HR oversight working with the Union.

i) Sometime towards the end of February, I asked for the email files of the former HR AVP and was denied access due to the confidential nature, by Mr. Taylor and the President.

j) I was shocked that Mr. Casares had access to all HR files.

M) Jason Casares File Review – after my conversation with Mr. Casares, I reported my findings to the President and Mr. Matt Taylor and expressed my concerns.  I suggested that Mr. Casares needed closer supervision in order to limit liabilities to the organization.  I suggested that Mr. Casares reporting order change to either Student Affairs, the Provost Office or as a last resort hire a director over Mr. Casares to provide more direction, development and supervision of his work.

a) The lack of concern from both President Anderson and Mr. Taylor bothered me, and I pulled Mr. Casares employment file and reviewed his application, resume and credentials background check. findings were:

b) Falsified application, claimed a PHD (ABD) in Philosophy – He had a Master of Science in Student Affairs;

c) Falsified his resume, - claimed that he was the Director of Multi-cultural affairs at Ball State University – He was a student worker doing filing and copying and after graduation was a coach mgr. for less than a year.

d) Googling his name revealed allegations of Sexual Misconduct.  In discussion with the HR team, Ms. Mary Ames (HR Manager) and Ms. Gertrude Hairston (payroll mgr.) I was informed that his hiring created an outcry from parents and alumni that was ignored by Mr. Matt Taylor who hired him.  That HR's role in the hiring process was relegated to processing the paperwork.

e) According to Ms. Mary Ames, HR Manager, Mr. Matt Taylor's response to this lack of due diligence was to add a question to reference checks going forward "Do you know of any embarrassing personal information why we shouldn't hire this person?" Ms. Ames stated that she didn't use the question because she felt that it could be construed wrongly and could potentially be illegal.

f) Sometime at the end of March I discussed; my findings with the President regarding Mr. Casares, my conversation with Mr. Mock after the cabinet meeting on March 27th, my concerns about Mr. Taylor refusal to hold Ms. Martin accountable; Mr. Primus's lack of ability in managing the finance area and the fact that I believed that she was not being provided truthful and full detail by these individuals and that Mr. Casares was Utilizing his position for personal gain.

g) Her response shocked me.  She became angry and stated that:

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

    a.   Dr. Mock was not happy with my "continual interference in business that did not concern me"; she said that she was inclined to agree with Dr. Mock that I was "just an angry black woman".

    b.   That Mr. Mock, Mr. Taylor and Mr. Primus were upset because I had fired Ms. Lafabian Marshall (executive director of Henson Center) for theft and there was no one to handle summer camps.

    c.   That Mr. Primus had the right to be upset "because of your investigations Ms. Michelle Martin was on leave and she was the only one who knew how to "handle the books"

    d.   That there would not be any restructure of the organization

    e.   That Mr. Casares had his own way of doing investigations that were unique and that he had kept her abreast of all investigations; and she was familiar with investigations taking longer than 6 months.

    f.   That Mr. Casares reported to her and would continue to report to her and that she had regular updates from Mr. Casares and she had approved all his work.

    h.   In closing Dr. Anderson asked for the falsified documents from Mr. Casares (employment application, employment check from prior employees that I had completed) which was provided to her.

    i.   As I was leaving, she asked whether I thought Ms. Beatrice Wright (Director of Budgets), could be terminated.  Surprised at this after our conversation, I stated that Mr. Primus felt he could train her (Ms. Wright).

5) Budgetary and Fiscal Mismanagement

    a.   Most of the employees under Student Affairs are being paid by Title IV funding – including the Registrar's Office, highly unusual and probably a violation of Federal statutes.

b)   UMES is a NCAA Division I school.  Women Basketball, Bowling, & Golf teams are nationally ranked.  They also have a Division I Men's basketball team

c)   NCAA provides funding to support academic scholarship, tutoring and academic support.  In 2017/18 FY the University received in excess of $200,000 From NCAA for restricted use.  Most of the funding is unaccounted for.

d)   The Athletic fees paid by students to support free admissions to the games etc. are not allocated to athletics

e)   At some point in March of 2019, Assoc. VP Admin & Finance, Michelle Martin and Current VP Mr. Primus instituted a policy on campus restricting any other form of tender other than Hawk Card or Cash. The policy change was not communicated to anyone on campus and was implemented without notice, having an adverse impact on the student population.

f)   Karen Harmon, an Auxiliary Internal Audit Accountant, was approached by the Manager campus bookstore for the remainder of the balance that could not be processed on Student's Hawk Cards, since the university refused to allow purchases on credit cards or debit cards.

    a.   Book purchase of $380;

    b.   Student tries to use a form of tender other than Cash (0.00) or Hawk Card (balance $190.);

    c.   Bookstore runs total sale for $190 on Hawk Card;

    d.   Bookstore is told by Ms. Martin & Mr. Primus that balance of $190 will be placed on Students Account with the Bursar's office and the payment transferred to the bookstore from the students account with the Bursar.

13

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

g) Ms. Karen Harmon advises the Bookstore that she cannot place balances on student accounts when they have already run purchases as a total sale on the Hawk card.

h) Ms. Harmon refused to process the balance onto students accounts without substantiation that the balance was owed. Ms. Martin then contacts Ms. Harmon and threatens to fire her if she does not comply. Ms. Martin tells Ms. Harmon "to get with Mr. Billie, University Bursar, and add the remainder of the lost sale to each student's account and to pay the Book Store and reminds Ms. Harmon that they both work for her"

i) Mr. Norman Billie, Bursar, refused to put charges on Students' Accounts citing the illegality of the process, and after some badgering from Ms. Martin, Mr. Billie conveys Ms. Martin that he will only comply if Ms. Martin or Mr. Primus documents the specific request in writing.

j) In a meeting with Mr. Primus he advised me that it was normal accounting procedures to charge balances to student accounts without their knowledge

k) Henson Center is a revenue generating INN, with non-revenue generating office, classroom and ballroom lab space and kitchen for the degreed hospitality program. The Inn was run by a General Manager Lafabian Marshall, close friend to the Associate VP of Administration and Finance, Michelle Martin.

6) Financial Misconduct; Subjecting Students and UMES Community to potential Harm; and Abuse of Authority
A) At some point in March of 2019, Ms. Harmon made me aware that Ms. Marshall (GM Henson) was holding events on campus and not logging the events into the system. And that Ms. Martin had instructed the Registrar to provide Ms. Marshall with access to book the non-revenue generating classroom and lab space in the Henson Center. The registrar Ms. Duffy complies with the request despite a State Audit's report finding. This violation of policy and procedure resulted in:

    a. Several false bookings, parties that were held in the Henson Center that the University was not aware of and therefore not able to track monetary transactions.

    b. In October of 2018 an event was held for a Biker Gang and listed as an employee appreciation event in a non-revenue generating room in the Henson Center. Ms. Marshall notified Security that they would not be needed for the event.

    c. Petty Cash was used to purchase the alcohol for the event at a local liquor store. Only Ms. Marshall and her assistant would run the bar for these types of events and the Assistant General Manager sent home, from his regular over night shift. No bar receipts were ever turned in.

    d. The Biker event in October of 2018, turned into a brawl sometime in the early hours of the morning. Princess Anne Police notified the campus police that they had received a call from campus that there was a fight on campus.

    e. Both Campus police and Princess Anne police responded and broke up a brawl that involved the bikers with mace and batons. The Biker gang left campus and continued the fight at their headquarters in Virginia, where the fight resulted in one of the bikers being shot and killed by another biker, investigated by State police.

B) In October of 2018 a second event was scheduled in a non-revenue generating space in the Henson Center as an anniversary celebration. Either the State Police or the FBI, who had started surveillance into gang activities in the area, intercepted a series of flyers produced by the biker gang of a party that was to be held

14

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

at the Henson Center. The Authorities contacted the Interim head of Campus Police and notified him. The Interim head of campus police cancels the event citing false bookings with Ms. Marshall and her direct supervisor Ms. Martin.

C) Ms. Karen Harmon (accountant), began to detail a series of cash handling accounting procedural violations with which Ms. Martin was excusing Ms. Marshall on.

    a. continued failure to put revenue event transactions into the hotel booking system;

    b. Utilizing the facilities and other University resources for personal monetary gain, Several Superbowl parties with cash bars, where members of the campus community attended, including Ms. Martin, Mr. Evans, Mr. Boyle. For one party a review of Ms. Martin's work cell phone showed text messages to Ms. Marshall's cell phone requesting her (Ms. Martin's) preferred choice of wines, that she wanted Ms. Marshall to purchase at the local liquor store.

    c. Theft of University resources targeted for student's educational program; Each year in the spring the University Hospitality program host a series of luncheons that the program markets to the immediate community with ticket sales. The event is very popular within the Salisbury and Princess Anne Communities. The event provides the students in the program with hands on experience of planning menus and exemplary customer service experience. The ticket sales are used to defray the cost of the event, outlaid by the department. Ticket sales are collected by the Auxiliary and never returned to the program. Chef Wallingford, lecturer in the Program stated that he has asked Ms. Martin for the proceeds to be credited back to the program a request that has been denied.

    d. Housekeepers assigned to the Henson Center, have reported that during the "under the table events", that they are sent home by Mr. Kenny Evans and docked hours because they don't want housekeeping around.

    e. One of the main purposes of the Henson was to provide training for the students in the Hospitality program. Prior to Ms. Martin and Ms. Marshall taking over the running of the Henson center, many of the students who worked in the Henson Center were students from the program. In fact, the Assistant General manager, Kevin O'Dell was a graduate of the program. By February of 2018 no students of the Hospitality program worked for the center. Because of the way Ms. Marshall treated people.

        a. Mr. O'Dell had met with Mr. Mathew Taylor, after he had resigned his position as Assistant GM, due to the stress that it was causing in his personal life. He detailed for Mr. Taylor the issues including accounting procedures, lack of proper cash handling and the verbal abuse that students were subjected to. Mr. O'Dell came to speak with me in mid to late March and provided for me an example of the treatment and verbal abuse students experienced. There was an e-mail sent to Ms. Martin from an Alum who had witnessed a verbal attack on a student by Ms. Marshall while staying in the Henson.

        b. Ms. Martin had never responded to the email and the student quit the work study job in Henson.

    f. I notified the President of the issues in the Henson Center along with the issues regarding the student accounts and other concerns brought to me by Ms. Harmon. The President asked me if Ms. Harmon was the same individual who had spoken to Dr. Mock? I indicated that she was, surprised to be aware that the President knew that this had all been brought to Dr. Mock's attention and he had done nothing. I told the President that the accounting

15

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

irregularities were such that we should bring in the State to do an Audit of Auxillary.  After speaking with Dr. Mock and Mr. Taylor the President advised me that she had been convinced to bring in the System Auditors because the State had done an Audit several years ago and found so many findings that she felt it was better for the system.

g.  The President was leaving to attend a trip in Argentina and stated that Mr. Taylor would handle the Audit.  Mr. Taylor then informed me that only the President could recommend an audit.

h.  Ms. Marshall was terminated.  When I recommended Ms. Martin's termination Mr. Taylor intervened and persuaded the President to place her on paid leave.  It is my understanding that Ms. Martin has been returned to work.

7) Failure to fill critical vacancies – The campus for the most part is being run by interim appointees and in many cases have unfilled crucial vacancies, in order to have an appearance of a balanced operating budget.

a.  The Director of IT is retired from Salisbury University and collecting his pension from the system. in order to get around the System rules regarding hiring retirees, he has been given a contract by Ms. Michelle Martin.

b.  The head of Security is an interim position, he was refused the permanent position because Ms. Martin did not want to "hire a white man for a job at a black university"

c.  The Director of Auxiliary had been posted for 3 years and not filled, because Ms. Martin assumed the position of Director of Auxiliary; Ms. Martin was also the Direct Supervisor of the Bursar, Internal audit functions; and indirectly Grant Accounting.  In any other institution this would pose a concern with checks and balances.

d.  Facilities Director position was vacant, and the University was refusing to fill it.  There was no one qualified or who had the competencies to do the position.

a.  In April of 2019, the university was going through the process of building a Pharmacy building (despite the lack of enrollment in Pharmacy programs throughout the country and the lack of enrollment at UMES overall) in an effort to get the plans approved for the building they were using the Electrical Supervisor as an Electrical Engineer to design the electrical system of the new building; and the HVAC Supervisor functioning as  an Engineer.  Both of whom were spending all their time in Facilities and no coverage for Physical Plant.

e.  Physical Plant – Has an Interim Assistant Director, a female (whose salary was less than other male counterparts with less responsibilities and education).

f.  The Fleet Coordinator position, was not replaced and the Interim AD was required by Mr. Primus to assume the duties, manning a desk in the back of the plant for 8 hours a day, unable to function as the Interim Director of Physical plant.

g.  Many Housekeepers, Maintenance Personnel, Grounds Keepers were laid off without the System's knowledge and not replaced.

h.  Overtime in physical plant, grounds and housekeeping are high as a result of staffing shortage; employees are often not paid overtime because the supervisors who report directly into Finance are afraid, to process the hours because OT is not allowed, a violation of DOL, FLSA.

i.  Faculty Promotional increases (Assistant to Associate etc.) have not been paid since 2009 (possibly since 2005)

16

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

    j.  Adjunct Faculty and Coaches go for numerous months without payment for work done.  Their contracts are held up for months in Finance with the VP and Associate VP of Administration and Finance, in order to balance the budget.

    k.  The "Friends of", Assoc. VP of Admin and Finance are routinely rewarded with salaries outside the scope of their responsibilities, with Mr. Matt Taylor finding a way to make it happen.  For example:

        a.  Dr. Whitehead, former Assistant Provost, $138,000;

        b.  Promoted to Interim Provost, $180,000;

        c.  Removed as Interim Provost, for cause, had a position created for her as an administrative coordinator in the International Program, @ $138,000.  Top of the scale for Admin Coordinator is $61,000; after Mr. Taylor convinced the President that she was subject to notice under the termination policy;

        d.  The President, Heidi Anderson, with advice of Matt Taylor, legal counsel, secretly provides free housing to VP of Student Affairs (Hans Cooper), in violation of State audit recommendations. There is no documentation in his offer letter of the arrangement and the value of his housing is not being taxed.

            i.  On April 3, 2019 I sent an e-mail to the President informing her that the VP of Student Affairs, Mr. Hans Cooper was caught twice breaking into the Provost Office late in the evening (around 7pm) by the Associate Provost Dr. Wade.

**l.**  **Gross Budgetary Mismanagement**

    m.  As discussed earlier, Ms. Michelle Martin and Ms. Beatrice Wright budget officer are responsible for maintaining the budget system with the system office.  A review of the system (conversations with Monica West) found that the University budgets had not been updated in 5 years.

    n.  I strongly suspect, that this is intentional.  It makes it easier to hide from the system the cash flow management; accurate headcounts; misappropriation of funds involving Title 4, NCAA restricted funds (restricted funds such as NCAA dollars were being swept into general funds to help balance the budget, thus creating supposed shortfalls in the Athletic programs)and gross mismanagement occurring at the University.

    o.  As I began the update to the payroll system, having my then Payroll Manager work with Ms. Monica West at the system office, to assign budget codes and item numbers to each employee; and building a position control management database,  I was continually told that I was overstepping my bounds.

    p.  Suspicious, Fleet – The majority of the university fleet is leased, what is remarkable is that much of the fleet is aged. I brought this to the attention of President Anderson in early March 2019, who stated that she would have Dr. Mock look into it.

  **8) OSHA Violations & Safety Concerns**

    a.  There was an OSHA recordable incident that occurred approximately one or two weeks prior to April 5, 2019.  In short when transferring oil from boiler 1 to boiler 2 over 100k gallons of oil was contaminated with water.  In addition to the waste of resources, the President, Mr. Taylor, Mr. primus and Dr. Mock were not concerned.  I continued to express my concern, as I pointed out the lack of Mr. Primus's competency and the fact that he was way over his head and the lack of safety for our employees.  During my meeting on March 27, with Dr. Mock as I tried to explain the potential risk/liability, he waved me off and said "yeah you keep saying that".

17

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

b.  Since no one was concerned, I reported to the physical plant to investigate the incident the following morning at 8am, as required by OSHA and submitted a report to Mr. Primus on the findings:

a.  I discovered:
b.  A lack of safety procedures, failure to tag and lock out each step of the two-day process required to switch from one boiler to another;
c.  Supervisors not qualified to lead or having knowledge of OSHA procedures;
d.  HVAC Supervisor, working outside of his License, functioning as an Engineer working primarily in Facilities leading the efforts of the building of the new Pharmacy;
e.  Electrician Supervisor, working outside of his License, functioning as an Engineer working on electrical plans for the new building;
f.  Critical understaffing –boiler house staff reduced to two operators
g.  For 1000 acres of campus the staff had been reduced from 17 to 7 grounds keepers
h.  No Safety Trainings for any personnel
i.  And a lack of proper PPE equipment

9) Retaliatory Disciplinary Actions:

a.  My employment with the University was terminated on April 5, 2019, after the discovery, reports and meetings detailed above.
b.  On March 17, 2019 the President sent me an email commending my performance;
c.  On March 27, 2019 I met with Dr. Mock, as the President requested, when I was verbally attacked and put in my place for informing about Mr. Jason Casares, to Mr. Taylor and the President; Dr. Mock was also upset at me for my role in removing Dr. Whitehead from campus, which should have been done by Mr. Matt Taylor initially when she was removed from acting Provost. Mr. Mock in this conversation and others berated me for the suspension of Ms. Martin and Ms. Marshall who he continued to state should have been handled by Mr. Primus.
d.  On March 28, 2019, I wrote Dr. Mock about his sexist treatment of me during the meeting on the 27th. Having made similar reports of Mr. Primus's behavior towards to the President in the past. In fact, it was this type of sexist and belligerent behavior that initially moved the President to change my direct reporting order.
e.  On April 1, 2019, I met with the President who stated, "Rosalie I like having you here, I hope you like being here. I am not changing Mr. Primus's portfolio. And Jason is going to continue to report to me."
f.  On April 3, 2019, I sent an e-mail to the President and Mr. Matt Taylor formally documenting the issues concerning Mr. Casares, his falsification of documents (employment application, resume degree and his experience); Mr. Cassare's utilization of his position for his own personal gain, obtaining adjunct positions while investigating a chair and then moving the employee out of the way.
g.  The April 3, 2019, email also documented Mr. Matt Taylor's involvement in trying to get a key made to the former Title IX office and his inability to supervise investigations. And documentation showing that the reason UMES Affirmative Action Plan had not been completed was because it was assigned to Mr. Taylor, with specific instructions given to the consultant to no longer communicate with Ms. Gertrude Hairston in HR, who had previously provided the information to the consultant and had successfully completed the reports until it was taken over by Mr. Taylor.
h.  In a separate e-mail, On April 3, 2019, sent only to the President, I made her aware of the fact that Mr. Hans Cooper had been caught breaking into the Provost's Office On two consecutive nights and

18

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

had been caught by Associate Provost Dr. Wade.  Behavior very similar to the break-in to the former Title IX officer's office.

i.  On April 4, 2019, I attended the System HR Meeting at University Park. I notified Ms. Carolyn Skolnick at the end of the meeting that there were issues that I was concerned with at the University.  I gave her the Jason Casares issues as example, my findings regarding non-payment for faculty promotions, and the lack of budget updates from the University in the last 5 years.  I also told Carolyn that Mr. Matt Taylor was complicit.  She stated that I should speak with her boss.  I stated that I had sent the President the e-mail the evening before and asked for time to let President Anderson respond.  We left it that if President Anderson did not respond that I would reach out and set up a meeting with her boss.

j.  On April 5, 2019 I was terminated for cause.  I was not provided any notice, pursuant to the policy on termination.  My termination letter erroneously indicated that I was in my probationary period.  A fact that Mr. Taylor and Dr. Mock would have known, since they had requested a copy of my offer letter from Ms. Mary Ames in HR on April 4, 2019.

k.  The termination meeting included President Anderson, Dr. Rondell Allen (Interim Provost), and Myself.  I read the letter aloud and for each item I asked for an example of the behavior or actions that constituted the vague points in the termination letter.  For each one President Anderson stated, "I have examples, I'm just not going to tell you!"   I would then turn to Dr. Allen and asked if he had any.  Dr. Allen stated that he had none and was just there as a witness and that he felt that I had done a lot to promote the cause of the faculty in the short time I was there.

l.  President Anderson then told me to hurry up and to read in silent.  I stated I wanted to read the letter out loud so that I could ensure that Dr. Allen understood.  When I read the last point President Anderson stated, ok that's it she got up from her desk to show me out.  I got up surprised that she had not asked me to sign the letter and left the Provost Office.

m.  I was escorted from the Provost Office by an African American male campus Police Officer.  The Officer was extremely cordial and asked if I needed help packing up my office.  I replied that I did not have any personal belongings in the office except for my pocketbook and car keys.  He asked for my University badge and Office Key.  I explained to him that I had attended a System meeting in Maryland yesterday (April 4, 2019) and that I had forgot my keys and badge in the briefcase that I had taken to the meeting.

n.  Ms. Mary Ames (who I had often carpooled with), approached the officer and I at that point.  I explained what was happening and Ms. Ames volunteered to pick up the badge and key at 5pm that evening and bring it to the security office.  She further explained that she was in interviews all day and could not get it before.  With the matter of the key settled the officer then walked me to my car to escort me off campus.

o.  When I got home, I informed my husband of the events, and upset I went upstairs to my bedroom to try and sleep.  I informed my husband that Mary Ames was expected at 5pm to get the office key and my ID.  I placed the key and Badge on my nightstand where my husband would be able to find it.

p.  I received a text from Ms. Gertrude Hairston, "*Dr. Mock stated that you would be returning your keys, photo identification, etc.  They would like to have these by 3p.m. today.  Mary will not be leaving work until 5 p.m. and they want the items by 3p.m.*"  I replied, "*Sorry I'm not coming back to campus.  I'll give to Mary. Best*"

q.  I then fell asleep out of pure emotional exhaustion.  When my husband woke me and asked for the key and badge, I assumed it was 5pm.  My husband returned upstairs and I noticed it was around

19

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

2pm.  My husband informed me that a White Police Officer in an unmarked police car wearing his UMES uniform and gun had come to the house.  The Officer instructed my husband that I had failed to sign a letter and that I needed to sign it.  My husband a African American male, told the White officer that I think you're here for her keys and ID badge.  He came inside to get it and then provided them to Ms. Ames who was with the Officer.  The Officer again stated, that I needed to sign the letter, and my husband told the officer, "its my understanding that she no longer works for you.  You're entitled to your property and that's it.  I'm not asking her to sign anything".  With that the Officer returned to the car and left the property. It should be noted that the Officer was respectful.

r.  It was obvious that the Keys and the badge were a ploy in order to scare me into signing the false termination letter, that President Anderson had failed to request.  And illegally sending a white Armed Police Officer, to my home in Salisbury outside of his jurisdiction, UMES Campus of Princess Anne, was a racist terroristic threatening act towards me orchestrated by senior cabinet members of the organization.

10. *Post Termination retaliation and Harm:*

a)  I worked for the University of Maryland Eastern Shore (UMES) from February 18, 2019 to April 5, 2019, therefore I was not eligible for unemployment from the state of MD through UMES.  I therefore applied for unemployment in the State of Pa, which would impact my last employer The City of Philadelphia, where I served as the Chief Human Resources Officer for the Philadelphia International Airport and Deputy Director of HR for the City of Philadelphia.

b)  UMES under the guidance of Mr. Matt Taylor and Dr. Mock contested my unemployment making false allegations against and causing harm to my reputation.  At one point after I had appealed, they held up my claim by refusing to comply with the adjudicators time frame in order to submit evidence supporting their claim of fraud against me.  It wasn't enough that they had conspired to support members of the UMES community who continued to violate the public trust; participate in fraudulent behavior; commit gross mismanagement and create situations that were Grossly unsafe to human life and the environment; by terminating me for following the whistleblower procedures and bringing to light the issues to them and the system; they also filed false documentation to a Federal process, (unemployment) that is administered by the state.

a.  I eventually received my unemployment after the adjudicator found that their claims against me were false, because "they were unable to substantiate that I was involved in the fraudulent behavior" that they either concocted or tried to blame on me.

c)  Benefits – As you may be aware the University of Maryland System, at the time of my hire was having problems getting individuals enrolled on benefits in a timely manner.  I was not enrolled into the benefit plan until late March 2019.  At the time of my termination on April 5, 2019, I had not received any insurance cards.  By the time I received my insurance cards my benefits had expired at the end of April.  I never received COBRA information in order to continue benefits. Therefore, my contributions towards benefits for my husband and myself were wasted.

a.  I am the bread winner of my family, my husband and I moved to Salisbury to take this job and we utilized all our savings towards the purchase of a home in Salisbury.  We had and have no income at this time.  My husband who is a diabetic could not afford his medication and his health was failing.  His sugar level shot up to over 500 in July almost placing him in a diabetic coma.  He was hospitalized for close to two weeks and received intravenous IVs with a home nurse for 6 weeks after the release from the hospital. While in the hospital he had to have his right big toe

20

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

amputated.   He could not attend any of the wedding activities in Princeton of our eldest son, we lost money that we had pre-paid to our family re-union in Tennessee, that occurred in August 2019, while he attended the funeral of a beloved brother, he was not able to say his goodbye during the last days of his life; or run, an activity that my husband, has done since grade school and continued after his ALL American college career as a stress reliever.

b. Had we been provided Unemployment benefits in a timely manner, or the four (4) week notice pursuant the System Termination policy my husband would not have had to suffer or lose his toe, because we would have been able to pay for his life enabling medication.

Count I – Retaliation

Paragraphs 1- 10 are incorporated as though set forth fully herein

1) I was subjected to taunts; aggressive behavior and a hostile environment in meetings with Mr. Lester Primus and Dr. Robert Mock for the termination of Ms. Lafabian Marshall, the recommendation to terminate Ms. Michelle Martin for cause and Ms. Martin's suspension;

2) I was terminated on April 5, 2019 for bringing in the System to Audit the Henson Center;

3) I was terminated on April 5, 2019 for reporting an OSHA violation in physical Plant involving the boiler house;

4) I was terminated on April 5, 2019 for Overturning the illegal termination of an employee in good standing, who was terminated on protected leave under The Family and Medical Leave Act of 1993 (FMLA).

5) I was terminated on April 5, 2019 for terminating Mr. Mills, the nephew of the Budget Director, removing him from paid leave status and not granting him severance for violation of the University of Maryland System Drug Policy, and violation of State and Federal law for which he had pled guilty in a court of law.

6) I was terminated for advocating for employees who were subjected to false allegations; unfair treatment by Mr. Matt Taylor, Dr. Mock and Mr. Jason Casares; and denied fair and timely due diligence in investigations.

7) I was terminated on April 5, 2019 for informing the President that Mr. Casares had falsified his State employment application; falsifying his experience and education; and utilizing his position for personal gain.

8) I was terminated on April 5, 2019 for informing the President that Mr. Matt Taylor had failed to do his due diligence in the recruitment of Mr. Casares; failing to check previous employment or review Mr. Casares's resume appropriately, after they had removed HR from the process.

9) I was terminated on April 5, 2019 for addressing Dr. Mock's sexist and aggressiveness towards me in a meeting on March 27, 2019. And complaining about the continued hostile sexist environments that I was subjected to by Dr. Mock and Mr. Lester Primus.

10) I was terminated on April 5, 2019 for telling the President that the free housing that she was providing to Mr. Hans Cooper was a violation of state audit findings and federal and State Tax Codes.

11) I was subjected to Racist Terroristic Threats by members of the Cabinet on April 5, 2019, who conspired to intimidate me when they illegally sent an armed UMES police Officer to my home.

12) I was denied due process, when they failed to provide notice to me during the termination process a violation of USM, Policy on Separation for Regular Exempt Staff Employees.  Employees who plead guilty to drug violations and  violate policies, steal from the university, create safety violations and other gross

21

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

misconduct; are provided notice and do not have their jobs taken away from them for no reason; or are placed on paid leave pending an investigation and do not have their jobs taken away for no reason.

13) In May of 2019, they slandered my reputation, lied to cover up their retaliatory action by lying to the Pennsylvania Unemployment commission. Employees who are terminated for gross violations do not have their unemployment denied and do not have their jobs taken away for no reason.

### Count II – Gender Pay Equity

Paragraphs 1- 10 are incorporated as though set forth fully herein

1) See Paragraph 4
2) On April 5, 2019 I was terminated.  Caucasian White females, and Males are paid appropriately for their responsibilities and do not have their jobs taken away for no reason.
3) On April 5, 2019 I was terminated. Caucasian White Females and Males are placed in the position with the appropriate title and Pay immediately and not delayed till the budget is fixed and do not have their jobs taken away for no reason.
4) On April 5, 2019 I was terminated. Males are provided free campus housing in violation of State and IRS guidelines and do not have their jobs taken away for no reason.

### Count III – Gender Discrimination

1) See Paragraph 4, H through S
2) On April 5, 2019 I was terminated.  Consideration are given to Males who move their family to the area and purchase a home, regardless of their capability to perform the work and do not have their jobs taken away for no reason.

### Count IV – Racial Discrimination

1) See Paragraph 4, H Through S
2) White females are provided increase in pay and title to sit on Cabinet and break up the testosterone; without any additional responsibilities and do not have their jobs taken away for no reason.

### Count V – Age Discrimination

1) See Paragraph 4, H Through S
2) Younger cabinet members employees are provided pay consistent with experience and function and do not have their jobs taken away from them for no reason.

### CONCLUSION

Based on the above, I allege that the Respondents violated Section 5-309 of the Maryland State Code, Pers. & Pens.;

And that the Respondents Violated

By retaliating against me for informing of Gross violations of Management, Life Safety, Environmental Safety; Failing the public trust and Fraud of public resources; And

By discriminating against me based on Race, Gender and Age; As well as violating Gender Pay Equity.

22

Rosalie Hornbuckle Whistleblower Complaint Vs. University of Maryland Eastern Shore

DUAL FILING

This complaint has been dually filed with the Equal Employment Opportunity Commission (EEOC)

REMEDY

Pursuant to the allegations herein, I request that Respondents be required to provide all remedies available to me under Section 5-309 of the Maryland State Code, Pers. & Pens.; any other applicable State and Federal statues, and Title VII of the Civil Rights Act of 1964 of the United States of America code;

VERIFICATION

I hereby verify that the statements contained in this complaint are true and correct to the best of my knowledge, information and belief.  I understand that false statements herein are made subject to the penalties of State and Federal Statutes, relating to unsworn falsification to authorities.


_____          _____

*Date*                         *Rosalie I. Hornbuckle*

23



# EX 2A

change.org　　☰



# Stop UMES from letting the right people go!

**Sign petition**

## 1,034 

Verified signatures ⌄

---

 Decision Makers: University of Maryland Eastern Shore Housing Department +1

## The Issue

On June 27th 2024 popular social media platform Fizz broke the news about Mr. Samuel Douglas better known as Coaches termination from the University of Maryland Eastern Shore after more than 25 years working for the University. Coach has impacted the lives of thousands of students being a beloved figure across campus dating back almost three decades. From what students have heard Coach has been terminated for helping students receive a better quality of housing which is not within the University's policy. The University

in the past two years has allowed more students to be admitted into the school without proper factors to ensure a quality campus experience. In 2023 UMES had admitted more students since 2015 causing an uproar within the housing department. Coach Douglass was tasked to most students knowledge alone to solve this problem making sure each student had somewhere to lay their heads although housing was at complete Capacity. This upcoming school year we are anticipating even more students to be admitted causing disarray in the standard housing protocols where underclassmen has to be placed in traditional housing for upperclassmen along with upperclassmen being placed off campus. This also has caused graduate housing to be infiltrated by undergraduates not to mention these housing selections are at a higher price and has not be renovated to any current students knowledge in 20 years. Coach has helped thousands of students overcome the obstacle of housing shortages basically alone in these past years and this is how the university chooses to repay his efforts. The university continues to ignore the root of the problem with the student body replacing staff and faculty members who care about the campus community with people who have never been to UMES and see this opportunity as just a job. The university has shown to only care about students when they are benefiting from the media exposure and money coming in. With this many students being placed into an at Capacity campus there have been no plans or efforts to add additional housing, hire more staff to meet the needs of this growing University or anything of that magnitude. We the students of UMES are tired of having our funds be put to use where it will not benefit us but instead the classes after we have long graduated. Please share with alumni, parents, staff and the community as the University has shown their true colors in not being for the students but for their own benefit. Coach did not deserve this and neither do us students who give thousands to have are needs discarded by administration.

please do not donate !!! We just need signatures

⚐ Report a policy violation



**Chelsea Cassidy**
Petition Starter

**Media inquiries**

# The Decision Makers

Firefox

https://outlook.live.com/mail/0/id/AAkALgAAAAAAHYQDEapmEc...

Case 1:26-cv-00893-JRR    Document 1-4    Filed 03/03/26    Page 87 of 207

**E-FILED: Somerset Circuit Court**
Docket: 2/16/2026 4:12 PM; Submission: 2/16/2026 4:12 PM
**Envelope: 25126466**

 Outlook

EX 3

---

**RE: UMES Allegations**

---

From ████████████@usmd.edu>

Date  Tue 25/02/2025 13:42

To  ████████████████████████

Cc  ████████████@usmd.edu>

████████

Thank you for response.  As this is a potential criminal investigation, it is not appropriate to share the details with anyone including the whistleblower.

