**IN THE UNITED STATES DISTRICT COURT FOR MARYLAND**

| | |
|---|---|
| **JACOB DOE**<br>**Plaintiff**<br><br>v.<br><br>**HEIDI M. ANDERSON**<br>**JASON CASARES**<br>**ALEXANDRA GINTA MARTIN**<br>**CECILIA RIVERA**<br>**UNIVERSITY OF MARYLAND EASTERN SHORE**<br>**UNIVERSITY SYSTEM OF MARYLAND**<br>**STATE OF MARYLAND**<br><br>11868 College Backbone Rd<br>Princess Anne, MD 21853<br><br>**Defendants** | **Case No. 1:26-cv-**<br>**00893-JRR** |

_____

**AMENDED COMPLAINT**

This amended complaint is based exclusively on state law claims. There are no federal law claims

and all the Defendants are Maryland residents or entities. There is absolutely no basis for the

federal court's jurisdiction in this matter.

**I. PARTIES**

1. Plaintiff Jacob Doe is a tenured full professor and administrator at the University of Maryland

   Eastern Shore (UMES). Most of the facts giving rise to this complaint arose in Maryland.

2. Defendant 1 is Ms. Heidi Anderson, President of UMES. She is a Maryland resident and is

   being sued in her personal capacity.

3. Defendant 2 is Jason Casares, Title IX Director, AVP, and Director of the Office of Institutional

   Equity (OIE). He is a resident of MD and is being sued in his personal capacity.

1

4. Defendant 3 is Alexandra Ginta Martin, Assistant Director of OIE, a Maryland resident sued in her personal capacity.

5. Defendant 4 is Cecilia Rivera, Associate Director, OIE, a Maryland resident sued in her personal capacity.

6. Defendant 5 is the University of Maryland Eastern Shore, based in Somerset Co., MD.

7. Defendant 6 is the University System of Maryland which is responsible for oversight of UMES.

8. Defendant 7 is the State of Maryland responsible for oversight of UMES and USM.

## II. JURISDICTION AND VENUE

9. The Defendants removed this case from the state court where it was originally filed. They have previously claimed that the federal court does not have subject matter jurisdiction. We agree.

## III. FACTS COMMON TO ALL COUNTS[1]

10. The Plaintiff joined UMES in 2023 as a tenured professor and administrator to help improve an institution producing some of the worst outcomes in the nation. He is a vocal anti-corruption and law-enforcement advocate, including for the enforcement of immigration laws.

11. In December 2023, Plaintiff was awarded a multi-million dollar federal grant by dint of his hard work. It was one of the largest ever individual grants at UMES.

12. In January 2024, Plaintiff received a job offer at a prestigious university. Given that the offer was superior in every respect to his current position, he was about to take it.

13. UMES offered him a promotion and a substantial pay increase to remain. He was promised that his pay increase would become even higher in a few months and that he would be able to

---

[1] The contents of the Exhibits and Affidavits to the Complaint are fully incorporated into this Complaint as facts for all counts.

build a team and grow his portfolio. He was guaranteed the role would be permanent and that UMES had followed a similar pattern for other employees they wanted to retain. The promises were made with knowledge that they would induce him to stay and the university could benefit from his vast expertise.

14. It is well known at UMES that Plaintiff was highly qualified and competent and certain to become a university president at better institutions.

15. Plaintiff relied upon UMES's promises of promotion and substantially higher pay and declined the other job offer in January 2024.

16. Defendant 1 Heidi Anderson became President of UMES in 2018. She was selected apparently for ulterior reasons despite a problematic prior record of abuses. UMES had an enrollment of about 4800 students in 2018; the university's enrollment collapsed to 3000 in 2026.[2] Anderson is embroiled in scandal and running corrupt schemes -- evidenced by numerous serious complaints against her (**EXs 1**, **2, 2A**). Anderson was Plaintiff's direct supervisor. She exhibited racial animus against White and Asian employees in hiring, pay, and promotion. Anderson only has Blacks as vice presidents and implements racial discrimination. She gave Plaintiff the worst working conditions, lower pay, no budget, worst facilities, and discriminatory working environment.

17. Heidi Anderson has also been busted for plagiarizing her PhD dissertation. (**EXs 29, 30, 31**)

18. Jason Casares, Defendant 2, was promoted to his current position by Defendant 1 and paid a massively inflated salary in exchange for suppressing complaints against her and her husband, and intimidating faculty and staff who oppose illegal activities. Casares has a public news-media record for alleged rape and abuses at other universities and has been a named defendant

---

[2] This is a fraudulent claim made by Heidi Anderson to deceive state and federal governments.

before courts in many states. He led the fake "investigation" against the Plaintiff. Anderson is his direct supervisor. (**EX 32**)

19. Whistleblower complaints were filed against Casares by UMES employees shortly after his appointment detailing fraudulent claims in his job application. These were ignored. There were subsequent complaints about illegal activities including obstruction of justice, illegal trespass, surveillance, intimidation, and conspiracy (**EX 2**). Casares' salary was exceptionally increased by 50% as a quid pro quo bribe by Anderson for silencing whistleblowers.

20. UMES Faculty and staff have reported fraud, fake investigations, and egregious violations by Casares, Ginta, and Rivera in numerous surveys. Def. 5 neglected these complaints. (**EX 33**)

21. Alexandra Ginta Martin is a crony of Casares hired due to her willingness to engage in unlawful activities. Her salary increased by 100% in recent years likely as a bribe for unlawful acts.

22. TNG Consulting is a firm embroiled in fraud and was likely contracted by Heidi Anderson due to their willingness to engage in tortious acts. Casares and Anderson supervise TNG. **EX 34**.

23. Individual defendants operate as a gang to engage in corruption and fraud with others at UMES.

24. Plaintiff directly observed Heidi Anderson engaging in unlawful activities, organized corruption, racketeering, bribery, fraud, discrimination, deception, and abuse of processes.

25. After witnessing criminal activity, Plaintiff filed reports against Defendants 1 and 2 with the USM Board, federal and state agencies in June, September, and December 2024. Federal investigations were launched and are ongoing.

26. In August 2024, Ms. Anderson informed Plaintiff that there was a complaint against her and that "from the language used in the whistleblower letter I know who did it." Anderson claimed

4

the Office of Attorney General[3] and USM told her about the complaints. She repeated variations of the same in subsequent meetings and claimed "I don't look pretty in orange."

27. Plaintiff had also sent letters to Jay Perman and Alison Wrynn – two administrators of USM – with inappropriate and close relationships with Heidi Anderson. They informed Heidi Anderson about the complaints against her in violation of their duties.

28. Anderson and her toady Rondall Allen were cold and hostile toward Plaintiff thereafter. Allen virtually ceased communication and made threats including "don't be fooled, I can fight …"

29. Anderson obstructed Plaintiff's participation in a federal audit triggered by allegations of fraud and sought to deceive the external auditors. Plaintiff realized that Defendants knew about his complaint and was near certain that Anderson would retaliate because of her vicious nature.

30. Joe Pitula, a direct supervisee of Plaintiff, was the liaison with the auditors. Plaintiff told him to cooperate fully and protect no one who was corrupt. Pitula showed Plaintiff proof that Anderson and Allen had embezzled IT equipment meant for poor Blacks.

31. In October, Pitula informed Plaintiff that one of the staff had filed a complaint against him with Jason Casares and that he was under investigation. He sought the Plaintiff's advice.

32. Plaintiff advised him to tell the truth and that the investigation was likely fake.

33. Under UMES policy, Casares was required to inform Plaintiff about an investigation into his direct supervisee. Casares did not inform him.

34. During one-on-one meetings Anderson made hostile remarks about Pitula and indicated a desire to have him removed. She demanded to see his performance reviews. Plaintiff was under no doubt that Pitula was being targeted due to his participation in the audit.