If you have additional information that you would like to share with us, we would be happy to schedule a meeting with you.

Thank you,

████████

, CPA

University System of Maryland
Office of Internal Audit
10630 Little Patuxent Parkway, Suite 450
Columbia, Maryland 21044
Office: (443) 864-5162

████████████

 UNIVERSITY SYSTEM
*of* MARYLAND

---

From ████████████████████████████>
**Sent:** Thursday, February 20, 2025 11:56 AM
**To** ████████████████████>
**Cc** ████████████████████>
**Subject:** Re: UMES Allegations

H,

Thanks for your email.

I am puzzled. What is confidential? I am the whistleblower who revealed the crimes and know all about it. So, there is nothing confidential about it. Moreover, you have been telling Rondall Allen and others at UMES - meaning the accused are actively being tipped off.

Please answer my questions. The questions do not relate to anything confidential - they are about the minimum steps necessary for an auditor to obtain the facts. They are easy to answer and go to the heart of the credibility of this investigation.

As I said previously, the meeting is not for my benefit - it is for *your* benefit if you are actually interested in catching the criminals rather than covering up their crimes.

The important thing here is to catch criminals, stop fraud, and return illegally obtained federal and state funds. You and I are not related to Heidi Anderson and Rondall Allen and are not paid enough to go to jail with them for their crimes. 😊

Respectfully,

**From**  d.edu>
**Sent:** 13 February 2025 12:07
**T**
**Cc** @usmd.edu>
**Subject:** RE: UMES Allegations

Thank you for the email.  Our investigations are confidential.  As such, we do not share the details of what we have obtained or reviewed.

Please let me know if you are still interested in scheduling a meeting.

Thank you,



University System of Maryland
Office of Internal Audit
10630 Little Patuxent Parkway, Suite 450
Columbia, Maryland 21044
Office: (443) 864-5162

UNIVERSITY SYSTEM
*of* MARYLAND

**From** >
**Sent:** Wednesday, February 12, 2025 9:15 AM
**T**
**Cc** usmd.edu>
**Subject:** Re: UMES Allegations



**COCKEY BRENNAN & MALONEY** P.C.

**ROBIN RINGGOLD COCKEY, ESQ.**
rrcesq@cbmlawfirm.com
D) 410.546.1698

313 Lemmon Hill Lane
Salisbury, MD 21801

O) 410.546.1750
F) 410.546.1811

CBMlawfirm.com

December 12, 2024

***Via Email*** ▉▉▉▉▉@umes.edu

Matthew A. Taylor, Esquire
General Counsel
Office of the President
John T. Williams Hall, Suite 2102
Princess Anne, MD 21853

***Re:*** ▉▉▉▉▉▉▉▉▉▉

Dear Matt,

I am counsel for ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ and ▉▉▉▉▉▉▉▉ a faculty appointment as a tenured full professor.) I write concerning the adverse actions recently taken against ▉▉▉▉.

On December 6, ▉▉▉▉▉▉ was summoned to a meeting with Jason Casares, who presented him a letter informing him of a complaint he had "created a hostile work environment… characterized by intimidation and harassment." The complainant was identified as ▉▉▉.

M▉▉▉▉ is a temporary employee housed in a separate building with whom ▉▉▉▉ has met perhaps six times, never for more than a few minutes and always in the presence of a witness, ▉▉▉▉▉. Manifestly ▉▉▉▉ has never been in a position to intimidate or harass ▉▉▉ as I am confident Ms. ▉▉▉ will confirm (if she has not already done so).

Despite the implausibility of Ms. ▉▉▉▉▉▉, Mr. Casares handed ▉▉▉ a memo putting him on administrative leave "pending a fact-finding investigation." Mr. Casares then had ▉▉▉▉▉ escorted off-campus by two uniformed security officers. Meanwhile, I am informed Ms. Martin of the OIE has reached out to members of the campus community in an attempt to develop support for Ms ▉▉▉▉ specious accusation.

It i▉▉▉▉▉▉▉ intention to su▉▉▉▉▉ for defamation and to sue the University and its agents -including without limitation Jason Casares- for so-called false light defamation▉▉▉▉ reputation has been irreparably tarnished, for which he intends to seek redress.

I will shortly send you an evidence hold letter and will shortly send the Treasurer a tort claim notice.

Very Truly Yours,

Robin R. Cockey

RRC/mw

Co█████████████*via email*

E-FILED; Somerset Circuit Court
Docket: 2/16/2026 4:12 PM; Submission: 2/16/2026 4:12 PM
Envelope: 25126466

# EX5

Professor ██████████

University of Maryland Eastern Shore

**From:** ███████████ @umes.edu>
**Sent:** Wednesday, December 11, 2024 2:31 PM
**To:** Ginta Martin, Alexandra F <agmartin1@umes.edu>; regents@usmd.edu <regents@usmd.edu>
**Subject:** Re: Preliminary Investigation Report Review - Follow up

Hello Ms. Martin (AG's office and members of the USM Regents),

Your office has continued hunting me and harassing me with emails during this busy time of the final exam week with the pressing deadline for me as a faculty to submit my final grades.

As the entire UMES community and the people outside of UMES all hear about your office has put ██████ ██████ under administrative leave without investigation, why hasn't your office followed the same process when handling my case against ████████████?

I am the only person who works with Ms. ████████████ (the complainant). She is a temp worker and I coordinate all communications between two parties. They only met in-person six times (all at the public area) and one virtual meeting. I arranged all those meetings and was present as an eyewitness on every occasion. Your office has never contacted me for investigation before putting ████████ on leave.

Whereas I filed complaints two times providing documents and detailed information regarding each interaction I had with ████████████ since two years ago. Despite the fact that there are multiple official and unofficial complaints against ████████ from several colleagues from two departments (including current and past colleagues), your office refused to conduct impartial investigation and has showed bias by calling witnesses who has strong ties with him, including Mr. Jason Casares, who has been accused of rape and is not qualified

Case 1:26-cv-00893-JRR    Document 1-4    Filed 03/03/26    Page 92 of 207

# EX6

## Affidavit

State of Maryland
City of Salisbury

BEFORE ME, the undersigned Notary Public in and for the State of Maryland, duly commissioned, on this **24** day of December 2024, personally appeared ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ known to me to be a credible person and of lawful age, who being by me first duly sworn, deposes and says this statement of facts:

1. I, the undersigned, am over 18 years of age and competent to testify to the facts and matters set forth in this Affidavit.

2. My name is ▮▮▮▮▮▮▮▮▮▮ I am a PhD student at the University of Maryland Eastern Shore and a resident of Salisbury.

3. In early December, I was contacted by the Office of Institutional Equity (OIE) to attend a meeting.

4. Alexandra Martin and Cecilia asked me hostile questions that were aimed at making me speak negatively about ▮▮▮▮▮▮▮▮▮.

5. I responded to their questions honestly that I had only met ▮▮▮▮▮▮ for a few minutes in person and that my interaction with him was absolutely professional.

6. I felt threatened during my interview with OIE staff to speak badly about ▮▮▮▮▮

7. OIE staff were not interested in learning about my experience at UMES or hearing anything positive about ▮▮▮▮▮▮ They were obviously biased.

8. ▮▮▮▮▮▮ has been kind, respectful, and polite to me and has never acted inappropriately toward me.

9. I am concerned that false statements may be attributed to me by the OIE staff for some conspiracy against ▮▮▮▮▮▮ OIE staff asked me to attend another meeting and I have nothing further to say other than the facts in this Affidavit.

10. I am extremely worried that OIE staff and some Pharmacy faculty will interfere with my research, scholarship and visa, and deny me opportunities at UMES if I do not participate in their schemes.

11. To the best of my knowledge and belief ▮▮▮▮▮▮ has only created a positive work environment and research culture at UMES.



12. I am signing this affidavit of my own free will and without being subjected to any pressure or compulsion or receiving any benefit from anyone.

I do solemnly affirm under the penalties of perjury that the contents of this affidavit are true to the best of my knowledge, information, and belief.

_____ Signature of affiant

12 . 29 . 24 _____ (Day/month/year)

Subscribed and sworn to before me, this 24 day of December 2024.

AS WITNESS my hand and notarial seal. _____

Notary Public

My Commission expires: 05/31/2028

EMILY ANDREAS
Notary Public - State of Maryland
Howard County
My Commission Expires May 31, 2028

Case 1:26-cv-00893-JRR   Document 1-4   Filed 03/23/26   Page 94 of 207

**E-FILED: Somerset Circuit Court**
**Docket: 2/16/2026 4:12 PM; Submission: 2/16/2026 4:12 PM**
**Envelope: 25126466**

# EX 7

### Affidavit

State of Maryland
City of Salisbury

BEFORE ME, the undersigned Notary Public in and for the State of Maryland, duly commissioned, on this 19th day of December 2024, personally appeared ▓▓▓▓▓▓▓▓▓▓, known to me to be a credible person and of lawful age, who being by me first duly sworn, deposes and says this statement of facts:

1. I, the undersigned, am over 18 years of age and competent to testify to the facts and matters set forth in this Affidavit.

2. My name is ▓▓▓▓▓▓▓ I am a PhD student at the University of Maryland Eastern Shore in good academic standing. I have always been a good student with high grades.

3. I was contacted by the Office of Institutional Equity (OIE) on December 10th to attend a meeting this week in person on 12th or 13th of December. It was my finals week and I had my final for course 601 on 12th of December, also had two take home finals of courses 805 and 822. All of this was stressful and I was not offered a choice to attend.

4. Alexandra Martin and Cecilia asked me questions that were designed to make me speak negatively abou▓▓▓▓▓▓▓▓

5. I responded to their questions honestly that I had only me▓▓▓▓▓▓▓ for a few minutes in person and that my interaction with him was professional.

6. I felt threatened during my interview with OIE staff to speak badly abou▓▓▓▓▓▓▓▓

7. OIE staff were not interested in learning about my experience at UMES or hearing anything positive abou▓▓▓▓▓▓▓ They appeared to be manipulative, biased, and seemed to be coercing me by informing professors who would grade my academic work.

8. ▓▓▓▓▓▓ has been kind, respectful, and polite to me and has never acted inappropriately toward me.

9. I am concerned that false statements may be attributed to me by the OIE staff for some conspiracy again▓▓▓▓▓▓

10. I am extremely worried that OIE staff will interfere with my research, scholarship and visa, and deny me opportunities at UMES if I do not participate in their schemes.

11. To the best of my knowledge and belief ▓▓▓▓▓▓ has only created a positive work environment and research culture at UMES.

I do solemnly affirm under the penalties of perjury that the contents of this affidavit are true to the best of my knowledge, information, and belief.

_____ Signature of affiant

_____ 12-19-2024 _____ (Day/month/year)

Subscribed and sworn to before me, this 19th day of December 2024.

AS WITNESS my hand and notarial seal. _____

Notary Public

My Commission expires: __05/31/2028_____

EMILY ANDREAS
Notary Public - State of Maryland
Howard County
My Commission Expires May 31, 2028

Case 1:26-cv-00893-JRR   Document 14   Filed 02/02/26   Page 96 of 207

E-FILED: Somerset Circuit Court
Docketed: 2/16/2026 4:12 PM; Submission: 2/16/2026 4:12 PM
Envelope: 25126466

EX8

UNIVERSITY of MARYLAND
EASTERN SHORE

**OFFICE OF INSTITUTIONAL EQUITY AND COMPLIANCE**

### Notice of Allegations[1]

The UMES Office of Institutional Equity and Compliance (OIE) has received a complaint from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ concerning possible violations of the applicable University of Maryland Eastern Shore Prohibiting Policy Discrimination, and/or the State of Maryland Policy on Sexual Harassment in the Workplace, by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The following information contains details regarding allegations of violations related to a course of conduct by ▮▮▮▮▮ based on the Complainant's sex, race/ethnicity, and national origin. The allegations of harassment had an adverse impact on the Complainant in the form of intimidation, as well as an adverse impact on the Complainant's working conditions, which created a hostile work environment for the Complainant.

1. Early on in ▮▮▮▮▮▮▮▮▮▮ recruitment process ▮▮▮▮▮▮▮▮ has allegedly displayed a diminished focus on her technical knowledge and professional skills and, during a call about a project on which he was working, he switched the conversation to personal information related to the Complainant ▮▮▮▮▮▮ allegedly asked ▮▮▮▮▮▮▮ questions about Persian women, how they were "under oppression," and made statements that "he liked to help women from Iran."

2. During subsequent conversations in text (via WhatsApp) and prior to the Complainant's arrival on campus ▮▮▮▮▮▮ allegedly asked ▮▮▮▮▮▮▮ personal questions (i.e., if she had any weekend plans, if she did not have time for fun), and made "really weird comments" about the Complainant and "partying." Examples included:
   *"All work and no fun make ▮▮▮▮▮▮▮▮▮▮ a dull girl"*
   *"We don't allow laptops at parties here"*
   *"You are only allowed here if you party properly"*
   *"Looks like we need to give you tutorials [on partying]"*
   *"[Partying] That's part of the training"*
   *"Don't need laptop at parties here"*
   *"You are the busy party animal so I have to work around your busy schedule"*
   *"See, always partying, just as I thought"*

3. Prior to the Complainant's arrival on campus ▮▮▮▮▮▮ allegedly asked ▮▮▮▮▮▮ ▮▮▮▮▮ text (via WhatsApp) for "pics" on two occasions, when she told him that she was going on a trip with friends. The first time ▮▮▮▮▮▮ allegedly told the Complainant to "send pics," followed up with "not [pics] of reading articles," and "hope this phone will be

---

[1] The OIE reserves the right to supplement and/or amend the current Notice of Allegations, as appropriate, if new and pertinent information becomes available as it relates to the allegations.
INITIALS:
DATE: _ _/_ _/_ _ _ _

able to handle it [the pics]." When the Complainant did not send anythin█████████
followed up the next day to inquire "what happened to the pics."

4.  During a virtual meeting and prior to the Complainant's arrival on campu██████████
    allegedly invite█████████████ to meet up with him in person in Washington, DC.

5.  During a virtual meeting and prior to the Complainant's arrival on campu██████████
    allegedly tol██████████████n the context of sharing he went on a trip to Turkiye, that
    "people say that Turkish women are beautiful, but I prefer Persian women."

6.  During an in-person interaction in the Complainant's office on campu███████ allegedly
    initiated a conversation wit████████████ about "what she does when Persian men
    approach her, because they obviously have already." In that conte████████lso stated
    that he "did not like working with Persian men, only with Persian women."

7.  During an in-person interaction on campu████████ aske███████████o go to
    breakfast or dinner with him "to discuss work."

8.  After the Complainant's arrival on campu████████ allegedly offered to hel████████
    ██████nove her furniture, which she believed was a pretext for him to get in her house.

9.██████ allegedly took a similar approach in his interactions (asked her for "pics," invited
    her to lunch, offered to help her move) wit████████████(who also
    identifies as a Persian woman and was recruited and hired b█████████

Initials: _____
Date: __/__/____

E-FILED; Somerset Circuit Court
Docket: 2/16/2026 4:12 PM; Submission: 2/16/2026 4:12 PM
Envelope: 25126466





**COCKEY BRENNAN
& MALONEY** P.C.

**ROBIN RINGGOLD COCKEY**, ESQ.
█████████@█████████.com
D/ 410.546.1698

313 Lemmon Hill Lane
Salisbury, MD 21801

O) 410.546.1750
F) 410.546.1811

CBMlawfirm.com

January 24, 2025

***Via Email*** █████████@umes.edu 

Alexandra Martin
Office of Institutional Equity and Compliance
Early Childhood Research Center, Suite 1129,
Princess Anne, MD 21853

***Re:*** ████████████████

Dear Ms. Martin,

I write as ██████████ counsel to provide purely legal analysis of ████████ complaint. I understand my client is incorporating this correspondence by reference in his own response, which will address the complaint's factual allegations.

Preliminarily, I note that nowhere does ████████ assert she informed ████████ his communications were "unwelcome". In applying the University's sexual harassment policy, a threshold determination is whether the conduct was "unwelcome". That determination is made objectively – not subjectively- by establishing that the complainant protested, and her protest was ignored. As explained in the leading (and quite opposite) case of *Albero v. City of Salisbury*, 422 F. Supp. 2d 549, 557 (D. Md. 2006), "conduct is 'unwelcome' when it continues after the employee sufficiently communicate that it is unwelcome."

In *Albero*, as in this matter, "[Complainant] does not allege that [the perpetrator] or anyone else at work propositioned her, touched her inappropriately, or made sexual comments in an effort to humiliate her" (*id.* at 422 F. Supp. 558). Moreover, in *Albero*, as in this matter, "there is no evidence that [complainant contemporaneously] complained about any of the alleged incidents…" [*id.*] Thus, even if one adopts complainant's allegations, wholesale, they cannot constitute sexual harassment as a matter of law because complainant never objected, protested or complained about the conduct attributed to ████████. Had she done so, and had ████████, persisted, then and only then, would it have become necessary to determine if the conduct was either "severe" or "pervasive".

Applying that analysis nonetheless to ████████'s allegations, I note they do not explicitly characterize his conduct as "sexual" or "based on sex". While ████████ disputes the accuracy of ████████ allegations, even if one assumes *arguendo*, they are true, they fall short of attributing to him a sexual *animus*. While some might find the comments ascribed

to ██████████ appropriate and others not, the comments are not overtly "sexual" and certainly fall far short of the "severe-or-pervasive" standard.

As you are aware ██████████ denies any impropriety in connection with ██████████ and regards her complaint as pretextual and the University's handling of it as retaliatory. Regardless of these considerations, however, ██████████ complaint does not impute actual "sexual harassment" to ██████████ as a matter of law, and the complaint should be dismissed as untenable.

Very Truly Yours,

Robin R. Cockey

RRC/mw

Cc: ██████████ *via email*

E-FILED; Somerset Circuit Court
Envelope: 25126466

EX10

January 24, 2025

*Via Email* @umes.edu

Alexandra Ginta Martin
Office of Institutional Equity and Compliance
Early Childhood Research Center, Suite 1129,
Princess Anne, MD 21853

*Re:* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *and Jason Casares*

Ms. Ginta Martin:

This is in response to the fictitious allegations leveled by ▮▮▮▮▮▮▮▮▮ under the direction of Jason Casares. Please treat the attached letter from my attorney Robin Cockey as an addition to this letter.

As I informed you during the meeting on the 21st, my participation in this process is solely under protest to record my objections and does not constitute consent or any admission of jurisdiction by your office over these allegations, much less any acceptance of the lawfulness of your "investigation." OIE staff including you are engaging in a pretextual witch hunt against me despite conclusive exculpatory evidence. This biased "investigation" is in retaliation for a criminal complaint filed against UMES President Heidi Anderson last year.

On 6th December 2024, during the meeting where I was placed on administrative leave, you and Jason Casares were informed that this complaint was fabricated because I had caught ▮▮▮▮▮▮▮▮▮▮▮ submitting fraudulent timesheets to unlawfully take federal funds for hours that she did not work. I had also provided ▮▮▮▮▮▮▮▮ ▮▮▮▮▮ with critical feedback for impaired cognitive performance on the few occasions she showed up for work and for not producing work products of acceptable quality within deadlines. These documented facts about her unsatisfactory work performance and fraud provided the unlawful motivation for ▮▮▮▮▮▮▮▮▮▮ fabricated allegations.

I reiterate that I have never met ▮▮▮▮▮▮▮▮▮▮▮▮ in person without other employees being present. I have never even shaken her hand. I have never been within 6 feet of her. I have had no physical contact of any kind with her.

I categorically reject the allegations as fabricated, concocted, manipulated, and manufactured with malicious motivations. The word salad that you have deliberately and maliciously sequenced as a monologue with no context, dates, or actual production of the cell phone to create a flimsy innuendo does not constitute sexual harassment, intimidation, or any kind of harassment. Not a single word in your word salad has any connection with anything sexual. Merely putting random strings of phrases within quotes and selectively ordering them to create a weak and flimsy insinuation does not make

them true. Instead, the flimsiness of the innuendo – even assuming *arguendo* the whole fabrication at face value – highlights how it does not satisfy even the weakest definition of harassment, much less sexual harassment. Despite your perverse imagination, even assuming the word salad is taken verbatim, only an insane person would assume that things such as a meeting in Washington DC would be harassment or intimidation. Moreover, as you yourself admit, the word salad presented was "temporally" long before ██████████████████ was an UMES employee. She was not even an applicant for employment. Communications between a stranger to the university and me on matters completely unrelated to the university are beyond the jurisdiction of your office.

Equally, the absolutely false claim that there was a "similar approach" with another person who is not a complainant is nonsense. It is fabricated to pad a flimsy false accusation. Even with such fluffy padding, it amounts to nothing of substance and there is nothing even remotely sexual, harassing, or intimidating. I have never met ████ ████████ without other employees being present, have never shaken her hand, and never been within 6 feet of her. I wasn't even in Maryland when she supposedly moved somewhere.

To conclude, as you well know, this maliciously fabricated complaint is a pretextual witch hunt that will not stand up to scrutiny before any rational person much less in any court of law. It does not satisfy the definitions of sexual harassment, harassment, or intimidation. Moreover, no man would sexually harass these individuals and your insinuations are farcical and absurd. It must be quashed with an apology.

I also note that there has been no investigation into my complaint against Jason Casares despite the passage of over 6 weeks since the complaint was filed, and over three days since you were asked about its status.

Sincerely,

██████████████████████  ███████████████████████████████

UMES



**E-FILED; Somerset Circuit Court**
**Docket: 2/16/2026 4:12 PM; Submission: 2/16/2026 4:12 PM**
**Envelope: 25126466**

 Outlook

---

**Re: Follow-up Meeting - Please Respond**

---

**From** ████████████████████om>

**Date** Mon 27/01/2025 13:03

**To**  Ginta Martin, Alexandra F ████████@umes.edu>

**Cc** ████████████████████Rivera, Cecilia M ████████mes.edu>

Hello Ms Martin,

I have still not received an update about the status of my complaint against Casares.

As noted in my response, we have plenty of evidence about the OIE staff's bias and the farcical nature of this unlawful investigation to achieve a predetermined outcome. That will all be brought forward to the appropriate agencies at the appropriate time.

Given this, we can do any further follow-ups in writing.

Please send me anything that is necessary for me to respond to in writing. You mentioned this was possible during our last meeting.

Sincerely,



---

**From:** Ginta Martin, Alexandra F ████████@umes.edu>
**Sent:** 27 January 2025 12:34
**To** ████████████████████>
**Cc:** Robin Cockey ████████>; Rivera, Cecilia M ████████@umes.edu>
**Subject:** Follow-up Meeting - Please Respond

Hello ████████,

As discussed during our previous meeting, we would like to schedule a follow-up meeting after a review of your response to the allegations.

Kindly provide your availability during the week of February 3 through February 7, 2025, so that we may locate a mutually convenient time.

Kind regards,

Firefox

kALgAAAAAAHYQDEapmEc...

Case 1:26-cv-00893-JRR    Document 14    Filed 03/05/26    Docket: 2/16/2026 4:12 PM Submission: 2/16/2026 4:12 PM    Page 103 of 207

**E-FILED; Somerset Circuit Court**

**Envelope: 25126466**

1 of 3    8/14/2025, 11:25 AM



 Outlook

---

## Re: Follow-up Meeting - Please Respond

---

**From** Ginta Martin, Alexandra F⬛⬛⬛@umes.edu>

**Date** Tue 28/01/2025 16:03

**To** ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛>

**Cc** Robin Cocke⬛⬛⬛⬛⬛⬛⬛⬛>; Rivera, Cecilia M ⬛⬛⬛@umes.edu>

Hello ⬛⬛⬛⬛⬛

Thank you for the note. During our last meeting, we discussed your options to respond to the Notice of Allegations (provided in-person and via email), which included a written response. You indicated that a written response was the option you were inclined to consider. At that point, I explained that once we review your written submission, we would follow up with an invite to reconnect in person to clarify and/or ask questions related to the information included in your response. To further clarify, the option to submit a written response referred to the Notice of Allegations only, not the follow-up meeting.

Therefore, we do need to meet and reconnect in-person during the week of February 3 through February 7, 2025. Kindly advise of your availability, along with your Advisor's, so that we may locate a mutually convenient option.

Kind regards,

***Alexandra Martin***
***Assistant Director for Civil Rights, Complaint Resolution***
***& Deputy Title IX Coordinator***
***(She/Her)***

Office of Institutional Equity and Compliance
University of Maryland Eastern Shore (UMES)
Early Childhood Research Center, Suite 1129
Phone: 410-651-7999
Email: ⬛⬛⬛@umes.edu
Website: www.umes.edu/OIE

Follow Us on Twitter: @UMESequity

Follow Us on Instagram: @UMESequity

**CONFIDENTIALITY NOTICE:** This e-mail and any attachments contain private, privileged, and confidential information belonging to the sender. The information therein is solely for the use of the addressee. If the receipt of this transmission has occurred as the result of an error, please immediately notify us so we can arrange for the return of the documents. You are advised that you may not disclose, copy, distribute or take any other action on the information transmitted.

E-FILED: Somerset Circuit Court
Submission: 2/16/2026 4:12 PM
Envelope: 25126466

 Outlook

---

**Re: Criminal activities at UMES**

---

**From**

**Date** Tue 28/01/2025 13:26

**To**          @oag.state.md.us          @oag.state.md.us>

---

Dear Ms. Bainbridge,

Good afternoon.

I was researching the standards governing professional misconduct for attorneys working for government agencies and thought of writing to you as a courtesy and to understand your actions.

I have sent you several emails detailing criminal activities by a gang under the leadership of the University of Maryland Eastern Shore President Heidi Anderson. These include the Ipad scam (taking federal funds deceitfully), reporting false enrolment data to obtain Title III, Title IV, and other federal and state funds for unlawful purposes, corruption, operating an organized racket for criminal schemes, conspiracy, honest services fraud, and wire fraud.

As I informed you previously, I sent whistleblower letters to the AG's office and others in June and September 2024. Upon learning about this, Anderson and gang started to retaliate against me in December and placed me on administrative leave based on an absolutely fabricated and false complaint by a temporary worker (an Iranian national).

You were given evidence that the action against me was a pretextual witch hunt and not maintainable as a matter of law because it did not satisfy the definition of intimidation, or harassment.

You were also informed about unlawful targeting of students and faculty by Anderson and gang in an attempt to coerce them to pad her false allegations, and continued retaliation against many by members of this criminal conspiracy. Specifically, you were informed that in addition to their above crimes, they were engaging in a conspiracy to violate civil rights.

Although you do not work in the US DoJ and their procedures (https://www.justice.gov/opr/professional-misconduct) do not apply to you, I am writing to kindly inquire as to what steps you have taken to stop the continuing illegal activities by Heidi Anderson, Jason Casares, and gang at UMES.

I am sure you are conscious of your obligations as an attorney working for the citizens of Maryland and just want to understand the steps taken in furtherance of those obligations. I would especially like to know why you continued to ignore my emails despite the clear evidence of retaliation and why you did not apparently take any steps to stop illegal activity at UMES.

Please let me know at your earliest convenience.

E-FILED; Somerset Circuit Court
Docketed: 2/16/2026 4:12 PM; Submission: 2/16/2026 4:12 PM
Envelope: 25126466

# EX 14

 Outlook

---

**Follow-up to Meeting Request - Please Respond**

---

**From** Ginta Martin, Alexandra F███████@umes.edu>

**Date** Fri 21/02/2025 09:00

**To** ████████████████████████

**Cc**    Robin Cockey███████@cbmlawfirm.com>; Rivera, Cecilia M ███████@umes.edu>

Hell██████

I am following up on the email below regarding our requested in-person meeting with you.

It is our understanding that you have been communicating with other entities regarding your multiple complaints; therefore, we encourage you to refer any questions or inquiries related to those complaints to the entities in question. We will continue to focus on our investigation only.

As a result, we are moving forward with our investigation process into the complaint in which you have been named a Respondent. The following six (6) meeting dates with wide ranges in time are being proposed:

- **Option 1**: Tuesday, February 25, 2025, anytime between 1pm and 4pm
- **Option 2**: Thursday, February 27, 2025, anytime between 8am and 4pm
- **Option 3**: Friday, February 28, 2025, anytime between 8am and 4pm
- **Option 4**: Monday, March 3, 2025, anytime between 8am and 4pm
- **Option 5**: Tuesday, March 4, 2025, anytime between 8am and 4pm
- **Option 6**: Wednesday, March 5, 2025, anytime between 8am and 4pm

Please provide a date/time for the meeting (*from the options above*). The meeting will be held in-person in the conference room of the Office of Institutional Equity and Compliance in the Early Childhood Research Center, Suite 1129. Please understand that failure to respond to this email correspondence by Monday, February 24, 2025, close of business (5pm) with a date/time, and meet with our office by March 7, 2025, close of business (5 pm) will result in you being placed in unpaid administrative leave, pending the completion of the investigation.

In addition, and prior to your arrival, please provide the passcode (*that you generated*) for your University-issued/owned cell phone. Please include it in your reply to this email correspondence.

Kind regards,

*Alexandra Martin*
*__Assistant Director for Civil Rights, Complaint Resolution__*
*__& Deputy Title IX Coordinator__*
*(She/Her)*

E-FILED: Somerset Circuit Court
Docket: 2/16/2026 4:12 PM; Submission: 2/16/2026 4:12 PM
Envelope: 25126466

# EX 15.1

Outlook

---

**Re: Follow-up to Meeting Request - Please Respond**

---

**Date** Mon 24/02/2025 16:48

**To** Ginta Martin, Alexandra F ██████████████

**Cc** Rivera, Cecilia M ████████@umes.edu>

📎 1 attachment (517 KB)
Response to Martin-Feb 24 2025.pdf;

Hello Ms. Martin,

Thanks for your encouragement: I do not know what I would have done without it. I did not give you specific consent to send any communications or materials t██████████████ please do not do so again. Do not communicate with him about any matter concerning me without my prior approval.

My email below asked you about the complaint against Jason Casares that was submitted to **you**. It has nothing to do with any other entities or their actions. You said during our meeting in January that you would update me on the status of the complaint. Was that another lie?

Survey after survey of UMES faculty and staff has documented that you and your OIE colleagues lie and cheat. So, your reputation for dissembling is rock-solid and that's why I refused to attend any meeting with you in person. As many other UMES employees have documented, statements made in your office to you, Casares, and Rivera are invariably distorted and bear no resemblance to what is actually stated. I am happy to participate in any objective true investigation, just not fake investigations by people documented to be liars.

Under applicable law and UMES policy, you cannot evade the complaint submitted to you against Jason Casares in December 2024. What is the status of that complaint?

Re the investigation you referenced below, where is the actual complaint? Please send me a copy of the actual complaint allegedly submitted by ██████████ Notably, her contract ended on February 19, 2025. What is her current employment status?

*You* are a Respondent in that investigation as well. I have filed a complaint of serious illegal activity by you in relation to that investigation. The consensus view of UMES employees is that you have no relevant qualifications for your job and were only employed due to a predilection for evil and a remarkable willingness to engage in unlawful activity in exchange for money. UMES employees actually recoil from you and walk away when they see you on campus. Despite these deficits, you will know that you cannot investigate yourself. So, let me know who USM/UMES nominates to conduct this investigation and I would be happy to participate.

Previously, when told that your actions may be violating the law and you may be held liable in a

court, you have scoffed dismissively, exhibiting contempt for the rule of law. Other faculty have also reported similar conduct by you - visibly sneering at mentions of the court. It seems you are under the illusion that taxpayers will fund your defense and you will be able to keep the proceeds of unlawful activity with impunity. Let me disabuse you of this fantasy - we will seek to legally claw back your salary and other benefits collected by you for the last several years from UMES on behalf of the state of Maryland.

Returning to this investigation, you have not indicated the date when I may cross-examine ██████ ███████████████████████████████████ Please provide some dates and times for me to review for the cross-examination.

Aside from the cross-examination in person, I am happy to meet with an objective investigator to discuss the complaint including the ones against OIE staff. This meeting can be scheduled in virtual format so that we can record and transcribe the proceedings and avoid the kinds of dissembling you are renowned for.

Finally, please pass on the attached motion to dismiss ██████████████s complaint under section 106.45 (3) of Title IX to your superiors at USM. You have no discretion: the statutory section states you "must dismiss" because none of your allegations satisfy the definition of sexual harassment in Title IX, even if proved. I am not asking for dismissal of the complaint under any eleemosynary considerations, just based on my legal rights which have to be respected.

Have a wonderful evening.

Yours most respectfully,

---

**From:** Ginta Martin, Alexandra F███████████@umes.edu>
**Sent:** 21 February 2025 09:00
**To:** ██████████████████████████████
**Cc:** Robin Cockey ██████████████████>; Rivera, Cecilia M ██████████@umes.edu>
**Subject:** Follow-up to Meeting Request - Please Respond

Hello ███████████,

I am following up on the email below regarding our requested in-person meeting with you.

It is our understanding that you have been communicating with other entities regarding your multiple complaints; therefore, we encourage you to refer any questions or inquiries related to those complaints to the entities in question. We will continue to focus on our investigation only.