35. The fake complaint against Pitula was procured to coerce him.

---

[3] Anthony Brown, the Attorney General, attended a fund-raiser at UMES shortly after the complaints against Heidi Anderson apparently organized by Anderson. He has not been seen in this area prior to the complaint.

5

36. Pitula feared for his job and started applying for other jobs. He stopped being fully engaged in the audit and miraculously the "investigation" by Jason Casares against him stopped.

37. The USM initiated a cosmetic investigation intended to save Anderson but could not avoid learning about scams under Anderson reported via the USM Fraud Hotline (**EX 3**).

38. Heidi Anderson was informed by USM about complaints against her and shown the complaints. This includes the Plaintiff's reporting of Anderson's plagiarism as proven by Anderson mentioning Plaintiff in a fake defamation case she filed in October 2025 to intimidate another whistleblower. Anderson knew that Plaintiff had reported her for fraud. Only she and her gang had the motive, means, and opportunity to retaliate against Plaintiff.

39. Mahsa Sheikhi Karizaki,[4] an Iranian national, graduated from another university and came to UMES as a temporary worker to work on a project of the Plaintiff. Her legal ability to work is from her student visa which permits Optional Practical Training (OPT).

40. Plaintiff did not directly supervise Karizaki and his office was about half a mile from hers. He only had minimal interactions with her typically lasting a few minutes. From day one, Karizaki was not punctual, did not work, and was frequently absent. Plaintiff reprimanded Karizaki for poor attendance, coming to work impaired, not delivering work products, and submitting false timesheets to collect federal funds. In Oct-Nov. 2024, Karizaki feared being reported for fraud and knew her 6-month contract would not be renewed. She was desperate to remain in the US and enjoy a partying-lifestyle without doing any work and made up a false complaint.

41. Anderson's gang met Karizaki and coached her after learning that Plaintiff reprimanded her because they wanted to retaliate against Plaintiff for reporting Heidi Anderson's fraud. It was exactly the pattern they used against numerous others previously.

---

[4] Plaintiff hereby notifies Defendants that he is likely to add Karizaki as a Defendant at a later date.

42. On December 5, 2024, after work hours, Jason Casares asked Plaintiff to attend a meeting on December 6th. He refused to answer what the meeting was for despite two inquiries.

43. During the December 6th meeting, Casares and Ginta Martin placed Plaintiff on administrative leave accusing him of creating a "hostile and intimidatory work environment" for Karizaki. Casares informed Plaintiff that a Title IX investigation would ensue. Plaintiff was not given an opportunity to refute and the administrative leave was predetermined in violation of the presumption of innocence.

44. On December 11, 2024, Professor X, a faculty member and colleague of Plaintiff emailed Ginta Martin stating, "I am the only person who works with [Karizaki] ... She is a temp worker and I coordinate all communications between two parties. They only met in-person six times (all at the public areas) and one virtual meeting. I arranged all those meetings and was present as an eyewitness on every occasion. Your office has never contacted me for investigation before putting [Plaintiff] on leave." (**EX 5**)

45. On December 12, 2024, Plaintiff's then counsel wrote to Defendant 5 telling him that "Karizaki is a temporary employee housed in a separate building" with whom Plaintiff "has met no more than six times, never more than for a few minutes, and always in the presence of a witness." The counsel's letter named Professor X who attended every meeting with Karizaki. (**EX 4**)

46. Plaintiff's counsel's stated "Manifestly, [Plaintiff] has never been in a position to intimidate or harass [Karizaki]" as Professor X can confirm. Counsel is aware that Defendant 3 Ginta Martin is attempting to develop support for Karizaki's "specious accusation."

47. Defendants ignored the letter and did not contact Professor X.

48. From December 2024 onwards, Defendants displayed Plaintiff's photo in the Campus Police department and told employees and students that Plaintiff has been "fired," "is never coming

back," and "he has been removed." This was before the "investigation" even started and shows that the entire process is a pretextual witch hunt with a predetermined outcome.

49. The display of Plaintiff's photo in a public area as if he is an offender is extreme and outrageous and violates all decency and no civilized person would consider this acceptable.

50. Throughout December 2024, Rivera and Ginta emailed people who they believed could speak negatively about Plaintiff as part of a smear campaign. They failed to obtain others.

51. Plaintiff obtained sworn notarized affidavits from Jane Coe 1 and Jane Coe 2 testifying that Rivera, Casares, and Ginta Martin had interviewed them under coercion and sought to get them to speak negatively about Plaintiff. Coes 1 and 2 swore under oath that Plaintiff had always behaved respectfully toward them and he was a decent person. (**EX6, EX7**)

52. In December, Plaintiff filed a complaint with USM against Jason Casares but was ignored.

53. In January 2025, Defendants unlawfully took away a federal grant that Plaintiff had obtained without any due process and in brazen violation of rules governing grant administration.

54. Ginta Martin told numerous students and others that the grant was being terminated.

55. In early January 2025, Ginta Martin wrote to Plaintiff summoning him to a meeting as part of her "investigation" into the accusation.

56. Plaintiff attended the meeting on January 21, 2025, along with his counsel.

57. Plaintiff and counsel both denied the accusations, reiterated that Plaintiff had never met Karizaki alone, that her accusations were baseless and pretextual. They reiterated that Karizaki had an ulterior motive because she was caught submitting fraudulent work, was desperate to stay in the US, and would do anything to get a visa. Plaintiff also clearly challenged OIE jurisdiction because the events were prior to Karizaki's employment at UMES.

58. Ginta Martin thrust a 2-page document which contained "Notice of Allegations" at Plaintiff.

59. The Notice contained about 10-15 phrase statements allegedly attributed to Plaintiff. There were no dates, times, or locations, and no indication when they were uttered or in what context. Taking the alleged comments in the most favorable light to Defendants, the worst of the statements were, "people say Turkish women are beautiful, but I prefer Persian women," "all work and no fun makes [Karizaki] a dull girl," and asking for "pics" of an event Karizaki attended. (**EX8**)

60. Plaintiff responded that the contents were false and concocted and that he would respond in writing. He also challenged the absence of dates and other details establishing that OIE had any jurisdiction in the matter because it was not evident that the comments were made after Karizaki was employed at UMES – **a precondition for OIE's investigatory powers**.

61. It appeared the alleged comments were made before Karizaki was an employee or an applicant.

62. During the meeting, Plaintiff asked Ginta Martin to provide an update into his complaint against Jason Casares. Ginta Martin was flustered and responded that she would "check and get back to him." The meeting ended.

63. Notably, Karizaki's contract was due to expire in about 3 weeks from this meeting and her visa with it. Defendants renewed her visa in violation of the OPT rules and immigration laws.

64. On January 21, Ginta Martin wrote to Plaintiff asking him to provide a written response by January 24, 2025: less than 3 days after the meeting.

65. On January 24, 2025, Plaintiff and counsel submitted two documents in response to Ginta Martin: a legal analysis by counsel and factual response by Plaintiff.

66. Plaintiff's counsel wrote that nowhere do the allegations note that Plaintiff's comments were "unwelcome" to Karizaki and cited *Albero v. City of Salisbury*, 422 F. Supp. 2d. 549 for the proposition that the analysis was objective rather than subjective. Counsel stated, "even if one

adopts complainant's allegations wholesale, they cannot constitute sexual harassment as a matter of law because the complainant never objected, protested, or complained about the conduct attributed ... Had she done so, and had [Plaintiff] persisted, then and only then would it have become necessary to determine if the conduct was "severe" or "pervasive". (**EX9**)

67. Counsel wrote "[Plaintiff] disputes the accuracy of [Karizaki's] allegations, even if one assumes arguendo, they are true, they fall short of attributing to him a sexual animus... the "comments are not overtly sexual and certainly fall far short of the severe-or-pervasive standard."