As a result, we are moving forward with our investigation process into the complaint in which you have been named a Respondent. The following six (6) meeting dates with wide ranges in time are being proposed:

E-FILED; Somerset Circuit Court
Docket: 2/16/2026 4:12 PM; Submission: 2/16/2026 4:12 PM
Envelope: 25126466

# EX 15.2

**Response to Alexandra Ginta Martin**

**2/24/2025**

Re: Matter of Jason Casares and 

Ms Martin:

Please see below my response to your email of Feb 21, 2025. I note that you provided me just a little over 1 business day's notice to submit a response.

You have alleged that there is a complaint in which I am a Respondent. Where is this complaint? I have not been provided with a copy. Please provide a copy immediately.

Under Title IX, in material part, sexual harassment "means conduct on the basis of sex that satisfies one or more of the following: (1) An employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct; (2) Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity."

Your notice of allegations contains nothing that satisfies the definition of sexual harassment in Title IX. There is nothing even remotely sexual in the word salad you have stated in your Notice of Allegations, no 'sexual conduct,' no 'unwelcome conduct' of any kind, and nothing that is 'severe, pervasive, or objectively offensive.'

As such ⬛⬛⬛⬛⬛⬛ s complaint must be dismissed as not satisfying the requirements of Title IX.

On 6th December 2024, you and Mr. Jason Casares provided a letter placing me on administrative leave. On 21st February 2025, you followed this up with a threat to place me on unpaid administrative leave.

Although unstated in your letter of 6th December, it is presumed that the administrative leave is under the color of Title IX's provision pertaining to "supportive measures." The statute defines these as "**non-disciplinary, non-punitive** individualized services offered as **appropriate, as reasonably available**, and without fee or charge to the complainant or the respondent before or after the filing of a formal complaint or where no formal complaint has been filed. Such measures are designed to restore or preserve **equal access** to the recipient's education program or activity **without unreasonably burdening the other party**, including measures

1

designed to protect the safety of **all parties** or the recipient's educational environment, or deter sexual harassment." (emphasis supplied)

The administrative leave action you have taken runs afoul of what is permitted by Title IX. It is disciplinary, punitive, and unreasonably burdens me. My work area is about half a mile from ▓▓▓▓▓▓▓▓▓▓▓▓'s office and I have never met her one-on-one and had no contact with her on a daily basis. In fact, my interactions with her were minimal and always in the presence of other ▓▓▓▓▓▓ was caught submitting false timesheets to receive federal funds illegally, performing poorly at work, and reprimanded. She is an hourly worker and was taking federal money without working the hours claimed. In other words, she was engaging in fraud. You have continued to pay her since December without doing any work. This is violative of Title IX's appropriateness and reasonableness requirements.

The termination of my email, banning me from campus, stopping my ▓▓▓▓▓▓▓▓▓▓▓▓ telling people on campus that I have been fired, stopping my important work, posting my photograph in the campus police department, defaming me with students, etc., are all unreasonable burdens. This is a clear violation of Title IX's injunction against such unequal and unreasonable action.

Notably, section 106.44(a) states in material part that "A recipient's response must **treat complainants and respondents equitably** by offering supportive measures as defined in § 106.30 to a complainant, and by following a grievance process that complies with § 106.45 **before the imposition of any disciplinary sanctions or other actions that are not supportive measures as defined in § 106.30, against a respondent**." (emphasis supplied)

Section 106.45 requires that you conduct "an objective evaluation of all relevant evidence—including both inculpatory and exculpatory evidence—and provide that credibility determinations may not be based on a person's status as a complainant, respondent, or witness." Here your actions have been the exact opposite of objective - it has been biased from the start and designed to obtain a predetermined outcome. Jason Casares, Alexandra Martin, Jocelyn Reader (a pharmacist toady of Heidi Anderson and Rondall Allen) and Cecilia Rivera have been frantically trying to pad the fabricated complaint by pressuring others on campus to make up falsehoods. Casares interviewed potential witnesses and tried to coach them. Rivera's communications to potential witnesses violated OIE policies and Title IX provisions and exhibited bias. The facts conclusively establish partisanship and a ready desire to take the complainant's side without any evidence of wrongdoing or concern for due process.

The statutory mandate to evaluate exculpatory evidence has been completely ignored. There is incontrovertible evidence that ▓▓▓▓▓▓▓▓▓▓ was submitting false timesheets, showing up for work cognitively impaired because she was under the influence, and that her work performance was poor. These are documented facts and establish a motivation to file a false complaint. It also establishes that she has no credibility at all. A fraudster shown to be filing

2

false timesheets and reprimanded therefor must be taken to be lying in this complaint. Similarly, there is incontrovertible evidence that I never met ███████████████ alone, never was within 6 feet of her, and had no inappropriate interactions with her. The word salad of fabricated statements, even assuming them to be true (which they are categorically not) shows absolutely no sexual animus or content and are banal statements even on the most generous construction to the alleged complainant.

Title IX requires the investigator to act without conflicts of interest and bias. You and OIE staff are biased and have an actual conflict of interest. You procured this complaint in conjucntion with Heidi Anderson's gang including Jocelyn Reader and Rondall Allen in retaliation for my filing whistleblower complaints against them for serious criminal activity. It stands to reason that you are acting in a biased manner and want to arrive at your predetermined outcome because you have a conflict of interest.

Title IX mandates "a presumption that the respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process." Your conduct in this investigation, specifically, the procurement of a fake complaint, pressuring others to make negative statements against me, and the statements by you and team that I have been fired, the removal of my bio from the website, the termination of my email address, the termination of my research projects, all show that you have not maintained the presumption of innocence.

Section 106.45 provides for pauses or delays for "good cause" which specifically includes "law enforcement activity." There is concurrent law enforcement activity in this case examining the illegal activities of UMES personnel including Heidi Anderson, Jason Casares, Alexandra Martin, and Cecilia Rivera. Under this provision, you should have paused your activities other than dismissal of this fake complaint. Your continuation of this farcical investigation violates the 'good cause' provision in Title IX.

OIE also violated section 106.45(2) which requires specific steps to be taken in relation to the Notices of Investigation and Allegations. You have not complied with those requirements and violated my procedural due process rights. These violations are not trivial - they are substantial and establish that your office lacks jurisdiction in this matter given your own admission in January that many of the alleged statements were before ██████ was an employee of UMES. The violations are fatal to your case.

In conclusion, you are asked to dismiss the complaint allegedly filed by █████████████ immediately. Section 106.45(3) mandates OIE to dismiss a complaint when "the conduct alleged in the formal complaint would not constitute sexual harassment as defined in § 106.30 even if proved." We have explained to you in considerable detail in previous communications and hereinabove why the allegations do not meet the Title IX definition of sexual harassment. As such, you  have no recourse but to dismiss. The statute uses the words "must dismiss" and the

language is binding and unambiguous. Failure to follow this statutory mandate will compound your errors and further prove your actual malice throughout this matter. In addition, the complaint should be dismissed because ███████████ s contract ended on February 19, 2025, and there are serious violations of due process by you in this investigation.

4

E-FILED: Somerset Circuit Court
Docket: 2/16/2026 4:12 PM; Submission: 2/16/2026 4:12 PM
Envelope: 25126466

# EX16

Outlook

---

## Re: Follow-up to Meeting Request - Please Respond

---

**From** ██████████████████████████

**Date** Tue 04/03/2025 17:02

**To** Ginta Martin, Alexandra F ████████ @umes.edu>

**Cc** Rivera, Cecilia M ████████ @umes.edu>

Good afternoon, Ms. Martin.

It is common knowledge at UMES that you do not like to obey the law and have contempt for legal institutions. Regardless of your tendencies and your lack of qualifications, as the "Assistant Director for Civil Rights," you have no choice but to follow the mandates of Title IX and the US Constitution.

All interactions between you and I are to be conducted within the boundaries of Title IX. If the statute says you must do something, you <u>must</u> do it whether you like it or not. If you make any demands, you must reference a statutory provision that supports your claims. I regret that I cannot indulge your whims.

It appears that you have not read my email response sent on February 24th. Please read it carefully again (text below in addition to the attachment submitted on 24th), consult with your superiors at the University System of Maryland office, and have them respond to the questions posed. As noted, you must follow the mandatory provisions and must dismiss the complaint against me as per the directive of Title IX.

Finally, given the allegations of criminal activities by you in this investigation, you are asked to recuse yourself from any further involvement in this matter until the investigation against you is completed.

I look forward to receiving the responses to my questions.

Enjoy your evening.

Thanks and best regards,

██████████████████████████

UMES

---

**From:** Ginta Martin, Alexandra ████████ @umes.edu>
**Sent:** 03 March 2025 17:44
**To:** ██████████████████████

**Cc:** Rivera, Cecilia M ████████ @umes.edu>
**Subject:** Re: Follow-up to Meeting Request - Please Respond

██████████████

E-FILED: Somerset Circuit Court
Docket: 2/16/2026 4:12 PM; Submission: 2/16/2026 4:12 PM
Envelope: 25162466

EX17

Outlook

---

**Re: Notice of Final Investigation Report (Respondent)- Please Confirm Receipt**

---

| From | ████████████████████████████████  ● |
|------|------|
| Date | Mon 02/06/2025 17:14 |
| To   | Ginta Martin, Alexandra F ███████@umes.edu> |
| Cc   | Rivera, Cecilia M ████████@umes.edu> |

📎 1 attachment (517 KB)
Response to Martin-Feb 24 2025.pdf;

Hello Ms. Ginta Martin,

I see that you have not learned anything. I have not received a response to my email sent to you on 4 April 2025. It is pasted below in case you have forgotten. I had inquired about my right to examine your "evidence", cross-examine the alleged complainant, and the status of my complaint against the rape-accused Jason Casares, amongst other matters. The legal memo submitted then and the letter submitted previously by my then attorney conclusively showed that your only legal option was to drop this fake investigation and apologize to me.

Your so-called final "investigation" report is nothing but a shambolic pack of lies designed to achieve your predetermined outcome. Your kangaroo court has not even followed your own processes. Perhaps you do not know that the Maryland law you reference is pre-empted by federal law? Which attorney advised you to draft this ridiculous report? It will be laughed out of court.

The only reason I have not instituted legal action to claw back the inflated salary paid to you as a bribe in exchange for your eagerness to willfully violate the law for your criminal masters is out of charitable consideration for your family. That is at an end from today.

I am overseas and could not have attended your meeting to review your "preliminary" report. The unholy haste with which you have acted even before your own time-frame lapsed shows that there was no real review or anything preliminary - this was an amateur stitch-up job by a bunch of bumbling criminals from day-one.

The criminals will be found out in court. And you can bet that I will appeal this nonsense.

Sincerely,

████████████████

_____

E-FILED: Somerset Circuit Court
Docket: 2/16/2026 4:12 PM; Submission: 2/16/2026 4:12 PM
Envelope: 25126466

# EX18

 Outlook

---

## Fw: Notice of Final Investigation Report (Respondent)- Please Confirm Receipt

| | |
|---|---|
| From | ███████████████████████ |
| Date | Mon 02/06/2025 17:22 |
| To | Taylor, Matthew A ██████ @umes.edu> |

📎 1 attachment (517 KB)
Response to Martin-Feb 24 2025.pdf;

---

Hello Matt,

Please see below. I am not sure you had a chance to review this predetermined hogwash. You know very well that I did not harass anyone or create any hostile environment for anyone.

The ████████████ are nasty criminals - everyone at UMES knows this. They might think they have nothing to lose but they are about to find out otherwise.

Unlike these trashy individuals, you went to a decent law school and took an oath to follow the law. Please uphold your responsibilities. No paycheck is worth sacrificing one's conscience for. If I had not reported the criminal gang at UMES they would not have fabricated this and acted with such alacrity. Remember this is a group that cannot do even the simplest things within time - that Anderson cannot even type a simple email without ChatGPT. Why did they put me on leave within days of a procured fabricated complaint and act as if I was fired even before any investigation??

The whole thing will be blown up in court and I am determined that these crooks will go to jail.

Please observe your oath, read my legal memo attached, and provide a confidential statement about the many illegal activities of the Anderson gang to the Attorney General's office and the DoJ.

The only legal avenue open to UMES is to drop these fabricated allegations bereft of any evidence and apologize to me.

Thanks,

████████████████████

---

| | |
|---|---|
| From | ████████████████████ > |
| Sent: | 02 June 2025 17:14 |
| To | ████████████████████ |
| Cc: | Rivera, Cecilia M ██████ @umes.edu> |
| Subject: | Re: Notice of Final Investigation Report (Respondent)- Please Confirm Receipt |

Hello Ms. Ginta Martin,

E-FILED: Somerset Circuit Court
Docket: 2/16/2026 4:12 PM; Submission: 2/16/2026 4:12 PM
Envelope: 25126466

# EX19

 Outlook

---

**Fw: Notice of Final Investigation Report (Respondent)- Please Confirm Receipt**

---

From ████████████████████████████████████

Date   Thu 05/06/2025 12:22

To     Katherine Bainbridge████████@oag.state.md.us>

Cc     ████████████████████████████████████████

📎 3 attachments (786 KB)
Response to Martin-Feb 24 2025.pdf; Cockey-Martin 1.24.25.pdf; Iranian female students - letter.pdf;

Dear Ms. Bainbridge████████████████████████████

Good morning. I hope you are doing well.

Please see the below. Are you aware of the grotesque and willful violations of basic due process by the crooks at UMES?

Ms. Bainbridge, did you see the memo I sent in February 2025 asking for specific details about the allegations against me? To date, I have not been provided with the dates on which I am alleged to have created a hostile environment/harassed the alleged complainant, Iranian national████████, or any evidence.

As you know, due process requires that I must be provided with the specific allegations, the dates and times when offensive conduct is alleged to have occurred, an opportunity to examine any evidence advanced to support the allegations, and the opportunity to cross-examine the accuser to establish the credibility of the accusations. Any first-year law student would know this, and surely, you all know that these basic minimum guarantees are owed to anyone in the US.

Given that, are the gross violations of my constitutional rights being orchestrated with your knowledge and consent?

You know that the UMES administration are a bunch of crooks███████████████████████ ████████████████████████████████████████████████████████████. They are running a diploma mill to steal federal and state funds. The previous provost, CFO, and head of Human Resources were all pushed out illegally because they were honest and resisted criminal activity.

The UMES Office of Institutional Equity (OIE) is headed by a rape-accused individual named Jason Casares, who has been the subject of numerous complaints about serious illegal activities with his cronies Alexandra Martin and Cecilia Rivera. Your office has been notified about these complaints. They are being paid grossly exaggerated salaries and benefits as bribes in exchange for illegal acts in

aid of the Heidi Anderson criminal gang.

The fake claims against me were fabricated because I exposed fraud an█████████is just a poor stooge used by the Anderson gang.

The fake and fabricated allegations against me will collapse with the simple responses to these basic questions:
   1. What were the remarks constituting harassment/hostile behavior?
   2. When did the conduct occur? What are the dates for each comment?
   3. What was the response of the supposed victim?

The refusal of the OIE to answer these basic questions shows they know their fabricated house of cards will collapse.

From the claims, it appears that some of the comments were made before████████(alleged complainant) even applied for a job at UMES or was under any realistic prospect of such employment.

If my comments were hostile or harassing, why did she then subsequently apply for the job to work with me and move all the way to UMES? Even a 10-year old child can see the contradiction.

If I was hostile or harassing her, why di█████████request me for a loan? She could have asked her fellow countryma████████(an Anderson gang-member with numerous current complaints being suppressed by OIE) or others. I can show you her text messages which clearly contradict any iota of harassment or hostile behavior.

The fact is that I was only charitable and generous to her.

Even assuming for the sake of argument that her claims are true (which they are absolutely not), there is nothing sexual or harassing about the comments. It simply does not meet the required legal threshold - see attached memo from my previous counsel.

We have witnesses who will testify tha████████was a chronic absentee at work from day-one and that her work performance was abysmal. When she was caught submitting fraudulent timesheets and not doing her work, she fabricated this complaint with the Heidi Anderson gang because she feared being deported for violating the conditions of her visa.

We also have witnesses who will show that████████claims about being distressed are all lies. She has been spotted partying with drugs and alcohol and entertaining random men at a location in Salisbury with an associate who self-describes herself as a "pole dancer." The appearance of immoral activities is reported and investigation may expose consideration for these acts with the random men.

Alexandra Martin's so-called report is full of lies including her list of witnesses. She has deliberately omitted the names of witnesses who provided clear and contradictory testimony t█████claims. Three students and a full professor of repute were witnesses interviewed by Martin/Casares. They contradicte█████version but Casares and Martin deliberately omitted these pieces of evidence because they were destructive t█████claims. We have sworn affidavits from these witnesses about the attempted coercion by Casares and Martin to speak negatively about me. The omission of

these testimonies is so amateurish and so prejudicial that it alone destroys the fake case against me.

Casares and Martin are spinning a fantasy about me having some preference for Iranians. This is absolute nonsense. Attached is a statement from six female Iranian students about how my behavior with them was absolutely professional and respectful. I also have sworn statements from two other Iranian female students stating that my conduct toward them was absolutely professional.

I treat all people fairly based on merit. Many Iranians were hired because UMES is not a selective university and we had to take what we could get. The Iranians applied and were selected to work on projects by top faculty at UMES. I did not show any favor and the hiring was by others. My projects had people from many nationalities and they were all treated based on merit.

is a hideous and smelly individual. I have never met her alone and every interaction was with other witnesses present. Every meeting was in a public, observable place. I have never been within 6 feet of her. This is conclusive evidence to destroy any implication of sexual animus. To put it bluntly, I made every effort to stay as far away from her as possible - a fact observed by others. And the reason why meetings with her were organized in large open areas where I sat as far away as possible - often at the extremity of the room - was to avoid the stench from poor hygiene.

Despite being told this in writing, Martin and Casares did not interview the witness (an eminent professor who would have directly contradicted fake complaint observed every interaction I had with and managed her day-to-day work. She has information essential to any investigation in this matter but has not been contacted by OIE staff. Why?

and numerous other female faculty and staff at UMES will testify in court that I have been very respectful and professional in my interactions with them.

They and others will also testify about the many illegal activities of Casares, Martin, and other criminals at UMES.

We also have copies of emails written by Martin and Rivera to others about this case in violation of their own confidentiality requirements. The list of due process violations is long and destructive of any notions of an impartial investigation. It would be an embarrassment to the OAG to defend this.

Ms. Bainbridge, unlike Heidi Anderson, Casares, and Martin, you went to a good law school and took an oath as an attorney. They are base individuals who will stoop to any depths. You are an officer of the court and are working for the state. How can you participate in these grotesque abuses of due process and enable the willful harming of an innocent man?

I filed a whistleblower complaint in June and September last year - with agencies including to the OAG - after Heidi Anderson's criminal activities were detected. This fabricated complaint against me is an act of retaliation to escape jail.

The USM hotline has received information from faculty about illegal activities by Anderson's gang. Have you asked them to show you those complaints? David Mauriello and Mosca were given specific

information by faculty. It is impossible to hide any of this.

How are you going to stand up in court and defend the actions of these criminals? Are you going to stand on the side of criminals, a rape-accused, and a liar making fake accusations after submitting fraudulent timesheets? Are you going to defend retaliation against an innocent man who exposed fraud? It will destroy your credibility as attorneys and bring disgrace to the OAG and the Governor when all of this becomes public.

Further █████████ is a temp worker whose contract expired in February. Why was it renewed other than to keep the fake case against me alive? As you know, given the fiscal deficit, temporary contracts are not to be renewed per state government directives. The USM and UMES are under severe financial distress and all hiring and renewals are to be paused. So, what is the source of funding fo ██████████ contract to be renewed? Who authorized this and for what legitimate purpose?

Please answer these questions. Evasion won't be helpful and this is the last opportunity before I go to court. The questions will inexorably have to be answered in court. It would be better for the USM to not go there because UMES will be exposed in public as the criminal organization it has become under Heidi Anderson. Many employees who have detailed insights will provide testimony at trial and I cannot wait to take depositions of Jay Perman, Heidi Anderson, and Jason Casares.

Please put an end to the illegal activities at UMES and fulfil your obligations as officers of the court.

I am happy to provide any further information you may need.

Respectfully,



UMES

---

**From** ██████████████████████████████
**Sent:** 02 June 2025 17:14
**To:** Ginta Martin, Alexandra F████████@umes.edu>
**Cc:** Rivera, Cecilia M ████████@umes.edu>
**Subject:** Re: Notice of Final Investigation Report (Respondent)- Please Confirm Receipt

Hello Ms. Ginta Martin,

I see that you have not learned anything. I have not received a response to my email sent to you on 4 April 2025. It is pasted below in case you have forgotten. I had inquired about my right to examine your "evidence", cross-examine the alleged complainant, and the status of my complaint against the rape-accused Jason Casares, amongst other matters. The legal memo submitted then and the letter submitted previously by my then attorney conclusively showed that your only legal option was to drop this fake investigation and apologize to me.

E-FILED; Somerset Circuit Court
Docket: 2/16/2026 4:12 PM; Submission: 2/16/2026 4:12 PM
Envelope: 25126466

# EX20



Outlook

**illegal activities at Univ of MD Eastern Shore**

| | |
|---|---|
| From | |
| Date | Sun 08/06/2025 11:07 |
| To | Katherine Bainbridge |
| Cc | |

📎 3 attachments (660 KB)
Iranian female students - letter.pdf;   sworn affidavit.pdf;   sworn affidavit.pdf;

Hello Ms. Bainbridge and colleagues,

I have not received a response to my previous email. Do you have anything to say about the grave violations of my constitutional and legal rights by the criminal gang at UMES?

OAG colleagues, please assist. There is willful illegal activity of the most gross sort here and nothing is being done by the OAG official who is supposed to oversee these crooks.

I filed a whistleblower complaint against Heidi Anderson (president of UMES) and a gang of criminals stealing federal and state funds last year. In retaliation, a fake complaint of harassment was procured by Anderson's toady: a rape-accused man named Jason Casares.

I have not been provided even the most minimal procedural and substantive due process rights mandated by the US Constitution, Title IX, and numerous court decisions.

I do not know when the comments alleged to have been harassing were made, what proof exists, or an opportunity to examine credibility despite numerous requests in writing. No dates, times, or any evidence has been provided to me to date. The rape-accused Casares and his cronies are acting as judge, jury, and executioner in exchange for bribes paid by Heidi Anderson.

I have never met the alleged accuser alone, and never been within 6 feet of her. Every interaction was in the presence of witnesses and there is absolutely no truth to this fake case.

The alleged accuser was caught committing fraud and has no credibility whatsoever. Even taking her claims at face value, the comments do not constitute harassment. The Title IX office does not even have jurisdiction in the case because the comments appear to have been made before the person was even an applicant for employment. Her subsequent conduct, the timing, and other contextual evidence destroys any possibility that she felt harassed.

The whole thing is a scam - a pretextual witch hunt by a bunch of crooks seeking to escape jail for their crimes.

Please see the attached. I urge you to do the decent thing and compel these crooks to act within the boundaries of the law.

It brings your office very little credit to enable the violation of the constitutional rights of an honest, innocent person in this way.

Thanking you,

Sincerely,

---

**From** ████████████████████████████
**Sent:** 05 June 2025 12:22
**To:** Katherine Bainbridge ███████████████tate.md.us>
████████████████████████████████████████
████████████████████████████████████

**Subject:** Fw: Notice of Final Investigation Report (Respondent)- Please Confirm Receipt

Dear Ms. Bainbridg███████████████████████████

Good morning. I hope you are doing well.

Please see the below. Are you aware of the grotesque and willful violations of basic due process by the crooks at UMES?

Ms. Bainbridge, did you see the memo I sent in February 2025 asking for specific details about the allegations against me? To date, I have not been provided with the dates on which I am alleged to have created a hostile environment/harassed the alleged complainant, Iranian national ████████ or any evidence.

As you know, due process requires that I must be provided with the specific allegations, the dates and times when offensive conduct is alleged to have occurred, an opportunity to examine any evidence advanced to support the allegations, and the opportunity to cross-examine the accuser to establish the credibility of the accusations. Any first-year law student would know this, and surely, you all know that these basic minimum guarantees are owed to anyone in the US.

Given that, are the gross violations of my constitutional rights being orchestrated with your knowledge and consent?

Case 1:26-cv-00000-JRR   Document 1-1   Filed 03/03/26   Docket 2/16/2026 4:12 PM   Page 121 of 207

E-FILED: Somerset Circuit Court
My Submission: 2/16/2026 4:12 PM
Envelope: 251126466

# EX 21



**Statement of Support for** ██████████████████

To Whom It May Concern,

We, a group of graduate students formerly affiliated with the ████████████████
University of Maryland Eastern Shore (UMES), are writing to express our full and
unwavering support fo██████████.

███████████ has consistently served as a dedicated academic mentor, advocate, and
Principal Investigator who has guided us through our research journey with utmost
professionalism, compassion, and integrity. Despite the recent disruptions to our
funding, he has remained the only faculty member to support and stand by us as we
seek justice.

We are deeply concerned that recent administrative actions taken by the university
███████████████████████████████████████████████████████ss
███████████████████████████████████████ by an apparent campaign
to discredi██████████These actions, in our view, are unfounded and represent a
misuse of institutional power that jeopardizes not only his reputation but also our
educational futures.

It is important to state clearly that we, the students directly involved in this program,
have never witnessed any misconduct or mismanagement by██████████. On the

**Statement of Support fo**▮▮▮▮▮▮▮▮▮▮

contrary, he has always acted in accordance with university and federal guidelines, and has tirelessly advocated for our academic rights.

We respectfully request tha▮▮▮▮▮▮▮ be treated fairly and that any attempt to falsely implicate him be stopped immediately. He deserves institutional protection not retaliation for standing up for truth and student welfare.

Sincerely,

**Signatures:**

1. Nasim Mohammad▮▮▮▮▮▮▮            Date: 17-April-2025
▮▮▮▮▮▮▮▮▮

2. Shadi Khorrami               Date: 17-April-2025
▮▮▮▮▮▮▮▮▮

3. Shaghayegh Shojaei         Date: 17-April-2025
▮▮▮▮▮▮▮▮▮

4. Sima Mahmoudi              Date: 17-April-2025
▮▮▮▮▮▮▮▮

5. Asal Sami                    Date: 17-April-2025
▮▮▮▮▮▮▮▮

6. Farzane Maleki              Date: 17-April-2025
▮▮▮▮▮▮▮▮

E-FILED; Somerset Circuit Court
M. Submission: 2/16/2026 4:12 PM
Envelope: 25126466



# EX 22



Outlook

---

**Re: Notice of Final Investigation Report (Respondent)- Please Confirm Receipt**

---

From ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

Date  Mon 09/06/2025 16:53

To    Ginta Martin, Alexandra ▬▬▬▬▬▬ @umes.edu>

Cc    ▬▬▬▬▬▬▬▬▬▬▬▬Katherine Bainbridge ▬▬▬▬▬@oag.state.md.us>;
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬;
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬;

📎 2 attachments (345 KB)
OIE Appeal Fillable Form.pdf; OIE Appeal submission.pdf;

Hello Ms. Ginta Martin,

Please find attached the completed appeal form and submission. Please identify the appeal authority so that additional information may be delivered directly without your manipulation.

Ensure that ▬▬▬▬▬▬▬▬ receives these documents.

I am very much looking forward to seeing you in court shortly for you to face the music for your intentional illegal activities.

The OAG staff are being copied to ensure that there is no pretence about their lack of knowledge of these illegal acts by your gang. These and related documents will also be provided to the federal government agencies including the DoJ and FBI.

Yours most respectfully,

▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬

---

**From:** Ginta Martin, Alexandra ▬▬▬▬▬▬@umes.edu>
**Sent:** 02 June 2025 15:45
**To:** ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
**Cc:** Rivera, Cecilia M ▬▬▬▬▬▬@umes.edu>
**Subject:** Notice of Final Investigation Report (Respondent)- Please Confirm Receipt

Hello ▬▬▬▬▬▬▬

# EX 23

 Outlook

---

**Re: Notice of Final Investigation Report (Respondent)- Please Confirm Receipt**

---

**From** Ginta Martin, Alexandra F ███████@umes.edu>

**Date** Mon 09/06/2025 18:47

**Cc**   Rivera, Cecilia M ███████@umes.edu>

---

Good evening ███████,

I am confirming receipt of your appeal documents.

Kind regards,

---

**From:** ██████████████████

**Sent:** Monday, June 9, 2025 4:53 PM

**To:** Ginta Martin, Alexandra F ███████@umes.edu>
██████████████ Katherine Bainbridge ████bridge_@███.state.md.us>;
████████████████████████████████████
███████████████████████████████████

**Subject:** Re: Notice of Final Investigation Report (Respondent)- Please Confirm Receipt

Hello Ms. Ginta Martin,

Please find attached the completed appeal form and submission. Please identify the appeal authority so that additional information may be delivered directly without your manipulation.

Ensure that ███████ receives these documents.

I am very much looking forward to seeing you in court shortly for you to face the music for your intentional illegal activities.

The OAG staff are being copied to ensure that there is no pretence about their lack of knowledge of these illegal acts by your gang. These and related documents will also be provided to the federal government agencies including the DoJ and FBI.

Yours most respectfully,



E-FILED; Somerset Circuit Court
Docket: 2/16/2026 4:12 PM; Submission: 2/16/2026 4:12 PM
Envelope: 25126466

# EX 23

 Outlook

---

**Re: Notice of Final Investigation Report (Respondent)- Please Confirm Receipt**

---

**From**  Ginta Martin, Alexandra F ██████@umes.edu>

**Date**  Mon 09/06/2025 18:47

████████████████████████████████████

**Cc**  Rivera, Cecilia M ██████@umes.edu>

---

Good evening ██████████,

I am confirming receipt of your appeal documents.

Kind regards,

---

**From:** ████████████████████████████████

**Sent:** Monday, June 9, 2025 4:53 PM

**To:** Ginta Martin, Alexandra F ██████ @umes.edu>
██████████ Katherine Bainbridge ████ bridge @███.state.md.us>;
██████████████████████████████████████████████████
██████████████████████████████████████████████████

**Subject:** Re: Notice of Final Investigation Report (Respondent)- Please Confirm Receipt

Hello Ms. Ginta Martin,

Please find attached the completed appeal form and submission. Please identify the appeal authority so that additional information may be delivered directly without your manipulation.

Ensure that ██████████ receives these documents.

I am very much looking forward to seeing you in court shortly for you to face the music for your intentional illegal activities.

The OAG staff are being copied to ensure that there is no pretence about their lack of knowledge of these illegal acts by your gang. These and related documents will also be provided to the federal government agencies including the DoJ and FBI.

Yours most respectfully,



# EX 24

 Outlook

---

**Re: Notice of Final Investigation Report (Respondent)- Please Confirm Receipt**

---

From ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Date  Tue 24/06/2025 15:53

To    Taylor, Matthew A ▓▓▓▓▓▓@umes.edu>

📎 2 attachments (264 KB)
Cockey-Martin 1.24.25.pdf; OIE Appeal submission.pdf;

Hi Matt,

I am sending you the attached as a professional courtesy and to eliminate any pretense of lack of knowledge. It is difficult to believe any attorney would participate in such egregious illegal activity.

I am sure you are familiar with Rules 3.3 and 4.1 of the ABA Model Rules. It is not worth jeopardizing your law license and livelihood for these criminals. These illegal actions are indefensible and will be humiliating in court.

Please consider carefully and act within the confines of the law. The recent harsh punishments against attorneys Rudy Giuliani, Jenna Ellis, John Eastman, etc., should give you pause for thought.

If you are being coerced, please submit a complaint to the DoJ and the US Dept of Education.

Thank you,

▓▓▓▓▓▓▓▓

---

From ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓>

Sent: 02 June 2025 17:22

To: Taylor, Matthew A ▓▓▓▓▓▓@umes.edu>

Subject: Fw: Notice of Final Investigation Report (Respondent)- Please Confirm Receipt

Hello Matt,

Please see below. I am not sure you had a chance to review this predetermined hogwash. You know very well that I did not harass anyone or create any hostile environment for anyone.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ criminals - everyone at UMES knows this. They might think they have nothing to lose but they are about to find out otherwise.

Unlike these trashy individuals, you went to a decent law school and took an oath to follow the law. Please uphold your responsibilities. No paycheck is worth sacrificing one's conscience for. If I had not

reported the criminal gang at UMES they would not have fabricated this and acted with such alacrity. Remember this is a group that cannot do even the simplest things within time - that Anderson cannot even type a simple email without ChatGPT. Why did they put me on leave within days of a procured fabricated complaint and act as if I was fired even before any investigation??

The whole thing will be blown up in court and I am determined that these crooks will go to jail.

Please observe your oath, read my legal memo attached, and provide a confidential statement about the many illegal activities of the Anderson gang to the Attorney General's office and the DoJ.

The only legal avenue open to UMES is to drop these fabricated allegations bereft of any evidence and apologize to me.