68. Counsel denied any impropriety in connection with Karizaki and "regards her complaint as pretextual and the University's handling of it as retaliatory."

69. Counsel closed by asserting that the "complaint should be dismissed as untenable."

70. Plaintiff asserted that the accusations were false and the "OIE staff ... are engaging in a pretextual witch hunt against me despite conclusive exculpatory evidence. This biased "investigation" is in retaliation for a criminal complaint filed against [Heidi Anderson] ..."

71. Plaintiff stated he had provided Karizaki with "critical feedback for impaired cognitive performance ... and for not producing work products of acceptable quality within deadlines. These ... provided the unlawful motivation for [Karizaki's] fabricated allegations." (**EX10**)

72. Plaintiff stated, "I have never met [Mahsa Sheikhi Karizaki] in person without other employees being present. I have never even shaken her hand. I have never been within 6 feet of her. I have had no physical contact of any kind with her. I categorically reject the allegations as fabricated, concocted, manipulated, and manufactured with malicious motivations."

73. Next, Plaintiff pointed out the Notice of Allegations only had a "word salad that you have deliberately and maliciously sequenced as a monologue with no context, dates, or actual

production of the cell phone to create a flimsy innuendo does not constitute sexual harassment, intimidation, or any kind of harassment."

74. Plaintiff noted that "Not a single word ... has any connection with anything sexual."

75. He wrote, "... the flimsiness of the innuendo – even assuming arguendo the ... fabrication at face value – highlights how it does not satisfy even the weakest definition of harassment ..."

76. Plaintiff also highlighted the fatal flaw in the Defendants' fraudulent allegations: the absence of dates and acknowledgment by individual Defendant 3 that the comments were prior to Karizaki commencing employment. He wrote: "as you yourself admit, the word salad presented was "temporally" long before [Karizaki] was an UMES employee. She was not even an applicant for employment. Communications between a stranger to the university and me on matters completely unrelated to the university are beyond the jurisdiction of your office."

77. Further, he reiterated "this maliciously fabricated complaint is a pretextual witch hunt … It does not satisfy the definitions of sexual harassment, harassment, or intimidation. ..."

78. Defendants provided no response to this rebuttal.

79. Defendants employed an evasion strategy. On January 27, 2025, Ginta Martin asked Plaintiff to attend a follow-up meeting side-stepping the written responses provided.

80. Plaintiff replied that he had "not received an update about ... my complaint against Casares. As noted ... we have plenty of evidence about the OIE staff's bias ... we can do any further follow-ups in writing. ...." (**EX11**)

81. Ginta replied on January 28th stating "... do need to meet and reconnect in-person during the week of February 3 through February 7, 2025." (**EX12**)

82. Ginta Martin's email on the 28th again did not address the clear and convincing denials, legal analysis, lack of jurisdiction, and conclusions detailed in Plaintiff's email on January 24th.

83. Plaintiff responded on the same date (28th) asking, *inter alia*, "What happened to the complaint against Jason Casares? ... I need my questions to be answered in full."

84. On February 19, 2025, Karizaki's contract should have expired thereby concluding this investigation. Defendants extended Karizaki's visa and contract will malintent and in egregious violation of immigration laws to keep the complaint alive and retaliate against Plaintiff – claiming it is a "supporting measure." This is illegal under immigration law because Optional Practical Training visa extensions must be for specific "work experience" for identified tasks. The visa was a bribe for Mahsa Sheikhi Karizaki in furtherance of the conspiracy against Plaintiff: pay without any work and the right to remain in the US.

85. Ginta Martin threatened Plaintiff: "... failure to respond to this email  ... and meet with our office  ... will result in you being placed in unpaid administrative leave.  ..." (**EX14**)

86. Ginta Martin also asked Plaintiff: "… provide the passcode (that you generated) for your University-issued/owned cell phone." This was in reference to the cellphone that had been seized by Casares on December 6th.

87. Ginta's email again evaded the submissions made in Plaintiff's January 24th email asking for due process and closure of the untenable allegations.

88. On February 24, 2025, Plaintiff wrote to Ginta Martin attaching a legal memorandum (**EX15**): "Please send me a copy of the actual complaint allegedly submitted by [Karizaki]. Notably, her contract ended on February 19, 2025. What is her current employment status?" .... Previously, when told that your actions may be violating the law ... you have scoffed dismissively, exhibiting contempt ... Other faculty have also reported similar conduct ...."

89. The email text specifically asked for an opportunity to cross-examine Karizaki and another witness used by Ginta to pad her false allegations: "... you have not indicated the date when I

may cross-examine [Karizaki] and [her friend]. Please provide some dates and times for me to review for the cross-examination. ...”

90. Cross-examination is mandated by 4th Circuit case law but Defendants violated it.

91. The memorandum attached to that email asked for a copy of the complaint filed:

“You have alleged that there is a complaint in which I am a Respondent. Where is this complaint? I have not been provided with a copy. Please provide a copy immediately.”

92. The memorandum argued that the definition of harassment was not satisfied:

“Your notice of allegations contains nothing that satisfies the definition of sexual harassment in Title IX. There is nothing even remotely sexual in the word salad you have stated in your Notice of Allegations, no 'sexual conduct,' no 'unwelcome conduct' of any kind, and nothing that is 'severe, pervasive, or objectively offensive.'

93. Next, the memorandum attacked the Plaintiff's being unlawfully placed on leave, the biased and predetermined nature of the investigation, violation of the presumption of innocence, conflict of interest, ulterior motives, coercion of witnesses by Casares, procedural errors, arbitrary violation of deadlines, lack of jurisdiction, and willful refusal to interview witnesses with actual data contradicting the allegations.

94. The memorandum specifically highlighted that Defendants had not contacted Professor X at all despite her being identified as early as December 11th as possessing conclusively exculpatory evidence. Professor X had directly emailed Ginta Martin stating that she was a witness to every interaction but received no response at all. The memorandum noted:

“The statutory mandate to evaluate exculpatory evidence has been completely ignored. ... Similarly, there is incontrovertible evidence that I never met [Karizaki] alone, never was within 6 feet of her, and had no inappropriate interactions with her. ...”

95. Finally, the memorandum asserted Defendants' legally binding duty to dismiss the complaint:

"Section 106.45(3) mandates OIE to dismiss a complaint when "the conduct alleged in the formal complaint would not constitute sexual harassment as defined in § 106.30 even if proved." We have explained to you in considerable detail ...why the allegations do not meet the Title IX definition of sexual harassment. ... The statute uses the words "must dismiss" and the language is binding and unambiguous. ..."

96. Ginta Martin provided no response. Defendants violated their legal duties to provide the complaint, proof of jurisdiction, evidence, and cross examination.

97. On February 26th, Ginta Martin evaded again asking Plaintiff to attend another meeting.

98. On March 3rd again she willfully ignored the requests for a copy of the complaint, the evidence, an opportunity to cross-examine witnesses, etc.

99. Plaintiff followed up again on March 4th. (**EX16**)

100. Ginta Martin and Defendants provided no response to this email. There was no communication from Defendants for over 6 weeks.

101. Defendants were in no hurry, violated all their deadlines whilst imposing harsh ones on Plaintiff, and had the ability to consult counsel. They deliberately chose to act unlawfully.

102. Abruptly, on May 19, 2025, Ginta Martin resurfaced claiming to have concluded the investigation and asking Plaintiff to attend a meeting to review a "preliminary report" beginning May 20th and offering some dates and times.

103. Plaintiff was about to travel overseas during that time for a 2-week trip.

104. On June 2nd, when Plaintiff was overseas, Ginta-Martin emailed a document purporting to be the Final Report of the investigation. Ginta did not even adhere to her own deadline.