Thanks,

██████████

---

**From:** ████████████████████████
**Sent:** 02 June 2025 17:14
**To:** Ginta Martin, Alexandra █████████umes.edu>
**Cc:** Rivera, Cecilia M██████████umes.edu>
**Subject:** Re: Notice of Final Investigation Report (Respondent)- Please Confirm Receipt

Hello Ms. Ginta Martin,

I see that you have not learned anything. I have not received a response to my email sent to you on 4 April 2025. It is pasted below in case you have forgotten. I had inquired about my right to examine your "evidence", cross-examine the alleged complainant, and the status of my complaint against the rape-accused Jason Casares, amongst other matters. The legal memo submitted then and the letter submitted previously by my then attorney conclusively showed that your only legal option was to drop this fake investigation and apologize to me.

Your so-called final "investigation" report is nothing but a shambolic pack of lies designed to achieve your predetermined outcome. Your kangaroo court has not even followed your own processes. Perhaps you do not know that the Maryland law you reference is pre-empted by federal law? Which attorney advised you to draft this ridiculous report? It will be laughed out of court.

The only reason I have not instituted legal action to claw back the inflated salary paid to you as a bribe in exchange for your eagerness to willfully violate the law for your criminal masters is out of charitable consideration for your family. That is at an end from today.

I am overseas and could not have attended your meeting to review your "preliminary" report. The unholy haste with which you have acted even before your own time-frame lapsed shows that there was no real review or anything preliminary - this was an amateur stitch-up job by a bunch of bumbling criminals from day-one.

The criminals will be found out in court. And you can bet that I will appeal this nonsense.

Sincerely,

# EX 25

**Appeal and Complaint Against the University of Maryland Eastern Shore for Willful and Malicious Violations of Constitutional and Statutory Rights, Due Process Obligations, and Abuse of Process to Orchestrate a Fake Investigation based on Fabricated Allegations.**

I. Introduction:

The Office of Institutional Equity led by Jason Casares -- a rape-accused individual with a long-established record of abusing Title IX processes and investigations --- has been engaging in a campaign of illegal activities against ▮▮▮▮▮▮▮▮▮▮▮. Casares in collusion with his toadies Alexandra Ginta Martin and Cecilia Rivera (hereinafter referred to collectively as "OIE crooks") -- both unqualified, incompetent individuals against whom numerous complaints have been filed by faculty and staff with federal and state regulatory agencies -- procured a complaint from a fraudster named ▮▮▮▮▮▮▮▮▮▮. The complaint was procured in retaliation against ▮▮▮▮▮▮▮ because he reported criminal activities at UMES led by the president, Heidi Anderson. These crimes are currently under investigation by various agencies, and it is expected that legal consequences will follow. Without following the law, conducting anything even approximating a fair investigation, and ignoring repeated written questions from ▮▮▮▮▮▮▮ (last communication in April 2025), the OIE crooks abruptly proceeded to issue a "Final Report" on June 2nd. The "report" is absolute gibberish - trademark Casares and Ginta Martin work-product full of lies and exhibiting the logical reasoning ability of a mentally retarded child.

The OIE crooks even lie about the most basic facts such as the witnesses interviewed -- conveniently omitting the names of several witnesses they interviewed from the list on page 3 of their fraudulent report. Casares, Ginta Martin, and Rivera are seemingly oblivious to how easy it is to destroy their lies in court. For example, we have sworn testimony from individuals who are not named as "witnesses" that they were in fact interviewed by Casares and Ginta and attempted to be coerced.

This appeal and complaint about UMES engaging in gross due process violations and infringing upon ▮▮▮▮▮▮▮ rights is being submitted without any expectation that the OIE crooks will follow the law in this appeal. Rather, the anticipated illegal actions during the appeal will only underscore their criminality and add to the devastating legal consequences they will face in court shortly.

1

The violations of applicable legal protections are willful, malicious, and with the apparent aid of the UMES General Counsel. Absurdly, the OIE crooks err even about one of the most basic questions in this case: the applicable legal regime. Given that a first-year law student would be able to read and apply the mandatory legal regime -- Title IX -- the error must be considered willful and malicious. Notably, the OIE crooks started this fake investigation under Title IX but after realizing that their fake case would go up in smoke, now claim for the first time in their "Final Report" that Title IX does not apply. Only a moron or imbecile would now claim in a footnote that Title IX does not apply to this case: "the OIE/the Title IX Coordinator determined that the allegations did not fall under the "2020 Title IX Rule."

Sadly, for the OIE crooks, such wishful thinking will not prevent applicable federal law from nailing them. Like the average criminal who claims he was not aware of the law or that it does not apply to him whilst violating it, the OIE crooks will meet the same end: accountability in court and harsh punishment.

The OIE staff and the UMES General Counsel apparently cannot read and comprehend the plain text of Title IX itself which mandates its application and are not aware of the supremacy of federal law under the US Constitution. UMES General Counsel has apparently not advised the OIE crooks about the preemption doctrine and the fact that Title IX must be followed and that its due process protections must be afforded in any such investigation at UMES. The US Department of Education's explanatory memorandum issued whilst promulgating regulations states: "**Title IX applies to all recipients of Federal financial assistance, whether the recipient is a public or private entity and regardless of the size of the recipient's student body** (emphasis supplied.) Fair, reliable procedures that best promote the purposes of Title IX are as important in public schools, colleges, and universities as in private ones, and are as important in large institutions as in small ones. The final regulations therefore **prescribe** (emphasis supplied) a consistent grievance process for application by all recipients without distinction as to public or private status, or the size of the institution."

UMES is a recipient of federal financial assistance. It cannot exist without such assistance. Therefore, UMES must follow the mandate of Title IX. The deliberate refusal to follow Title IX by itself means that UMES is discriminating against ████████ based on sex. UMES's illegal actions will meet harsh administrative enforcement by the US Department of Education terminating its eligibility for receiving federal funds and by way of private litigation for substantial money damages. This flows from Supreme Court case law including decisions such as *Cannon v. University of Chicago*, 441 U.S. 677, 717 (1979). As the court explained in *Cannon*, "Title IX ... sought to accomplish two related, but nevertheless somewhat different, objectives. First, Congress wanted to avoid the use of

2

federal resources to support discriminatory practices; second, it wanted to provide individual citizens effective protection against those practices."

UMES now risks severe penalties from the US Department of Education for not following Title IX despite being an institution entirely dependent on federal funds. Under section 1682 (Title 20), providing the consequences for the violation of Title IX Rules by institutions receiving federal funds, the Congress stipulated that "Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient ... [for] a failure to comply with such requirement." UMES can expect consequences including the loss of Title IV funds which would effectively shut down the university unless it retreats from its malicious and unlawful actions and submits an unconditional apology t█████

In addition, the OIE crooks will be sued and the most stringent sanctions including a permanent ban on Casares, Ginta, and Rivera ever working in any institution receiving federal funding will be sought from the court. If the General Counsel, Matthew Taylor, did enable this willful and malicious violation of mandatory law and gross abuses of due process, a permanent disbarment order stripping him of his law license will be sought. ████████████will face legal action for making a false complaint and violating immigration laws imminently.

Given the obvious application of the wrong legal standard without any reasoning or legal support by OIE, and the gross violations of the US Constitution, this memorandum does not engage in a lengthy excursus about the numerous Supreme Court and federal court opinions that should terrify anyone pretending to support UMES's legal position. If any attorney can offer any putative legal reasons to support UMES's position██████████s happy to provide additional legal argumentation with supporting case law. This memo is also being sent to the Office of Attorney General so that there cannot be any pretense to lack of knowledge.

II. Factual Background



1. ████████████████has been employed at UMES██████████████████

   additional role o███████████████████████████████████████

   ████████████████████and the position would become permanent in about

3

six months. In every respect, his performance was exemplary, and he received the maximum points possible in his annual performance reviews

2. ██████████████████ ████████████████ ████████████████████
████████████████  is the most widely published professor at UMES by a massive margin ███████████ has an established record of impeccable probity and fighting public corruption.

3. ████████████ s the recipient of about $5 million in external research funding during his tenure at UMES.

4. Heidi Anderson is the president of the UMES. During her tenure starting in 2018, UMES has been on a sharp downward spiral with cratering enrollment, faculty and staff morale, financial malfeasance, and collapse of academic standards.

5. Whereas UMES had a healthy enrollment of about 5000 students when Heidi Anderson took office in 2018, the university's current claimed enrollment is about 3000 - a collapse of 40% owed entirely to incompetent administration.

6. Under Anderson's watch, the Physician Assistant program lost accreditation, academic standards have been willfully sabotaged, and the university has been turned into a diploma mill with low academic standards.

7. Anderson's management ability is illustrated by the fact that her own discipline -- Pharmacy -- has an enrollment of barely 20 new students each year despite receiving egregious favored treatment and the highest amount of university resources. The passing rate for UMES pharmacy students fell to a historic low of 57% this year - one of the lowest in the nation. The pass rate for UMES students was 95% when Anderson started at UMES.

8. Jason Casares is the director of OIE at UMES. He has been publicly accused of rape (which did not result in criminal prosecution and jail due to technical reasons) and willful violations of Title IX processes and investigations. His employment at UMES is unlawful and his tenure at UMES has been marked by a concerning record of malicious illegal activities that merit criminal prosecution. There may be cause in the current changed environment with greater protections for sexual assault survivors for the previous rape accusations against Casares to be reopened for prosecution. Similarly, given the continued record of violating Title IX processes and investigations at UMES, the US Department of Education will be requested to investigate Casares as a serial abuser and ban him from working in higher education permanently.

9. Alexandra Ginta Martin and Cecilia Rivera are subordinates of Casares in the OIE employed without required qualifications or necessary ethical character. In fact, they were employed solely due to the absence of those qualifications and ethics. All

4

three - Casares, Ginta, and Rivera - possess basic degrees from low-ranked universities and lack the logical reasoning and analytical capabilities necessary for their roles. Their competency is even lower than their ethics as illustrated by their conduct in these sordid proceedings.

10. Casares, Ginta Martin, and Rivera have been paid grossly inflated salaries and benefits in exchange for abusing investigations and related processes to achieve the nefarious objectives of UMES administration. Salary data will be provided in court in addition to expert witness testimony.

11. ███████████████ commenced employment as a temporary contractual staff member in late August 2024. Her role was that of an entry-level data analyst. ████████ is employed at UMES under the OPT visa - a U.S. work authorization for international students on F-1 visas, allowing them to work in the U.S. after completing their studies. Optional Practical Training (OPT), by definition, is part of educational activity at a US public university receiving federal funds - meaning that the OIE crooks' claim that Title IX does not apply in this case is absurd from the start.

12. ██████ contract was due to expire on February 19, 2025.

13. From day-one of her employment ███████████████ was a chronic absentee at work and did not perform her duties satisfactorily. Although her contract required her to work from the UMES campus between 9 am and 5 pm, she did not come to work at 9 am and left well before 5 pm. In fact, on many occasions she did not attend work at all.

14. It became apparent that ██████ was submitted fraudulent time-sheets to obtain pay. UMES employees who worked in the same hallway as ██████ reported never seeing her in her office.

15. ██████ also appeared to be cognitively impaired and disoriented at work on several occasions. On two separate occasions ████████ went to the third floor of ████████ Hall claiming to look for ████████ when she had previously been shown his office on the ground floor. ████████ smelled of weed or alcohol on numerous occasions and was frequently confused and clueless about basic matters such as the day/date and time, work instructions, deadlines, performance expectations, locations, names of UMES personnel, events, etc.

16. ██████ immediate supervisor was ██████████████████████ ██████████████ at UMES. Dr. ██████ was the first-line manager and oversaw ████████ work.

17. Within days of her work at UMES, it became apparent that ████████ did not possess the ability to conduct basic statistical analysis projects that were assigned to her.

She did not seem to comprehend basic work instructions, could not work independently, and was not producing written work.

18. ██████ was requested to provide a daily report of her work activities prior to closing her time-sheet at 5pm each day. This was intended as a sound management practice to document progress and to ensure our compliance with the use of federal funds.

19. ██████ failed to upload daily work reports despite numerous reminders.

20. When it became impossible to ignore that ██████ was submitting fraudulent time-sheets ██████ sent her a polite email inquiring if she was actually working the hours claimed.

21. ██████ admitted that she was not working the hours claimed ██████ responded that if the variance was just a few minutes, it was fine because it would be considered trivial.

22. By November, it became obvious that the variance between ██████ submitted time-sheets and the hours worked was not trivial or minor ██████ seemed to be engaging in a deliberate practice of deception claiming substantially more hours than she worked, was more interested in non-work activities, having a good-time, and securing permanent employment at UMES rather than performing her assigned work duties.

23. After failing to meet important work product delivery deadlines in November and being unable to explain her tardy performance ██████ emphasized to her in two meetings in November that ██████ would have to improve her work performance. In a polite and respectful manner ██████ told ██████ that her work had to be comprehensible, that there had to be discernible logical sequence to the written materials submitted, and minimum standards had to be met.

24. In late November 2024 ██████ apprehended that her contract would be terminated and that she may be deported to Iran for fraudulently submitting time-sheets and taking federal funds. In addition, the consumption of drugs is a violation of immigration law.

25. On 5th December 2024, at about 6:30pm, Jason Casares emailed ██████ to attend a meeting at the OIE office at 11 am on the 6th (Friday). When ██████ asked for specifics, Casares did not explain.

26. Heidi Anderson and senior administration knew that ██████ ██████ iday afternoons to be with his family.

27. On 6th December 2024, Robert Mock, a close crony of Heidi Anderson, emailed ██████ asking him to attend a meeting that afternoon at 2pm. The putative subject of the meeting did not require ██████ participation, and the request seemed to be a ruse to keep him on campus.

6

28. On 6th December, Casares emailed ████████ changing the meeting time to 4pm.

29. During the morning ████████████████████████████████████████████ ubious consultant who is a close crony of Heidi Anderson. Qualls has no actual work experience in any university and has never been a professor or researcher. Qualls was being paid from federal funds by Anderson for questionable purposes for no apparent benefit to the university. Instead, the pay appeared to be to do dirty work for Anderson in the name of "leadership training." The irony of Qualls who has led nothing and no one, teaching others who have substantial leadership experience is apparently beyond the cognition of these individuals. During the meeting, Qualls was insulting and condescending and proceeded to provide unsolicited feedback abou ████████ presentation to campus about research activity at UMES. That same presentation had received widespread praise from faculty who appreciated the analysis and constructive suggestions for improving the environment based on faculty involvement ████████ questioned Qualls' participation in the presentation since she was not a UMES employee and rejected her opinions as lacking any merit. This angered Qualls.

30. ████████ attended the 2pm meeting organized by Robert Mock. It was a complete shambles with Mock bumbling about the supposed agenda and it became quickly apparent that it was not a genuine meeting. One of the participants showed up 20 minutes late and the entire meeting ended at about 2:30 pm. Sadly, it was a classic UMES administration-led meeting - no agenda, no professionalism, and no actual work. Incompetent and fake work masquerading as the real thing.

31. At 3:45pm, Rondall Allen knocked loudly o ████████ office door. When he opened the door, Allen merely said, "just checking on you," shook his hand, and left. Allen had never visite ████████ n his ground floor office before this incident.

32. ████████ went to the OIE meeting at 4pm where Casares and his toady Alexandra Ginta Martin shoved two pieces of paper at him and told him he was being placed on administrative leave. They had no interest in hearing anything, provided no specifics about the allegations, and the meeting was an orchestrated set-up. Casares demanded IT equipment, ID cards, and keys be surrendered to him. Two campus police officers were outside the door to supposedly escort ████ ████████ They were embarrassed by the obviously illegal activities of the OIE crooks and conspicuously showed their embarrassment and non-participation in this charade.

33. The fake allegations are just a pretextual witch-hunt organized by Heidi Anderson and her criminal enforcer Jason Casares because ████████ reported the theft of federal funds to the authorities in June and September 2024.

34. There is absolutely no merit to the allegations an█████████████ will bear devastating legal consequences for defamation, intentional infliction of emotional and professional harm, and other choses of action█████ can expect legal proceedings to commence shortly.

### III. Legal Analysis:

The applicable legal regime for harassment allegations in the educational environment is provided by Title IX. In fact, this is why Casares and Ginta Martin referenced Title IX as the applicable law during the meeting on December 6, 2024. Subsequently, they realized that their fake case would collapse after the fatal flaws in the fake allegations were pointed out by█████ and his then legal counsel Robin Cockey. To escape from their fake case blowing up in their faces, now Casares, Rivera, and Ginta Martin claim in a footnote on page 2 of their fraudulent report that Title IX does not apply to their fake case -- contradicting their own previous position.

Unfortunately for the OIE crooks, mandatory legal obligations cannot be picked and chosen only when convenient and based on their whims. Mandatory legal obligations are precisely that - compulsory and applicable regardless of whether the OIE crooks like it or not. Setting aside the gibberish and irrelevant statements made by OIE staff to pad their fake case, the following paragraphs will analyze the legal standards applicable to the supposed allegations made by█████████████

1. Title IX is the mandatory legal regime

The Title IX statute was enacted in 1972 by the US Congress and provides that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." The US Department of Education has periodically issued rules effectuating the statute. The rules currently in effect were issued in May 2020 and took effect in August 2020. The 2020 Title IX rules are the mandatory legal rules governing this case.

As the US Department of Education elucidated in its explanatory memorandum in 2020, "**Title IX applies to all recipients of Federal financial assistance, whether the recipient is a public or private entity and regardless of the size of the recipient's student body. Fair, reliable procedures that best promote the purposes of Title IX are as important in public schools, colleges, and universities as in private ones, and are as important in**

8

large institutions as in small ones. The final regulations therefore prescribe a consistent grievance process for application by all recipients without distinction as to public or private status, or the size of the institution."

That memorandum also recognized that UMES has additional obligations: "**some recipients are State actors with responsibilities to provide due process of law to students and employees under the U.S. Constitution, including the Fourteenth Amendment**." UMES is a state actor - it is a university within the University System of Maryland and is a public university bound to provide protections under the Constitution including the Fourteenth Amendment. Section 106(6) (b) is unambiguous in its text: "The obligation to comply with Title IX and this part is not obviated or alleviated by any State or local law or other requirement that conflicts with Title IX or this part."

2.  UMES willfully and maliciously violated mandatory Title IX provisions and constitutional protections

Casares and his toadies Ginta Martin and Rivera cannot just absolve themselves of the mandate to follow Title IX in a footnote. Given that it is impossible to comprehend such stupidity even from such ill-qualified individuals, it must be assumed that the violations and refusal to follow Title IX are willful and malicious.

Section 106(6) (d) underlines the inalienable nature of constitutional protections that must be guaranteed to █████████ "Nothing in this part requires a recipient to: (1) Restrict any rights that would otherwise be protected from government action by the First Amendment of the U.S. Constitution; (2) Deprive a person of any rights that would otherwise be protected from government action under the Due Process Clauses of the Fifth and Fourteenth Amendments of the U.S. Constitution; or (3) Restrict any other rights guaranteed against government action by the U.S. Constitution." And section 106(11) relating to scope of application is equally unambiguous: "**this part applies to every recipient and to all sex discrimination occurring under a recipient's education program or activity in the United States**. For purposes of this section, conduct that occurs under a recipient's education program or activity includes but is not limited to conduct that occurs in a building owned or controlled by a student organization that is officially recognized by a postsecondary institution, and conduct that is subject to the recipient's disciplinary authority." Simply put, Casares and his toadies have no escape from Title IX and have been hoisted on their own petard.

3.  UMES willfully violated specific legal requirements governing complaints

9

If a complaint is made, Section 106.44 (f) (iii) B mandates Casares as the Title IX coordinator to "notify the respondent of the grievance procedures under § 106.45, and if applicable § 106.46, and the informal resolution process under paragraph (k) of this section, if available and appropriate." In this case, Casares has flip-flopped on the applicable grievance procedures and willfully violated the provisions of section 106 applicable to the conduct of grievance proceedings. The statute does not transition all complaints automatically into a formal grievance process. It stipulates a number of factual and evidentiary thresholds for the Title IX coordinator to satisfy in section 106.44 (f)(v) A: "the Title IX Coordinator must consider, at a minimum, the following factors:

(1) The complainant's request not to proceed with initiation of a complaint;

(2) The complainant's reasonable safety concerns regarding initiation of a complaint;

(3) The risk that additional acts of sex discrimination would occur if a complaint is not initiated;

(4) The severity of the alleged sex discrimination, including whether the discrimination, if established, would require the removal of a respondent from campus or imposition of another disciplinary sanction to end the discrimination and prevent its recurrence;

(5) The age and relationship of the parties, including whether the respondent is an employee of the recipient;

(6) The scope of the alleged sex discrimination, including information suggesting a pattern, ongoing sex discrimination, or sex discrimination alleged to have impacted multiple individuals;

(7) The availability of evidence to assist a decisionmaker in determining whether sex discrimination occurred; and

(8) Whether the recipient could end the alleged sex discrimination and prevent its recurrence without initiating its grievance procedures under § 106.45, and if applicable § 106.46."

The factual record shows that Casares did not follow the mandate of this section at all. The allegations were completely spurious, not severe or repeated, and had nothing even remotely sexual. As such, Casares had a duty to dismiss the initial complaint and not initiate a formal grievance process.

4. UMES intentionally violated provisions governing supportive measures

The facts also show that Casares had already typed up the letter placing ▓▓▓▓▓▓ on administrative leave even without giving him an opportunity to be heard before the first meeting on December 6, 2024. This was a willful and malicious violation of basic due process. It shows that Casares was never interested in assessing the merits of the allegations, had predetermined the outcome to suit his criminal masters, and was absolutely biased. It also conclusively establishes that Casares showed no interest in any informal process despite the ample evidence that the claims were false and even taken at face value had not occurred anytime close to 6th December. Further, there were ample facts contradictory of any harassment: application for a job by ▓▓▓▓▓ after the comments were allegedly made, relocation by ▓▓▓▓▓ to Salisbury after the comments were allegedly made, submission of fake time sheets by ▓▓▓▓ reprimanding ▓▓▓▓ for bad performance and cognitive impairment, the evidence that ▓▓▓ requested money from ▓▓▓▓▓▓ etc.

5. UMES intentionally violated mandatory grievance procedures

Section 106.45 of the statute elucidates the procedures to be followed by UMES. It is also phrased in language that admits of no ambiguity and is mandatory: "**A recipient's grievance procedures for the prompt and equitable resolution of complaints of sex discrimination must be in writing and include provisions that incorporate the requirements of this section**." The language used is "must" and Casares and minions cannot dispense with section 106.45 by claiming in a footnote that it is not applicable.

6. UMES did not treat ▓▓▓▓▓ equitably as mandated by statute

106.45 (b) specifies the "basic elements" and establishes the fundamental requirement that grievance procedures must: (1) Treat complainants and respondents equitably; (2) Require that any person designated as a Title IX Coordinator, investigator, or decisionmaker not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent."

In this case, the respondent has not been treated equitably. The factual record shows the complete opposite - absolute bias and malice toward ▓▓▓▓▓ for nefarious purposes. Clause (2) prohibits Casares and his minions from having a conflict of interest. Here the factual record reveals an absolute conflict of interest. Casares and gang were exposed as

violating legal obligations in whistleblower complaints filed by ██████████and found out for violating accreditation mandates in his capacit██████████████████████████. ██████████also filed formal complaints under Title IX with the Human Resources Office and the University System of Maryland against Casares, Ginta Martin, and Rivera. Ginta Martin made a sarcastic remark "encouraging"████████o continue to complain to others - under the mistaken notion that taxpayers would pay to defend her illegal acts.


7. UMES intentionally violated mandatory requirements applicable to Notice of Allegations.

According to section 106.45(c), UMES is required to provide notice of allegations at the initiation of the grievance process. Specific to postsecondary institutions, the Notice rules mandate that UMES must provide notice including "all information required under § 106.45(c)(1)(i) through (iii) and also inform the parties that: (i) The **respondent is presumed not responsible for the alleged sex-based harassment** until a determination is made at the **conclusion of the grievance procedures under this section and that prior to the determination, the parties will have an opportunity to present relevant and not otherwise impermissible evidence to a trained, impartial decisionmaker**."

This mandate was willfully flouted by UMES. In relation to postsecondary institutions, Title IX imposes additional requirements. From the inception, UMES was mandated to "provide, to a party whose participation is invited or expected, written notice of the date, time, location, participants, and purpose of all meetings or proceedings with sufficient time for the party to prepare to participate." Jason Casares's email on December 5th 2024 asking ██████████to attend a meeting on 6th December violates this statutory mandate. The repeated refusal to provide additional details afte████████nquired about what the meeting was for shows that the violation was intentional and designed as a trap. Had details been provided on 5th December██████████would have sought and obtained an injunction from a court against these illegal actions.


106.45(c)(1)(ii) mandates that the UMES issued Notice must contain "Sufficient information available at the time to allow the parties to respond to the allegations." The statute defines "sufficient information" as including "the identities of the parties involved in the incident(s), the conduct alleged to constitute sex discrimination under Title IX or this part, and **the date(s) and location(s) of the alleged incidents**." UMES intentionally violated the Notice provisions to ensure that██████████could not appropriately respond

to the fake allegations ███████ requested the dates and times of the alleged incidents orally and in writing several times - on December 6th, in January, February 2025, and repeatedly since then by email.

The OIE crooks refuse to provide dates and locations because it would expose their fake allegations.

Clause (iv) also requires UMES to provide ██████ with an opportunity to examine the relevant evidence - in this case the cell phone of ██████ which allegedly contains text messages ██████ has requested access to this device to expose the fake allegations and to show the doctored messages. Casares and gang have simply refused to respond. Given the repeated refusals, the deliberate concealment of information mandated to be provided by the statute is fatal to this fake case.


8. UMES intentionally violated mandatory legal provisions governing investigations.


Section 106.46(f) imposes certain defined legal obligations upon UMES when conducting investigations. The statute mandates an "adequate, reliable, and impartial investigation of complaints." The burden of investigation is on UMES - which it has plainly failed to discharge in its willful haste to achieve a predetermined outcome without considering relevant evidence.

106.46(f)(2) specifies that UMES must "provide an equal opportunity for the parties to present fact witnesses and other inculpatory and exculpatory evidence that are relevant and not otherwise impermissible."

UMES violated this provision by deliberately hiding witnesses favorable to ██████ in its fake "Final Report" and refusing to collect evidence from honest witnesses who would have provided incontrovertible evidence that ██████ allegations are fake.

Sub-clause 4 require ██████ to be provided with an opportunity to access and examine the evidence. He requested this access on multiple occasions and asked for any evidence that exists to be sent to him by email. OIE crooks have not responded to these emails because any evidence they are claiming is fake ● and doctored. They are well aware that such doctored evidence would not withstand independent objective evaluation by a forensic expert.

Subclause 6(ii) mandates that a "postsecondary institution must provide the parties with a reasonable opportunity to review and respond to the evidence or the investigative report

described in paragraph (e)(6)(i) of this section prior to the determination whether sex-based harassment occurred."

Again, UMES violated this mandate despit ███████ requesting access to review and respond to the evidence. In their unholy haste to achieve their desired illegal outcome, the OIE crooks claimed to organize a meeting whe ██████████ was overseas. It would have been easy and costless to ema ██████████ any evidence and any preliminary investigation report. UMES'S failure to follow the law and observe these basic fairness protections mandated by statute shows the whole process to be a pretextual witch-hunt at the behest of criminals who were caught defrauding the federal and state governments.

9. UMES intentionally violated legal obligations to enable cross-examination to establish the lack of credibility o ████████████████

The statute mandates the questioning of witnesses and parties within both live-hearing and non-live hearing contexts. The statute mandates this "**to adequately assess a party's or witness's credibility to the extent credibility is both in dispute and relevant to evaluating one or more allegations of sex-based harassment**." If live hearings are not adopted, the statute requires UMES to provide "each party with an audio or audiovisual recording or transcript with enough time for the party to have a reasonable opportunity to propose follow-up questions." Despite repeated requests in writing, the OIE crooks have not provided an opportunity to cross-examine ████████ or any audio or video transcript. This is a fatal and egregious violation that destroys this fake case agains ████████

████████ provided evidence tha ████ had no credibility repeatedly ████ submitted fake time sheets, was reprimanded for coming to work under the influence of drugs or alcohol, reprimanded for poor attendance and performance, and lied. She has zero credibility and her conduct subsequent to the alleged incidents destroys any implication that she experienced harassment. This would all have been exposed during cross-examination where she would have been required to explain the facts contrary to her fake claims. She would have been confronted directly about her lies with contradictory facts ███████ s credibility would have been destroyed and she would have been exposed as a liar and fraudster. It would have been conclusively established that she fabricated the allegations to fraudulently take federal funds and to escape deportation for violating immigration laws.

The OIE crooks did not follow the legal mandate for cross-examination because their entire case agains█████████████rested on this fraudulent edifice. The critical need for cross-examination has been upheld in a number of judicial decisions. For instance, in *Doe v. University of Cincinnati*, Judge Barrett ruled, "where a disciplinary proceeding depends on a 'choice between believing an accuser and an accused ... cross-examination is not only beneficial, but essential to due process.'" Barrett concluded that **cross-examination was an absolutely essential part of due process**: "Therefore, the value of cross-examination is not 'somewhat muted' based on the school administrator's firsthand knowledge of the students involved. In this case, the ARC hearing committee was given the choice of believing either Jane Roe or plaintiff, and therefore, cross-examination was essential to due process."

In the case of *Doe v. Baum et al* (2018), the court ruled that "if a public university has to choose between competing narratives to resolve a case, **the university must give the accused student or his agent an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder**. Because the University of Michigan failed to comply with this rule, we reverse." The court explained why cross-examination is such a vital component of due process:

"Due process requires cross-examination in circumstances like these because it is "the greatest legal engine ever invented" for uncovering the truth. Univ. of Cincinnati, 872 F.3d at 401–02. Not only does cross-examination allow the accused to identify inconsistencies in the other side's story, but it also gives the fact-finder an opportunity to assess a witness's demeanor and determine who can be trusted. Id. So if a university is faced with competing narratives about potential misconduct, the administration must facilitate some form of cross-examination in order to satisfy due process." In *Baum*, the court held that "Doe never received an opportunity to cross-examine Roe or her witnesses—not before the investigator, and not before the Board. As a result, there is a significant risk that the university erroneously deprived Doe of his protected interests. See Mathews, 424 U.S. at 335."

Here, despite repeated requests by █████████████ the OIE crooks have repeatedly just ignored the request for an opportunity to cross-examine█████████thereby depriving him of his constitutionally and statutorily protected interests.

The court's analysis of the ease of allowing cross-examination is directly applicable here. As the judge noted:

> "This risk is all the more troubling considering the significance of Doe's interests and the minimal burden that the university would bear by allowing cross-

examination in Doe's case. See id. at 334–35. Time and again, this circuit has reiterated ... substantial interest at stake when it comes to school disciplinary hearings for sexual misconduct. Doe v. Miami Univ., 882 F.3d 579, 600 (6th Cir. 2018); Univ. of Cincinnati, 872 F.3d at 400; Doe v. Cummins, 662 F. App'x 437, 446 (6th Cir. 2016). Being labeled a sex offender by a university has both an immediate and lasting impact ... The [respondent] may be forced to withdraw from his classes and move out of his university housing. Id. His personal relationships might suffer. See id. And he could face difficulty obtaining educational and employment opportunities down the road, especially if he is expelled. Id. In contrast, providing Doe a hearing with the opportunity for cross-examination would have cost the university very little. ...importantly, the university identifies no substantial burden that would be imposed on it if it were required to provide an opportunity for cross-examination in this context."

The court's analysis is absolutely on-point here ███████ was receiving unlawful payments from Casares under the guise of supportive measures. She was in Salisbury attending parties and entertaining men. It was absolutely costless to require her to attend cross-examination.

The *Baum* court's rationale for the criticality of cross-examination merits quotation because of its direct applicability to the facts here:

"Cross-examination is essential in cases like Doe's because it does more than uncover inconsistencies—it "takes aim at credibility like no other procedural device." Id. Without the back-and-forth of adversarial questioning, the accused cannot probe the witness's story to test her memory, intelligence, or potential ulterior motives. Id. at 402. Nor can the fact-finder observe the witness's demeanor under that questioning. Id. For that reason, written statements cannot substitute for cross-examination. if credibility is in dispute and material to the outcome, due process requires cross-examination. See 872 F.3d at 406 (recognizing that credibility disputes might be more common in sexual misconduct proceedings than other university disciplinary investigations)."

Her ████████ frequently attended work appearing intoxicated and cognitively impaired. She had no recollection for basic facts, dates, times, people, locations, etc. Her memory and intelligence were very much in question. Even more devastatingly for Casares and ████████, both had ulterior motives for fabricating these fake allegations. Casares was the

16

subject of complaints by ███████, and █████ feared being deported for violating immigration laws after being caught committing fraud.

As in *Baum*, these proceedings must be quashed.

10. The alleged unproven comments do not meet the definition of hostile workplace environment.

Section 106(2) defines "Hostile environment harassment" as "unwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (i.e., creates a hostile environment). Whether a hostile environment has been created is a fact-specific inquiry that includes consideration of the following: (i) The degree to which the conduct affected the complainant's ability to access the recipient's education program or activity; (ii) The type, frequency, and duration of the conduct; (iii) The parties' ages, roles within the recipient's education program or activity, previous interactions, and other factors about each party that may be relevant to evaluating the effects of the conduct; (iv) The location of the conduct and the context in which the conduct occurred; and (v) Other sex-based harassment in the recipient's education program or activity."