105. On June 2nd, whilst overseas, Plaintiff replied:
"Hello Ms. Ginta Martin, ... I have not received a response to my email sent to you on 4 April 2025.... about my right to examine your "evidence", cross-examine the alleged complainant,

14

and the status of my complaint against the rape-accused Jason Casares, amongst other matters" (**EX17**)

106. The "Final Report" which is identical to the preliminary report purported to make "findings" against Plaintiff. Despite their actual malice, desperate attempts to manufacture evidence, coerce witnesses, and violate the laws, they <u>had to conclude that Plaintiff's actions were not "severe or pervasive.</u>" The document was illogical, lied about witnesses interviewed, not supported by any evidence, and exhibited circular and incoherent reasoning. Even so, Defendants imposed a massive demotion in rank and type of job, a reprimand on Plaintiff's file, and "training". This is cruel and disproportionate punishment aside from being entirely illegal and was done for retribution against Plaintiff for exposing corruption and fraud.

107. On June 5th, Plaintiff emailed the Office of Attorney General outlining unlawful activities and attached a statement by 6 female Iranian students that Plaintiff had only behaved respectfully with them. (**EX21**)

108. Critically, the students clearly stated they had never witnessed "any misconduct or mismanagement" by Plaintiff and "on the contrary, **he has always acted in accordance with university … guidelines and has tirelessly advocated for our academic rights. He deserves institutional protection not retaliation for standing up for truth and student welfare**."

109. Again, there was no response from OAG. Defendants willfully violated Plaintiff's rights.

110. Plaintiff submitted his appeal in a timely manner on June 9th, asking Ginta Martin to "Please identify the appeal authority so that additional information may be delivered directly ...." (**EX22**)

111. Ginta Martin acknowledged the email but did not identify the "appeal authority." (**EX23**)

112. Plaintiff's appeal submission challenged the nonsensical "findings" noting the pretextual nature of the investigation and bias throughout (**EX25**):

15

113.    Plaintiff was under no illusion that the appeal would also be biased against him writing:

"This appeal ... is being submitted without any expectation that the OIE ... will follow the law

... the anticipated illegal actions...will only underscore their criminality ...."

114.    Plaintiff's appeal challenged the willful refusal to follow mandatory law:

" The violations of applicable legal protections are willful, malicious, and with the apparent

aid of the UMES General Counsel. Absurdly, the OIE crooks err even about one of the most

basic questions in this case: the applicable legal regime. .... after realizing that their fake case

would go up in smoke, now claim for the first time in their "Final Report" that Title IX does

not apply."

115.    In the memorandum's factual background section, Plaintiff highlighted that Karizaki was

in the US on a student visa and was hired to her temp position under that visa:

"Optional Practical Training (OPT), by definition, is part of educational activity at a US public
university receiving federal funds - meaning that the OIE crooks' claim that Title IX does not
apply in this case is absurd from the start."

116.    It noted that Karizaki came to work cognitively impaired "smelled of weed or alcohol on
numerous occasions and was frequently confused and clueless about basic matters such as the
day/date and time, work instructions, deadlines, performance expectations, locations, names
of UMES personnel, events, etc."

117.    Plaintiff explained that:
"[Karizaki] did not seem to comprehend basic work instructions, could not work
independently, and was not producing written work. [she] was requested to provide a daily
report of her work activities prior to closing her time-sheet at 5pm each day. ... [Karizaki] failed
to upload daily work reports despite numerous reminders.

When it became impossible to ignore that [Karizaki] was submitting fraudulent timesheets,
[Plaintiff] sent her a polite email inquiring if she was actually working the hours claimed.
[Karizaki] admitted that she was not working the hours claimed. ...
In late November 2024, [Karizaki] apprehended that her contract would be terminated and that
she may be deported ... the consumption of drugs is a violation of immigration law."

16

118.   Plaintiff outlined various other facts showing a conspiracy between Defendants to retaliate.

119.   Next, Plaintiff asserted that Casares and other Defendants' refusal to follow mandatory laws was willful and malicious.

120.   Plaintiff asserted that Defendants were biased:
"Casares had already typed up the letter placing [Plaintiff] on administrative leave even without giving him an opportunity to be heard before the first meeting on December 6, 2024. This was a willful and malicious violation of basic due process. It shows that Casares was never interested in assessing the merits of the allegations, had predetermined the outcome to suit his criminal masters, and was absolutely biased. ... Further, there were ample facts contradictory of any harassment: application for a job by [Karizaki] after the comments were allegedly made, relocation by [Karizaki] ...[Karizaki] requested money from [Plaintiff], etc."

121.   Plaintiff asserted that Defendants refused to provide dates because they knew that there was not even one comment made to Karizaki after her hiring at UMES and therefore they had no case.

122.   Plaintiff challenged the refusal to allow cross-examination of witnesses.

123.   Plaintiff submitted that Defendants determined credibility without cross-examination.

124.   The due process protections accorded by the Maryland Constitution including the right to cross-examine one's accuser, right to notice containing dates, establishment of jurisdiction to prosecute, etc., should have been provided to the Plaintiff. Defendants violated Plaintiff's due process rights.

125.   Plaintiff submitted that Defendants willfully ignored his requests for cross-examination "because their entire case rested on ...[a] fraudulent edifice. The critical need for cross-examination has been upheld in a number of judicial decisions. For instance, in *Doe v. University of Cincinnati*, Judge Barrett ruled, "where a disciplinary proceeding depends on a 'choice between believing an accuser and an accused … cross-examination is not only beneficial, but essential to due process."

126.    Plaintiff cited *Doe v. Baum et al* (2018), where the court ruled that:

"if a public university has to choose between competing narratives to resolve a case, the university must give the accused ... an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder." Plaintiff pointed out ... was absolutely costless to require [Karizaki] to attend cross-examination."

127.    Plaintiff quoted the *Baum* court's rationale and explained why the precedent applied:

"[Karizaki] frequently attended work appearing intoxicated and cognitively impaired. She had no recollection for basic facts, dates, times, people, locations, etc. Her memory and intelligence were very much in question. Even more devastatingly for Casares and [Karizaki], both had ulterior motives for fabricating these fake allegations. ... As in *Baum*, these proceedings must be quashed."

128.    Plaintiff appealed that the definition of hostile work environment was not satisfied:

"Even reading [Karizaki] and Casares's fabricated allegations in the most favorable light and assuming everything to be true, the allegations do not satisfy the legal definition. As even Casares is forced to concede, they are not offensive, severe, or pervasive."

129.    Plaintiff appealed that the Final Report should be quashed because it was:

"...full of irrelevant drivel and riddled with lies about relevant matters ... Final Report claims that [Plaintiff] did not participate in the proceedings. This is an absolute lie. [Plaintiff] attended meetings ... on 6th December and in January 2025. ... [Plaintiff] submitted detailed written responses in conjunction with his then legal counsel categorically rejecting and debunking the fake allegations. ...."

130.    Plaintiff attacked Defendants' circular reasoning and opinions dressed up as "findings of fact, he had not been provided with any evidence, he had never met Karizaki alone, and the doctored screenshots had no date or timestamps.

131.    Plaintiff submitted:

the "only doctored screenshots provided with dates expose the allegations as fake. The first instance of screenshots showing any dates are contained on page 13. The date is shown as August 8, 2024. The message shows emojis sent by [Karizaki] laughing. This response by [Karizaki] conclusively debunks any claim that she was harassed or experienced any discrimination from any messages sent prior. In addition, the date of August 8th is extremely significant. It was well before [Karizaki] commenced employment at UMES, relocated out of state to Maryland from [...], and before she completed any paperwork for employment. ...The other screenshots with dates of August 13, and 17th also debunk any claim of harassment. They show friendly exchanges and meetings. Not once did [Karizaki] express any reservations about

18

the alleged communications. There is not a shred of evidence that she objected to the humor or tone of the communications or indicate that they were anything but in jest."