Even reading ███████ and Casares's fabricated allegations in the most favorable light and assuming everything to be true, the allegations do not satisfy the legal definition. As even Casares is forced to concede, they are not offensive, severe, or pervasive.

11. UMES's "Final Report" is full of Lies and Falsehoods and must be quashed.

The OIE crooks's final report does not appear to have been written by a sane person. It is full of irrelevant drivel and riddled with lies about relevant matters. In page 3 *et seq*, the Final Report claims that ███████ did not participate in the proceedings. This is an absolute lie. ███████ attended meetings with the OIE crooks on 6th December and in January 2025. The OIE crooks were free to ask him any questions. They chose not to. ██ ███████ submitted detailed written responses in conjunction with his then legal counsel categorically rejecting and debunking the fake allegations. It was conclusively shown that the allegations were fabricated, there was no evidence, and even taken at face value, the comments would not constitute harassment. ███████ also testified that Casares and crooks were undertaking a witch-hunt in retaliation for exposing criminal activity by Heidi Anderson.

17

The OIE crooks' response to this in their Final Report is so comical as to bear full quotation: "To date, there is no record of a criminal complaint against President Anderson, which was confirmed by UMESPD" (at p.4). Criminal complaints against Heidi Anderson for theft of federal funds are not submitted to the UMES campus police. They are submitted to federal agencies. The State of Maryland's Office of Attorney General, Governor, and various federal investigatory agencies received the whistleblower complaints many months before the 6th December 2024 witch-hunt and have commenced investigations. Casares and gang are aware of this fact - their lies in the final report notwithstanding.

OIE crooks next claim that Human Resources does not have a record of reprimand against ██████ The absurdity of this is manifest. Every reprimand or rebuke is not reported to HR. There is conclusive evidence of ████████ submitting false timesheets - she admitted it. And there is ample witness testimony. There is conclusive witness testimony that ██████ was a chronic absentee at work from day-one of her employment. In fact, it is likely that ██████ never had any intention of doing honest work and was seeking to fraudulently obtain federal funds.

In our early rebuttal of the OIE crooks' fake case, we stated that Dr. ████ was ██████'s immediate manager and observed every interaction. There were additional witnesses who worked in the same physical location as ██████ who stated that ██████ never came to work from day one. The OIE crooks deliberately did not contact such witness in violation of the requirements of Title IX and the US Constitution.

The OIE crooks next use a Thanksgiving message from ██████ to ██████ for a perverse purpose. A person of ordinary intelligence and honest character (in other words everything that the OIE crooks are not) would characterize the message as polite and respectful. In fact, the opposite of harassment and completely destructive of any such claim. Moreover, the same or similar Thanksgiving message was sent by ██████ to all of his acquaintances at UMES. Again, anything but a bumbling and malicious investigation would have learned this fact.

12. The OIE Crooks's Findings of Fact are absurd, irrelevant, illogical, and false.

The OIE crooks present various conjectures and gibberish dressed up as findings of fact. A person of elementary intelligence and reasoning ability can read those so-called "findings" and discern that they are nothing but the OIE crooks' opinions. There is nothing even remotely factual and the opinions are unsupported by any evidence. As an added bonus,

18

they bear no relation to the purpose of this investigation: to determine whether there was harassment.

First, the OIE crooks claim to make findings about ███████ technical ability in AI and robotics ███████ was hired to work as an entry-level data analyst. Her work has nothing to do with AI or robotics. The work is low-level statistical analysis. Regardless, Casares, Ginta Martin and Rivera are ill-equipped with their diploma mill degrees to make any findings about ███████ "technical abilities."

Second, OIE crooks claim that many Iranian women were hired ███████ does not discriminate in hiring based on race or national origin. UMES is a low-ranked non-seletive university that struggles to attract qualified workers. The actual recruitment of the PhD students was made by experts in various fields after interviews by those experts. The most eminent of UMES professors - the award-winning Prof. Bidar Wang - provided testimony to Casares that he interviewed candidates and selected them. Six Iranian students provided sworn statements to the US Department of Education that ███████ lways behaved respectfully toward them and that the relationship between them was entirely professional. Three other students – two of them Iranians – provided sworn affidavits that ███████ behaved respectfully toward them. These have been provided to the OAG, USM, and the federal government. All these pieces of sworn evidence will be provided in court and directly to the appeal authority when he/she is identified.

Third, the OIE crooks purport to show screenshots that have been doctored. There is no date or timestamp on these supposed screenshots that appear to be manufactured by Photoshop. The reliance on these doctored images is an absolute violation of the rules relating to evidence in Title IX ███████ requested access to the cellphone to expose doctoring but OIE crooks have not responded to this request to date. The doctoring and false conclusions being drawn by the OIE crooks is exposed as the lie it is b███████'s own statement on page 12 ███████ appeared "very friendly [towards her] at first," and she felt that she had to be friendly as well, despite her reservations. She stated tha███████ ███████ behavior has gotten worse since her arrival on campus because she had been distant towards him." This is obviously contradictory to OIE's fake case. A███████ admits, ███████ was distant toward her from the moment she arrived at UMES. That is the only part of the "gotten worse" that is supported. This absolutely destroys any claim about harassment or inappropriate interest i███████

Moreover, as ███████ has stated repeatedly, he has never me███████ one-on-one without witnesses present. Every interaction was in public an███████ was never

19

within 6-feet o█████████ There are eye-witnesses that OIE was notified about that can verify these facts. As another example of OIE crooks' intentional illegal activities, Casares and minions did not contact these witnesses even once. And they deliberately hid witnesses who provided exculpatory evidence.

Illogically and bereft of even the thinnest reasoning capacity akin to a retard, OIE claims to determine th█████████sent text messages containing "personal inquiries and jokes." No corroboration, no actual evidence, no credibility. Just an opinion as part of a pretextual witch hunt.

Next, OIE purports to show doctored screenshots without any dates or timestamps of Dr. ████████sking for "pics." Note that there is no suggestion that the pics were inappropriate in any form. For instance, even the doctored screenshots do not ask for inappropriate pics.

If as is likely, this exchange was made befor████████as an applicant for a position at UMES, why did she apply for a position at UMES? If she felt harassed by the messages, why did she seek to come and work with████████Why did she relocate to a different state if she was harassed? The lowly entry-level position was not such a lottery that would necessitate relocation to the location of alleged harassment. The amount of effort to apply, relocate, move to UMES is completely contradictory of any harassment c████████ The fact is████████wanted to steal money and not do any actual work. She manufactured these fake accusations after being caught and because she feared deportation for violating immigration laws.

13. The only doctored screenshots provided with dates expose the allegations as fake.

The first instance of screenshots showing any dates are contained on page 13. The date is shown as August 8, 2024. The message shows emojis sent b████████ laughing hysterically. This response b███████ conclusively debunks any claim that she was harassed or experienced any discrimination from any messages sent prior. In addition, the date of August 8th is extremely significant. It was well befor████████commenced employment at UMES, relocated out of state to Maryland from Pennsylvania, and before she completed any paperwork for employment. ████████was harassed by messages sent prior to August 8th, why did she apply for the job to work with███████? Why did she relocate to Maryland for a mere 6-month contractual position? Why did she undertake the

difficult task of securing temporary housing for a mere 6-month contractual position? Why did she undertake the laborious paperwork required for UMES employment.

The other screenshots with dates of August 13, and 17th also debunk any claim of harassment. They show friendly exchanges and meetings. Not once did ██████ express any reservations about the alleged communications. There is not a shred of evidence that she objected to the humor or tone of the communications or indicate that they were anything but in jest.

In fact, the August 17th screenshot is devastating to the OIE crooks. In the purported message is a request from ██████ for a meeting to "discuss something" to which ● ██████ olitely offered a time. Funnily and devastatingly for OIE and ██████ there is not a single message after this date.

The August 17th screenshot is also befor ██████ moved to Maryland to take up employment at UMES. I ██████ felt harassed on August 17th, why did she relocate to work with ██████ subsequently? Why did she undertake highly inconvenient and difficult processes to move, obtain housing, complete HR paperwork, etc?

I ██████ felt harassed on August 17th, why did she wait until December to file a complaint? Why did she wait until she was caught submitting false timesheets and coming to work impaired?

Why are the OIE crooks o ██████ unable to produce a single message after the date on which ██████ started working at UMES - late August 2024 - which even remotely suggests harassment?

Next, Casares makes up some nonsensical claim abou ██████ s work phone. It is false an ██████ did not attempt to delete or alter the phone in any way directly or indirectly after the phone was taken by Casares on December 6th.

Given Casares's criminal antecedents and background, it must be surmised that he undertook some illegal efforts to manipulate ██████████ work phone. This will be referred to law enforcement for investigation.


The UMES HR office has been notified in early 2025 about Casares' illegal interference with electronic communications. A police complaint will also be filed shortly.


14. Casares has pending complaints from other UMES employees about unlawful surveillance and interference with electronic communications.

██████████████ former head of Human Resources of UMES, filed a sworn complaint about Casares lying on his job application, repeatedly engaging in illegal activities, violating civil rights of UMES employees, producing fake allegations and evidence. This is documented at UMES HR, the University System of Maryland Board of Regents, and federal agencies including the US Department of Education and the Federal Bureau of Investigation. It is expected that Casares will face prosecution. His previous conduct and a multitude of complaints documenting similar illegal activities at UMES is consistent with his illegal activities, manufacturing of evidence, doctoring communications, inventing facts and violating ██████████'s rights in this case.


It would be safe to say that it is impossible to find a dirtier character and an individual or lower ethics than Jason Casares in the entirety of the US higher education system. The only close competition is provided by his underlings Ginta Martin and Rivera.


15. The Final Report's irrelevant drivel should be dismissed and struck down.

Casares and gang seek to pad their fraudulent final report with irrelevant drivel such as a purported conversation between ████████ and some unknown individual with no connection whatsoever with this case. While these fantasies of Casares may be a cure for insomnia, they are absolutely rejected and must be stricken from the record as irrelevant, immaterial, and violative of ██████████ rights. They are fictions concocted to damage ██████████'s reputation and have no basis in fact. The fictions are inserted to pad what is obviously a gossamer-thin fake case and to cause prejudice by masking fiction as fact by sticking it into a section on "findings of fact."

They undermine the totality of Casares and ██████ case by exposing the whole thing as a scam.


16. The Final report makes unsupported and false findings about an invitation to go to DC. Casares makes a conclusion without any evidence that ██████ was invited to go to DC. He is unable to doctor any messages but still makes such a determination based just allegedly on ██████'s statement ██████ has no credibility and is frequently confused about basic facts and is a fraudster. No such conclusion can be made. Even assuming for the sake of argument that ██████ was invited to a meeting in DC prior to her commencing employment at UMES, Casares's unsupported and completely illogical suggestion that there is anything inappropriate about a meeting in DC needs to be quashed. Based on the evidence of actual meetings between ██████ and ██████ the latter never met ██████ alone and was never within 6-feet distance of her. Casares's manufactured innuendo about both the existence of any invitation and anything inappropriate about a meeting in DC, must be seen in the light of his well-documented record of abusing Title IX processes and investigations for nefarious activities.

If every meeting between two individuals in Washington DC were to be deemed inappropriate, this country's courts would be full of lawsuits and judges would have time for little else. So, Casares's perverted imagination and fantasies should be quashed with prejudice.


17. "Factual finding" no. 6, 7, 8 are false/exculpatory but introduced to cause prejudice.

 They must be quashed. As stated repeatedly ██████ never met ██████ one-on-one without witnesses being present. Casares and gang claim to use a calendar note as proof of a one-on-one meeting. Crucially, they do not provide a screenshot of said calendar. Nonetheless, the logic and reasoning from seeing a calendar note to making a determination that an actual meeting occurred strain all credulity. First, even if a calendar note existed, it does not prove that others did not attend the meeting. Not all meetings and invitees are recorded in a calendar. Many meetings have related parties attend them based on verbal invitations. Every meeting with ██████ was in the presence of other individuals. ██████ in particular attended every meeting as stated to the OIE crooks repeatedly.


 ██████ never invited ██████ to a meal of any sort. A ██████ herself admitted in the Final Report ██████ rarely interacted with her, avoided her, and was distant. Casares

and gang also make up a lie that ███████ did not invite the Indian male employee to a meal. This is absolutely false. The Indian male employee - Dr Dheeraj Kumar - was invited and attended lunch with ███████ on two separate occasions with the following witnesses being present: Dr Bidar Wang, Dr Dhekney, Dr. Das, Dr. Salem, Dr. Tsai, and Dr. Sharma.

███████ never offered to help ███████ move any furniture. The claim is absurd and false and destroys the credibility o ███████ Findings no.6, 7, and 8 must be quashed.

18. Factual finding no. 9 is full of lies and distorted to suit a pretextual predetermined outcome.

███████ never offered to help ███████, asked for any inappropriate pics, or invited her to a meal. There is absolutely no evidence of anything inappropriate. In trademark Casares style of manipulation and lying, Casares pads this "finding" with absolute nonsense to concoct a prejudicial innuendo.

███████ as never offered anything beyond a 6-month contract and there was never any promise of any extension. From the padded fiction with no evidence, Casares conjures up a sleight of hand to make up another fiction at page 23 with absolutely no evidence to support it: ███████ s conduct and actions were deemed to be based on the two staff members' gender and national origin. For the Complainant, in particular, having knowledge of this comparable treatment ... The overall adverse impact was significant for ███████ ███████ to the point where it ultimately affected her health, and her work productivity." In fact, this above statement is so disconnected from the paragraphs that precede it that one must wonder if it was actually written by a sane person. However, given Jason Casares and gang's criminal antecedents, documented illegal activities, multitude of complaints with UMES HR, USM officials, the Office of Attorney General, and federal government agencies, this statement must be seen as the concoction of an evil mind for nefarious purposes. It must be quashed.

19. OIE's summary findings and conclusions are absolutely false, illogical, apply the wrong legal standard, and need to be quashed.

The OIE crooks claim to conclude that "The totality of the circumstances in this matter is sufficient to establish tha ███████ engaged in a course of conduct, beginning with his

24

recruitment and hiring of the ██████████████████████████ that constituted unequal treatment based on national origin and gender, which amounted to harassment and a hostile work environment in violation of the UMES Policy Prohibiting Discrimination and the State of Maryland Sexual Harassment Policy, adopted by UMES" (page 24).

The "totality of circumstances" shows exactly the contrary. It shows that ██████ has no credibility, made up false accusations that not even the OIE crooks could prop-up, was caught submitting fraudulent timesheets and coming to work under the influence of alcohol or drugs, and performed poorly at work. The totality of circumstances shows OIE staff manufacturing lies, blatantly violating the law, and engaging in disgusting practices that expose UMES to massive liability. It also shows that this was a scam of a witch hunt organized by a criminal gang in retaliation for a complaint against Heidi Anderson and her gang.

But it gets worse for UMES because Casares and his incompetent minions apply the totality of circumstances to the wrong legal standard to come to their predetermined conclusion. As previously discussed, the applicable legal regime is mandated by federal law - Title IX. This is supported by due process protections established by the US Constitution, including the Fourteenth Amendment. Casares and gang pretend to wish away the applicable legal standard and try to apply an absolutely inapplicable and lower standard to achieve their preferred outcome. The claim the State of Maryland Sexual Harassment Policy applies instead.


Casares is seemingly ignorant and unaware of the US Constitution's supremacy clause. Article VI clause 2 provides:

**This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding.**


It is open to question how an individual of such low intellectual, logical, reasoning, linguistic, analytical, moral, and ethical qualities was appointed as the Title IX director at UMES. Casares conduct in office and his long record of illegal activities indicates that he may have been appointed precisely because of these deficits. Article VI, clause 2 is

underpinned by the doctrine of preemption. Here, based on a plain reading of Article VI clause 2, Title IX preempts the Maryland Sexual Harassment policy and UMES policies that are in conflict. There is absolutely not even a shred of opportunity to argue this point because Congress explicitly stated such preemption in the plain wording of Title IX as noted previously in this appeal. As that quoted language notes, universities receiving federal financial assistance must apply Title IX provisions in these cases.

Congress did not leave the application of Title IX to the whims of crooks such as Casares - hence the plain English wording mandating its application.

In addition, congressional intent to preempt any conflicting state law is expressly stated in the Explanatory Memorandum issued by the US Department of Education which is the implementing agency. That memorandum notes that sexual harassment allegations are substantially different in the educational context that other workplaces because of the implications of constitutional requirements such as the First Amendment, the use of federal funds, etc. It explains the deliberate legal protections including specific mandatory definitions of sexual harassment, the process to be followed, due process obligations, cross-examination requirements, and the need to ensure that innocent persons are not wrongly accused and punished.

The Explanatory Memo states:

> "an institution of higher education differs from the workplace. In this regard, these final regulations are consistent with the sense of Congress in the Higher Education Act of 1965, as amended, that "an institution of higher education should facilitate the free and open exchange of ideas."  The sense of Congress is that institutions of higher education should facilitate the free and robust exchange of ideas, but such an exchange may prove disruptive, undesirable, or impermissible in the workplace. Moreover, workplaces are generally expected to be free from conduct and conversation of a sexual nature, and it is common for employers to prohibit or discourage employees from engaging in romantic interactions at work. By contrast, it has become expected that college and university students enjoy personal freedom during their higher education experience, and it is not common for an institution to prohibit or discourage students from engaging in romantic interactions in the college environment. The Department does not wish to apply the same definition of actionable sexual harassment under Title VII to Title IX because such an application would equate workplaces with educational environments, whereas

both the Supreme Court and Congress have noted the unique differences of educational environments from workplaces and the importance of respecting the unique nature and purpose of educational environments."

**The memo is unambiguous about preemption**: "the Department believes that these final regulations create clear legal obligations that facilitate the Department's robust enforcement of a recipient's Title IX responsibilities. **The mandatory obligations imposed on recipients under these final regulations share the same aim as the Department's guidance**."

Finally, the desire of Congress is expressly stated in the text as noted earlier in this document.

OIE's failure to apply the correct legal standard, and the willful application of the wrong, preempted state law standard vitiate this fake investigation. Applying either standard, the totality of circumstances exposes this to be a fake, pretextual witch hunt with innumerable violations of the US Constitution, statutory rights, and the Maryland Declaration of Rights. The application of the wrong legal standard is an immediate and unarguable ground for quashing these proceedings. Fictitious and illogical statements at pages 24-26 must be quashed with prejudice. They are mere opinions dressed up as findings and are completely unsupported by even a pretense of evidence.

Casares and gang just make up statements attributed to ████ and assume them to be true. There is not even a shred of evidence to support these statements ████ has been spotted partying and consuming drinks and alcohol in November and December and entertaining random men. This contradicts any claim or stress or anxiety from anything falsely alleged to have been done by ████. As she admits, she was on medication even before commencing UMES employment suggesting that there is no causal relationship between anything done by ████ and her supposed anxiety. It is more likely that she is delusional or hallucinating as indicated by apparent confusion and disorientation from day-one of her employment at UMES.

The violations documented show that UMES violated Title IX and discriminated against ████ ████ Accordingly, this document must also be treated as a complaint against Casares, Ginta Martin, Rivera, and Anderson with a mandatory investigation to follow.

27

IV. The entirety of these proceedings is tainted by Bias.

The factual record in this case evidences unchecked and fatal bias by Casares and his underlings.

1. UMES did not treat ▮▮▮▮▮▮▮ equitably.

Section 106(44) (f) (1) requires the Title IX coordinator - here the rape-accused Jason Casares ---- to "[t]reat the complainant and respondent equitably." Manifestly, Casares has acted in a biased and prejudiced manner in this case willfully refusing to follow legal requirements in pursuit of his criminal goals.

2. UMES abused supportive measures in a biased manner.

Sub-clause (ii) mandates Casares to offer "supportive measures under paragraph (g) of this section, as appropriate, for the respondent." The section specifically recognizes that both parties must be treated fairly and imposes a mandate for supportive measures to be provided for both complainant and respondent. In this case, Casares acting under the guise of supportive measures has been paying bribes to ▮▮▮▮▮▮▮▮▮ in the form of salary payments from December 2024 to date in blatant violation of federal laws. In contrast, he has offered nothing in the form of supportive measures to ▮▮▮▮▮▮. Clause (g) stipulates that "Supportive measures must not unreasonably burden either party and must be designed to protect the safety of the parties or the recipient's educational environment, or to provide support during the recipient's grievance procedures under § 106.45, and if applicable § 106.46, or during the informal resolution process under § 106.44(k). A recipient must not impose such measures for punitive or disciplinary reasons."

Casares's unlawful act of placing ▮▮▮▮▮▮ on administrative leave, banning him from campus, and stopping his research violate clause (g). It places an unreasonable burden, has no bearing on the safety of the parties or the educational environment. ▮▮▮▮▮▮ rarely interacted with ▮▮▮▮▮▮▮▮▮▮▮ office was located about half a mile away from ▮▮▮ office. He was a busy person and avoided unnecessary interactions with ▮▮▮ as shown by the documentary record from the time of her employment at UMES to date. The deliberate concealment of the dates for the alleged comments made to ▮▮▮ by Casares is to escape his legal obligations under clause (g). It is to hide the reality that there was no practical or legal justification for placing ▮▮▮ ▮▮▮▮▮ on administrative leave. The action is a clear illustration of fatal bias destroying the legal mandate for an impartial investigation. It eviscerates any claim of neutrality and shows Casares and his minions to be deliberately violating Title IX, the US Constitution, and federal criminal laws in an illegal campaign against ▮▮▮▮▮▮ These actions were

28

challenged as illegal by ███████ on 6th December, in January 2025, and repeatedly in subsequent communications including the memorandum submitted in February 2025.

Under Title IX, UMES is required to do certain things when supportive measures are contested. These are stated in (g) (4):
"A recipient must provide a complainant or respondent with a timely opportunity to seek, from an appropriate and impartial employee, modification or reversal of the recipient's decision to provide, deny, modify, or terminate supportive measures applicable to them. The impartial employee must be someone other than the employee who made the challenged decision and must have authority to modify or reverse the decision, if the impartial employee determines that the decision to provide, deny, modify, or terminate the supportive measure was inconsistent with the definition of supportive measures in § 106.2. A recipient must also provide a party with the opportunity to seek additional modification or termination of a supportive measure applicable to them if circumstances change materially."

Despite the repeated requests, UMES did not provide an opportunity for ███████ to seek modification from an appropriate and impartial employee. This is a deliberate flouting of clause (g) (4). Instead, UMES allowed Casares and gang to serve as judge, jury, and executioner. This violation of the express and unambiguous statutory mandate destroys this fake case against ███████ and is grounds for punitive sanctions against UMES. it is another incontrovertible proof of bias against ███████ The statute allows the coordinator to remove an individual for emergency purposes. However, even this fig-leaf is not available to the OIE crooks. Clause (h) imposes specific legal obligations on UMES if it was pleading that administrative leave and the ban on ███████ from campus was necessary for emergency purposes. In order to place ███████ on administrative leave or ban him from campus as an emergency measure, UMES was required to undertake "an individualized safety and risk analysis," and "determines that an imminent and serious threat to the health or safety of a complainant or any students, employees, or other persons arising from the allegations of sex discrimination justifies removal." The statute also mandates that ███████ be provided "with notice and an opportunity to challenge the decision immediately following the removal." Here, UMES did not conduct an individualized safety and risk analysis. If it had done so, even the moronic OIE would have had to admit that there was no risk to ███████ from ███████ much less any "imminent and serious threat." There was absolutely no finding of justification for the administrative leave and ban from campus. And there was no notice and opportunity to challenge the decision - despite ███████ repeatedly challenging the illegal actions in writing.

3. UMES violated the presumption of innocence.

Section 106.45 (b)(3) mandates a "presumption that the respondent is not responsible for the alleged sex discrimination until a determination is made at the conclusion of the recipient's grievance procedures." The factual record shows a number of individuals connected to the Casares OIE crooked gang telling campus community members that ██████ ████████ has been removed," "he is never coming back", terminating his research institute illegally, displaying his photograph in a public area of the campus police department, etc.

4. UMES intentionally lied and hid exculpatory evidence and witnesses.

Section 106.45 (b)(6) mandates an "objective evaluation" of "all evidence that is relevant, as defined in § 106.2, and not otherwise impermissible under paragraph (b)(7) of this section—including both inculpatory and exculpatory evidence." Here, Casares and gang's Final Report lists the witnesses they claimed to have interviewed. There is no mention of the fact that they interviewed a full professor and three students who provided testimony that is fatal to this fake case. Despite Casares's fantasy, the hiding of these names is not going to make their testimony go away. Their sworn affidavits have been provided to the Office of Attorney General, and the University System of Maryland. A signed statement by six Iranian students contradicting ████████'s fake allegations has also been provided. In addition, Mr. Robin Cockey notified OIE in December 2024 that the allegations have absolutely no merit and that all interactions between ██████████ and ████████ were witnessed by ████████. Despite this clear communication, the OIE crooks make no attempt to contact ████████. These willful violations of the requirement to consider all evidence including decisively exculpatory evidence by highly credible individuals destroys this fake case. In contrast, the witnesses listed by the OIE crooks are of similarly corrupt and incompetent stock as Casares, Ginta Martin, and Rivera ██████████████████████ are base characters with numerous complaints of bullying and harassment against them by faculty and staff at UMES within the files of OIE. This is incontrovertible despite the best attempts of the Casares gang to shield them. ████████ an ████████'s abject incompetence and corruption have been extremely costly to UMES and have exposed the university to adverse federal regulatory action.

V. OIE's sanctions are grossly disproportionate, cruel, unusual, and expose these proceedings as a scam.

OIE proposes to remove ████████ as the ████████████ despite the following fatal flaws: 1. applying the wrong law; 2. possessing no evidence; 3. numerous fake claims by ██████; 4 offering unsubstantiated fictions and opinions as findings of fact; 5. illogical, absurd, and manifestly wrong reasoning; 6. deliberate distortion and manipulation of evidence; 7. lying about witnesses interviewed; 8. excluding directly exculpatory testimony; 9. denying due process; 10. violating ████████'s constitutional and statutory rights; 11. OIE's own admission that even taking ███████ claims at face value the comments are not "severe or pervasive"; 12. the absence of a single text message or evidence after ██████ started working at UMES to even maintain a pretense of harassment; 13. the clear evidence of ██████'s ulterior motives; 14. the strong record of Casares as a willful unlawful actor with a record of illegal activity and live complaints against him; 15. the numerous pieces of evidence documenting the pretextual nature of these proceedings to arrive at a predetermined outcome.

In their overreach to arrive at their predetermined outcome despite these grave errors and bias, the OIE exposes itself as the gang of crooks that it is. The punishment must fit the crime. Here, there is absolutely no basis for a sanction of removal from the position of ████. It is grossly excessive, disproportionate and violative of constitutional bans on cruel and unusual punishment. In contrast to the sanctions against ████████, a rape-accused Casares has not been sanctioned. Ridiculously, he and his underlings are paid inflated salaries as bribes - exposing the absolute lack of reasonableness and moral authority to impose such disproportionate punishment. Further briefing about why the sanctions are unconstitutional and impermissible will be provided with case law after the OIE identifies the appeal authority. Even without the devastating constitutional challenge to the sanction, this case has collapsed for the numerous fatal errors including the application of the wrong legal standard and the gross violations of due process obligations. The illegality of the sanctions only exposes UMES to massive money damages and administrative enforcement by the federal government.

**Conclusion**:

In engaging in this pretextual witch-hunt against an innocent man, OIE has exposed itself to be a criminal gang that is so gravely violating the law that harsh legal action must follow. The appeal authority is requested to dismiss the case against ████████ with prejudice, commence proceedings against ██████ Casares, Ginta Martin and Rivera, and tender an unconditional apology on behalf of UMES. ████████ intends to commence legal action against these individuals within days but will absolve UMES from liability if an apology is tendered and these proceedings are quashed.

31

Respectfully submitted b

E-FILED; Somerset Circuit Court
Docket: 2/16/2026 4:12 PM; Submission: 2/16/2026 4:12 PM
Envelope: 25126466



# EX26

## UNIVERSITY OF MARYLAND EASTERN SHORE

HBCU 1886

## DIVISION *of* ACADEMIC AFFAIRS

### *Office of the Provost and Vice President*

Date:   July 25, 2025

To:   ██████████████

From:   Rondall E. Allen, Pharm.D.
        Provost and Vice President for Academic Affairs

Re:     Decision on Appeal of Office of Institutional Equity and Compliance Report of Investigation

---

Pursuant to the University of Maryland Eastern Shore Policy and Procedures Prohibiting Discrimination (or the "Discrimination Policy") and the State of Maryland Sexual Harassment Policy, you have the right to submit an appeal of the findings of the Office of Institutional Equity and Compliance (OIE) in its June 2, 2025 Final Report of Investigation (or the "Final Report"). In support of your appeal request, you submitted the Intent of Appeal Notice (with grounds for appeal noted on the form) and a Notice of Appeal, with narrative, on June 9, 2025. This correspondence shall serve as my final decision on your appeal per University Policies and Procedures.

## I.    Allegations and OIE Determinations

Allegation Number 1

It was alleged that early on in ███████████████s recruitment process, you displayed a diminished focus on her technical knowledge and professional skills and, during a call about a project on which you were working, you switched the conversation to personal information related to the Complainant.  Also, it was alleged that you asked ████████ ██████ questions about Persian women, how they were "under oppression," and made statements that you "liked to help women from Iran."

Finding Number 1

The OIE determined that you displayed a diminished focus on ████████ ███ technical knowledge and professional skills.  It is more likely than not that you asked ████████ ███████ questions about Persian women, how they were "under oppression," and made statements that you "liked to help women from Iran."  This determination is supported

1

by your recruitment record ██████████████ which consists of a disproportionately high number of Iranian women.

Allegation Number 2

It was alleged that during subsequent conversations in text (via WhatsApp) and prior to the Complainant's arrival on campus, you asked ████████████ personal questions (i.e., if she had any weekend plans, if she did not have time for fun), and made "really weird comments" about the Complainant and "partying."

Finding Number 2

The OIE determined you sent ██████████████ the text messages containing personal inquiries and jokes that constitute the basis of the allegations in this report segment.

Allegation Number 3

It was alleged that prior to the Complainant's arrival on campus, you asked ████████████ ████████ in text (via WhatsApp) for "pics" on two occasions, when she told you that she was going on a trip with friends. The first time, you allegedly told the Complainant to "send pics," followed up with "not [pics] of reading articles," and "hope this phone will be able to handle it [the pics]." When the Complainant did not send anything, you followed up the next day to inquire "what happened to the pics."

Finding Number 3

The OIE determined that you sent ██████████████ the text messages asking her for personal pictures that constitute the basis of the allegations in this report segment. The investigation also verified that you requested "pics" from ████████████████████ ████████████████████ You did not ask for any personal pictures from the other two employees, an Indian male and an Indian female.

Allegation Number 4

It was alleged that during a virtual meeting and prior to the Complainant's arrival on campus, you invited ████████████████ to meet up with you in person in Washington, D.C.

Finding Number 4

The OIE determined that it is more likely than not that you invited the two Iranian women - ████████████████ to Washington, D.C, and her coworker, to a conference in Türkiye. Conversely, you did not invite the other two staff members, an Indian male and an Indian female, to any events out of town.

Allegation Number 5

It was alleged that during a virtual meeting and prior to the Complainant's arrival on campus, you told ████████████████ in the context of sharing you went on a trip to Türkiye, that "people say that Turkish women are beautiful, but I prefer Persian[1] women."

Finding Number 5

The OIE was not able to determine by a preponderance of the evidence that you made the statement that constitutes the basis of this set of allegations, as it could not be corroborated by witnesses or supported by the evidence available at this time.

Allegation Number 6

It was alleged that during an in-person interaction in the Complainant's office on campus, you initiated a conversation with ███████████ about "what she does when Persian men approach her, because they obviously have already." In that context, you also stated that you "did not like working with Persian men, only with Persian women."

Finding Number 6

The OIE was not able to determine by a preponderance of the evidence that ██████ made the statement that constitutes the basis of this set of allegations, as it could not be corroborated by witnesses or supported by the evidence available at this time.

Allegation Number 7

It was alleged that during an in-person interaction on campus, you asked ████████ ██████ to go to breakfast or dinner with you "to discuss work."

Finding Number 7

The investigation concluded that it is more likely than not that you invited ██████ ██████ to have a meal and discuss work. It was also confirmed that you invited Ms. ██████ to lunch, based on the witness' corroborating statement; however, you did not invite the other employee in the department, an Indian male.

Allegation Number 8

It was alleged that after the Complainant's arrival on campus, you offered to help Ms. ██████ move her furniture, which she believed was a pretext for you to get in her house.

Finding Number 8

The OIE could not conclude by a preponderance of the evidence that you offered to assis██. ████████████ move, as it could not be corroborated by witnesses or supported by the existing evidence.

Allegation Number 9

It was alleged that you took a similar approach in your interactions (asked her for "pics," invited her to lunch, offered to help her move) with ███████████████████████ ████████████.