132.    Plaintiff challenged the Defendants' findings as illogical:
"If [Karizaki] felt harassed on August 17th, why did she wait until December ... until she was caught submitting false timesheets and coming to work impaired? Why are the OIE... unable to produce a single message after the date on which [Karizaki] started working at UMES ..."

133.    Plaintiff appealed the Defendants "findings" that "totality of the circumstances in this matter is sufficient to establish that [Plaintiff] engaged in a course of conduct constituted unequal treatment based on national origin and gender, which amounted to harassment and a hostile work environment" (page 24).

134.    The "totality of circumstances" shows exactly the contrary. It shows that [Karizaki] has no credibility, made up false accusations that not even the OIE crooks could prop-up, was caught submitting fraudulent timesheets and coming to work under the influence of alcohol or drugs, and performed poorly at work. The totality of circumstances shows OIE staff manufacturing lies, ... this was a scam of a witch hunt organized by a criminal gang in retaliation for a complaint against Heidi Anderson ..."

135.    Plaintiff asserted that UMES discriminated on the basis of gender by blindly believing Karizaki and ignoring his statements rebutting her assertions.

136.    Plaintiff appealed the sanction imposed even though he did not do anything "severe or pervasive." Despite this "finding", Defendants imposed a sanction of demotion to a position paying half of what Plaintiff currently earned. He asserted the punishment was grossly disproportionate and violated the constitutional norm against cruel and unjust punishment.

19

137. There was total silence from Defendants after this appeal submission and there was no decision within the timeframe stipulated in the Defendants' policies.

138. Abruptly, on July 25th, Defendant Ginta Martin emailed Plaintiff a "Final Appeal Decision" issued by the appeal authority, Rondall Allen.

139. The appeal authority simply evaded the appeal grounds and just recited what was in the Defendants' report in a short peremptory response without reasoning or logic. (**EX26**)

140. The Plaintiff has evidence that this decision was produced by ChatGPT or other AI violating substantive due process under the Maryland Constitution. The appeal process was fake and the outcome was predetermined.

141. Under the Defendants' policies, Karizaki has to be provided the Plaintiff's appeal submission, and she is required to provide a response within 5 days. There is no evidence showing that Karizaki was provided with the Plaintiff's appeal submission or what her response was.

142. Rondall Allen does not seem to understand mandatory legal rules. He did not cite the standard of review for the appeal, nor does he seem to understand what that concept is.

143. Defendants knew or ought to have known of controlling law that cross-examination is an essential part of due process in such proceedings. Plaintiff was denied this right despite repeated requests. Rondall Allen did not address this point. **EX 26.**

144. On July 27, 2025, Heidi Anderson demoted Plaintiff to a position of a different type paying less than half of his current salary. This was malicious, unjustified, and aimed at retribution. It accorded with no policy or practice at UMES and breached all precedent.

145. In August 2025, Plaintiff was abruptly assigned 3 courses to teach about 5 days before the semester started without any consultation or notice.

146.    In September 2025, on at least 4-5 dates, Plaintiff was stalked and intimidated by Leesa Thomas-Banks, a goon of Heidi Anderson. This was calculated to make Plaintiff resign and he reported the stalking to Campus Police and the OIE. The OIE has not investigated the complaint because of the connivance of Heidi Anderson. (**EX 35**)

147.    In late September 2025, Plaintiff filed a complaint about egregious plagiarism by Heidi Anderson in her PhD dissertation.

148.    A few days later, Plaintiff received an email from OIE that he was being investigated for "retaliation" against Karizaki for allegedly reporting her to ICE.

149.    The timing of this new investigation based on the same old facts shows that it is just a pretextual witch hunt in retaliation for reporting cheating by Heidi Anderson.

150.    Plaintiff asked to see the complaint and any evidence but was refused.

151.    Jason Casares claimed to hire TNG Consulting – a firm in the news for fraud – to conduct this investigation. **EX 34**.

152.    Plaintiff met with Lauren Starnes from TNG once and it was obvious that she was hired for a hit job. She provided no details or evidence and appeared to be committing fraud. Plaintiff asked for strict proof of all allegations and reiterated that he did not permit any assumptions without proof. **EX 36**.

153.    On February 10th, TNG claimed to issue a report "finding" that Plaintiff had retaliated against Karizaki. Their only witnesses were Jason Casares, Alexandra Ginta Martin, and Cecilia Rivera – all three of whom are fraudsters and were named defendants in a lawsuit filed by Plaintiff and have motives to retaliate against Plaintiff. They plan to punish him.

154. The fake "investigation" based on three "witnesses" who witnessed nothing and who had every ulterior motive to retaliate against Plaintiff was for malicious and retributive purposes. It is to provide a pretext to take further adverse action against Plaintiff.

155. As a result of Defendants' unlawful actions, Plaintiff has and continues to suffer immense harm. He has been demoted from leadership to a different type of role with massive losses.

156. Plaintiff's reputation has been irreversibly harmed, he has been labeled an abuser, banned from campus, stalked, and shunned by colleagues who are afraid of Heidi Anderson's criminal gang. He fears for his physical safety because of Anderson's vicious nature and past record.

## IV. STATEMENT OF CLAIMS

### COUNT 1: Violation of Article 24 Maryland Constitution, Due Process, and Conspiracy

157. Plaintiff incorporates the allegations above and Exhibits and realleges them as if fully set forth again below.

158. Article 24 of the Maryland Declaration of Rights states "no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

159. Article 2 states, "The Constitution of the United States, and the Laws made, or which shall be made, in pursuance thereof, … are, and shall be the Supreme Law of the State; and the Judges of this State, and all the People of this State, are, and shall be bound thereby

160. UMES is a public university subject to the Maryland Constitution and federal laws.

161. Plaintiff is entitled to due process protections by the Defendants following applicable laws for investigations, including by way of proper notice of charges showing dates and locations of any alleged misconduct, an opportunity to examine and rebut evidence, an opportunity to

cross-examine an accuser, hearing by an impartial fact finder, and have exculpatory witnesses be heard.

162.    Defendants cannot substitute their own processes and claim they followed due process. They have no such choice because Article 24 and Article 2 mandate which procedures are to be followed and confers liberty interests in those protections.

163.    Plaintiff has a liberty interest in those mandatory processes, his good name, job, reputation, honor, career, employment opportunities, advancement, and freedom – all violated by the Defendants.

164.    Plaintiff has a right to be free from unlawful and arbitrary demotion to a different type of role derived from UMES and USM policies and rules and state laws in addition to his contract.

165.    Individual Defendants had the motive, means, and opportunity to undertake the fake investigation based on a false complaint they procured from Karizaki who had an ulterior motive to lie. The temporal proximity of the false complaint within weeks of Plaintiff's whistleblowing about Heidi Anderson's fraud shows that the demotion was retribution. Within days of the fake complaint Plaintiff was removed from campus. No other complaint at UMES has been processed this quickly – including complaints filed by Plaintiff which have received no action after many months. The temporal proximity, speed of action in a place reputed for tardiness, sloth, and incompetence, and severity of punishment for non-severe alleged acts all show that the actions were caused by Plaintiff's reporting of fraud by Heidi Anderson.

166.    Defendants acted beyond their lawful authority, refused to follow mandatory law, willfully deprived due process protections including evidence examination and cross-examination and conspired to deprive Plaintiff of his due process rights to achieve a predetermined outcome in retaliation of the complaints he had filed against them.