Finding Number 9

The OIE concluded by a preponderance of the evidence that there were sufficient similarities between your conduct toward ██████████ and ███████████. Your conduct and actions were deemed to be based on the two staff members' gender and national origin. For the Complainant, in particular, having knowledge of this comparable treatment of her coworker by you, further contributed to the totality of the circumstances, which maintained a hostile work environment. The overall adverse impact was significant for ███████████ ████████ to the point where it ultimately affected her health, and her work productivity.

**II.     Appeal**

A.     <u>A Flaw or Denial of Due Process Rights</u>

In support of your appeal, you assert the following:

i.      *The deliberate refusal to follow Title IX by itself means that UMES is discriminating against ███████████ based on sex.*
ii.     *UMES willfully and maliciously violated mandatory Title IX provisions and constitutional protections.*
iii.    *UMES willfully violated specific legal requirements governing complaints.*
iv.     *UMES intentionally violated provisions governing supportive measures.*
v.      *UMES intentionally violated mandatory grievance procedures.*
vi.     *UMES did not treat ███████████ equitably as mandated by statute.*
vii.    *UMES intentionally violated mandatory requirements applicable to Notice of Allegations.*
viii.   *UMES intentionally violated mandatory legal provisions governing investigations.*
ix.     *UMES intentionally violated legal obligations to enable cross-examination to establish the lack of credibility of ██████████.*

The UMES Procedures Prohibiting Discrimination state the following:

> The University provides fundamental fairness to the parties. Among other things, this means they are provided notice of the charges and evidence, the right to present information and identify witnesses relevant to their case, to take part in an impartial Investigation, and to appeal the Office of Institutional Equity and Compliance UMES findings and/or sanctions. In addition, a party may have an Advisor present during meetings related to an investigation. (p. 4).

I have reviewed the Final Report of Investigation, Intent to Appeal Notice, the Notice of Appeal, and the Procedures set forth in the Policy Prohibiting Discrimination and the State of Maryland Sexual Harassment Policy. Upon review, it is evident that you were advised of your right to present information and evidence, to have an Advisor present, to provide a response to the Preliminary Investigation Report, to identify witnesses who have direct and germane knowledge of this matter, and to appeal the OIE findings.

The investigation complied with the due process requirements of the UMES Procedures Prohibiting Discrimination, but I note that much of your appeal focuses on OIE's failure to follow the Title IX regulations as a violation of your due process rights. To fully assess this issue, I asked OIE to supplement its explanation (included in footnote 2 of the final investigation report) as to why Title IX does not apply to this matter. OIE has explained that the 2024 Title IX Regulations were vacated in January 2025. As a result, UMES must comply with the 2020 Final Title IX Rule, which applies to conduct that is allegedly Severe, Pervasive, and Objectively offensive. For a matter to be pursued under UMES Policy and Procedures Prohibiting Discrimination (Title VII), the alleged conduct must meet the severe or persistent/pervasive standard, while under the State of Maryland Sexual Harassment Policy, the alleged conduct need not be severe or pervasive.

Therefore, OIE reevaluated the alleged conduct and determined:

> • Harassment and hostile work environment on the basis of sex reasonably implicated the UMES Policy and Procedures Prohibiting Discrimination and the State of Maryland Sexual Harassment Policy.

> • Discrimination and hostile work environment on the basis of race/ethnicity and national origin reasonably implicated the UMES Policy and Procedures Prohibiting Discrimination.

You were made aware of this on or about January 21, 2025, when you met with the OIE. You were also provided with an updated Notice of Investigation which referenced the remaining applicable policies in effect, namely the UMES Policy Prohibiting Discrimination and the State of Maryland Sexual Harassment Policy. As such, I conclude that the failure to follow Title IX did not violate your due process rights.

Therefore, I am unable to establish that there was a flaw or denial of your due process rights in violation of the Policy and Procedures Prohibiting Discrimination.

B.      New Evidence or Insufficient Consideration of all Aspects of the Situation

In support of your appeal, you assert the following:

i.      *The alleged unproven comments do not meet the definition of hostile workplace environment.*
ii.     *UMES's "Final Report" is full of Lies and Falsehoods and must be quashed.*
iii.    *The OIE Crooks's Findings of Fact are absurd, irrelevant, illogical, and false.*
iv.     *The only doctored screenshots provided with dates expose the allegations as fake.*
v.      *The Final Report's irrelevant drivel should be dismissed and struck down.*
vi.     *The Final report makes unsupported and false findings about an invitation to go to DC.*
vii.    *"Factual finding" no. 6, 7, 8 are false/exculpatory but introduced to cause prejudice.*
viii.   *Factual finding no. 9 is full of lies and distorted to suit a pretextual predetermined outcome.*
ix.     *OIE's summary findings and conclusions are absolutely false, illogical, apply the wrong legal standard, and need to be quashed.*


After careful review of the Final Report of Investigation, Intent to Appeal Notice, the Notice of Appeal, and the Procedures set forth in the Policy Prohibiting Discrimination and the State of Maryland Sexual Harassment Policy, there was no new evidence provided.  The appeal broadly attacks the credibility of the evidence presented but fails to present any evidence such as text messages, emails or other documentation to substantiate allegations that the messages included in the report were "doctored" or that the Complainant had performance issues, engaged in timesheet fraud, and had been reprimanded.

I am unable to establish that insufficient consideration has been given to all aspects of the situation.

C.      Evident Bias in the Investigation

In support of your appeal, you assert the following:

i.      *UMES did not treat* ███████████ *equitably.*
ii.     *UMES abused supportive measures in a biased manner.*
iii.    *UMES violated the presumption of innocence.*
iv.     *UMES intentionally lied and hid exculpatory evidence and witnesses.*
v.      *OIE's sanctions are grossly disproportionate, cruel, unusual, and expose these proceedings as a scam.*
vi.     *OIE was undertaking a witch-hunt in retaliation for exposing criminal activity by Heidi Anderson.*

The appeal does not present any evidence supporting the allegation that OIE's investigation was biased.  OIE has sufficiently established that the Title IX Regulations do not apply to the allegations in this matter, thus Title IX provisions regarding supportive measures are not relevant.  However, USM Policy VII-7.20 (Policy on Administrative Leave for Nonexempt and Exempt Staff Employees) and OIE operating procedures allow employees to be placed on paid

administrative leave and such action has been taken in other OIE matters.  Additionally, OIE complied with applicable policies and procedures—you were provided with opportunities to present your own evidence and to review the preliminary report before a final decision, and you brought your legal advisor to meetings with OIE.

I discuss sanctions in the following section.

Having reviewed the Final Report of Investigation, Intent to Appeal Notice, the Notice of Appeal, and the Procedures set forth in the Policy Prohibiting Discrimination and the State of Maryland Sexual Harassment Policy, I find no evidence of bias in the investigation.

D.    Sanction Recommended by the Investigator

In your appeal, you contest the sanctions (see below) recommended by the

investigator.

1.    *The removal of* ███████████████████████████████████████
      ███████████████ *as well as the removal of any corresponding rights
      and obligations pertaining to these roles.* ███████ *will revert to his 9-month tenured
      position as a Professor* ███████████████████████████████████
      ████████████████████

2.    *Issuing a formal letter of reprimand to be placed in* ████████ *personnel file. The letter of
      reprimand will be issued in connection to findings of violations of the UMES Policy
      Prohibiting Discrimination and the State of Maryland Sexual Harassment Policy and will be
      completed by the appropriate supervisor.*

3.    *The OIE is assigning* ████████ *the following online training through Vector Solutions
      platform to be completed by August 22, 2025.*

      a.    *Sexual Harassment:  Staff-to-Staff*

      b.    *Preventing Harassment & Discrimination:  Non-Supervisors*

      c.    *Social Media & Your Job*

      d.    *Social Media for Managers*

The Policy Prohibiting Discrimination states that:

The following sanctions may be imposed upon any member of the University Community found to have violated this Policy and Procedure.  Sanctions that may be imposed, include, without limitation:

Faculty Sanctions
i. Reassignment of duties
ii. Mandatory training

    iii. Verbal reminders
    iv. Written reminders/ letters of reprimand
    v. Suspension with or without pay
    vi. Termination.

Having reviewed the Final Report of Investigation, Intent to Appeal Notice, the Notice of Appeal, and the Procedures set forth in the Policy Prohibiting Discrimination, the sanctions are appropriate.

In my role as the appeal authority, I must inform you that your actions were determined to be unbecoming of an administrator and supervisor in a higher education setting.

As a leader in the academic environment, you are held to a high standard of professional conduct, particularly in your interactions with applicants, students, and staff and in your obligation to foster an inclusive, respectful, and equitable workplace. Your behavior, as documented and substantiated in the investigation, failed to meet those expectations.

As an administrator in higher education, you have a responsibility to model integrity, impartiality, and professionalism in University programs and in all dealings with staff. Your failure to do so not only compromised the well-being of your colleagues but also damaged the trust and collegiality essential to a healthy and productive academic workplace.

This behavior is inconsistent with the values and expectations of this institution and constitutes a serious breach of your professional obligations.

**Conclusion**

Based on the foregoing, your appeal of OIE's findings contained in its June 2, 2025, Final Report of Investigation is hereby denied.

E-FILED; Somerset Circuit Court
Docket: 2/16/2026 4:12 PM; Submission: 2/16/2026 4:12 PM
Envelope: 25126466



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS

**EX27**

THE ACTING ASSISTANT SECRETARY

February 4, 2025

Dear Colleague:

This letter[1] is to clarify that, in light of a recent court decision, the United States Department of Education's (ED) Office for Civil Rights (OCR) will enforce Title IX under the provisions of the 2020 Title IX Rule,[2] rather than the 2024 Title IX Rule.[3] Accordingly, lawful Title IX enforcement includes, *inter alia*, the definition of sexual harassment, the procedural protections owed to complainants and respondents, the provision of supportive measures to complainants, and school-level reporting processes as outlined in the 2020 Title IX Rule.

On January 9, 2025, the United States District Court for the Eastern District of Kentucky issued a decision that vacated the entirety of the 2024 Title IX Rule nationwide.[4] Prior to that decision, federal courts in other jurisdictions had enjoined the 2024 Title IX Rule, which amounted to a prohibition against its enforcement in 26 states.[5] Although the United States Department of Justice is responsible for determining whether to appeal the United States District Court for the Eastern District of Kentucky's vacatur order, that judgment was immediately effective and no portion of the 2024 Title IX Rule is now in effect in any jurisdiction.

In addition, on January 20, 2025, President Trump issued an Executive Order, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government. President Trump ordered all agencies and departments within the Executive Branch to "enforce all sex-protective laws to promote [the] reality" that there are "two sexes, male and female," and that "[t]hese sexes are not changeable and are grounded in fundamental and incontrovertible reality." ED and OCR must enforce Title IX consistent with President Trump's Order.

---

[1] This letter replaces and supersedes the January 31, 2025, letter issued on Title IX enforcement.
[2] 85 Fed. Reg. 30026 (2020).
[3] 89 Fed. Reg. 33474 (2024).
[4] *Tennessee v. Cardona*, No. 24-0072-DCR, 2025 WL 63795, at *6 (E.D. Ky. Jan. 9, 2025).
[5] *See Alabama v. U.S. Sec. of Educ.*, No. 24-12444, 2024 WL 3981994 (11th Cir. Aug. 22, 2024); *Oklahoma v. Cardona*, No. CIV-24-00461-JD, 2024 WL 3609109 (W.D. Okla. July 31, 2024); *Arkansas v. Dep't of Educ.*, No. 4:24-CV-636-RWS, 2024 WL 3518588 (E.D. Mo. July 24, 2024); *Texas v. United States*, No. 2:24-CV-86-Z, 2024 WL 3405342 (N.D. Tex. July 11, 2024); *Kansas v. Dep't of Educ.*, No. 24-4041-JWB, 2024 WL 3273285 (D. Kan. July 2, 2024); *Louisiana v. Dep't of Educ.*, No. 3:24-CV-00563, 2024 WL 2978786 (W.D. La. June 13, 2024).

400 MARYLAND AVE. S.W., WASHINGTON, DC 20202-1100
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

In light of the recent federal court decision vacating the 2024 Title IX Rule, and consistent with President Trump's *Defending Women* Executive Order, the binding regulatory framework for Title IX enforcement includes the principles and provisions of the 2020 Title IX Rule and the longstanding Title IX regulations outlined in 34 C.F.R. 106 et seq., but excludes the vacated 2024 Title IX Rule. Accordingly, open Title IX investigations initiated under the 2024 Title IX Rule should be immediately reevaluated to ensure consistency with the requirements of the 2020 Title IX Rule and the preexisting regulations at 34 C.F.R. 106 et seq.

Resources pertaining to Title IX and the 2020 Title IX Rule are available here.

Sincerely,

/s/
Craig Trainor
Acting Assistant Secretary for Civil Rights
United States Department of Education

E-FILED; Somerset Circuit Court
Docket: 2/16/2026 4:12 PM; Submission: 2/16/2026 4:12 PM
Envelope: 25126466

HBCU president sues professor who accused her of plagiari...    https://www.washingtonpost.com/education/2025/12/15/ume...

# EXHIBIT 29

HBCU president sues professor who accused her of plagiari...          https://www.washingtonpost.com/education/2025/12/15/ume...

*Democracy Dies in Darkness*

**Higher Education**

# HBCU president sues professor who accused her of plagiarism and racism

A former University of Maryland Eastern Shore professor says she was illegally pushed out at the historically Black college because she is White.

Today at 6:00 a.m. EST

 By Dan Rosenzweig-Ziff

Heidi Anderson never imagined she would take a former professor to court. Not as a university president, and certainly not over her decades-old dissertation.

But the University of Maryland Eastern Shore leader, who is Black, and former professor Donna Satterlee, who is White, are now locked in dueling lawsuits over plagiarism, defamation and race. Later this week, they will have their first day in court.

Earlier this fall, Satterlee began telling news outlets that Anderson had plagiarized several paragraphs of her 1986 dissertation. Anderson said she was confident that wasn't true, and that an investigation would prove it. So she called the chancellor of Maryland's university system and asked for a formal inquiry.

Advertisement

12/15/25, 18:06

Satterlee had left UMES in turmoil last December and sued for wrongful termination this summer. She maintained she had been illegally pushed out because of her race and had been punished for calling out corruption at the historically Black institution. On Oct. 15, Satterlee took her story to the conservative TV network Newsmax, where she accused Anderson of reverse discrimination, called the college president a "scam artist" and repeated the plagiarism claims.

Anderson said she didn't consider legal action until another professor said during a faculty meeting that the spiraling allegations were affecting them all, and that it felt like an attack on the university. On Oct. 24, Anderson filed a defamation suit seeking $1 million in damages. She said in an interview that citation standards were different in the 1980s, and she did nothing wrong.

"I stayed quiet for as long as I could," Anderson said. "There's no plagiarism here. It's an attack on me and my character and all of us at the university. I needed to take a stand."

Since Satterlee's plagiarism allegations surfaced, Anderson said she has lost a speaking opportunity and received several racist messages. She is the latest Black university leader — at Harvard, at the University of Maryland and elsewhere — accused of plagiarism. The tensions at Eastern Shore also mirror hostilities occurring across American higher education, as the Trump administration seeks to scale back diversity programs it sees as discriminatory.

Advertisement

The allegations come at a tense time for the university, as three other current and former employees have also filed suits since July alleging Anderson and the school had engaged in "criminal activity," unlawful termination of funding and "fraud with federal funds."

The university also recently lost its classification as an R2 research institution, though its student enrollment is rebuilding after falling to a recent low in 2021.

Satterlee is holding her ground, saying Anderson is trying to silence her by filing the defamation suit.

"This is vicious retaliation," she said. "It's not going to deter me or intimidate me. Anderson is not qualified to be president."

Advertisement

HBCU president sues professor who accused her of plagiari...          https://www.washingtonpost.com/education/2025/12/15/ume...

# EXHIBIT 29

HBCU president sues professor who accused her of plagiari...          https://www.washingtonpost.com/education/2025/12/15/ume...

*Democracy Dies in Darkness*

**Higher Education**

# HBCU president sues professor who accused her of plagiarism and racism

A former University of Maryland Eastern Shore professor says she was illegally pushed out at the historically Black college because she is White.

Today at 6:00 a.m. EST

 By [Dan Rosenzweig-Ziff](Dan Rosenzweig-Ziff)

Heidi Anderson never imagined she would take a former professor to court. Not as a university president, and certainly not over her decades-old dissertation.

But the University of Maryland Eastern Shore leader, who is Black, and former professor Donna Satterlee, who is White, are now locked in dueling lawsuits over plagiarism, defamation and race. Later this week, they will have their first day in court.

Earlier this fall, Satterlee began telling news outlets that Anderson had plagiarized several paragraphs of her 1986 dissertation. Anderson said she was confident that wasn't true, and that an investigation would prove it. So she called the chancellor of Maryland's university system and asked for a formal inquiry.

---

Advertisement

Satterlee had left UMES in turmoil last December and sued for wrongful termination this summer. She maintained she had been illegally pushed out because of her race and had been punished for calling out corruption at the historically Black institution. On Oct. 15, Satterlee took her story to the conservative TV network Newsmax, where she accused Anderson of reverse discrimination, called the college president a "scam artist" and repeated the plagiarism claims.

Anderson said she didn't consider legal action until another professor said during a faculty meeting that the spiraling allegations were affecting them all, and that it felt like an attack on the university. On Oct. 24, Anderson filed a defamation suit seeking $1 million in damages. She said in an interview that citation standards were different in the 1980s, and she did nothing wrong.

"I stayed quiet for as long as I could," Anderson said. "There's no plagiarism here. It's an attack on me and my character and all of us at the university. I needed to take a stand."

Since Satterlee's plagiarism allegations surfaced, Anderson said she has lost a speaking opportunity and received several racist messages. She is the latest Black university leader — at Harvard, at the University of Maryland and elsewhere — accused of plagiarism. The tensions at Eastern Shore also mirror hostilities occurring across American higher education, as the Trump administration seeks to scale back diversity programs it sees as discriminatory.

Advertisement

The allegations come at a tense time for the university, as three other current and former employees have also filed suits since July alleging Anderson and the school had engaged in "criminal activity," unlawful termination of funding and "fraud with federal funds."

The university also recently lost its classification as an R2 research institution, though its student enrollment is rebuilding after falling to a recent low in 2021.

Satterlee is holding her ground, saying Anderson is trying to silence her by filing the defamation suit.

"This is vicious retaliation," she said. "It's not going to deter me or intimidate me. Anderson is not qualified to be president."

Advertisement

E-FILED; Somerset Circuit Court
Docket: 2/18/2026 9:06 AM; Submission: 2/18/2026 9:06 AM
Envelope: 25152457

# EXHIBIT 30



THE BALTIMORE BANNER

## University of Maryland Eastern Shore president accused of plagiarism by former professor

**Ellie Wolfe**

10/3/2025 2:28 p.m. EDT



University of Maryland Eastern Shore President Heidi Anderson, shown here at an event on campus in 2021, is accused of plagiarism in a complaint filed with the University System of Maryland. (Joe Andrucyk/Maryland Government)

### Heidi Anderson is the second Maryland university president accused of plagiarism in just over a year

The president of the University of Maryland Eastern Shore has been accused of plagiarizing portions of her doctoral dissertation in a complaint to the university system.

Heidi Anderson is accused of lifting seven paragraphs of her 400-page dissertation nearly verbatim from a previously published scholarly article. An additional three paragraphs in the 1986 dissertation included in-text citations but no quotation marks. The complaint was filed by a former UMES professor who is also alleging

👤 Sign

Overseeing a student body of roughly 3,000, Anderson has served as president of the historically Black university in Somerset County since 2018. She earned her doctoral degree in pharmacy administration from Purdue University.

The accusations mark the second time in just over a year that a university president in the state's public system has been accused of plagiarism. University of Maryland, College Park President Darryll Pines was accused last fall of inappropriately lifting passages without attribution in a scientific paper he co-authored in 2002. The university system said the accusation against Pines is still under investigation.

Donna Satterlee, who was an associate professor of human ecology at UMES from 2002 through 2024, filed the complaint against Anderson to the university system's Office of Internal Audit through its fraud reporting hotline last month. The office is tasked with evaluating complaints and determining whether they should be investigated.

Satterlee said she put Anderson's dissertation through computer software that looks for and flags instances of potential plagiarism. She said the program found that Anderson's dissertation, on the effectiveness of computer-assisted instruction versus traditional lectures in teaching pharmacy students about nonprescription drugs, plagiarized portions of text from a 1981 paper by Robert M. Caldwell about computer-based medical education.

Satterlee, who now works with graduate students at Wilmington University in Delaware to help prepare and submit their dissertations, said she scrutinized Anderson's dissertation because of negative interactions she had with the UMES president previously.

Satterlee is representing herself in a lawsuit that alleges she was "unlawfully terminated" from UMES and that members of her department, as well as senior leadership, preferentially hired African American employees over white and Asian applicants. The suit, filed Aug. 15, names Anderson, members of her leadership team, the university system and its chancellor, Jay Perman.

The Banner independently reviewed both the dissertation and Caldwell's paper, finding several passages of text in the dissertation that do not use quotation marks or other direct attribution.

In some cases, the text is verbatim, while in others, Anderson includes some minor filler words. Anderson's dissertation also includes passages lifted almost word-for-word from a second academic paper published three years before her dissertation with no quotations marks.

Purdue University, which awarded Anderson her doctorate, did not immediately respond to a request for comment.

At present, the utilization of data bases is certainly one of the most common uses of computers in medical education. At the University of Texas Health Science Center at Dallas, for example, data based instruction is a common element in the education of health care professionals.

Another common use of computers in health care has been to interface computer systems with various types of existing and new equipment. For instructional purposes computers are being used to control slide projectors, 16mm film projectors, video tape and video desk units. In most instances, the computer allows random access to these other media with the exception of the 16mm film projector.

A comparison of Robert M. Caldwell's 1981 article and Anderson's 1986 dissertation run through a website created by Prof. Debora Weber-Wulff showed similarities in several paragraphs. An excerpt of Caldwell's original paper is highlighted in yellow where the words match Anderson's.

At present the application of data bases is certainly one of the most common uses of computers in medical education. At the University of Texas Health Science Center at Dallas data based instruction is a common element in the education of health care professionals.

Another common use of computers in health care has been to interface computer systems with various types of existing and new equipment. For instructional purposes computers are being used to control slide projectors, 16mm film projectors, video tape and video disk units. The computer allows random access to these other media with the exception of the 16mm film projector.

An excerpt of Anderson's 1986 dissertation is highlighted in orange where the words match Caldwell's in the sixth and seventh paragraphs.

Officials at the University System of Maryland and the University of Maryland Eastern Shore declined to comment, but Tina Wilson, the chair of the UMES Board of Visitors, released a letter supporting Anderson on her Facebook page.

"Two lawsuits alleging discrimination and a reckless, anonymous accusation sent to The Baltimore Banner attempting to undermine Dr. Anderson's academic credentials are emblematic of [a] disturbing trend," Wilson wrote in the letter. It was signed by five other people, including Anderson's dissertation advisor at Purdue.

Four lawsuits have been filed in the last three months by current and former UMES employees against Anderson and the university. All of the lawsuits, including Satterlee's, accuse Anderson and her leadership team of creating a hostile work environment and perpetuating various forms of fraud on campus.

Wilson wrote that the claim was "a destructive distraction from the important work of advancing education, equity and opportunity," and that the claim follows a "calculated pattern aimed at discrediting Dr. Anderson's leadership and legacy."

Wilson wrote that she stands "firmly" with Anderson despite the accusations.

"We affirm our confidence in her leadership, her character and her scholarly integrity," Wilson wrote.

Sign In

READ MORE

 **University of Maryland Eastern Shore president sues ex-professor for defamation**
Dec 18, 2025

Experts on academic plagiarism, however, described the allegation against Anderson as troubling after reviewing portions of Caldwell's original article and Anderson's dissertation side by side.

"This isn't good," said Jonathan Bailey, the head of Plagiarism Today, a consulting firm that studies the issue. "It doesn't necessarily invalidate the entire dissertation, but it does raise issues that would need an in-depth investigation."

The allegedly plagiarized passages are in the introduction and the literature review sections of Anderson's dissertation.

"Plagiarism in the background of a paper is not as severe, [but] it is still considered plagiarism and could have been easy rectified in this paper," Bailey said. "It's another sign that points more to sloppiness and recklessness rather than malice, but at some point recklessness becomes its own integrity violation."

Because of the highly illustrative nature of much of what is presented in traditional medical and allied health education, the graphic capabilities of the computer offer enormous possibilities for instruction and research. The graphic, animation, and color features offered by many computers allow complex graphs to be drawn, detailed cross sections of organs and molecules to be displayed and even animated, and multicolored illustrations to be presented on a monitor. Learners can respond to questions presented about these graphics and watch the computer modify them as a result of those responses.

The fifth paragraph of Robert M. Caldwell's 1981 paper, highlighted in yellow where the words match Anderson's.

Because of the highly illustrative nature of much of what is presented in traditional medical and allied health education, the graphic capabilities of the computer offer enormous possibilities for instruction. The graphic, and color features offered by many computers allow complex graphs to be drawn, detailed cross sections of organs and molecules to be displayed and even animated, and multicolored illustrations to be presented on a monitor. Learners can respond to questions presented about these graphics and watch the computer modify them as a result of those responses.

The fifth paragraph of Anderson's 1986 dissertation, highlighted in orange where the words match Caldwell's.

Bailey said the lack of in-text citations is "worrisome," but that the allegations against Anderson were not as severe as the ones against Pines, president of the state's flagship university.

A September 2024 story by The Daily Wire alleged that 1,500 words of the 5,000-

was a professor at the University of Maryland when the paper was published.

The investigation into Pines is being conducted by Ropes & Gray, an independent law firm. So far, according to records obtained by The Banner, the investigation has cost the University of Maryland, College Park just under $400,000.

In recent years, there has been a growing frequency in accusations of plagiarism against Black university leaders.

In 2023, Harvard University President Claudine Gay was accused of plagiarizing sections from multiple published papers. That same year, Alade McKen, who was in charge of diversity, equity and inclusion at Columbia University's Irving Medical Center, was accused of plagiarizing parts of his doctoral dissertation. And in 2018, Hobart and William Smith Colleges President Gregory Vincent was accused of plagiarizing his published work.

Debora Weber-Wulff, a professor who studies plagiarism at the University of Applied Sciences in Berlin, said an investigation into Anderson's dissertation is warranted. She, like Bailey, reviewed portions of the dissertation, as well as Caldwell's original article.

"This is definitely plagiarism," Weber-Wulff said. "The important question is, is there more?"

If the findings are serious, she said, Anderson should be stripped of her doctorate degree.

"If a student had done this in a paper, it would be sufficient enough for a fail," she said.

It's not common to revoke a doctoral degree from an academic, but it has happened.

In 2016, Pennsylvania State University revoked a graduate's Ph.D. after administrators discovered they had plagiarized parts of their thesis. And in 2014, former Montana Sen. John E. Walsh had his master's degree from the U.S. Army War College stripped because of plagiarism.

Though the accusations against Anderson cover only a few pages, Bailey, the American plagiarism expert, said an investigation is needed to examine the whole document more thoroughly.

"One of the things I've learned over the years, is when you find issues like these, there are often other issues in the paper that haven't yet been discovered," Bailey said.

### About the Education Hub

*This reporting is part of The Banner's Education Hub, community-funded journalism*

Sign In



**Ellie Wolfe**

ellie.wolfe@thebaltimorebanner.com

Ellie Wolfe reports on higher education at the Baltimore Banner. Raised in western Massachusetts and a proud graduate of Bates College, Ellie spent a year reporting on higher education at the Arizona Daily Star in Tucson before moving to Baltimore.



MORE FROM ELLIE WOLFE

**Expect sleet, freezing rain on Friday after a warm Christmas**

Dec 25, 2025

**'Real Housewives of Potomac' stars have 'very little money,' prosecutor alleges**

Dec 19, 2025

HOLIDAY GIFT GUIDE




**Staff Picks**



**Locally Made**



**Experien...**

Sign In

Ex31

# Another College President Plagiarized Her Dissertation. That's Just The Tip Of The Iceberg.

*Luke Rosiak*

A college president and former chair of the American Association of State Colleges and Universities plagiarized extensively in her doctoral dissertation, a Daily Wire review found.

Heidi M. Anderson is president of the University of Maryland Eastern Shore. For nearly four decades, she has climbed the academic ladder while producing an unremarkable amount of low-quality research.

Now, a lawsuit from a former Eastern Shore professor threatens to cast Anderson's career in a startling new light. Donna Satterlee alleges that, under Anderson, low-skilled black faculty were hired based on their race and paid more than white faculty. The suit said whites were forced to do the work that black officials took credit for.

A Daily Wire review suggested that it could be a pattern that began with her 1986 doctoral dissertation for Purdue University, which kicked off her academic career.

Portions of the dissertation, which deal with the use of computers in pharmaceutical education, appear to be a repurposed and uncredited copy of a 1984 paper by Donna E. Larson, a professor of nursing, about the use of computers in nursing education, with simply the name of the field changed. The photos below show just the beginning of a lengthy section where Anderson appears to crib Larson's eight points.

## Heidi Anderson (1986)

### Advantages of CAI in Pharmacy Education

Computer-assisted instruction has been defined as one kind of learning method in which, through the use of computer technology, a learner receives, reacts to and interacts with instructional material. The two key concepts of CAI are (1) the learner <u>actively</u> participates in the learning process and (2) the learner must <u>interact</u> with the instructional method. CAI <u>individualizes</u> the learning activities for students. CAI can accomodate for student's own particular rate of learning and intellectual level. Through the use of good instructional design, the same CAI program should appear different to the 'good' student than it does to the student who does not learn as readily. Today's microcomputer can contribute to pharmacy education because of the following features.

1. <u>Provide effective, efficient methodology</u>. Research on CAI in health professional education has demonstrated that when compared to more traditional teaching strategies (e.g., lecture, lab, etc.), students learn equally as well with CAI, but in less time (Bitzer, 1973, Boettcher, 1981, Huckabay, 1979, Kulik, 1980). Saving the learner time can be essential in pharmacy education with the increase in knowledge that is required for graduation.

## Larson (1984)

### COMPUTER-ASSISTED INSTRUCTION IN NURSING EDUCATION

Donna E. Larson, R.N., Ph.D.
Associate Professor of Nursing
Grand Valley State Colleges, Allendale, Michigan

Computer-assisted instruction (CAI) has been defined as one kind of learning environment in which, through the use of computer technology, a learner receives, reacts to, and interacts with instructional material prepared by an instructional specialist (Burson, 1976). Contained in this definition are two key concepts. The first concept is that the learner participates in <u>active</u> learning activities. Only through active and continual participation does the student progress through the instructional material. The student <u>must</u> interact with the instructional material. In well-designed computer-assisted instruction, there is no way that the student can be a passive recipient of information. The second key concept is that well-designed computer-assisted instruction individualizes the learning activities for each student. Within a specified framework, each student's own particular rate of learning and intellectual level can be accommodated. Through the use of branching and good instructional design, the same computer-assisted instruction program should appear very different to the "good" student than it does to the student who does not learn as readily.

### ADVANTAGES OF COMPUTER-ASSISTED INSTRUCTION IN NURSING

Keeping in mind the key attributes in the above definition, the use of computer-assisted instruction has many advantages for nursing education.

1) <u>Provides effective, efficient methodology</u>. Research on computer-assisted instruction in health professional education has repeatedly demonstrated that, when compared to the more traditional teaching strategies (e.g., classroom lecture, discussion, lab), students learn equally as well with computer-assisted instruction, but in one-third to one-half the amount of time (Bitzer, *Computers in Biology*, 1973; Boettcher, 1981; Droste-Bielak, 1980; Huckabay, 1979; Kulik, 1980; Larson, 1982; Rubinson, 1977; Valish, 1975). In this age of exploding knowledge in nursing, the saving of student learning time can be viewed as a tremendous advantage.

DAILY WIRE+

Note at the bottom that Larson cited a number of papers, including her own prior work. Anderson appeared to lift those citations, in order, but remove Larson's citation to herself—perhaps to avoid leaving a clue that could unravel an academic crime. Larson's name is not mentioned anywhere in Anderson's dissertation.

Larson's list had eight items on it, but Anderson had 12. The 10th item on the list also copied someone else's words verbatim and without quotation marks to make a simple point.