167. Defendants conducted their sham investigation in ways calculated to achieve their erroneous outcome to harm Plaintiff including by intimidating witnesses, excluding exculpatory witnesses, manipulating and doctoring evidence, bribing the complainant, exhibiting bias, failing to apply the correct legal standards, claiming their opinions are "facts", denying notice, denying cross-examination, denying any opportunity to examine evidence, failing to uphold the presumption of innocence, and a fake appeal process.

168. Defendants deliberately failed to follow witness testimony from Professor X and other witnesses as that would have destroyed Karizaki's claims.

169. The difference in evidence collection, treatment, credibility highlights discriminatory treatment. Karizaki's words are taken as the truth whereas the Plaintiff's statements and the statements by 8 student witnesses that Plaintiff acted respectfully was ignored.

170. As detailed above and in the Exhibits, Defendants violated Plaintiff's due process rights by violating mandatory legal requirements: a. failing to give him required notice of allegations stating dates and times, b. acting beyond their jurisdiction to process a complaint based on accusations before Karizaki was associated with UMES or connected to Maryland, c. refusing to allow Plaintiff to examine evidence, d. refusing to provide cross-examination of complainant and witnesses, e. deliberately ignoring exculpatory evidence, f. violating their own policies' timelines, g. refusing to apply the correct legal standard, h. refusing to apply the correct standard of review to the appeal, i. refusing to be equitable in supportive measures, j. refusing to follow the rules allowing Plaintiff to contest supportive measures, k. failing to follow conflict of interest rules, l. failing to refrain from bias, m. refusing to observe controlling case law, n. violating immigration law.

171.   Defendants acted in furtherance of the conspiracy by going beyond their scope of employment[5] after forming an agreement to retaliate because of Plaintiff's complaints against their corruption and unlawful activities. Anderson, Ginta Martin, Matthew Taylor, Jason Casares, and Cecilia Rivera conspired, met, and fabricated to ignore demands for due process including applying the correct legal standards, withholding exculpatory witnesses, intimidating witnesses, coercing witnesses (e.g. **EX6, 7**), defaming Plaintiff, falsely conveying that Plaintiff had been fired, concealing evidence, refusing to provide sufficient notice with dates, times, and locations of alleged misconduct, conducting an investigation into matters over which they had no jurisdiction because complainant Karizaki was not an employee at that time, manipulating and doctoring evidence to convey a false narrative, adding extraneous and irrelevant matters, deliberately claiming to make "findings of fact" when there were neither "finding" nor "facts" but just gibberish, and making illogical unlawful claims.

172.   Defendants violated due process by producing an appeal decision obtained from ChatGPT without even addressing any of the appeal grounds. The appeal process was fake.

173.   Under Maryland law, conspiracy requires "1) [a] confederation of two or more persons by agreement or understanding; 2) some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and 3) [a]ctual legal damage resulting to the plaintiff." *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 284 (Md. 2007). All elements are present here.

---

[5] Individual defendants' scope of employment and authority is restricted to undertaking lawful actions. If unlawful actions are pointed out, they have a duty to consult readily available legal counsel and obtain an opinion that their understanding of the law is correct. Here the mandatory legal regime was brought to their attention repeatedly. Defendants did not explain why they violated that regime or how their actions were in conformity with the law. The lack of explanation leads to the inference that they could not support their actions with legal basis. Their pivot away from the mandatory regime after finding out they could not meet the law's burden shows malice.

174. Individual Defendants reached an understanding after numerous meetings from July 2024 onwards and planned to remove Plaintiff by fabricating complaints against him. They actively solicited fake complaints, procured and coached a temp worker who had been caught for fraud and had an ulterior motive, offered her a visa in exchange for making a complaint, followed their pattern of fake witnesses and abusing investigations, refused to follow mandatory laws, defamed Plaintiff, and obtained a malicious outcome to remove him from his job. They had access to counsel and were aware of their legal responsibilities. There is no grey area or ambiguity, and they wanted to violate established legal rights of the Plaintiff.

175. Defendants are not entitled to any kind of immunity because they acted outside the scope of their authority, unlawfully, maliciously, and in bad faith for retribution against Plaintiff for exposing their corruption and fraud. Only they had the motive, means, and opportunity.

176. Plaintiff suffered serious and pervasive economic and emotional damages as a result of Defendants' unlawful actions.

177. Plaintiff is entitled to reinstatement and declaratory and injunctive relief.

**COUNT 2: Violation of Maryland Declaration of Rights Article 40**

178. Plaintiff incorporates all the allegations above and the Exhibits as if realleged again.

179. Article 40 guarantees "that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege."

180. Plaintiff's reports to government agencies about fraud, corruption, and illegal activities including the violation of immigration laws by Individual Defendants and Karizaki is protected by Article 40's language.

181. Plaintiff's whistleblowing about unlawful acts and the Individual Defendants acting as an organized gang to engage in corruption is in the public interest.

26

182.    Defendants violated article 40 by retaliating against Plaintiff for exercising his free speech rights for unlawful purposes. They would not have concocted their fake allegations and punished Plaintiff under a pretext but for his speech.

183.    Plaintiff continues to suffer harm as a result of the Defendants' violation of article 40.

**COUNT 3: Negligent Hiring, Supervision, and Retention**

184.    Plaintiff incorporates all the allegations in paragraphs above.

185.    Defendants 5, 6, 7 owe a duty of care to Plaintiff to use care in hiring, supervision, and retention of its personnel and in ensuring they follow the law.

186.    Defendant 2 has a well-publicized public record for alleged rape and abusing investigatory processes and rules. Defendant 1 hired him because of this record to use him for intimidation.

187.    Defendant 1 intentionally and maliciously promoted and paid exorbitant salaries and benefits to Jason Casares as a bribe for engaging in illegal activities on her behalf.

188.    It was entirely foreseeable that employing Jason Casares would result in biased investigations, lawsuits, discrimination complaints, and serious violations. Numerous faculty and staff at UMES have filed complaints about serious fraud and abuses by Casares, Rivera, and Ginta Martin since 2018. There are dozens of such complaints against them.

189.    Defendant 1 employed gang-recruitment tactics in hiring persons of manifest and documented illegal activities precisely because of their willingness to violate the law.

190.    Defendant 1 deliberately and maliciously failed to properly train and supervise Jason Casares, Rivera, and Ginta Martin because she wanted to employ them for unlawful purposes including suppressing complaints against her and associates, and weaponizing investigations for unlawful purposes.

191.    Defendant 1 did not possess the qualifications, experience, or character to be appointed president of UMES. Defendant 1 plagiarized her PhD and despite obvious cheating exposed in the national media, Defendant 5 and 6 were recklessly negligent in taking any action.

192.    Ginta Martin and Rivera maliciously fabricated evidence, deliberately withheld exculpatory testimony provided by at least 4 witnesses, coerced witnesses, manipulated testimony for a predetermined outcome, refused to interview eyewitnesses, willfully refused to follow due process, violated confidentiality provisions, defamed Plaintiff, and acted deceitfully in furtherance of a conspiracy against Plaintiff for personal motives.

193.    Defendant 5, 6, 7 did not train Individual Defendants or supervise them appropriately and was recklessly indifferent to their unlawful actions despite numerous complaints (**EX1, EX2**).

194.    Defendant 5, 6, 7's improper hiring, failure to supervise, train, and monitor all the other Defendants was negligent or reckless and violated their duty of care and caused severe foreseeable economic, reputational, health, and emotional harm to Plaintiff.

**COUNT 4: The Maryland State Policy on Sexual Harassment Violates Article 40 of the Maryland Declaration of Rights, is Unconstitutionally Vague, and Overbroad.**

195.    Defendants intentionally adopted a ruse by seeking to apply the inapplicable Maryland State Policy on Sexual Harassment because their fake case could not withstand applicable law.