When Anderson summarizes a book by Christopher Evans, she is actually copying someone else's summary of Evans's work, even though there is no parenthetical attribution in that section of the text indicating it. The summary on the right, by Richard E. Pogue, was from the introduction to the same journal issue where Larson's paper appeared.

| Heidi Anderson (1986) | Pogue (1984) |
|---|---|
| Those who study history contend that the computer will have more impact on the history of mankind than did the industrial revolution. This is further illustrated by Christopher Evans (1980) in his book The Micro Millenium. Evans compares the computer revolution with the industrial revolution in terms of its total impact on society.<br><br>He outlines some important differences between these two revolutions. First, he notes the computer revolution is aimed at amplifying our intellectual and knowledge processes whereas, the industrial revolution amplified man's muscle power, making it capable to carry out physical accomplishments that were never possible before. Secondly, the computer revolution will take place in as few as 50 years in contrast the industrial revolution happened over 150 years.<br><br>Finally, unlike the industrial revolution where no one really foresaw its total impact on society, so that society was surprised and unprepared when it occurred; our modern communications allow us to observe and predict what is likely to happen so we have time to prepare for the anticipated changes and become computer literate. | Those who study such things contend that the computer will have more impact on the history of mankind than did the industrial revolution. This case is particularly well made by Christopher Evans in his book, The Micro Millenium. Evans describes the characteristics of the industrial revolution as follows: One, it amplified man's muscle power, permitting us to carry out physical accomplishments never before possible. Two, it brought about tremendous changes in society, including the way we organize and live. Three, it happened very rapidly, in a space of less than 150 years. Fourth, once started, its growth was unstoppable, even remorseless in its impact. And fifth, and particularly interesting, no one really foresaw its total impact on society, so that society was surprised-- and unprepared--when it happened.<br><br>Evans compares the computer revolution with the industrial revolution in its total impact on society but sees some important differences. The biggest, of course, is that the computer revolution is aimed at amplifying our intellectual and knowledge processes. Another, perhaps somewhat frightening, difference is that the computer revolution will take place in far less time, perhaps in as few as 50 years.<br><br>(The history of the electronic digital computer as we know it goes back less than 40 years.) Finally, and a most hopeful factor, is that our modern communications allow us to observe and predict what's likely to happen, therefore giving us time to prepare for the anticipated changes. |

DAILY WIRE+

Likewise, Anderson appears to have simply taken the language of University of Texas medical professor Robert M. Caldwell, writing about computers in medical schools, and changed the name of the field. Caldwell does not appear in the references section of that chapter.

| Heidi Anderson (1986) | Caldwell (1984) |
|---|---|
| At present the most common mode of instruction which is found in pharmacy schools is lecture. This traditional form of instruction is adequate for most situations -- except when it is difficult to locate well qualified experts who are both knowledgeable and proficient at lecturing or in other instances where the educational environment needs to: enhance problem solving, develop creative thinking and allow students to apply skills that are learned. Where such a shortfall exists the computer can provide self-paced instruction which may be highly interactive and provides learners with a variety of applications for the knowledge and skills they need to acquire. | At present the most common mode of instruction which is found in medical schools and continuing medical education is lecture. This traditional form of instruction is adequate for most all situations except when it is difficult to locate well qualified experts who are both extremely knowledgeable and proficient at lecturing. Where such a shortfall exists the computer can provide self-paced instruction which is highly interactive and which provides learners with a variety of applications for the knowledge they want to acquire. |

DAILY WIRE+

A significant stretch of Anderson's paper is identical to "Introduction to Instructional Media" (1978) by David H. Jonassen, even though Jonassen's name never appears in her paper. That includes mirroring Jonassen's language that something was "recent" in the world of computers, without the reader knowing that it was actually new almost a decade prior.

| Heidi Anderson (1986) | Jonassen (1978) |
|---|---|
| The unique character of a CAI system depends on the ability of the computer to provide two significant capabilities: memory and logic. No other instructional aid provides the detailed collated memory of students' responses to individual displays of instructional materials in a form that is directly useful for automatic processing. Nor does any other instructional aid provide its logical capability for making the organization of instructional information dependent upon the characteristics of the individual. There are six major "modes" of use of CAI instruction. They are problem-solving, drill and practice, inquiry, simulation and gaming, tutorial and author. Each mode is further described below. | The unique character of a CAI system depends on the ability of the computer to provide two significant capabilities: memory and logic. No other aid provides the detailed collated memory of students' responses to individual displays of instructional materials in a form that is directly useful for automatic processing. Nor does any other aid provide its logical capability for making the organization of instructional information dependent upon the characteristics of the individual. These features can best be seen in terms of the six major "modes" of use in CAI instruction. |
| Problem-solving involves the combination of previously learned rules into a new higher-order rule that solves the problem and generalizes to an entire class of stimulus situations embodying other problems of the same type. | One of the CAI system modes is problem solving. This mode is readily achieved, provided the typical computational capability of the computer is available and there is a typewriter or some other display and response device, usually remote, in two-way communication with it... |
| The second of the CAI system modes is drill and practice. This mode is designed to supplement and reinforce the regular instruction received elsewhere by providing a means by which concepts that are presented and developed in the classroom can be practiced and refined at the computer. This mode can provide continual practice of the concepts. | The second of the CAI system modes is drill and practice. In order for the student to use the CAI system in this mode, the system must be programmed to handle the particular drill and practice materials selected, or developed, by a teacher. The materials are designed to build skills and give the students the kinds of practice that the teacher feels they need to meet the minimal objectives of his course... |
| The inquiry mode is the third type of CAI application. In this mode the CAI system responds to the student inquiry with answers it has stored in its files to the extent that the computer files provide access to that information. This system must be designed to anticipate student questions so the correct information can be programmed into the computer files. | The inquiry mode is the third type of CAI application. In this mode the CAI system responds to the student inquiry with answers it has stored in its files to the extent that the algorithms it contains provide access to that information. In this mode, the student does not need to know much about the CAI system, but the instructional staff must learn how the system operates in order to establish files and search algorithms that anticipate student questions. |
| The fourth mode of CAI is simulation and gaming. In this mode the students play through a real or idealized complex situation. In order to play the game the students have to know certain facts, perform certain skills, or demonstrate mastery of certain concepts. Winning the game depends upon mastery of these cognitive skills. | A fourth mode of CAI is simulation and gaming.· In this mode the instructional staff formulates a model of some real or idealized complex situation. The complex relationships among the variables that represent the situation are the aspects of the situation that the student must learn to work with and interpret. A game may not represent a particular business or interpersonal interaction. |
| Simulation attempts to represent a real situation. To implement this mode of CAI certain elements of social or physical reality are abstracted and the student must interact with and become part of that simulated reality. Simulations are most effectively used after basic concepts and principles are learned, in order to integrate them into the context of a meaningful problem. | A simulation, on the other hand, does attempt to represent a real situation. To implement this mode of CAI the teacher must define the model sufficiently to permit it to be programmed. A computer program must be written to process the student's input so that he gets a meaningful output. The output is determined by what the student does and by the model. The student interacts by using natural language. |
| The fifth mode of CAI is tutorial instruction. This mode is intended to stand alone as an instructional entity in | |

the curriculum and is not used to supplement classroom teaching, as is drill and practice. This requires that the program teach rules and concepts embodied in the subject matter, evaluate the student's comprehension of the concepts, and provide practice in the specific skills to be learned.

A new mode of CAI is the author mode. In the author mode, a CAI system is used to support instruction by generating sets of materials for student's use. This is a more recent form of CAI system and is still being developed.

From this description it becomes apparent that a CAI program is qualitatively quite different from a book, film, or television, in flexibility of adaptation to virtually any kind of instructional role. It can combine content and process with evaluation, decision making, and record keeping. It is potentially a test, text, teacher, remedial specialist, audiovisual specialist and administrator wrapped into one coherent system (Anastasio and Morgan, 1972).

### Advantages of CAI

The main advantages of a CAI system over traditional instructional methods are related to the degree to which it permits the individualization of education and, particularly, instruction. The kinds of advantages include the capability of: (1) individualizing both the means and the ends of instruction; (2) doing research on teaching under controlled conditions and, in particular, under conditions which individualize instruction in a particular way; (3) conducting research on various modes of teaching, with the ability to collect detailed records of student performance which in turn permits evaluation of the effectiveness of the teaching procedures, as well as the effectiveness of the materials; (4) developing ways of assisting teachers and authors in the development of instructional materials; and (5) evaluating alternative media used to implement and support instruction, e.g., slides, audio tapes, or films.

A fifth mode of CAI is tutorial instruction. In this mode the instructional staff takes responsibility for the student's instruction on the system. The logic of the instruction must be formalized and entered into the system...

An additional capability not now available in any substantial way can be called the author mode of CAI. In the author mode, a CAI system is used to support instruction by generating sets of materials for a student's use. In order to build a system with this capability, instructors must identify the primitives of their instructional materials and the algorithms that can be used to generate the desired text for student use...

### Advantages of CAI

The main advantages of a CAI system are related to the degree to which it permits the individualization of education and, particularly, instruction. It is important to distinguish between individualization of means and individualization of ends. More specifically, the kinds of advantages to be gained from a CAI system include: (1) the capability of individualizing both the means and the ends of instruction; (2) the capability of doing research on teaching under controlled conditions and, in particular, under conditions which individualize instruction in a particular way; (3) the capability of doing research on various modes of teaching, with the ability to collect detailed records of student performance permitting evaluation of the effectiveness of the teaching procedures, as well as the effectiveness of the materials; (4) the capability of developing ways of assisting teachers and authors in the development of instructional materials; and (5) the capability of evaluating alternative media used to implement and support instruction, e.g., slides, audio tapes, films, CRT displays, typewriters, light pen, tough plates, sketch pads, etc.

**DAILY WIRE+**

Anderson's personal touches consisted of adding woke language and grammatical errors. For example, a 1,000-word stretch appears copied directly from a paper by Robert M. Caldwell (1984) and an introduction to another paper by Christopher R. Brigham and Martin Kamp in 1973. The primary difference is that Anderson changed "his" to "his/her," and the correctly-spelled "judgment" to the incorrect "judgement."

| Heidi Anderson (1986) | Caldwell (1984) |
|---|---|

**Heidi Anderson (1986)**

The applications of computer technology to medical and allied health education are many and varied. The literature reveals that there is a long-standing and sustained interest in the use of CAI in schools of medicine, and to a lesser extent, in nursing and pharmacy. What follows are several examples which represent some of the ways computers are being used in the field of health care training.

Because of the highly illustrative nature of much of what is presented in traditional medical and allied health education, the graphic capabilities of the computer offer enormous possibilities for instruction. The graphic, and color features offered by many computers allow complex graphs to be drawn, detailed cross sections of organs and molecules to be displayed and even animated, and multi-colored illustrations to be presented on a monitor. Learners can respond to questions presented about these graphics and watch the computer modify them as a result of those responses.

The PLATO system is designed to display text or graphics as well as projected transparencies. It uses a sophisticated terminal and permits students to respond with the keyboard, a light pen or by touching the screen with a finger. The PLATO system is a good example of the concept of a single large computer serving remote users via communication links (Bitzer and Bitzer, 1973).

The University of California, San Francisco, as another example, uses computers to simulate various molecular fusions. By color-coding each molecule, researchers can study bonding thus saving valuable time in pharmaceutical research. Computer color display is also playing an increasingly important role in research with tomography and a variety of other photographic processes (Caldwell, 1981).

At present the application of data bases is certainly one of the most common uses of computers in medical education. At the University of Texas Health Science Center at Dallas data based instruction is a common element in the education of health care professionals.

One example of a data base system is the SCARS, (Surgical Coding, Reporting and Retrieval System) in the Department of Surgery. It processes about 6,000 surgery cases annually for the purpose of establishing a record of the most common surgical procedures used in various types of operations. In preparing for surgery, surgeons can consult this data base on procedures, anesthesia, recovery rates, and a variety of other factors that may affect a procedure. Following surgery, the surgeon can add to the data base so that others might share in the experience of that surgical operation (Caldwell, 1981).

Another example of a data base system is the DECsystem-10, which contains a compilation of over 5,000 test items in the area of biochemistry. Students use this system at the University of Texas to review material for biochemistry examinations (Caldwell, 1981).

Another common use of computers in health care has been to interface computer systems with various types of existing and new equipment. For instructional purposes computers are being used to control slide projectors, 16mm film projectors, video tape and video disk units. The computer allows random access to these other media with the exception of the 16mm film projector.

One example of the interfacing capabilities of the computer is a dental education program at the University of Iowa that uses the plasma display PLATO terminal to rear project slides on the terminal screen. Computer generated text can then be superimposed on these visuals. The computer allows random access of slides as well as the presentation of textual material (Caldwell, 1981).

Successful experiments in the use of video tape and video disk under computer control are being tried at a number of medical schools. Video disk allows learners to access taped or filmed segments immediately or

**Caldwell (1984)**

The applications of computer technology to medical and allied health education are many and varied. Obviously, in a paper of this length all of those applications cannot be cited. What follows, therefore, are several examples which represent some of the ways computers are being used in the field of health care training. These examples have been grouped to illustrate how the various capabilities of the computer are being used to improve instruction.

Because of the highly illustrative nature of much of what is presented in traditional medical and allied health education, the graphic capabilities of the computer offer enormous possibilities for instruction and research. The graphic, animation, and color features offered by many computers allow complex graphs to be drawn, detailed cross sections of organs and molecules to be displayed and even animated, and multicolored illustrations to be presented on a monitor. Learners can respond to questions presented about these graphics and watch the computer modify them as a result of those responses.

**Brigham, Kamp (1973)**

In the first paper, Marianne Bitzer and Donald Bitzer describe the use of the PLATO computer system in nursing instruction. The PLATO system was developed at the University of Illinois (at Urbana), and is a good example of the concept of a single large computer serving remote users via communication links. The PLATO system is designed, when fully operational, to be able to interact with literally thousands of students at once. It uses a sophisticated terminal that can display text or graphics as well as projected transparencies and permits students to respond with the keyboard, a light pen, or by touching the screen with a finger.

**Caldwell (1984)**

At the University of California, San Francisco, for example, computers are being used to simulate various molecular fusions. By color-coding each molecule, researchers can study bonding thus saving valuable time in pharmaceutical research. Computer color display is also playing an increasingly important role in research with tomography and variety of other photographic processes.

At present the utilization of data bases is certainly one of the most common uses of computers in medical education. At the University of Texas Health Science Center at Dallas, for example, data based instruction is a common element in the education of health care professionals. The following serve as examples which are fairly typical of the way in which computers are used in many institutions.

The Surgical Coding, Reporting and Retrieval System is a data base used in the Department of Surgery. It processes about 6,000 surgery cases annually for the purpose of establishing a record of the most common surgical procedures used in various types of operations. In preparing for surgery, surgeons can consult this data base on procedures, anesthesia, recovery rates, and a variety of other factors. Following surgery, the surgeon can add to the data base so that others might share in the experience of that surgical operation.

Over 5,000 test items in the area of biochemistry have been compiled and stored in the University's DECsystem-10 for use in reviewing for biochemistry examinations. The DECsystem-10 supports over 125 terminals simultaneously and these are usually full during exam time. Students may review as many items as they wish and receive a hard-copy print out of the items they answer incorrectly. This data base has been extremely popular among students and is well used. A similar data base is currently being established by the Department of Nutrition and Dietetics.

Another common use of computers in health care has been to interface computer systems with various types of existing and new equipment. For instructional purposes computers are being used to control slide projectors, 16mm film projectors, video tape and video disk units. In most instances, the computer allows random access to these other media with the exception of the 16mm film projector. The range of possibilities for interfacing both media systems and medical equipment is almost endless:

1. A dental education program at the University of Iowa uses the plasma display PLATO terminal to rear project slides on the terminal screen. Computer generated text can then be superimposed on these visuals. This allows

segments can be presented over and over for review instantaneously.

random access of the slides as well as the presentation of textual material. This technique has also been used in a burn care simulation in Iowa.

2. Successful experiments in the use of video tape and video disk under computer control are being tried at a number of medical schools. Video disk particularly adds a new dimension to individualizing instruction in a computer-based mode. Learners may access taped or filmed segments immediately or they can be presented over and over for review instantaneously.

### Brigham, Kamp (1973)

Hagamen et al. (1973) at the Cornell University Medical College has described another sophisticated instructional system called ATS (A Tutorial System). ATS is based on APL (All Purpose Language), an existing interactive system, and has two main functional divisions. One is intended to carry out instructional sequences with students, and the other provides an interactive prompting system to help faculty members to prepare instructional material for the computer. The system makes considerable use of computer technology permitting students to answer questions in free response rather than being restricted to multiple-choice lists, and to question the program about subject material presented.

Harless et al. (1973) created a library of computer simulations called CASE (Computer-Aided Simulations of the Clinical Encounter) which uses another system called GENESYS (Generating System). CASE offers students an opportunity to assume the role of a practicing physician and actively engage in the process of clinical decision-making. While GENESYS helps the instructor create new course material for the CASE system. The CASE system was one of the first designed to allow the student to enter questions and responses in his own words and to simulate the responses of a real patient, so the student can practice his history-taking and diagnostic skills. Simulations of the clinical encounter are beneficial since they provide students with an opportunity to deal with a variety of clinical situations in which they can independently exercise their judgement without the risks that would be involved if live patients were used.

Hoffer (1973), at the Massachusetts General Hospital, also worked on using the computer to simulate clinical situations. Using programs developed on the MUMPS system, students practice the management of disease syndromes such as diabetic keto-acidosis. The computer program is designed to generate an updated version of the simulated patient's condition, based on a mathematical model of the disease process. Since the "patient" is responsive to treatment by the user, the student gains the feeling that he is in an actual clinical situation and often becomes emotionally involved in the outcome of his therapeutic efforts.

At the University of Texas Medical Branch at Galveston, a different approach is being taken to provide computer services to students at reasonable cost. Instead of using an existing time sharing system and remote terminals, they are working with a relatively inexpensive mini-computer. Holm and Thompson (1973) describe their system, called CAISYS-8, as one which interacts with students via typewriter terminal and computer-controlled slide projector. It has the advantage of avoiding the technical problems associated with telephone communications, since the mini-computer can be physically located near the student terminals and connected with direct wiring.

Wilbur Hagamen of the Cornell University Medical College has described another sophisticated instructional system called ATS (A Tutorial System). ATS is based on APL, an existing interactive system, and has two main functional divisions. One is intended to carry out instructional sequences with students, and the other provides an interactive prompting system to help faculty members to prepare instructional material for the computer. The system makes considerable use of computer technology permitting students to answer questions in free response than being restricted to multiple-choice lists, and to question the program about subject material presented. The fact that ATS is written in an interactive language (APL) which is in use on many computers will help to make it more widely available for instructional use.

Work directed toward simulation of the clinical encounter and based on an interactive system called Coursewriter is described by William Harless. His group began work in 1966, and has evolved one system (CASE) to deal with the student, and another system (GENESYS) to interact with the instructor and help him create new course material. The CASE system was one of the first designed to allow the student to enter questions and responses in his own words and to simulate the responses of a real patient, so the student can practice his history-taking and diagnostic skills. Simulations of the clinical encounter are especially promising since they provide students with an opportunity to deal with a variety of clinical situations in which they can independently exercise their judgment without the risks that would be involved if live patients were used.

Edward Hoffer, at the Massachusetts General Hospital, has also been working toward the goal of using the computer to simulate clinical situations. Using programs developed on the MUMPS system, students can practice the management of disease syndromes such as diabetic keto-acidosis. The computer program is designed to generate an updated picture of the simulated patient's condition, based on a mathematical model of the disease process. Since the "patient" is responsive to treatment by the user, the student gains the feeling that he is in an actual clinical situation and often becomes emotionally involved in the outcome of his therapeutic efforts.

At the University of Texas Medical Branch at Galveston, a different approach is being taken to provide computer services to students at reasonable cost. Instead of using an existing time sharing system and remote terminals, they are working with a relatively inexpensive mini-computer. Cheryl Holm and William Thompson describe their system, called CAISYS-8, which interacts with students via typewriter terminal and computer-controlled slide projector. It has the advantage of avoiding the technical problems associated with telephone communications, since the mini-computer can be physically located near the student terminals and connected with direct wiring.

DAILY WIRE+

Anderson's paper proposed using computers to administer quizzes to pharmacy students, but she cribbed information about computers from papers that were woefully out of date even in 1986. One sentence said "Review of the literature demonstrates that there are relatively few methodologically sound evaluations of the effectiveness of computer assisted instruction (Atkinson, 1968)."

By the time of her writing, Apple II computers were widely available, and the sort of interactive tests her paper focused on were technically trivial. Yet with her experience with computers seemingly consisting only of reading old papers about them, her paper went on at length about topics like the comparative advantages of mainframes versus terminals. She copied older scholars' exact language even when explaining such obvious concepts as why it's better for a computer to be small than big ("microcomputer units may be transported into the environment of the subject").

The portion of Anderson's dissertation designed to drive the field forward consisted of showing a computer program to students and then asking them questions about their opinions about computers. But the interactive activity was programmed by someone else, and the questions were also written by another researcher.

Startlingly, the conclusion of her original research also appeared to be copied from someone else. "These findings suggest that CAI can be as effective and efficient as a more traditional instructional modality in teaching both factual content and application of learned material when both methods use the same instructional content," she wrote. That was virtually identical to a sentence that Elaine G. Boettcher wrote five years prior.

| Heidi Anderson (1986) | Boettcher (1981) |
|---|---|
| These findings suggest that CAI can be as effective and efficient as a more traditional instructional modality in teaching both factual content and application of learned material when both methods use the same instructional content. | This finding suggests that CAI can be as effective as a more traditional instructional modality in teaching both factual content and application of learned material when both media use the same instructional approach. |

DAILY WIRE+

Anderson's dissertation says that "financial assistance was provided to the author by the Purdue University Black Doctoral Fellowship."

**'Posture towards non-Black faculty and staff was barely concealed hostility.'**

In July, Satterlee sued the University of Maryland Eastern Shore and Anderson, saying, "Black faculty and administrators are paid vastly higher than others of similar or better qualifications. Heidi Anderson has instituted a two-tier system of racial preferences discriminating against White and Asian faculty who are given more and less-desirable work but significantly lower pay."

"The Heidi Anderson Administration's posture towards non-Black faculty and staff was barely concealed hostility. It was an established practice to pay non-Blacks less than Blacks, not include them in valuable opportunities, and only exploit their work for personal gain of the select few who were close to the university administration," the federal lawsuit said.

"Moses Kairo, a former Kenyan national, became the dean of the School of Agricultural and Natural Sciences at UMES in 2012. He exhibited a distinct preference for African nationals in hiring for positions within the school," the lawsuit said. Another Kenyan and apparent former schoolmate of Kairo's, Grace Namwamba, was hired as department chair and Satterlee's boss, even though "Namwamba had extremely poor work competencies and skills and appeared incapable of writing in English at the level required of a university professor," it said.

Satterlee, the lowest-paid faculty member in her department, "was assigned double the work of African or African-American faculty. In one instance, Dr. Satterlee was instructed by Dr. Namwamba to create a master's degree program in two days... after Dr. Satterlee worked without rest to complete the assignment, Dr. Namwamba took her work product and stole the credit," the suit said.

Satterlee said she earned the ire of Anderson and Namwamba after she called for a salary study that would publish faculty pay broken down by race, and by correcting sloppy work by Namwamba in an attempt to save the department from embarrassment. She was the only faculty member to be denied a request for a promotion that year, she said — with the denial letter misspelling her name as "Dr. Scatterlee."

She said she was disciplined by the school's DEI office, called the Office of Institutional Equity. The office is led by Jason Casares, who was hired after resigning from his job at a different university amid allegations that he sexually assaulted a college administrator. Casares' claim was that Satterlee had "bullied" her boss.

He also accused her of insubordination, to which Satterlee replied: "If a written communication from a department chair is 'riddled with grammatical errors and misspellings', I have an obligation to call that to her attention and may do so without fear of reprisal, because, ultimately, we seek to teach students how to communicate."

She was placed on "Transitional Terminal Leave." The lawsuit said the Office of Institutional Equity has no authority to terminate the employment of a tenured professor, and that "insubordination" is not grounds for any university office to terminate a tenured professor.

The lawsuit also said that the University of Maryland Eastern Shore has declined sharply under Anderson's leadership, losing the prized R2 research designation.

The university is required to submit a response to the lawsuit by October 10.

Anderson declined to comment for this story. After publication, she put out a public statement saying "Recent allegations of plagiarism have been raised regarding my 1986 doctoral dissertation. Integrity, accountability, and trust are the foundations of my leadership and I take these concerns with the utmost seriousness. Consistent with University System of Maryland policy, there will be an assessment of these allegations... I am deeply grateful for the support of the UMES family during this period."

Anderson's published research in the decades since defending her dissertation has been short and of low quality, often published in obscure journals. For one paper, she had students ask 89 people who was their "primary source of prescription medicine information." Most said their doctors, so she concluded that "pharmacists should consider providing more information."

In another, she claimed that an unnamed minority faculty member had students repeatedly subject her to racial slurs in class and over the phone, and that this research discovered that colleges should create a "grievance process" for "student-faculty conflicts."

Anderson repeatedly attained high academic positions. "I was the first African American to serve as President [of] the Accreditation Council on Pharmaceutical Education, the national accrediting body," she testified to Congress in 2021, and "The Chronicle of Higher Education also recognized UMES as having the second most diverse faculty."

"Allow me to say, that because we launched this program during the COVID pandemic, our efforts were not as robust or as smooth as it [sic] otherwise might have been," she acknowledged to lawmakers in written remarks about her school's use of federal funds. "One of the important issues we face as a nation and world are [sic] the challenges brought about by climate change."

She told Congress that the university, which is both a historically black college and an agricultural college, would focus on "creating safe spaces where farmers can meet monthly."

In 2023, Anderson served as president of the American Association of State Colleges and Universities, making her the face of public education.

Satterlee, the professor who was forced out, said that Anderson's alleged pattern of forcing white professors to do the work, while black faculty take credit, mirrors the apparent deception that began her academic career.

"Heidi's PhD has been obtained by fraud and by her passing off the work of other scholars as her own work. How can a university tell its students to be honest if its president is herself dishonest?" she told The Daily Wire. She called on Jay Perman, chancellor of the University System of Maryland, to fire Anderson.

Michael Sandler, a spokesman for the University System of Maryland, told The Daily Wire: "We are aware of the allegations raised against President Anderson and are reviewing them with our policies. We will determine the next steps once that process is complete."

In September 2024, The Daily Wire revealed that a 5,000-word paper on rocket science by Darryll Pines, the president of the Maryland's flagship campus at College Park, copied a 1,500 word stretch from a tutorial website by an Australian student. The paper, by Pines and a co-author, did not mention or cite the student anywhere, and attempted to change his British spellings to American ones–potentially a telltale sign that Pines knew he had not written the material, and was attempting to deceive readers.

In response, Pines wrote that he "acknowledge recurrent language," and said an investigation would begin. Perman's office said the review would be conducted jointly by the College Park campus and the statewide system, and the "two parties will use an expert consultant at an external law firm to lead the review... the consultant will determine who will serve on the review panel."

A month later, the Australian student, who said it was "clearly plagiarism...not worthy of an academic," said the panel hadn't contacted him. More than a year later, that panel has said nothing publicly, and Perman's office has declined to share updates.

"It just feels like something weird is going on," Professor Nick Seybert told the Baltimore Banner in July. "It doesn't feel like they're taking it very seriously."

| Heidi Anderson (1986) | Boettcher (1981) |
|---|---|
| Boettcher et al. (1981) investigated the learning outcomes of 83 baccalaureate nursing students randomly assigned to a CAI group or to a group taught with printed programmed instruction. Lessons in psychopharmacological nursing were developed which presented the same learning material for both teaching modalities in the cognitive categories of knowledge and application. Through the use of a pretest-posttest control group design, the evaluation of learning outcomes in these two categories was undertaken. | This study investigated the learning outcomes of 83 baccalaureate nursing students randomly assigned to a CAI group or to a group taught with printed programmed instruction. Lessons in psychopharmacological nursing were developed which presented the same learning material for both teaching modalities in the cognitive categories of knowledge and application. Through the use of a pretest-posttest control group design, the evaluation of learning outcomes in these two categories was undertaken. |
| Although results of the investigation revealed no significant differences between the groups in posttest scores related to either cognitive category, both groups of subjects made equally significant gains in the amount of knowledge and application learned. This finding suggests that CAI can be as effective as a more traditional instructional modality in teaching both factual content and application of learned material when both media use the same instructional approach. | While results of the investigation revealed no significant differences between the groups in posttest scores related to either cognitive category, both groups of subjects made equally significant gains in the amount of knowledge and application learned. This finding suggests that CAI can be as effective as a more traditional instructional modality in teaching both factual content and application of learned material when both media use the same instructional approach. |

DAILY WIRE+

| Heidi Anderson (1986) | Ploeger (1983) |
|---|---|
| He outlines three major differences in research on the use of microcomputers and mainframe computers. First, the general impressions of the subjects towards the visible equipment and surroundings differs between mainframe computer studies and microcomputer studies. He argues that mainframe monitors differ from microcomputer monitors and that the physical arrangements of mainframe units differ from microcomputers. Mainframe units are not portable, therefore subjects must be taken to another location to use them. Microcomputer units may be transported into the environment of the subject. Thus, subjects' awareness of these differences has an effect on research results. | First, the general impressions of the subjects toward the visible equipment and surroundings differs between mainframe computer studies and microcomputer studies. Second, certain features of mainframe operating systems necessitate recognizable differences in performance of instructional computing programs. And third, the timeliness of the programming and instructional tactics differs between previous mainframe instructional computing andcurrent instructional microcomputing.... |
| "Second, certain features of mainframe operating systems necessitate recognizable differences in performance of instructional computing programs" (Ploeger, 1983). Mainframe systems are under time-sharing arrangements that allow many users to access the memory of the mainframe simultaneously. This contributes to 'time lags', seen as pauses between when the user inputs information and receives a response. Microcomputers do not suffer from this problem. The memory of microcomputers is specifically for use of one person, therefore delays are limited. | As a result, the subjects must be taken to another location for testing. The issue of remote terminals will be dealt with subsequently. Microcomputer units may be transported into the environment of the subject. Naive subjects can hardly be oblivious to the differences.... |
| The microcomputer does not have to wait for another computer to enter information to the mainframe computer. In addition, mainframe terminals are either hardwired directly or use the telephone system to connect to the mainframe computer. Therefore, the number of terminals available for instructional mainframe computing is often limited. Another performance difference is that microcomputer displays can be programmed to produce more creative displays than mainframe units. Therefore both the control of variability and display speed can differ significantly between microcomputer and mainframe computer terminals. | Microcomputers do not suffer from this problem. The memory of the microcomputer is specifically for the use of one person. Programs can be written which are in the memory and ready for access without delay. In fact, the available user memory space for some mainframe computers currently on the market today. Microcomputer programs are typically written with little regard for paging and interrupts, or any of the concerns of the multiplexing or multiprogramming requirements of mainframe systems. |
| And third, the timeliness of the programming and instructional tactics differs between mainframe instructional computing and instructional microcomputing (Ploeger, 1983). | Mainframe terminals are either hardwired direct or use the telephone system to connect to the mainframe computer... |
| | The microcomputer program does not have to wait for another computer to send information to the mainframe computer... |
| | Therefore, it is argued that the control of variability and display speed can differ significantly between microcomputers and mainframe computer terminals. |

DAILY WIRE+

*This story has been updated with a statement from Anderson.*

E-FILED; Somerset Circuit Court
Docket: 2/16/2026 4:12 PM; Submission: 2/16/2026 4:12 PM
Envelope: 25126466

# EX 32

## Community Questions UMES Hiring Decision

*July 11, 2018 by Erica Murphy (https://www.wmdt.com/author/erica-murphy/)*

The new hire at University of Maryland Eastern Shore is starting to raise some questions.

"You could have found somebody better, that had better credentials that didn't carryover the bad resume. Cause I feel like definitely with this area, we're a family community base.", says Princess Anne resident, Marion Fletcher.

Residents are concerned about the background of Jason Casares, the new Title IX coordinator at the university, because of allegations raised against him while he was working at University of Indiana Bloomington in a similar role.

In December of 2015, a woman accused Casares of sexually assaulted her at a conference in Texas.

That accuser filed a report with police, but no charges were issued.

She also tweeted an open letter laying out her allegations.

Saying in part, "I made the mistake of letting my guard down while socializing with Jason about Association business. Jason took advantage of me after I had had too much to drink."

That's when the university put him on administrative leave and launched an investigation of their own.

Casares resigned later that month.

47 ABC asked UI Bloomington about what happened and were given a statement in response that says they investigated the allegations and Casares resigned.

University officials also said they couldn't comment further because the situation was a personnel matter.

Regardless of why he resigned, his hiring is something that's not sitting well with some members of the community like Marion Fletcher.

"Especially for our campus. Really the only thing for Princess Anne is UMES. So we're big on the community. By him having these things in the past allegations and its not really committing any crimes but its still the allegation it brings about a pretty iffy situation."

According to crime stats published on UMES', website there were 17 reported sex crimes to the school in 2016.

But those numbers may be far less than what actually occurs.

We spoke with an expert in the field who says many people on college campuses never come forward and if they question the integrity of the Title IX office  even more may choose to stay quiet.

"It would be imperative that they are trustworthy. That the survivors, the victims, the people that have complaints and are coming forward will feel like their complaints are going to be handled in the utmost professional way."

And Adriann Stanley thinks the hire is a bad move.

"I think its a smack in the face. How can they expect somebody to feel comfortable going to the office with somebody who has previously been dealt with sexual harassment. Like you don't feel comfortable. I know I wouldn't feel comfortable."

Now some community members like "Joyce"  are wondering how he got the job.

"Whoever did the background check did not do a very good thorough background check at all. Or they might not have cared, they just wanted to put this guy in position here at UMES. No I don't think that they cared really."

We spoke to UMES about Casares' hiring  and even asked to speak to Casares himself about the allegations.