196.    This state law, adopted in 2022, drastically departs from federal law and drops the "severe and pervasive" standard. It is a content-based restriction on speech that violates the Maryland Constitution.

197.    The Maryland law is preempted, unconstitutionally vague and overbroad.

198.    The Maryland law is preempted as per Article 2 of the Maryland Declaration of Rights. Defendants are not allowed to substitute their procedures.

199.    Article 20 610(a) of SB 450 defines "sexual harassment" in vague and overbroad terms to include unwelcome and offensive conduct, which ***need not*** be severe or pervasive, when the conduct "the conduct unreasonably creates a working environment that a reasonable person would perceive to be abusive or hostile, considering the totality of the circumstances."

200.    The Maryland policy reaches constitutionally protected speech that is merely offensive or unwelcome to some listeners. This upends the long-established judicial precedent and Article 40's intent to encourage speech.

201.    The Maryland policy is overbroad by sweeping up any kind of speech content that a listener deems offensive or unwelcome thereby eliminating jokes, casual statements, or harmless banal remarks. It does not define prohibited conduct, offers no procedural protections, prohibits speech outside Maryland (e.g. the text messages here), and is facially unconstitutional.

202.    It is well settled that the government cannot prohibit speech merely on the grounds that it is "offensive" or "unwelcome" to some listeners. Speech cannot be abrogated merely because it would cause discomfort to a hyper-sensitive listener such as Karizaki.

203.    Article 40's ban on prior restraints was designed to prevent exactly this type of law as it chills the right of "every citizen of the State … to be allowed to speak, write and publish his sentiments on all subjects …"

204.    Plaintiff has standing to bring this constitutional challenge because he was directly harmed by the enforcement of the Maryland law. He was demoted after a farcical investigation based on this law, deprived of procedural and substantive due process, and deemed responsible based on vague and overbroad conclusions under the color of this law for speech outside Maryland

about unlawful activities by the Defendants including fraud, corruption, plagiarism, and violation of immigration laws.

205.    The Maryland law was applied extraterritorially and unlawfully beyond the police powers of Maryland to conduct occurring outside the state without any nexus.

206.    Here, Defendants cited alleged private comments by Plaintiff from outside Maryland (MD) to Karizaki who was in Pennsylvania (PA) and unaffiliated to Defendants such as "that [Plaintiff] thinks Persian women are beautiful" as constituting sexual harassment under the Maryland policy illustrating its unconstitutional vagueness, overbreadth, and overreach. Defendants have no legitimate interest in policing such speech outside the employment context to a non-employee. The speech was outside Maryland and unconnected to employment – meaning there was no police powers at all.

There is no evidence that Karizaki is Persian and none was presented. Not all Iranians are Persians. Iran is a multi-ethnic country where Persians constitute a segment. A statement that Persian women are beautiful is pure opinion and constitutionally protected speech that cannot be prevented by a government entity. Ditto the other statements attributed to the Plaintiff before Karizaki was hired that were sent from outside MD to a person outside MD without using any MD equipment or having any connection to MD.

207.    Plaintiff had a free speech right to make the alleged (denied) comments to a non-employee.

208.    Plaintiff repeatedly asserted that he had no interest in Karizaki, that she never objected to any comment, that she responded with smiling emojis, that the comments were made prior to her employment or even making an application for employment, and she never asked Plaintiff to cease making any comment.

209.    Defendants themselves admitted that Plaintiff's conduct was not "severe or pervasive."

210. Defendants punished Plaintiff for allegedly making a report about an immigration law violation and timesheet/payroll fraud to the US government involving public funds. The fraud was by public officials and Plaintiff had every right to report fraud.

211. Defendants' fake investigation is retaliation for Plaintiff reporting plagiarism and cheating by Heidi Anderson. A report about cheating by a public official who is using the product of that cheating to obtain public funds is protected speech under the Maryland Constitution. It is a matter of public concern relating to a public institution. The fake complaint is a pretext to punish protected speech.

212. If the Defendants' position were to be accepted an employee could not communicate with any third party without being a risk of termination if that third party complained to his employer. Such an interpretation would be absurd and chill all speech violating article 40.

213. The plaintiff suffered an individual injury because of the unconstitutional Maryland law.

214. The Maryland law's vagueness, overreach, and overbreadth enables substantial violations of Article 40 and due process rights by officials acting arbitrarily and discriminatorily.

215. In *DeJohn v. Temple University*, 537 F.3d 301, 320 (3d Cir. 2008), the 3rd Circuit Court of Appeals analyzed binding Supreme Court precedents and opined: "since the inception of overbreadth jurisprudence, the Supreme Court has recognized its prominent role in preventing a "chilling effect" on protected expression. *Broadrick v. Oklahoma*, 413 U.S. 601, 630, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) ... This laudable goal is no less implicated on public university campuses throughout this country, where free speech is of critical importance because it is the lifeblood of academic freedom. As the Supreme Court in *Healy v. James* explained, "the precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on

college campuses than in the community at large." The court's analysis resulted in its finding that the sexual harassment policy was unconstitutionally overbroad.

216.    The Maryland law abrogates procedural protections and confers untrammeled and arbitrary powers to public officials, as in this case, to run kangaroo courts to stifle speech to achieve retribution for exposing corruption.

217.    In the hands of Defendants, any statements can be twisted to meet the Maryland law's definition of harassment based on the vague and overbroad "totality of circumstances" regardless of to whom or where they were made. It can mean anything that an official wants it to mean. This violates articles 24 and 40 of the Declaration of Rights.

218.    The Maryland law will have a chilling effect on protected speech under the Maryland Declaration especially in a university environment. As the Supreme Court has held, "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools [of higher learning]." *Healy v. James*, 408 US 169, 180 (1972). In *Rust v. Sullivan*, 500 U.S. 173, 200, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), the Supreme Court "recognized that the university is a traditional sphere of free expression so fundamental to the functioning of our society that the Government's ability to control speech within that sphere by means of conditions attached to the expenditure of Government funds is restricted by the vagueness and overbreadth doctrines …." In *Rust*, the Court noted that the "existence of a Government "subsidy," ... does not justify the restriction of speech in areas that have "been traditionally open to the public for expressive activity."

219.    The government has no compelling interest that outweighs the Plaintiff's speech rights under article 40. Indeed, the public interest compels the protection of the Plaintiff's rights to file reports about fraud and corruption involving public funds and outweigh any considerations

that such activities may be "offensive." Equally, it protects the Plaintiff's right to have private conversations without the fear of state discipline.

220.    The plaintiff's injury can be corrected by striking down the Maryland law.

**COUNT 5: Intentional or Reckless Infliction of Emotional Distress and Conspiracy**

221.    Plaintiff realleges and incorporates again all the allegations above and in Exhibits.

222.    Defendants Anderson, Casares, Rivera, Ginta Martin, and TNG engaged in reckless and malicious conduct when, either acting individually or in concert, they abused processes calculated to lead to the predetermined punishment of Plaintiff.

223.    Only the Defendants had the motive, means, and opportunity to concoct fake allegations, abuse processes, and unlawfully punish Plaintiff in retaliation for his complaints against them.

224.    Defendants maliciously and recklessly did not provide sufficient notice of allegations with dates and times because they knew the dates would show they had no jurisdiction and the process was fake, refused to provide cross-examination because they knew the allegations were false and would collapse, refused to show evidence for examination because none existed, falsified evidence, intimidated witnesses, lied about witnesses who contradicted the complainant, excluded exculpatory testimony, refused to apply the correct law and processes, predetermined a conclusion, presumed the Plaintiff guilty, predetermined the cruel punishment, acted with malice and bias, and displayed his photo on campus as an offender.