Those requests were denied  instead all we got is this statement which says in part before he was hired, he went through a background check and vetting process.

Categories: Local News (https://www.wmdt.com/category/news/), Maryland (https://www.wmdt.com/category/maryland/), Top Stories (https://www.wmdt.com/category/top-stories/)

Tags: jason casares (https://www.wmdt.com/tag/jason-casares/), princess anne (https://www.wmdt.com/tag/princess-anne/), title ix (https://www.wmdt.com/tag/title-ix/), title ix coordinator (https://www.wmdt.com/tag/title-ix-coordinator/), university of maryland eastern shore (https://www.wmdt.com/tag/university-of-maryland-eastern-shore/)

## RELATED POSTS:

(https://www.wmdt.com/2026/02/art-league-of-ocean-city-hosts-wine-pairing-event-and-fundraiser/)

**Art League of Ocean City Hosts Wine-Pairing Event and Fundraiser (https://www.wmdt.com/2026/02/art-league-of-ocean-city-hosts-wine-pairing-event-and-fundraiser/)**

(https://www.wmdt.com/2026/02/chocolate-lovers-flock-to-chincoteague-for-20th-annual-death-by-chocolate-event/)

**Chocolate Lovers Flock to Chincoteague for 20th Annual "Death by Chocolate" Event (https://www.wmdt.com/2026/02/chocolate-lovers-flock-to-chincoteague-for-20th-annual-death-by-chocolate-event/)**

**Community Heart Health & AEDs with TidalHealth (https://www.wmdt.com/2026/02/community-heart-health-aeds-with-tidalhealth/)**

| News | Weather | Sports | About WMDT | Connect With Us | Community |
|---|---|---|---|---|---|
| Top Stories (https://www.wmdt.com/news/) | Weather (https://www.wmdt.com/weather/) | Sports (https://www.wmdt.com/sports/) | Meet The Team (https://www.wmdt.com/meet-the-team/) | Submit a Photo (https://www.wmdt.com/about-us/submit-a-photo/) | Foodie Friday (https://www.wmdt.com/foodie-friday/) |
| Good Morning Delmarva (https://www.wmdt.com/news/good-morning-delmarva/) | Interactive Radar (https://www.wmdt.com/weather/interactive-radar/) | Delmarva Sports Insider (https://www.wmdt.com/sports/dsi/) | Advertise With Us (https://www.wmdt.com/advertise-with-us/) | Submit a Story (https://www.wmdt.com/about-us/submit-a-story/) | Viewer Photos (https://www.wmdt.com/viewer-photos/) |
| The Bright Side (https://www.wmdt.com/news/the-bright-side/) | Skycams (https://www.wmdt.com/weather/skycams/) | High School (https://www.wmdt.com/sports/high-school/) | Contact Us (https://www.wmdt.com/contact-us/) | Newsletter (https://www.wmdt.com/newsletter/) | Community Calendar (https://www.wmdt.com/things-to-do/) |
| GMD Cooking (https://www.wmdt.com/news/) | Weather Blog (https://www.wmdt.com/) | College (https://www.wmdt.com/sports/college/) | Job Openings (https://www.wmdt.com/job-) | Facebook (https://www.facebook.com/47ABCWMDT) | Contests (https://www.wmdt.com/) |
| | | Professional (https://www.wmdt.com/) | | Twitter (https://) | |

E-FILED; Somerset Circuit Court
Docket: 2/18/2026 9:06 AM; Submission: 2/18/2026 9:06 AM
Envelope: 25152457

# EX 32

## Community Questions UMES Hiring Decision

*July 11, 2018 by Erica Murphy (https://www.wmdt.com/author/erica-murphy/)*

The new hire at University of Maryland Eastern Shore is starting to raise some questions.

"You could have found somebody better, that had better credentials that didn't carryover the bad resume. Cause I feel like definitely with this area, we're a family community base.", says Princess Anne resident, Marion Fletcher.

Residents are concerned about the background of Jason Casares, the new Title IX coordinator at the university, because of allegations raised against him while he was working at University of Indiana Bloomington in a similar role.

In December of 2015, a woman accused Casares of sexually assaulted her at a conference in Texas.

That accuser filed a report with police, but no charges were issued.

She also tweeted an open letter laying out her allegations.

Saying in part, "I made the mistake of letting my guard down while socializing with Jason about Association business. Jason took advantage of me after I had too much to drink."

That's when the university put him on administrative leave and launched an investigation of their own.

Casares resigned later that month.

47 ABC asked UI Bloomington about what happened and were given a statement in response that says they investigated the allegations and Casares resigned.

University officials also said they couldn't comment further because the situation was a personnel matter.

Regardless of why he resigned, his hiring is something that's not sitting well with some members of the community like Marion Fletcher.

"Especially for our campus. Really the only thing for Princess Anne is UMES. So we're big on the community. By him having these things in the past allegations and its not really committing any crimes but its still the allegation it brings about a pretty iffy situation."

According to crime stats published on UMES', website there were 17 reported sex crimes to the school in 2016.

But those numbers may be far less than what actually occurs.

We spoke with an expert in the field who says many people on college campuses never come forward and if they question the integrity of the Title IX office  even more may choose to stay quiet.

"It would be imperative that they are trustworthy. That the survivors, the victims, the people that have complaints and are coming forward will feel like their complaints are going to be handled in the utmost professional way."

And Adriann Stanley thinks the hire is a bad move.

"I think its a smack in the face. How can they expect somebody to feel comfortable going to the office with somebody who has previously been dealt with sexual harassment. Like you don't feel comfortable. I know I wouldn't feel comfortable."

Now some community members like "Joyce"  are wondering how he got the job.

"Whoever did the background check did not do a very good thorough background check at all. Or they might not have cared, they just wanted to put this guy in position here at UMES. No I don't think that they cared really."

We spoke to UMES about Casares' hiring  and even asked to speak to Casares himself about the allegations.

Those requests were denied  instead all we got is this statement which says in part before he was hired, he went through a background check and vetting process.

Categories: Local News (https://www.wmdt.com/category/news/), Maryland (https://www.wmdt.com/category/maryland/), Top Stories (https://www.wmdt.com/category/top-stories/)
Tags: jason casares (https://www.wmdt.com/tag/jason-casares/), princess anne (https://www.wmdt.com/tag/princess-anne/), title ix (https://www.wmdt.com/tag/title-ix/), title ix coordinator (https://www.wmdt.com/tag/title-ix-coordinator/), university of maryland eastern shore (https://www.wmdt.com/tag/university-of-maryland-eastern-shore/)

**RELATED POSTS:**

(https://www.wmdt.com/2026/02/art-league-of-ocean-city-hosts-wine-pairing-event-and-fundraiser/)
**Art League of Ocean City Hosts Wine-Pairing Event and Fundraiser (https://www.wmdt.com/2026/02/art-league-of-ocean-city-hosts-wine-pairing-event-and-fundraiser/)**

(https://www.wmdt.com/2026/02/chocolate-lovers-flock-to-chincoteague-for-20th-annual-death-by-chocolate-event/)
**Chocolate Lovers Flock to Chincoteague for 20th Annual "Death by Chocolate" Event (https://www.wmdt.com/2026/02/chocolate-lovers-flock-to-chincoteague-for-20th-annual-death-by-chocolate-event/)**

**Community Heart Health & AEDs with TidalHealth (https://www.wmdt.com/2026/02/community-heart-health-aeds-with-tidalhealth/)**

| News | Weather | Sports | About WMDT | Connect With Us | Community |
|------|---------|--------|------------|-----------------|-----------|
| Top Stories (https://www.wmdt.com/news/) | Weather (https://www.wmdt.com/weather/) | Sports (https://www.wmdt.com/sports/) | Meet The Team (https://www.wmdt.com/meet-the-team/) | Submit a Photo (https://www.wmdt.com/about-us/submit-a-photo/) | Foodie Friday (https://www.wmdt.com/foodie-friday/) |
| Good Morning Delmarva (https://www.wmdt.com/news/good-morning-delmarva/) | Delmarva Sports Insider (https://www.wmdt.com/sports/delmarva-sports-insider/) | Advertise With Us (https://www.wmdt.com/advertise-with-us/) | Submit a Story (https://www.wmdt.com/about-us/submit-a-story/) | Viewer Photos (https://www.wmdt.com/viewer-photos/) | |
| Interactive Radar (https://www.wmdt.com/weather/interactive-radar/) | High School (https://www.wmdt.com/sports/high-school/) | Contact Us (https://www.wmdt.com/contact-us/) | Newsletter (https://www.wmdt.com/newsletter/) | Community Calendar (https://www.wmdt.com/community-calendar/) | |
| The Bright Side (https://www.wmdt.com/news/the-bright-side/) | Sky.cam (https://www.wmdt.com/weather/skycams/) | College (https://www.wmdt.com/sports/college/) | Facebook (https://www.facebook.com/47ABCWMDT) | Contests (https://www.wmdt.com/contests/) | |
| GMD Cooking (https://www.wmdt.com/news/gmd-cooking/) | Weather Blog (https://www.wmdt.com/weather/weather-blog/) | Professional (https://www.wmdt.com/sports/professional/) | Job Openings (https://www.wmdt.com/job-openings/) | Twitter (https://twitter.com/47abc) | |

E-FILED; Somerset Circuit Court
9:06 AM; Submission: 2/18/2026 9:06 AM
Envelope: 25152457



**EX 34**

Outlook

**Fw: Notice of Investigation Letter - Sheikhi Karizaki (C) and**

From ▇▇▇▇▇▇▇▇▇▇▇mes.edu>
Date Mon 10/13/2025 11:24 AM
To ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

📎 1 attachment (214 KB)
10.09.2025 - Investigation Letter - Sheikhi Karizaki (C)▇▇▇▇▇.pdf;

---

From: Equity Office <equity@umes.edu>
Sent: Thursday, October 9, 2025 4:44 PM
To: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇umes.edu>
Subject: Notice of Investigation Letter - Sheikhi Karizaki (C) and ▇▇▇▇▇

Hello ▇▇▇▇

The Office of Institutional Equity and Compliance (OIE) has received a complaint from Ms. Mahsa Sheikhi Karizaki, Data Analyst, concerning your alleged involvement in actions and/or behaviors which may be in violation of the University of Maryland Eastern Shore (UMES) Policy Prohibiting Discrimination and/or the State of Maryland Policy on Sexual Harassment in the Workplace. The matter has been referred to an external investigation firm (TNG Consulting) for resolution of the allegations. Additional details regarding that complaint can be found in the attached letter.

Thank you so much,

Office of Institutional Equity and Compliance

# EX 35

Outlook

**Re: Stalking complaint against Leesa Thomas Banks**

**From** Tyler, Mark A <matyler1@umes.edu>
**Date** Thu 9/25/2025 8:47 AM
**To** ████████████████████

Good Morning!
   Yes! I will have officer Vicky Johnson meet you at room 1083 at 9:05.....Mark

**From:** ████████████████
**Sent:** Thursday, September 25, 2025 6:30 AM
**To:** Tyler, Mark A <matyler1@umes.edu>; kcollins@umes.edu <kcollins@umes.edu>
**Subject:** Re: Stalking complaint against Leesa Thomas Banks

Good morning, Chief Tyler.

I have only been coming to campus for my classes because of the unsafe environment.

Is it possible for an officer to meet with me at Room ██ in the ████████████ building at 9:05 am? I can meet with them after my class.

Thanks very much,

████████

**From:** Tyler, Mark A <matyler1@umes.edu>
**Sent:** Tuesday, September 23, 2025 1:55 PM
**To:** ████████████████ kcollins@umes.edu <kcollins@umes.edu>
**Subject:** Re: Stalking complaint against Leesa Thomas Banks

Good Afternoon
   That is perfect! Just let me know a good time for you and we will send an officer to meet you at your office to take the report. You can also respond to our office if it works better for you, your choice. Just let me know.....Mark

**From:** ████████████████
**Sent:** Tuesday, September 23, 2025 12:01 PM
**To:** Tyler, Mark A <matyler1@umes.edu>; kcollins@umes.edu <kcollins@umes.edu>
**Subject:** Re: Stalking complaint against Leesa Thomas Banks

Good morning, Chief Tyler.

Thanks very much for the kind email.
Yes, I would like to file a report. Please let me know the process.

Thanks, again.



**From:** Tyler, Mark A <matyler1@umes.edu>
**Sent:** Friday, September 19, 2025 9:15 AM
**To:** ████████████████ kcollins@umes.edu <kcollins@umes.edu>
**Subject:** Re: Stalking complaint against Leesa Thomas Banks

Good Morning ████████
   I hope you are doing well....we can certainly assist you with this. We do not want anyone to feel unsafe on our campus. We do not take reports by email so we would need you to respond to the police department, or we can send someone to you, to take the report. I will then assign it for investigation. Just let me know when you want to formally file the report and I will make sure someone is available to meet with you. Take care and stay safe, Mark Tyler

**From:** ████████████████
**Sent:** Thursday, September ██, ████ ██:██ PM
**To:** Tyler, Mark A <matyler1@umes.edu>; kcollins@umes.edu <kcollins@umes.edu>
**Subject:** Stalking complaint against Leesa Thomas Banks

Dear Chief Tyler and Officer Collins,

Good afternoon.

Please see below a complaint of stalking against Ms. Leesa Thomas Banks.

I am concerned about my personal safety on campus. This stalking and intimidation is likely at the behest of Heidi Anderson, Jason Casares, and their gang. I have filed criminal complaints against them with federal law enforcement agencies, which are currently under investigation. You may also be aware that I am suing them in federal court in their personal capacities.

Please let me know what actions are necessary here.

Thanks,

~~[redacted]~~

**From:** ~~[redacted]~~
**Sent:** Thursday, September 18, 2025 12:37 PM
**To:** Dunn, Derrek B <ddunn@umes.edu>
**Subject:** Re: Update: complaint against Leesa Thomas Banks

Thank you.

I will report this to law enforcement as well and am concerned about my personal safety.

**From:** Dunn, Derrek B <ddunn@umes.edu>
**Sent:** Thursday, September 18, 2025 12:14 PM
**To:** ~~[redacted]~~
**Subject:** Re: Update: complaint against Leesa Thomas Banks

Hello Sir,

I have forwarded your email to OIE for consideration as a mandatory reporter.

Derrek Dunn

*School of Business, Engineering, Applied Sciences, Technology and Tourism Management (S-BEAST-TM)*
*University of Maryland Eastern Shore*

++++++++
"The only limit to the height of your achievements is the reach of your dreams and your willingness to work hard for them," --- Michelle Obama

*My working day may not be your working day, so please do not feel obliged to read and/or reply outside of your normal working hours.*

**From:** ~~[redacted]~~
**Sent:** Thursday, September 18, 2025 10:54 AM
**To:** Dunn, Derrek B <ddunn@umes.edu>
**Subject:** Update: complaint against Leesa Thomas Banks

Dear Dean Dunn,

Good morning.

As an update, I wish to add that Ms. Banks has been engaging in unlawful stalking.

On August 26th, between 8 am and 8:10 am, she was lurking around outside my classroom - room 1083.

On that same date, at 5:30pm, she was stalking me outside room 2116 at 5:30pm.

During the week of September 2, Banks was again stalking me outside room 2116 from 5:30pm to 5:50pm. She left at 5:50 pm just when I left the classroom because no students turned up for class. I saw her awkwardly fumbling at the door.

On September 16, she was again stalking me outside room 1083 at about 8:50 am. The students noticed it.

On September 16, she stalked me outside room 2116 from about 5:35pm to about 5:50 pm. The student noticed her outside the glass on the door and even waved at her, at which point she skulked away in embarrassment.

These instances violate the law and applicable USM and UMES policies governing workplace conduct.

Please provide appropriate remedies.

Sincerely,

~~[redacted]~~

**From:** ~~[redacted]~~
**Sent:** Tuesday, September 16, 2025 4:50 PM
**To:** Dunn, Derrek B <ddunn@umes.edu>
**Subject:** Re: complaint against Leesa Thomas Banks

Thank you, sir.

**From:** Dunn, Derrek B <ddunn@umes.edu>
**Sent:** Tuesday, September 16, 2025 4:27 PM
**To:** ~~[redacted]~~
**Subject:** Re: complaint against Leesa Thomas Banks

Hello Sir,

I have already reported your email to Jason in OIE.

Derrek Dunn

*School of Business, Engineering, Applied Sciences, Technology and Tourism Management (S-BEAST-TM)*
*University of Maryland Eastern Shore*

++++++++
*"The only limit to the height of your achievements is the reach of your dreams and your willingness to work hard for them."* — Michelle Obama

*My working day may not be your working day, so please do not feel obliged to read and/or reply outside of your normal working hours.*

---

**From:** ██████████████████████████
**Sent:** Tuesday, September 16, 2025 4:23 PM
**To:** Dunn, Derrek B <ddunn@umes.edu>
**Subject:** Re: complaint against Leesa Thomas Banks

Hello Dean Dunn,

Thanks for the kind email.

I will review the policy and do as you direct.

As this also concerns bullying and hostile workplace environment, and you are a mandatory reporter, you may have to report this to OIE as well. I would expect that their policies are also applicable here.

It is highly concerning that such practices are being followed at the business department by the chair against a faculty member who is just doing his job competently.

Thanks, again.

---

**From:** Dunn, Derrek B <ddunn@umes.edu>
**Sent:** Tuesday, September 16, 2025 4:07 PM
**To:** ██████████████████████
**Subject:** Re: complaint against Leesa Thomas Banks

Hello ███████,

Thank you for your email. I recommend that you follow the UMES POLICIES AND PROCEDURES GOVERNING FACULTY GRIEVANCES (Approved by the President January 1, 1992) which begins on page 24 of the attached file (UNIVERSITY OF MARYLAND EASTERN SHORE DIVISION OF ACADEMIC AFFAIRS, FACULTY HANDBOOK, Approved by the Faculty Assembly on December 10, 2024 Reviewed by the Division of Academic Affairs on February 3, 2025, updated on February 3, 2025).

As noted in the policy: *a signed complaint by a faculty member against UMES that alleges a violation of UMES policy by an academic administrator in the performance of any official act, when act adversely affects the faculty member in his or her academic or professional capacity.*

Please email your signed complaint as an attachment to ddunn@umes.edu.

Derrek Dunn

*School of Business, Engineering, Applied Sciences, Technology and Tourism Management (S-BEAST-TM)*
*University of Maryland Eastern Shore*

++++++++
*"The only limit to the height of your achievements is the reach of your dreams and your willingness to work hard for them."* — Michelle Obama

*My working day may not be your working day, so please do not feel obliged to read and/or reply outside of your normal working hours.*

---

**From:** ██████████████████████████
**Sent:** Tuesday, September 16, 2025
**To:** Dunn, Derrek B <ddunn@umes.edu>
**Subject:** complaint against Leesa Thomas Banks

Dear Dean Dunn,

Please consider this a formal complaint against Ms. Leesa Thomas Banks. The facts are below:

Ms Banks assigned me three courses about 3 days before the classes were due to start this semester. I had no access to email, no textbooks, no office, etc., at that time. I asked Ms. Banks by email as to why this workload assignment at the last minute was reasonable. She claimed that someone had asked her to do it.

I followed up by email again asking why she thought such a workload assignment was reasonable considering that it flouted normal workload assignment practices at universities. It was emphasized that teaching obligations have to be assigned so as to enable proper preparation and quality delivery. I also asked her to identify the person who had directed her to give me three courses to teach with 3 days' notice.

She did not respond to the email.

I told her the courses would be taught under protest subject to the court's ruling in a lawsuit challenging the actions of certain administrators against me.

I started teaching the courses in good faith and the students expressly told me how much they were enjoying the courses and that they had not learned anything in the prerequisite course, which was apparently taught by Banks.

One of the courses - Research Methods - is taught at 5:30pm. There are only two students. They do not attend classes, and on the rare occasions one does, he comes very late (over 25 minutes). I encouraged the students to learn and gave them two basic mandatory assignments to complete.
They did not do it within the assigned deadline.

I gave a couple of extensions and communicated that to them. One of the students turned in one late assignment but received a failing grade and did not complete the mandatory, prior assignment.

Both students were informed that they would have to be dropped administratively and were encouraged to transfer to another course given their inability to meet the course requirements.

I was planning to send you the forms today - having completed them last week - to allow for the possibility of helping the students if they did submit anything over the weekend even though that was weeks past the deadline.

Today, while I was teaching my 8 am class, Ms. Banks knocked on the door and in the presence of students, interrupted the teaching and asked me to meet with her after class. The students appeared embarrassed.

I went to her office after my class at 9:15 am. She was standing at her desk talking to a student. She dismissed the student and asked me "why aren't you teaching the 5:30 pm class?" I explained the above situation but she loudly insisted, "you cannot withdraw the students, they need to graduate." I explained that the students did not attend or do assignments and we have an administrative drop process. She replied, "the students can fail but you can't drop them." I explained again that we are required to drop students as specified in the HEA.

Banks kept insisting that they could not be dropped. I said I would send her the drop form which she was free to decline. She said rudely, "that's not the procedure, you need to talk to me first." I asked her where this "procedure" was specified. She said, "I don't know where the procedure is but you have to ask me." I said I would only follow proper procedure and she was welcome to respond when the form is sent to her.

She then said "the students may not be attending because the time does not work for them." I replied, "I did not set the class time at 5:30 pm." Banks replied, "I was the one who set up the class for 5:30pm." My response was that since she set up the time, the students had to attend at the time stated for the course.

I also told her that she had created the 5:30 pm class in bad faith and I had informed the Office of Attorney General about how this was further retaliation in the context of the lawsuit. She scoffed and said "I dont care what you have told the OAG." I replied, "oh, but you will certainly have to care."

Then she accused me of not activating the canvas pages for the other courses. Obviously, this was contrived to attack and insult. I contradicted her claim and inquired if there had been any complaints from the students. She said there were no complaints and proceeded to check my canvas pages in front of me. I told her it was not her role to be micromanaging my teaching or subjecting me to intrusive monitoring and I was happy to respond to any complaints or issues.

She kept behaving in an insulting and rude manner. After seeing there was no productive purpose in standing in front of her to be treated disrespectfully, I left her office.

After I had left her office and was walking down the hallway, she opened her door and started screaming at me in the hallway. It was extremely rude and offensive.

All of this is highly toxic and hostile workplace conduct. It is bullying done at the behest of others to achieve unlawful objectives and her actions have been in bad faith from the start.

I would also like to note that Ms. Banks is unqualified to be the department chair of any business department at any university in the US. She is not even qualified to be a full-time professor at any accredited university in any discipline. Her bullying behavior towards me, especially considering my academic record, is simply unacceptable.

I request you to investigate this toxic and hostile conduct by Ms Banks and take appropriate action.

Sincerely,

█████████████



Outlook

**Fw: Investigation Interview Request**

From
Date  Mon 12/22/2025 11:00 AM
To

---

From:
Sent: Thursday, December 11, 2025 1:16 PM
To:
Subject: Fw: Investigation Interview Request

---

From: Lauren Starnes <Lauren.Starnes@tngconsulting.com>
Sent: Monday, December 8, 2025 5:28 PM
To:
Cc: Patience L. Bartunek <patience.bartunek@tngconsulting.com>
Subject: RE: Investigation Interview Request

**CAUTION:** This e-mail came from OUTSIDE of UMES and is not an official e-mail from the University.

**WARNING:** DO NOT click on links in message, and do not download attachments unless you are expecting them and know the sender.

H

Thank you for your email. I apologize for my delayed response.

In your email, you mentioned that you had not received the video recording and transcript from our meeting on November 12, 2025. As I discussed during that meeting, I was not recording. During the meeting, you indicated you did not wish to move forward with a formal investigative interview that day, which would have been recorded. As such, there is no recording or transcript of that meeting. Should you wish to participate in an investigative interview, that interview would be recorded, and a transcript would be provided for your review.

In your email, you requested that I provide the following documents:

1. Contract between TNG Consulting, LLC., and UMES;
2. Any relevant correspondence with Jason Casares; and
3. Copy of TNG's liability insurance policy and information about any pending or previous lawsuits or legal claims against TNG.

Regarding the first item, I encourage you to contact Jason Casares at jacasares@umes.edu to request those items. As the agreement is with UMES, he should be able to direct you appropriately.

Regarding item 2, any relevant correspondence with Mr. Casares will be included in my investigation report. You will be able to review any relevant correspondence at that time.

Regarding item 3, can you please explain the relevance of the requested information to the instant investigation?

Regarding your concern that this investigation involves matters that are sub judice, as I stated during our December 12, 2025, meeting, I encourage you to contact the counsel representing UMES and/or any other named parties in the litigation with your concerns.

Regarding next steps on my end, I will follow up with you on Friday, December 12, 2025, to ask if you would like to schedule your investigative interview. I am also beginning to write my report. Please know that if you decide to participate in an interview before the report is finalized, I will update the report.

Thank you!

Best,

Lauren

**Lauren Starnes, J.D.**
Consultant
Resolution Officer, FAIR Center

Lauren.Starnes@tngconsulting.com
phone (610) 993.0229 ext 1033 | fax (610) 993.0228
www.TNGconsulting.com | www.ATIXA.org | www.NABITA.org
475 Allendale Rd, Suite 200 | King of Prussia, PA 19406
Click Here to Schedule a Direct Meeting



Ensure fairness in every case. Partner with the FAIR Center for impartial, expert complaint resolution services.

The information in this email is intended for the recipient only and may contain confidential information. If you have received this in error, please notify the sender immediately at Lauren.Starnes@tngconsulting.com and delete the message. Any advice or opinion given in this message is never to be construed as legal advice.

From:
Sent: Monday, December 1, 2025 6:09 PM

**To:** Patience L. Bartunek <patience.bartunek@tngconsulting.com>
**Cc:** Lauren Starnes <Lauren.Starnes@tngconsulting.com>
**Subject:** Re: Investigation Interview Request

Thanks, Patience.

Lauren:

I hope you had a nice Thanksgiving break.

I have not received the video recording and transcript of our last meeting.

As mentioned previously, this farcical and fake "investigation" is being orchestrated in retaliation for exposing plagiarism, fraud, and massive corruption by the Heidi Anderson gang and its chief goon, the rape-accused Jason Casares.

The fact that you sent the previous message just before Thanksgiving is further evidence of your intent to harass and abuse me.

I asked you for copies of the contract with you/your firm and any relevant correspondence with the rape-accused Casares during our last meeting. You said you did not know but would check. Please send those documents.

Please also send a copy of your firm's liability insurance policy and information about any pending or previous lawsuits or legal claims against your firm.

You are an attorney and should be aware that you may be in breach of your professional obligations by participating in illegal activities at the behest of crooks with a long track-record of such activities. Any licensed attorney would know that this fake "investigation" is in bad faith and there is nothing to investigate here. Your continued threats only underline the fact that you have crossed the line into malpractice. You were also advised that this matter is currently sub judice and anything relevant (including any new allegations) would have to be canvassed by UMES' attorneys in court - not in this ridiculous "investigation" orchestrated by your puppet-master, the rape-accused Jason Casares.

You have no authority to make any "understanding" about my participation, lack of participation, limited participation, or any variant thereof. I absolutely reject any and all of your assumptions concerning me.

I look forward to receiving the requested materials.

Yours faithfully,



**From:** Patience L. Bartunek <patience.bartunek@tngconsulting.com>
**Sent:** Tuesday, November 18, 2025 2:28 PM
**To:**
**Cc:** Lauren Starnes <Lauren.Starnes@tngconsulting.com>
**Subject:** RE: Investigation Interview Request

You don't often get email from patience.bartunek@tngconsulting.com. Learn why this is important

**CAUTION:** This e-mail came from OUTSIDE of UMES and is not an official e-mail from the University.

**WARNING:** DO NOT click on links in message, and do not download attachments unless you are expecting them and know the sender.

Good Afternoon –

Lauren asked me to reach out and schedule another time for you to meet with her regarding this issue.  Would either of the following dates/times work for you?

December 3, 2025 at noon ET
December 4, 2025 at 2 pm ET

Please let me know if either of these work for you or if we need to find an alternative time by Monday, December 1, 2025.  If I do not hear from you by end of business on Monday, December 1, 2025, we will understand that to mean you do not want to participate in this investigation, and it will move forward without your participation.

Thank you
Patience

**Patience L. Bartunek (she/her)**
Chief of Staff to the Managing Partner
Resolution Officer, FAIR Center

patience.bartunek@tngconsulting.com
phone (610) 993.0229 ext 1023 | fax (610) 993.0228
www.TNGconsulting.com | www.ATIXA.org | www.NABITA.org
475 Allendale Rd, Suite 200 | King of Prussia, PA 19406



Ensure fairness in every case. Partner with the FAIR Center for impartial, expert complaint resolution services.

*The information in this email is intended for the recipient only and may contain confidential information. If you have received this in error, please notify the sender immediately at patience.bartunek@tngconsulting.com and delete the message. Any advice or opinion given in this message is never to be construed as legal advice.*

**From:**

E-FILED; Somerset Circuit Court
Docket: 2/25/2026 9:06 AM; Submission: 2/18/2026 9:06 AM
Envelope: 25152457

EX 37

LOCAL

# UPDATE: IU administrator Casares resigns amid sexual assault claim

Indiana University's Associate Dean of Students and Deputy Title IX Director, Jason Casares, is on paid leave as the university investigates a sexual assault claim made by an employee of another un...



Jason Casares

Author: **WTHR.com staff**
Published: **9:56 AM EST February 5, 2016**
Updated: **6:46 PM EDT April 14, 2016**



**IN OTHER NEWS**

**Crash ends with injury and closures on Indy's west side**

2/26/16 UPDATE: Indiana University issued a statement Feb. 26 stating that Jason Casares has resigned.

ORIGINAL STORY:

Indiana University's Associate Dean of Students and Deputy Title IX Director, Jason Casares, is on paid leave as the university investigates a sexual assault claim made by an employee of another university, IU spokesperson Mark Land confirmed.

Casares was named to the position in June 2011.

The claim is from Jill Creighton, the president-elect of the Association for Student Conduct Administration. She says the assault happened at the association's Forth Worth, Texas conference in Dec. 2015.

She wrote an open letter to the association and conference attendees stating her case. Read the letter here.

"I made the mistake of letting my guard down while socializing with Jason about Association business," Creighton said. "Jason took advantage of me after I had had too much to drink."

She said she filed a complaint with Texas police because she felt unsafe. She also asked ASCA to impeach Casares.

Casares later resigned from his position as the Association's president-elect after several impeachment hearings.

"I also could not stand the hypocrisy of Jason parading his expertise on Title IX, knowing how he had behaved with me," Creighton wrote in the letter.

Creighton said she feels like she is risking her position as future ASCA president by speaking out about the incident with Casares. She said the Association has not supported her.

ASCA said Thursday it had received a formal complaint from Creighton in December and is investigating the incident, although Casares remains a member of the organization and can still present at conferences.

Casares is on paid leave from IU as the university now investigates the claim.

You can read more here from the Indiana Daily Student.

E-FILED: Somerset Circuit Court
Docket: 2/18/2026 9:06 AM; Submission: 2/18/2026 9:06 AM
Envelope: 25152457

# EX 38

Watch Live

## Indiana University rape expert on leave, accused of sexual assault

| Published  February 18, 2016 8:26pm CST  |  FOX 6 Now Milwaukee  |

INDIANA -- Indiana University is handing over more than a dozen sexual misconduct cases to a retired professor, who will provide a second opinion amid an administrator's suspension.

In early February, the school placed Associate Dean of Students and Deputy Title IX Director Jason Casares on paid administrative leave.

Officials began their investigation after a board member with the Association for Student Conduct Administration, Jill Creighton, wrote a letter dated February 3rd to members of the group. The letter surfaced online ahead of an annual ASCA conference in Florida.

After learning Casares would attend the ASCA conference, Creighton, who identifies herself as ASCA's president-elect, released her open letter on Twitter.

Creighton alleges Casares, who formerly served as the group's president-elect, took advantage of her after she had too much to drink at a convention in Texas in December. In the letter, Creighton states she filed a criminal complaint with Texas authorities.

Creighton goes on to say she felt unsafe with ASCA, stating the group failed to protect her even after Casares resigned from the board of directors. The woman wrote the group, which trains and offers guidance for college officials dealing with student misconduct, including sexual assault, allowed Casares to attend the conference.

Creighton's letter reads in part:

I also could not stand the hypocrisy of Jason parading his expertise on Title IX, knowing how he had behaved with me. While I knew it could blow up in my face, and that I had nothing to gain but my own sense of safety, I asked ASCA to impeach Jason.

When Jason resigned, I was shocked to learn that he was still planning to attend the conference, and was still planning to present his sessions on Title IX, though several of his co-presenters have backed out of co-presenting with him. He is under criminal investigation for a sex offense, and ASCA is still allowing him to present. I needed a safe space, and to be able to attend this conference free of the hostile environment that his presence creates for me. ASCA has failed to protect me.

Casares was hired at Indiana University in 2011.

**Read Creighton's open letter in its entirety here.**

This material may not be published, broadcast, rewritten, or redistributed. ©2026 FOX Television Stations

FOX LOCAL



**Watch FOX 6 Milwaukee for free on FOX LOCAL**
Watch local news, weather, and live events on Roku, Fire TV, and more — just search "FOX LOCAL"

✕