225.    Defendants' violation of mandatory law is extreme and outrageous and violates all humane notions of civilized conduct in a university. They knew that the extreme conduct would harm Plaintiff particularly because he was a person of integrity who upheld the rule of law.

226.    Plaintiff has an exceptional record of idealism, probity, adherence to the law, highest performance, and integrity, which was known to Defendants. They knew he would be uniquely

sensitive to egregious illegality. Plaintiff suffered serious and pervasive harm because of Defendants' malicious actions including hospital visits for serious health complications.

**COUNT 6: Breach of Contract/Interference with Contract/Economic Opportunities**

227.    Plaintiff incorporates by reference allegations in paragraphs above and the Exhibits.

228.    Plaintiff had a valid contract with UMES that contained both a permanent administrative role and a tenured professorship and expected to continue in those roles. He also had a valid contract with the federal government to implement his grant. He has an exceptional record of achievement throughout his career and everyone including Defendant 1 expected him to attain higher positions. On Dec. 3, 2024 she said Plaintiff would become a university president soon and he had given up other jobs in reliance upon her promise of the role.

229.    Individual Defendants tortiously interfered with his contracts and demoted him by: a. retaliating against him for reporting fraud, b. starting a fake investigation based on an inapplicable law, c. conducting an investigation without valid jurisdiction because the acts alleged occurred before Karizaki was an employee, d. making false statements, e. illegally putting him on leave, f. willfully refusing to provide a copy of the complaint and any evidence, g. willfully refusing to consider alternative explanations, h. willfully refusing to interview exculpatory witnesses, i. willfully lying about witnesses they interviewed, j. willfully refusing to follow applicable legal standards under the Maryland law, l. willfully refusing to adhere to federal preemption, m. willfully lying that Plaintiff admitted reporting to ICE, n. willfully giving Karizaki a visa in violation of immigration law as a bribe, o. willfully defaming Plaintiff by making false statements to harm his reputation, p. willfully imposing a cruel and disproportionate sanction despite their own fake investigation concluding that Plaintiff's actions were not severe or pervasive, q. terminating his federal grant contract.

230.    Defendants knew that the demotion, termination of his grant, and defamation would harm Plaintiff's career and cause him immense loss. They breached his contract intentionally.

231.    Defendants' actions were malicious retribution against Plaintiff for reporting fraud, plagiarism and cheating by Heidi Anderson, and exposing the various scams she was implementing at UMES.

232.    Defendants' conduct was independently wrongful and unlawful, consisting of willful refusal to follow applicable laws, violation of the Maryland Constitution, every law and policy, defamation and injurious falsehood, and was undertaken with the intent to disrupt Plaintiff's contracts  and prospective economic relationships and opportunities.

233.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff suffers serious harm including but not limited to loss of significant past and future salary, loss of his grant, benefits, other entitlements, loss of professional rank, and career growth. The Plaintiff has also suffered from emotional distress arising from the loss of his position and damage to his good reputation.

**COUNT 7: PROMISSORY ESTOPPEL**

234.    Plaintiff incorporates all allegations above and in the exhibits as if realleged again.

235.    Defendants promised a promotion and a substantial pay increase in January 2024 to the Plaintiff. He was promised a further increase in subsequent months and the posted range for his position was $265-295,000 p.a. He was promised full cooperation in implementing his federal grant. Defendants made the promises knowing Plaintiff had another job offer to induce him to decline that offer and remain at UMES. Plaintiff in fact relied on their promises and declined the job offer. Plaintiff hired others, recruited students, and worked tirelessly to implement various projects in reliance upon Defendants' promises. Plaintiff undertook

extensive work on implementing his federal grant in reliance upon Defendants' promises of cooperation and facilities. Thereafter, Defendants breached their promises for unlawful reasons: because Plaintiff observed and reported fraud and they wanted revenge.

236.    As a result of the Defendants' actions Plaintiff has suffered enormous economic, professional, emotional, health, and career harm.

## COUNT 8: DEFAMATION

237.    Plaintiff incorporates all allegations herein and in the exhibits as if realleged.

238.    Defendants 1-4 falsely told students and employees that Plaintiff was "fired," "removed," "never coming back," and indicated that he had been terminated from his role for wrongdoing.

239.    Defendants 1-4 had Plaintiff publicly escorted by campus police to signal wrongdoing.

240.    Defendants 1-4 displayed Plaintiff's photo in a public area of the police office to show the public that he is an offender. This was extreme and outrageous.

241.    Defendant 1 caused others to communicate with the federal government agency which awarded the Plaintiff a grant that he is a wrongdoer and was being removed.

242.    Defendant 1 made false statements to the USM that Plaintiff is a wrongdoer and that he should be removed. She knew her statements were false and motivated by personal motives.

243.    Defendants removed Plaintiff's bio from the university website to falsely communicate to the world that he was not employed at UMES. They knew this is wrong.

244.    Defendants knew that their actions and statements were false, they acted with malice and personal motives because he had reported them for fraud and cheating and they wanted to harm him in revenge. It fit the pattern of their conduct towards numerous other whistleblowers.

245.    Defendants' actions and statements are defamatory, outrageous, extreme, malicious, beyond the scope of their employment and not protected by any privilege.

246.    Plaintiff has suffered enormous reputational, economic, and health losses including the need for hospital admission due to the malicious actions of the Defendants.

**COUNT 9: INJUNCTION**

247.    Plaintiff incorporates by reference allegations in paragraphs above and the Exhibits.

248.    In Maryland, a court must examine four factors before deciding to grant injunctive relief: (1) the likelihood that the plaintiff will succeed on the merits; (2) the 'balance of convenience' determined by whether greater injury would be done to the defendant by granting the injunction than would result from its refusal; (3) whether the plaintiff will suffer irreparable injury unless the injunction is granted; and (4) the public interest. *Dep't of Transp. v. Armacost*, 299 Md. 392, 404-05 (1984) (citing *State Dep't v. Balt. County*, 281 Md. 548, 554-57 (1977)). Courts have noted that the first and third factors are generally considered to be the most significant. *Eastside Vend Distribs., Inc*., 396 Md. at 240–41.

249.    Plaintiff is highly likely to succeed on the merits because the entire edifice of the unlawful actions against him is premised on an inapplicable, preempted, or unconstitutional law, and in gross violation of the Maryland Declaration of Rights. There is no legal basis for any action against Plaintiff because he did not violate any law or policy and no evidence of wrongdoing exists. Defendants' actions are unlawful retribution for being reported for fraud.

250.    Plaintiff will suffer irreparable harm if Defendants are allowed to take further adverse action based on their fake investigation violating every rule of applicable law. A court decision after trial that the Defendants acted illegally and an award of compensation will not suffice to cure the harm caused to Plaintiff's career, reputation, health, and good name.

251.    Defendants will suffer no harm as a result of an injunction whereas the Plaintiff will suffer irreparable harm if the threatened adverse actions are taken. The balance tips in his favor.

252.   The public interest is advanced by prohibiting unlawful retaliation against an employee who reports fraud involving federal and state funds. Indeed, the very purpose of article 40 of the Maryland Constitution and the various whistleblower protection laws is premised on that public interest.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, the Plaintiff prays that this court award relief by:

1.  Remanding this case to the Somerset County Circuit Court;

2.  Enjoining defendants from continuing violations of the Plaintiff's rights;

3.  Awarding attorney fees, costs, other relief and orders as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury for all issues triable by jury.

Respectfully submitted,

Jacob Doe, Plaintiff

Jacobdoe2025@gmail.com, 11868 College Backbone Rd, Princess Anne, MD 21853

## CERTIFICATE OF SERVICE

I certify that, on this 11th day of March 2026, the foregoing was filed and served electronically by the EM/CF system on all persons entitled to service.

Jacob Doe, Plaintiff